### UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORMAN L. MORGENSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2123 (JR) |
| | ) | |
| MORGAN STANLEY DW, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT MORGAN STANLEY DW, INC.'S
### MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and LCvR 56.1, and as supported by the accompanying Statement of Material Undisputed Facts and Points and Authorities, Defendant Morgan Stanley DW, Inc. ("Morgan Stanley"), respectfully moves the Court for summary judgment on all of Plaintiff Norman Morgenstein's claims for the following reasons.

<u>Count II - Failure to Provide Reasonable Accommodation</u>

Morgenstein's reasonable accommodation claim (Count II) must be dismissed because:

(1) it is barred by the DCHRA's one-year statute of limitations;

(2) Morgenstein cannot establish that he was "disabled" within the meaning of the DCHRA during his employment with Morgan Stanley;

(3) Morgan Stanley had no legal duty to grant Morgenstein's request that it apply on his behalf to the DISR for a waiver of the Series 65 licensing examination, and his request was unreasonable as a matter of law;

(4) Morgenstein cannot establish that he suffered any damages as a result of Morgan Stanley's refusal to apply on his behalf to the DISR for a waiver of the Series 65 licensing examination; and

(5) Morgenstein failed to satisfy his obligations under the DCHRA by refusing to engage Morgan Stanley in the interactive process to determine whether another, reasonable accommodation was available.

<u>Count III - Retaliation</u>

Morgenstein's retaliation claim (Count III) must be dismissed because:

(1) Morgenstein cannot establish any of the elements of a *prima facie* case of retaliation;

(2) it is undisputed that Morgan Stanley had a legitimate non-discriminatory reason for suggesting that Morgenstein consider retirement - namely, his low level of revenue production; and

(3) Morgenstein has presented no evidence from which a reasonable jury could conclude that Morgan Stanley's legitimate reason was a pretext for discrimination.

<u>Count II - Discrimination in the Terms and Conditions of Employment</u>

Morgenstein's claim that Morgan Stanley discriminated against him with respect to the terms and conditions of his employment on the basis of his disability (Count I) must be dismissed because:

(1) insofar as it is based on Morgan Stanley's denial of Morgenstein's request that it apply on his behalf for a waiver of the Series 65 examination requirement, Count I is duplicative of Morgenstein's "reasonable accommodation" claim (Count II) and must be dismissed for the very same reasons; and

(2) insofar as Count I is based on his alleged constructive discharge, Morgenstein cannot make a *prima facie* case of disability discrimination or offer sufficient evidence to rebut Morgan Stanley's legitimate, non-discriminatory reasons for discussing his retirement with him in November of 2003.

Respectfully submitted,

_____/s/_____

John F. Scalia (admitted *pro hac vice*)
Maria E Hallas D.C. Bar 436529
Matthew H. Sorensen D.C. Bar 492130
Greenberg Traurig LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C.  20006
(202) 533-2312 (office)
(202) 261-2668 (fax)

*Counsel for Defendant*
*Morgan Stanley DW Inc.*

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

_____ )
NORMAN L. MORGENSTEIN,                   )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )      Civil Action No. 05-2123 (JR)
                                         )
MORGAN STANLEY DW, INC.                  )
                                         )
            Defendant.                   )
_____ )

## DEFENDANT MORGAN STANLEY DW, INC.'S
## POINTS AND AUTHORITIES IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PAGES

I.      INTRODUCTION……………………………………………………    1

II.     STATEMENT OF MATERIAL UNDISPUTED FACTS……………...    3

        A.      Morgan Stanley's Business…………………………………..    3

        B.      Morgenstein's Employment…………………………………    4

        C.      Morgenstein's Medical Condition………………………………    5

        D.      Morgenstein's Campaign to Avoid Taking the
                Series 65 Examination…………………………………………..    7

        E.      Morgan Stanley's Denial of Morgenstein's Request that it
                Apply for a Waiver, and Morgenstein's Refusal to Work
                with Morgan Stanley to Find Other Accommodations………….    10

        F.      Morgenstein's Continued Performance as a Financial
                Advisor, and his Contemplation of Possible Retirement………..    12

        G.      Morgenstein's November 2003 Resurrected Request that
                Morgan Stanley Apply for a Waiver, and Subsequent
                Retirement……………………………………………………    13

        H.      The Recurrence of Morgenstein's Acoustic Neuroma, and
                Morgenstein's Failure to Look for Another Job………………..    14

        I.      Morgenstein's DCOHR Charge and Civil Suit…………………    15

III.    ARGUMENT………………………………………………………...    15

        A.      Legal Standard………………………………………………    15

        B.      The One-Year Statute of Limitations Bars Morgenstein's
                Discrimination and Reasonable Accommodation Claims
                (Counts I and II)…………………………………………….....    16

        C.      Morgan Stanley is Entitled to Summary Judgment on
                Morgenstein's Reasonable Accommodation Claim (Count II)
                Because he Cannot Prove the Essential Elements of that
                Claim……………………………………………………………    18

1.      Morgenstein Cannot Establish That He Was Disabled
During The Time He Was Seeking The Accommodation
From Morgan Stanley……………………………………    19

a.      Morgenstein's non-vision related medical
conditions are not disabilities under the DCHRA…………  21

b.      Morgenstein's alleged vision problems are not
disabilities under the DCHRA……………………………..  23

2.      Morgan Stanley Was Not Required to Apply for a Waiver
of the Series 65 Examination Requirement on Behalf of
Morgenstein Under the DCHRA…………………………..  25

a.      It is undisputed that Morgenstein did not need
the Series 65 license in order to perform the essential
functions of the Financial Advisor position……………….  25

b.      Morgan Stanley's adherence to D.C. licensing
regulations does not violate the DCHRA…………………..  27

c.      Morgan Stanley did not have the power to
effectively accommodate Morgenstein by applying
on his behalf for a waiver of the Series 65 License……….  28

3.      Morgenstein Cannot Establish that he Suffered any
Damages as a Result of Morgan Stanley's Refusal to
Apply on his Behalf for a Waiver of the Series 65
License……………………………………………………    28

4.      Morgenstein's Reasonable Accommodation Claim
Must be Dismissed Because He Refused to Participate
with Morgan Stanley in the Interactive Process…………...  29

D.      Morgan Stanley is Entitled to Summary Judgment on
Morgenstein's Retaliation Claim (Count III)……………………..  31

1.      Morgenstein Cannot State A *Prima Facie* Case of
Retaliation………………………………………………      32

a.      Morgenstein's November 20, 2003 request that
Morgan Stanley apply for a waiver of the Series 65
Examination requirement was not a "protected act"
under the DCHRA………………………………………      33

b.      Morgenstein Did Not Suffer Any Adverse Action… 34

c.    Morgenstein cannot demonstrate the existence of a casual connection between his alleged protected activity and his alleged forced retirement………………    36

2.    Morgan Stanley Had Legitimate Non-Discriminatory Reasons for Suggesting that Morgenstein Retire, and Morgenstein Cannot Show that Those Reasons were Pretextual……………………………………………..    38

E.    Morgan Stanley is Entitled to Summary Judgment on Morgenstein's Claim That it Discriminated Against Him in the Terms and Conditions of Him in the Terms and Conditions of His Employment on the Basis of His Alleged Disability (Count I)………………………………………………………    40

IV.    CONCLUSION………………………………………………………    42

# TABLE OF AUTHORITIES

**PAGES**

Federal Cases

Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518
(1999)………………………………………………………………………………..  27

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986)…………………………………………………………………………………  16

Bennett v. Henderson, 15 F.Supp.2d 1097 (D.Kan. 1998)……………………………  38

Broderick v. Donaldson, 338 F.Supp.2d 30 (D.D.C. 2004)……………………………  37

Carpenter v. Federal Nat'l Mortgage Ass'n, 165 F.3d 69 (D.C. Cir. 1999)……………  32

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265
(1986)…………………………………………………………………………………..  15

Chenoweth v. Hillsborough County, 250 F.3d 1328 (11th Cir. 2001)…………………  21

Chicago, 1997 WL 43205, *2 (N.D.Ill. 1997)…………………………………………  17

Crandall v. Paralyzed Veterans of America, 146 F.3d 894 (D.C. Cir. 1998)…………  20

Del. State Coll. v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)………..  17

Equal Employment Opportunity Commission v. Sears, Roebuck & Company,
 417 F.3d 789 (7th Cir. 2005)…………………………………………………….............  30

Evans v. Davis Memorial Goodwill Industries, 133 F.Supp.2d 24 (D.D.C. 2000)……..  30

Hoffman v. Caterpillar, Inc., 256 F.3d 568 (7th Cir. 2001)……………………………….  26

Kalekiristos v. CTF Hotel Management Corporation, 958 F.Supp. 641
(D.D.C. 1997)…………………………………………………………………… 16, 20, 22, 24

Katradis v. Dav-El of Washington, DC, 846 F.2d 1482 (D.C. Cir. 1988)………………  34

Keyes v. District of Columbia, 372 F.3d 434 (D.C. Cir. 2004)……………  34, 35, 36, 37

Lemmons v. Georgetown University Hosp., 431 F.Supp.2d 76 (D.D.C. 2006)………..  31

Mackenzie v. Denver, 414 F.3d 1266 (10th Cir. 2005)…………………………………  23

Mayers v. Laborers' Health & Safety Fund of North America, 404 F.Supp.2d 59
(D.D.C. 2005)………………………………………………………………………………  34

McDaniel v. AlliedSignal, Inc., 896 F.Supp. 1482 (W.D. Mo. 1995)………………....  28

McGill v. Callear, 973 F.Supp. 20 (D.D.C. 1997)………………………………………  30

McGill v. Munoz, 203 F.3d 843 (D.C. Cir. 2000)………………………………………  30

Pantazes v. Jackson, 366 F.Supp.2d 57 (D.D.C. 2005)…………………………………  29

Parkinson v. Anne Arundel Medical Center, Inc., 214 F.Supp.2d 511 (D.Md. 2002)…  23

Passer v. American Chemical Society, 935 F.2d 322 (D.C. Cir. 1991)……………….  33

Peeples v. Coastal Office Products, Inc., 203 F.Supp.2d 432 (D.Md.,2002)…………..  33

Santiago Clemente v. Executive Airlines, Inc., 213 F.3d 25 (1st Cir. 2000)…………..  22

Stewart v. District of Columbia, 2006 WL 626921 (D.D.C. March 12, 2006)…….. 16-17

Sullivan v. Catholic University of America, 387 F.Supp.2d 11, 14 (D.D.C. 2005)…….  32

Weigert v. Georgetown University, 120 F.Supp.2d 1 (D.D.C. 2000)…........ 25, 32, 40, 41

Wells v. Shalala, 228 F.3d 1137 (10th Cir. 2000)……………………………………....  30

Welzel v. Bernstein, 2006 WL 1876524 (D.D.C. 2006)………………………………  38

State Cases

Arthur Young & Co. v. Sutherland, 631 A.2d 354 (D.C. 1993)………………………..  19

Croley v. Republican Nat'l Comm., 759 A.2d 682 (D.C. 2000)…………………….. 19
District of Columbia Housing Authority v. District of Columbia Office of Human
 Rights, 881 A.2d 600 (D.C. 2005)………………………………………………….. 16
Howard Univ. v. Green, 652 A.2d 41 (D.C. 1994)…………………………………. 19
Lyles v. District of Columbia Dep't of Employment Servs., 572 A.2d 81 (D.C. 1990)... 19

Federal Statutes

42 U.S.C. § 12102……………………………………………………………………. 19

State Statutes

D.C. Code § 1-2502………………………………………………………………….. 19
D.C. Code § 2-1402.61(a)…………………………………………………………… 32
D.C. Code § 2-1403.16(a)…………………………………………………………… 17
DC Code § 31-5602.08(6)………………………………………………………...... 28, 29

Federal Regulations

29 C.F.R. § 1614.203………………………………………………………………… 19
29 C.F.R. § 1630.2…………………………………………………………………… 19

## I.    __INTRODUCTION__

Plaintiff Norman Morgenstein ("Morgenstein"), a former Financial Advisor with Morgan Stanley, has brought this disability discrimination/retaliation lawsuit against his former employer because the company refused to ask an independent governing regulatory body to issue him an investment advisory services license without his having to take the required licensing examination.  Morgenstein claimed that this "accommodation" was necessary because he suffered from unspecified medical conditions that prevented him from studying for the examination.  But he never provided Morgan Stanley with any medical support for these claims.  Nor was he willing to work with Morgan Stanley to determine whether some other accommodations might be available to assist him in taking the required examination.  In any event, the license that Morgenstein sought was not even necessary for him to perform the essential functions of his job as a Financial Advisor for Morgan Stanley.

Morgenstein began asking Morgan Stanley to apply for the waiver in late 2001 or early 2002.  The company's position never changed; it informed him on numerous occasions that it was unwilling to seek a waiver of the licensing examination on his behalf.  By his own admission, Morgenstein understood that this was a dead issue in May 2002.  Nevertheless, nearly a year and a half later, after having had on-going discussions with his supervisor about considering retirement, Morgenstein inexplicably resurrected the issue in November 2003.  His supervisor reiterated the company's position that it would not seek a waiver for him.  Morgenstein retired from the company shortly after this discussion.  Although he now claims that he was forced to retire, the undisputed facts show that he made the decision voluntarily and free of duress.

Morgenstein's First Amended Complaint ("Complaint") contains three counts of disability discrimination under the D.C. Human Rights Act ("DCHRA"). First, Morgenstein alleges that Morgan Stanley discriminated against him in the terms and conditions of his employment by denying his request that it apply on his behalf to the D.C. Department of Insurance and Securities Regulation ("DISR") for a waiver of the Series 65 licensing examination and by forcing him to retire because of his alleged disability (Count I). Second, Morgenstein alleges that Morgan Stanley failed to reasonably accommodate him by denying his request that it apply on his behalf to the DISR for a waiver of the Series 65 licensing examination (Count II). And, third, Morgenstein alleges that Morgan Stanley forced him to resign his employment in retaliation for his request that the company apply to the DISR for a waiver of the Series 65 licensing examination (Count III).

Morgenstein's claims are precisely the kind that are appropriate for summary adjudication. His discrimination and reasonable accommodation claims (Counts I and II) must be dismissed because: (1) they are barred by the DCHRA's one-year statute of limitations;[1] (2) Morgenstein cannot establish that he was "disabled" within the meaning of the DCHRA during his employment with Morgan Stanley; (3) Morgan Stanley had no legal duty to grant Morgenstein's request that it apply on his behalf to the DISR for a waiver of the Series 65 licensing examination, and his request was unreasonable as a matter of law; (4) Morgenstein cannot establish that he suffered any damages as a result of Morgan Stanley's refusal to apply on his behalf to the DISR for a waiver of the Series 65 licensing examination; and (5) Morgenstein failed to satisfy his obligations under the

---

[1] Morgan Stanley has a motion to dismiss pending before this Court with respect to Morgenstein's discrimination and reasonable accommodation claims (Counts I and II) on the grounds that those claims are time-barred on the face of the Complaint and the judicially noticeable DCHRA charge documentation.

DCHRA by refusing to engage Morgan Stanley in the interactive process to determine whether another, reasonable accommodation was available.

Morgenstein's retaliation claim (Count III) must be dismissed because: (1) Morgenstein cannot establish any of the elements of a *prima facie* case of retaliation; (2) it is undisputed that Morgan Stanley had a legitimate non-discriminatory reason for suggesting that Morgenstein consider retirement - namely, his continuingly poor level of revenue production; and (3) Morgenstein has presented no evidence from which a reasonable jury could conclude that Morgan Stanley's legitimate reason was a pretext for discrimination.

## II.    STATEMENT OF MATERIAL UNDISPUTED FACTS

### A.    Morgan Stanley's Business.

Morgan Stanley is a global financial services firm providing a broad range of securities and other investment services and products.  Declaration of Ronald Masci ("Masci Dec."), attached hereto as Exhibit ("Ex.") 1, at ¶¶ 2, 4.  It operates its retail securities business through a nationwide network of approximately 450 branch offices. *Id.*, at ¶ 3.  Each branch is managed by a Branch Manager responsible for its daily operation and administration, including all personnel and client-related matters.  *Id.*, at ¶ 3.  Branches typically  are staffed by a cadre of brokers in training (Financial Advisor Trainees), brokers (Financial Advisors), Sales Assistants and Operations/Compliance personnel.  *Id.*, at ¶ 3.

Morgan Stanley at all relevant times has required its Financial Advisors to comply with any and all licensing and registration requirements imposed by state and federal regulatory bodies.  *See* Morgan Stanley Dean Witter Compliance Guide (Ex. 2), at

MSDW 02188.  In particular, Morgan Stanley requires all of its Financial Advisers to

hold the Full Registration/General Securities Representative (Series 7) license as a

condition of employment.  *See* Ex. 2, at MSDW 02189; Deposition of Ronald Masci

("Masci Dep.") (Ex. 3), at 10:20-11:2.  Because securities regulations impose additional

licensing and registration requirements on individuals who offer services in certain

product areas (such as Investment Advisory Services and Managed Money Accounts),

Morgan Stanley has also required that its Financial Advisers comply with those

additional requirements in order to transact business in those product areas.  Ex. 2, at

MSDW 02196.  However, Morgan Stanley has never required that its Financial Advisers

transact any business in those product areas, including Investment Advisory Services; nor

has it ever required that its Financial Advisers obtain any registrations or licenses for

those product areas if they are not transacting any business in them.  Masci Dec., at ¶¶

11-13.

> ### B.    Morgenstein's Employment.

Morgan Stanley employed Morgenstein as a Financial Advisor in its Washington,

D.C. branch office from the early 1970s until his retirement on December 31, 2003.

Deposition of Norman Morgenstein ("Morgenstein Dep.") (Ex. 4), at 21:10-15; Plaintiff's

Responses to Defendant's Interrogatories (Ex. 5), Resp. to Int. No. 2.  Defendant's

Responses to Plaintiff's First Set of Interrogatories (Ex. 6), Resp. to Int. No. 9.  From

approximately 1978 through the date of Morgenstein's retirement, Ronald Masci was the

Branch Manager of the D.C. branch office.  Masci Dec., at ¶ 6.  Morgenstein's primary

duties as a Financial Adviser consisted of researching the financial history, risk tolerance,

financial objectives, asset allocation, interests, prejudices and financial goals of his

clients, and advising those clients as to the instruments and product areas best-suited to their investment goals. Masci Dep., at 11:7-12:6.

Morgenstein was a below-average performer throughout his employment. Ex. 6, Resp. to Int. No. 9. As Branch Manager, Mr. Masci tolerated Morgenstein's low productivity out of a sense of loyalty to Morgenstein's father, who was a long-time and well-loved Financial Advisor in the D.C. branch. Masci Dep., at 59:16-60:3.

### C.    Morgenstein's Medical Condition.

In 1996 Morgenstein underwent surgery to remove a left acoustic neuroma (a non-cancerous tumor of the inner ear); Morgan Stanley granted him a four- or five-month medical leave of absence. Ex. 5, Resp. to Int. No. 4; Plaintiff's Responses to Defendant's Second Set of Interrogatories (Ex. 7), Resp. to Int. No. 21; Morgenstein Dep., at 8:19-9:4, 24:6-21. After Morgenstein's leave of absence, Morgan Stanley returned him to his Financial Adviser position and the same client accounts he had managed before his surgery. Morgenstein Dep., at 24:22-25:7.

Morgenstein claims that following his surgery, he began suffering a number of physical difficulties. Complaint, ¶ 8. He evidently made post-operative complaints to his treating surgeons, Drs. Jeff Jacobson and Denis Fitzgerald, about difficulties with his stamina, walking in a straight line, partial facial paralysis on the left side of his face, partial hearing loss in his left ear, visual blurring, and some memory deficit for recent events. Deposition of Dennis Fitzgerald ("Fitzgerald Dep.") (Ex. 8), at 47:17-49:1; Deposition of Jeff Jacobson ("Jacobson Dep.") (Ex. 9), at 11:21-12::11; December 27, 1999 Supplementary Neurosurgical Report of Jeff Jacobson, M.D. (Ex. 10). According to Dr. Jacobson, Morgenstein's partial facial paralysis was moderate and primarily

5

cosmetic in nature (Jacobson Dep., at 10:11-19) and any impairment in Morgenstein's ability to walk was minor (Jacobson Dep., at 33:20-34:10). Dr. Jacobson noted that with the exception of Morgenstein's partial facial weakness and partial left ear hearing loss, "the remainder of his neurological examination is for the most part normal." Ex. 10. Dr. Jacobson concluded that Morgenstein's overall abilities were not dramatically diminished. *Id.*

Notably, at no time during his employment or this litigation has Morgenstein presented any evidence that Dr. Jacobson and/or Dr. Fitzgerald ever diagnosed him with a vision-related reading disability. Dr. Jacobson's report makes no mention of any reading disability, and Dr. Jacobson testified in his deposition that he was not medically qualified to determine whether and the extent to which Morgenstein's condition might impair his ability to work or read. Ex. 10; Jacobson Dep., at 33:16-19, 34:16-19. And Dr. Fitzgerald testified in his deposition Morgenstein never complained to him about having problems reading, studying, or retaining information. Fitzgerald Dep., at 50:17-51:4. Moreover, although Dr. Jacobson's December 27, 1999 report surmises that "some accommodation is likely going to need to be made at his workplace so that he can continue to be productive," the report contains no information as to what medical condition needed to be accommodated or what accommodation might be necessary. Ex. 10. In his deposition, Dr. Jacobson made clear that he did not have the proper medical expertise to opine as to what accommodations Morgenstein might have needed. Jacobson Dep., at 31:9-32:8.

In March 2001, years after his 1996 surgery, Morgenstein saw Dr. Harry Wachs, a developmental optometrist, in connection with his alleged vision problems. Dr. Wachs

determined that Morgenstein's prescription eye glasses were sufficient to meet his needs, and that Morgenstein's eye-health was normal. April 17, 2001 Progress Report of Harry Wachs, O.D. (Ex. 11); Deposition of Harry Wachs ("Wachs Dep.") (Ex. 12), at 66:20-22. According to Dr. Wachs, Morgenstein's reading speed and accuracy were not abnormally low for a person of his age (Wachs Dep., at 65:16-66:1) and his reading comprehension was average (Wachs Dep., at 66:12-19). Dr. Wachs also testified that one possible explanation for Morgenstein's slower reading was the fact that he admittedly did not read often. Wachs Dep., at 67:1-8. Dr. Wachs concluded that he would need to see Morgenstein for at least 10 sessions before he could render a complete prognosis for treatment. Ex. 11. However, Morgenstein did not seek any further treatment for his alleged vision problems from Dr. Wachs or any other eye-care specialist until after he had resigned from Morgan Stanley and initiated the instant lawsuit. Wachs Dep., at 75:16-18; Morgenstein Dep., at 56:3-57:11, 59:16-60:5.

> **D.    Morgenstein's Campaign to Avoid Taking the Series 65 Examination.**

In the mid- to late-1990's, Investment Advisory Services underwent increased regulation at the federal and state levels. Ex. 6, Resp. to Int. No. 9. In particular, the new regulatory scheme required any individual whose principal office was in D.C. and who sought to transact business in Investment Advisory Services (for fees based on the amount of client assets under management) to hold a Series 65 or Series 66 license in addition to the Series 7 license. *Id.;* Masci Dep., at 20:5-21:4.

A March 2001 internal review Morgan Stanley's Financial Advisers' registrations revealed that Morgenstein was not registered to transact Investment Advisory Services in D.C. Ex. 5, Resp. to Int. No. 2. The review also revealed that Morgenstein had placed

five accounts under the management of an Investment Adviser. *See* March 9, 2001 e-mail exchange between Norman Morgenstein and Hugo Jauregui (Ex. 13). Morgan Stanley's national ICS Operations department informed Morgenstein that his failure to comply with the licensing and registration requirements for such business would jeopardize the sales credits generated by those accounts. *Id.* It was at this time that Morgan Stanley first informed Morgenstein that he would need to take and pass the Series 65 examination in order to become registered to transact Investment Advisory Services in D.C. Ex. 5, Resp. to Int. No. 2.

Rather than take the Series 65 examination, Morgenstein asked the DISR (the agency responsible for regulating the securities business in D.C.) to grant him a waiver of the Series 65 examination requirement on the basis of his alleged disability. April 4, 2001 letter from Norman Morgenstein to Theodore Miles (Ex. 14). The DISR informed Morgenstein that it would not grant his waiver request because he had not provided sufficient information regarding the extent to which his medical condition affected his ability to act as an Investment Adviser. May 15, 2001 letter from Dana Sheppard to Norman Morgenstein (Ex. 15). The DISR asked Morgenstein to provide additional information regarding his medical condition and its impact on his ability to serve his clients. *Id.*

In response, Morgenstein sent the DISR another copy of Dr. Jacobson's December 1999 Supplementary Neurosurgical Report and a copy of Dr. Wachs' April 17, 2001 Progress Report. May 21, 2001 letter from Norman Morgenstein to Dana G. Sheppard (Ex. 16). Although, in two subsequent letters to the DISR, Morgenstein provided his own additional opinions and thoughts about his work activities, he never

provided the DISR with any additional information or documentation from a medical
professional.  June 4, 2001 letter from Norman Morgenstein to Lilah Blackstone (Ex. 17);
August 22, 2001 letter from Norman Morgenstein to Lilah Blackstone (Ex. 18);
Morgenstein Dep., at 69:22-70:4.

    The DISR denied Morgenstein's waiver request by letter dated October 2, 2001.
October 2, 2001 letter from Theodore A. Miles to Norman Morgenstein (Ex. 19).[2]  In
March 2002, Morgenstein met with the DISR to pursue his waiver request.  *See* May 21,
2002 e-mail from Lilah Blackstone to Norman Morgenstein (Ex. 22).  The DISR once
again informed him that it was unable to grant his request.  *Id.*  The DISR also stated that
it would not re-consider the matter unless Morgan Stanley requested the waiver on his
behalf.  *Id.*

    Morgenstein subsequently began asking Morgan Stanley to apply on his behalf to
the DISR for a waiver of the Series 65 examination requirement as an accommodation for
his alleged disability.  Morgenstein made the first of these requests in late 2001 or early
2002 to Carolyn Greenhalgh, the Branch Administrative Manager for the D.C. branch.
Deposition of Carolyn Greenhalgh ("Greenhalgh Dep.") (Ex. 23), at 12:3-20, 21:19-
22:17, 62:18-22.  In response, Ms. Greenhalgh consulted Helen Dachtler of Morgan
Stanley's national registration department and Patty Unz of Morgan Stanley's national

---

[2]  The DISR denied Morgenstein's waiver request because it believed he had violated
D.C. securities law by acting as an investment advisor without having the Series 65
license.  *Id.*  In response to the DISR's subsequent investigation, Morgan Stanley
informed the DISR that Morgenstein had not violated D.C. securities law because he had
not received any "special compensation" (*i.e.,* fees based on the amount of client assets
under management) from any of the accounts he had placed for management with an
Investment Advisor.  September 19, 2002 e-mail from Douglas Lowe to Lilah Blackstone
(Ex. 20).  The DISR never issued a formal decision, or otherwise pursued the issue.
Deposition of Theodore Miles ("Miles Dep.") (Ex. 21), at 164:4-7, 166:5-168:11.

legal department, and learned from them that the company would not apply for a waiver because the company did not want to expose itself to potential legal liability to any dissatisfied customers of Morgenstein.  Greenhalgh Dep., at 33:22-35:8.  Based on that information, Ms. Greenhalgh informed Morgenstein that Morgan Stanley would not seek a waiver on his behalf.  Greenhalgh Dep., at 36:11-14.  Mr. Masci's assistant, Andrea Rouse, also informed him of that fact by e-mail dated March 25, 2002.  Morgenstein Dep., at 121:3-122:9; March 25, 2002 e-mail from Andrea Rouse to Norman Morgenstein (Ex. 24).  Morgenstein admits that his receipt of Ms. Rouse's March 25, 2002 e-mail was when he became aware that Morgan Stanley was unwilling to seek a waiver of the Series 65 examination requirement on his behalf.  *Id.*

> **E.**     **Morgan Stanley's Denial of Morgenstein's Request that it Apply for a Waiver, and Morgenstein's Refusal to Work with Morgan Stanley to Find Other Accommodations.**

In response to Morgan Stanley's denial of his request, Morgenstein filed a complaint with Janice Marks of Morgan Stanley's Human Resources department stating that Morgan Stanley had discriminated against him on the basis of his alleged disability.  March 27, 2002 e-mail exchange between Janice Marks and Norman Morgenstein (Ex. 25); Morgenstein Dep., at 128:7-129:5.  Ms. Marks instructed Morgenstein to provide her with information about his medical condition.  Ex. 25; Morgenstein Dep., at 131:16-133:2.  Morgenstein never gave Ms. Marks (or any other Morgan Stanley representative) any such information.  *Id.*  Instead, he once again raised the issue with Ms. Greenhalgh.  April 23, 2002 e-mail exchange between Catherine Kreger and Norman Morgenstein (Ex. 26).  Ms. Greenhalgh once again informed Morgenstein that his request had been denied.  *Id.*

Even though it denied his request that it apply on his behalf for a waiver of the Series 65 examination, Morgan Stanley made efforts to identify appropriate accommodations that would enable Morgenstein to take the Series 65 examination.  On May 3, 2002, Andrea Rouse informed Morgenstein that "your request for an accommodation was not denied (that I know of) - your request for a *waiver* was denied. We can start the process for an accommodation if that is what you want."  May 3, 2002 e-mail exchange between Andrea Rouse and Norman Morgenstein (Ex. 27).  Ms. Rouse and Morgenstein subsequently discussed possible accommodations for taking the Series 65 examination, including taking the examination without time limitations.  Morgenstein Dep., at 220:5-11.  But Morgenstein refused to pursue any of those possible accommodations.  Morgenstein Dep., at 220:10-13, 222:1-9; May 6, 2002 e-mail exchange between Norman Morgenstein and Andrea Rouse (Ex. 28).  Morgenstein admits that he was not interested in obtaining accommodations to take the examination, and only was interested in an outright waiver of the examination.  Morgenstein Dep., at 221:17-222:9.

Refusing to work with Morgan Stanley to identify accommodations for taking the Series 65 examination, Morgenstein once again contacted the DISR to request a waiver. *See* Morgenstein Dep., at 142:4-147:19; Ex. 22.  In a May 21, 2002 e-mail, the DISR informed Morgenstein that based on its understanding that Morgan Stanley would not seek a waiver on his behalf, its October 2, 2001 denial of his waiver request remained in effect.  Morgenstein Dep., at 147:20-148:7; Ex. 22.  Morgenstein admits that the DISR's May 21, 2002 e-mail put "to rest" the issue of his request that Morgan Stanley apply on

his behalf for a waiver of the Series 65 examination requirement.  Morgenstein Dep., at

147:20-149:4.

### F. Morgenstein's Continued Performance as a Financial Advisor, and his Contemplation of Possible Retirement.

Although he did not obtain a Series 65 license, Morgenstein nonetheless

continued to perform his Financial Advisor duties until his retirement in December 2003.

His revenue production during the last three years of his employment remained low.

Morgan Stanley at all relevant times required all Financial Advisors, such as

Morgenstein, with eight or more years of experience to produce at least $200,000 in gross

annual revenue in order to avoid being penalized by receiving a lower commission rate

for their work.  *See* Morgan Stanley Financial Advisor Compensation and Recognition

Programs (Ex. 29), at MSDW 01848; Masci Dec., at ¶ 16.  Morgenstein's annual revenue

production was well below the $200,000 threshold in each of his last three years of

employment.  Summary of Revenues of Morgan Stanley Financial Advisors in Branch

642 (Washington, DC) (Ex. 30), at MSDW 00703; Masci Dec., at ¶ 15.  His gross annual

revenue production for 2001, 2002 and 2003 was less than $150,000, and his gross

revenue production for 2003 was only $112,842.  *Id.*  In fact, from 2001 through 2003,

Morgenstein ranked among the lowest producing Financial Advisors in the D.C. branch

with eight or more years of experience.  Ex. 30, at MSDW 00701-04; Masci Dec., at ¶ 15.

In 2002, Morgan Stanley effected a nationwide reduction in force pursuant to

which it terminated the employment of all Financial Advisors with eight or more years of

experience and with less than $120,000 in gross revenue (annualized for 2002).  Ex. 6,

Resp. to Int. No. 1.  Although Morgenstein survived the 2002 reduction in force based on

his gross revenue numbers, Mr. Masci grew concerned that Morgenstein's continuing low

revenue production made him vulnerable to any future reduction in force.[3]  Masci Dec.,

at ¶ 18.  Accordingly, beginning in March or April of 2003, Mr. Masci began discussing

possible retirement options with Morgenstein.  Morgenstein Dep., at 199:19-200:5; Masci

Dec., at ¶ 22

      These retirement discussions continued through the summer of 2003, when

Morgan Stanley presented Morgenstein with a proposed "Sunset Agreement."

Morgenstein Dep., at 198:14-199:10; Memorandum Re:  Payments to Qualified Retiring

Financial Advisor/Norman Morgenstein (RFA), Washington, DC (Ex. 31).  The Sunset

Agreement is a retirement incentive that enables a retiring Financial Advisor to transfer

his accounts to a Financial Advisor still employed by the company in exchange for fifty

percent of any commissions generated by those accounts.  *Id.*  Although such agreements

normally last only a few years, the Sunset Agreement presented to Morgenstein entitled

him to fifty percent of the commissions for the rest of his life.  Masci Dep., at 49:22-

50:14.  The proposed Sunset Agreement also set a retirement date of December 31, 2003.

Ex. 31.  Morgenstein ultimately turned down the proposed Sunset Agreement.

     **G.**    **Morgenstein's November 2003 Resurrected Request that Morgan**
           **Stanley Apply for a Waiver, and Subsequent Retirement.**

      On November 20, 2003, Morgenstein sent a letter to Mr. Masci renewing his

request that Morgan Stanley apply on his behalf for a waiver of the Series 65 examination

requirement.  November 20, 2003 letter from Norman Morgenstein to Ronald Masci (Ex.

---

[3]  Mr. Masci's concerns proved well-founded.  Morgan Stanley implemented another
reduction in force in 2005, which, in relevant part, terminated all Financial Advisors with
eight or more years of experience and less than $225,000 in gross revenue (annualized for
2005).  Ex. 6, Resp. to Int. No. 1.

32).  At that time, Morgenstein was fully aware that the company had already denied this request nearly a year and a half earlier.  Morgenstein Dep., at 188:8-13.

On November 24, 2003, Mr. Masci met with Morgenstein to discuss the November 20, 2003 letter.  Masci Dep., at 49:12-16.  Reiterating that Morgan Stanley would not grant Morgenstein's request, Mr. Masci called attention to Morgenstein's low production (Morgenstein Dep., 197:19-198:1) and once again encouraged Morgenstein to consider the proposed Sunset Agreement (Masci Dep., at 49:12-51:8; Morgenstein Dep., at 204:9-205:7).[4]  *Id.*  One week later, Morgenstein contacted the Morgan Stanley's retirement department and requested a retirement date of December 31, 2003.  December 15, 2003 e-mail e-mail exchange between Ronald Masci and Norman Morgenstein (Ex. 34).  Morgenstein retired effective December 31, 2003.  Ex. 34.

### H.    The Recurrence of Morgenstein's Acoustic Neuroma, and Morgenstein's Failure to Look for Another Job.

After retiring from Morgan Stanley, Morgenstein undertook no job search for alternative employment in the securities industry.  Morgenstein Dep., at 244:13-245:18; 245:19-246:10).  Morgenstein suffered a recurrence of his left acoustic neuroma in February 2004.  Morgenstein Dep., at 11:12-17.  The recurrent tumor was treated with radiation therapy in late July 2004.  *Id.*

---

[4]  Although Morgenstein alleges that Mr. Masci told him he could either retire or be terminated (Complaint, at ¶ 16), both Mr. Masci and Matthew Ridnouer (a Morgan Stanley employee who witnessed the November 24, 2003 meeting) testified that no such ultimatum was ever made (Masci Dep., at 49:12-51:8; Deposition of Matthew Ridnouer ("Ridnouer Dep.") (Ex. 33), at 28:1-29:17, 31:11-15.  According to both Mr. Masci and Mr. Ridnouer, Mr. Masci merely suggested that due to his low production numbers, Morgenstein would be at risk of termination in any future reduction in force.  Masci Dep., at 49:12-51:8; Ridouer Dep., at 28:1-29:17.

According to Morgenstein, his vision-related reading problems have worsened following the recurrence of his tumor. *Id.,* at 10:15-11:22. He testified that following the recurrence, he is unable to work for Morgan Stanley or any other employer (*id.,* at 239:17-240:21) and has made no attempt to find any employment whatsoever (*id.,* at 246:15-18).

**I.      Morgenstein's DCOHR Charge and Civil Suit.**

On November 15, 2004, nearly one year after he retired from Morgan Stanley, Morgenstein filed a charge of discrimination with the DC Office of Human Rights ("DCOHR"). *See* District of Columbia Office of Human Rights Charge of Discrimination (Ex. 35). Notably, in the in-take questionnaire, he stated that Morgan Stanley had refused to apply on his behalf for an exemption to the Series 65 examination requirement "approximately 1½ years prior to 11/24/03." District of Columbia Office of Human Rights Intake Questions, Constructive Discharge (Ex. 36). On or about August 11, 2005, Morgenstein withdrew the DCOHR charge and filed his original Complaint in the Superior Court for the District of Columbia.

**III.   ARGUMENT**

**A.      Legal Standard.**

Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ("Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). A fact is

material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute of fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party opposing summary judgment has the burden of showing that a genuine dispute of material fact exists, and must do more than simply show "that there is some metaphysical doubt as to the material facts." *Id.* The movant is entitled to summary judgment "[w]here the nonmovant's evidence is insufficient to allow a reasonable jury to return a verdict in its favor as a matter of law, or is merely colorable or not significantly probative. *Kalekiristos v. CTF Hotel Management Corporation*, 958 F.Supp. 641, 645 (D.D.C. 1997) (*citing Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510-11).

**B.    The One-Year Statute of Limitations Bars Morgenstein's Discrimination and Reasonable Accommodation Claims (Counts I and II).[5]**

Under the DCHRA, a person who believes he has been subjected to an act of unlawful discrimination must file a complaint in a court of competent jurisdiction within one year of the alleged act of discrimination or discovery thereof. D.C. Code § 2-1403.16(a) (emphasis added). Courts interpreting the DCHRA look for guidance to cases interpreting analogous federal statutes. *District of Columbia Housing Authority v. District of Columbia Office of Human Rights*, 881 A.2d 600, 612 (D.C. 2005). This Court has made clear that in disability discrimination/reasonable accommodation cases, the statute of limitations begins to run on the date the employee first becomes aware of the employer's denial of the requested accommodation. *Stewart v. District of Columbia*,

---

[5] Morgan Stanley has a motion to dismiss on this issue pending before this Court. This section summarizes the legal arguments contained therein, and refers this Court to evidence obtained through discovery that further compels a finding that Counts I and II are time-barred.

2006 WL 626921, at *6 (D.D.C. March 12, 2006). ***An employee cannot extend, toll or reset the limitations period simply by repeating his request for accommodation or by filing internal complaints.*** *Id.* *See also Schroeder v. University of Illinois at Chicago*, 1997 WL 43205, *2 (N.D.Ill. 1997) (statute of limitations begins to run on date employer first denied request for accommodation, and was not reset or tolled by employee's subsequent requests for same accommodation); *Del. State Coll. v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (for purposes of the running of the statute of limitations on a claim, "the proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts become most painful").

The essence of Counts I and II is that Morgan Stanley discriminated against Morgenstein in violation of the DCHRA by denying his request that it apply on his behalf to the DISR for a waiver of the Series 65 examination requirement. Complaint, at ¶23, 26. Morgenstein admits in his DCOHR submissions, his deposition testimony, and his answers to Morgan Stanley's Interrogatories that he was fully aware of Morgan Stanley's denial of his request in early- to mid-2002. Ex. 36; Morgenstein Dep., at 121:3-122:9; Ex. 5, Resp. to Int. No. 2. Morgenstein testified in his deposition that he understood that this issue had been "put to rest" in May of 2002. Morgenstein Dep., at 147:20-149:4. As a matter of law, therefore, Morgenstein was required to bring any claim no later than May 2003 and his mere repetition of that request in November 2003 did not toll or reset the statute of limitations on any discrimination and reasonable accommodation claims related to the request. It is undisputed that Morgenstein did not file his DCOHR charge until November 15, 2004, well beyond the one-year limitations period. Accordingly, Morgenstein's claims of refusal to grant a reasonable accommodation (Count II) and

disability discrimination based on a failure to grant him a reasonable accommodation

(Count I) must be dismissed as time-barred.

**C.      Morgan Stanley is Entitled to Summary Judgment on Morgenstein's Reasonable Accommodation Claim (Count II) Because he Cannot Prove the Essential Elements of that Claim.**

Count II must be dismissed because Morgenstein cannot prove the essential

elements of a reasonable accommodation claim.  First, he cannot establish that he was

"disabled" within the meaning of the DCHRA during the period in which he was

requesting that Morgan Stanley seek a waiver of the Series 65 examination on his behalf.

Second, even if he somehow could create a factual dispute as to whether he was

"disabled" during that time, he cannot dispute that he never provided Morgan Stanley

with medical evidence that he had a covered disability warranting the accommodation he

sought.  Third, Morgan Stanley had no legal duty to apply to the DISR on Morgenstein's

behalf for a waiver of the Series 65 examination for the following reasons: A Series 65

license was not necessary to perform the essential functions of the Financial Advisor

position (and was not even guaranteed to enable him to perform the non-essential

functions of the position); Morgan Stanley was entitled to adhere to D.C.'s regulatory

requirement that he take the examination; and Morgenstein's request was not an effective

accommodation because only the DISR has the power to grant a waiver.  Fourth,

Morgenstein cannot establish that he suffered any damages as a result of Morgan

Stanley's refusal to apply for the waiver because there is no evidence that the DISR

would have granted the waiver.  Finally, it is undisputed that after he learned that Morgan

Stanley would not apply for a waiver on his behalf, Morgenstein failed to engage in the

interactive process with Morgan Stanley in order to determine whether another, reasonable accommodation was available.

> 1. **Morgenstein Cannot Establish That He Was Disabled During The Time He Was Seeking The Accommodation From Morgan Stanley.**

To be a protected "disability" under the DCHRA, a physical or mental impairment must substantially limit one or more of the individual's major life activities. D.C. Code § 1-2502 (5A).  This definition is substantially similar to that found in the Americans With Disabilities Act ("ADA") and the regulations interpreting that statute. 42 U.S.C. § 12102 (2); 29 C.F.R. § 1614.203 (a).  Accordingly, in construing the DCHRA, courts consider as persuasive authority decisions interpreting comparable provisions of the ADA.  *See, e.g.*, *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994); *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 367-68 (D.C. 1993); *Lyles v. District of Columbia Dep't of Employment Servs.*, 572 A.2d 81, 82-83 (D.C. 1990).

"Major life activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  *Croley v. Republican Nat'l Comm.*, 759 A.2d 682, 700 n.18 (D.C. 2000) (*citing* 29 C.F.R. § 1630.2(i)).  An individual is "substantially limited" when he is "unable to perform a major life activity that the average person in the general population can perform" or when he is "significantly restricted as to the condition, manner or duration under which [he] can perform a major life activity" as compared to the average person in the general population.  29 C.F.R. § 1630.2(j)(1)(i)-(ii).

When an employee requests a reasonable accommodation on the basis of a claimed disability, he has a legal duty to inform the employer of the disability and the

limitations it imposes.  *Crandall v. Paralyzed Veterans of America*, 146 F.3d 894 (D.C. Cir. 1998).  The employee "has the burden of establishing with ***medical evidence*** the existence of the alleged disability and presenting the documentation ***during the term of employment***, not following termination."  *Kalekiristos*, 958 F.Supp. at 657 (emphasis added).  An employee's "self-prescribed work restrictions do not establish that he is restricted in any major life activity."  *Id.*, at 658.  Furthermore, ***physician reports generated after an employee has ended his employment and about which the employer had no knowledge or access during the employee's employment cannot serve as the evidentiary basis of an alleged disability*****.**  *Id.*, at 657.

Morgenstein has identified in this litigation a number of alleged medical conditions on which he bases his claim that he was disabled.  He contends that as a result of a surgical procedure he underwent in 1976, he "does not absorb water as quickly as if he had a complete GI [Gastro-Intestinal] tract and with the result that Plaintiff suffers from fatigue.  Plaintiff must pace himself in any physical activity to avoid dehydration." Ex. 5, Resp. to Int. No. 21.  He also contends that as a result of his 1996 acoustic neuroma surgery, he was left with partial paralysis on the left side of his face, a loss of approximately 70% of the hearing in his left ear, damage to his left side balance nerve that affects his ability to walk in a straight line, and a "visional disability, particularly in reading and trying to focus."  *Id.*

However, it is undisputed that none of the medical evidence Morgenstein provided to Morgan Stanley during the term of his employment - which consisted solely of Dr. Jacobson's December 27, 1999 Supplementary Neurosurgical Report and Dr. Wachs' April 17, 2001 Progress Report - supported any finding that any of these alleged

conditions substantially impaired his ability to engage in any major life activities.  His reasonable accommodation claim fails for this reason alone.  It also fails because the undisputed evidence in this case establishes that these alleged conditions in fact did not substantially impair Morgenstein's ability to engage in any major life activities.

**a.      Morgenstein's non-vision related medical conditions are not disabilities under the DCHRA.**

The medical evidence in this case establishes Morgenstein's alleged fatigue, balance problems, facial paralysis, hearing loss and need to pace himself in physical activity do not rise to the level of "disabilities" under the DCHRA.[6]  The only two medical reports that Morgenstein provided to Morgan Stanley during his employment - *i.e.,* Dr. Jacobson's December 1999 Supplemental Neurosurgical Report and Dr. Wachs' April 2001 Report - provide insufficient information from which a reasonable jury could possibly find that these alleged conditions substantially impaired his ability to engage in any major life activities.[7]  And Morgenstein has presented no other ***medical evidence contemporaneous with his employment*** that would support such a finding.

---

[6] Several of these alleged symptoms are wholly unrelated to Morgenstein's request that Morgan Stanley apply on his behalf for a waiver of the Series 65 examination requirement.  Specifically, Morgenstein's alleged balance, hearing and exertion problems are physical limitations that would have no bearing on his ability to study for or take a written examination.  An employee alleging disability discrimination under the ADA may not rely on a medical condition that is wholly unrelated to the accommodation he is seeking in order to establish that he is "disabled."  *See, e.g., Chenoweth v. Hillsborough County*, 250 F.3d 1328, 1330 (11th Cir. 2001).  As such, Morgenstein cannot rely on any of these medical conditions to support his claim that he was disabled.

[7] Dr. Wachs' report makes no mention of Morgenstein experiencing problems with fatigue, balance problems, facial paralysis, hearing loss or having the need to pace himself in physical activity.  Ex. 11.  And, while Dr. Jacobson's Supplemental Neurosurgical Report mentions that Morgenstein complained of these problems, it provides no medical information or opinion as to the existence of these problems or the extent to which they may have impaired any major life activities.  Ex. 10.

With respect to Morgenstein's alleged fatigue, there simply is no evidence that any such condition *significantly* restricted his ability to work or perform any other major life activities. Morgenstein testified in his deposition that he normally worked from 9:30 or 10:00 a.m. until 4:00 p.m., when the stock market closed – almost a full work-day. Morgenstein Dep., at 22:14-23:5. More importantly, nothing in Dr. Jacobson's report - or any other medical record contemporaneous with Morgenstein's employment - provides any details regarding the nature, extent and duration of any restrictions on Morgenstein's ability to work or engage in other major life activities stemming from his alleged fatigue. *See* Ex. 10. In the absence of any such medical evidence, Morgenstein cannot meet his burden of establishing that his alleged fatigue qualifies as a disability under the DCHRA. *Kalekiristos*, 958 F.Supp. at 657.

With respect to Morgenstein's alleged balance problems, facial weakness and hearing loss, it is undisputed that these alleged conditions did not substantially impair his ability to engage in any major life activity. Dr. Jacobson testified that Morgenstein's facial weakness was merely "a cosmetic issue" and that Morgenstein's balance problems had a relatively minor impact on his ability to walk. Jacobson Dep., at 10:11-19; 33:20-34:10. And, while Morgenstein may have experienced some hearing loss in his left ear as a result of his 1996 surgery, Dr. Fitzgerald testified that this surgery had no effect on Morgenstein's ability to hear out of his right ear. Deposition of Dennis Fitzgerald ("Fitzgerald Dep."), at 34:18-35:13. As a matter of law, any such unilateral hearing loss does not constitute a substantial limitation of a major life activity. *Santiago Clemente v. Executive Airlines, Inc.*, 213 F.3d 25, 31-32 (1st Cir. 2000) (an individual's hearing loss in one ear does not qualify as a disability under the ADA).

Finally, neither Dr. Jacobson nor Dr. Wachs' report says anything about Morgenstein's alleged need to pace himself in physical activity.  In any event, as a matter of law, one's inability to engage in physical exertion does not qualify as a substantial limitation of a major life activity.  *See*, *e.g.*, *Mackenzie v. Denver*, 414 F.3d 1266, 1275 (10th Cir. 2005); *Parkinson v. Anne Arundel Medical Center, Inc.*, 214 F.Supp.2d 511, 515 (D.Md. 2002).

For these reasons, Morgenstein cannot establish that any of his alleged non-vision-related conditions qualify as a protected disability under the DCHRA.

### b.     Morgenstein's alleged vision problems are not disabilities under the DCHRA.

Morgenstein also claims that he suffers from a "visional disability, particularly in reading and trying to focus."  Neither of the two medical reports that Morgenstein provided to Morgan Stanley supports that claim.  Dr. Jacobson's December 27, 1999 Supplementary Neurosurgical Report makes no mention of any impairment in Morgenstein's ability to read, and simply states that he complained of "some visual blurring."  Ex. 10.  Similarly, Dr. Wachs' April 17, 2001 report provides no indication that Morgenstein suffered any vision-related medical condition whatsoever.  Dr. Wachs' report provides no medical diagnosis or classification, and does not even indicate whether Morgenstein's alleged symptoms are physical or psychological in nature.[8]  Ex. 11.  And Dr. Wachs testified in his deposition that Morgenstein's reading accuracy and speed were average.  Wachs Dep., at 65:16-66:1, 66:12-19.  This testimony makes clear that Dr. Wachs found any reading impairment to be insubstantial.  Accordingly, Dr. Wachs'

---

[8] Dr. Wachs' report does not identify the cause of Morgenstein's slow reading.  *Id.*  Dr. Wachs testified in his deposition that Morgenstein's slow reading could be caused by the simple fact that he did not read often.  Wachs Dep., at 67:1-8.

report lacks sufficient information to allow a reasonable jury to conclude that Morgenstein suffered from any vision-related medical problems that substantially limited his ability to read.

Morgenstein's reasonable accommodation claim must be dismissed by the mere fact that during his employment he never gave Morgan Stanley any medical documentation demonstrating that he suffered from any vision-related medical condition that substantially limited a major life activity.  It also must be dismissed because Morgenstein is unable to present any medical evidence ***contemporaneous with his employment*** that supports his assertion that he suffered from a vision-related disability. Simply put, while Morgenstein himself asserted that he was disabled, there is no ***contemporaneous medical evidence*** that supports his assertion.

During the course of this litigation, Morgenstein has obtained a medical opinion from Jeffrey Kraskin, O.D. in an attempt to prove that he has a vision-related disability. *See* April 29, 2006 Report of Jeffrey L. Kraskin, O.D., P.C. (Ex. 37).  As a matter of law, however, Morgenstein cannot rely on Dr. Kraskin's post-employment opinions to prove that he was disabled during his employment.  As this Court held in *Kalekiristos*, physician reports generated after an employee has ended his employment and about which the employer had no knowledge or access during the employment cannot serve as the evidentiary basis of an alleged disability.  958 F.Supp. at 657.  That legal rule is particularly sound here, because Morgenstein admits that his condition worsened as a result of the post-employment treatment of his recurrent acoustic neuroma in 2004. Morgenstein Dep., at 10:15-11:22; *see also* Ex. 37, at 1.  Dr. Kraskin's 2006 evaluation

and opinions cannot accurately reflect Morgenstein's condition during his employment with Morgan Stanley in 2002 and 2003.

For these reasons, Morgenstein cannot meet his burden of showing that he was disabled within the legal definition. His reasonable accommodation claim must be dismissed for this reason alone.

      **2.**      **Morgan Stanley Was Not Required to Apply for a Waiver of the Series 65 Examination Requirement on Behalf of Morgenstein Under the DCHRA.**

Morgenstein's reasonable accommodation claim also must be dismissed because his request that Morgan Stanley apply on his behalf to the DISR for a waiver of the Series 65 licensing examination was unreasonable as a matter of law. First, it is undisputed that Morgenstein did not need to have the Series 65 license in order to perform the essential functions of his job. Second, the DCHRA does not require Morgan Stanley to seek a waiver of licensing requirements imposed by a governmental regulatory body. Third, Morgenstein cannot establish that his requested "accommodation" (namely, that Morgan Stanley apply to the DISR for a waiver) would have been effective because Morgan Stanley had no control over whether the DISR ultimately would grant a waiver.

      **a.**      **It is undisputed that Morgenstein did not need the Series 65 license in order to perform the essential functions of the Financial Advisor position.**

The DCHRA does not require an employer "to accommodate an employee in any manner in which that employee desires." *Weigert v. Georgetown University*, 120 F.Supp.2d 1, 22 (D.D.C. 2000) (*quoting Whillock v. Delta Air Lines, Inc.*, 926 F.Supp. 1555, 1565 (N.D.Ga. 1995)). Nor is an employer required to provide a disabled

employee with an accommodation to perform a non-essential function of his position. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 577 (7th Cir. 2001).

Here, it is undisputed that Morgenstein did not need to hold a Series 65 license or transact business in the area of Investment Advisory Services in order to perform the essential functions of the Financial Advisor position. The only license that Morgan Stanley required its Financial Advisers to hold as a condition of their employment is the Series 7 license.[9] *See* Ex. 2, at MSDW 02189; Masci Dep., at 10:20-11:2. Morgan Stanley only required its Financial Advisors to hold a Series 65 license if they were transacting business in Investment Advisory Services, and the company did not require its Financial Advisors to perform Investment Advisory Services work. Ex. 6, Resp. to Int. No. 9. Morgenstein himself stated in his November 20, 2003 letter to Mr. Masci that he sought the waiver so he could make more money, not so he could meet any job requirement imposed on him by Morgan Stanley. Ex. 32.[10] Morgan Stanley was not required to accommodate this non-essential function. *Hoffman v. Caterpillar*, 256 F.3d at 577.

Because it is undisputed that the Series 65 license was unnecessary for Morgenstein to perform the essential functions of the Financial Advisor position, Morgan Stanley had no legal obligation under the DCHRA to apply on Morgenstein's behalf for a waiver of the examination requirements for this license.

---

[9] Morgenstein actually held a Series 1 license, which is equivalent to the Series 7, and therefore sufficient to meet Morgan Stanley's Series 7 license requirement.

[10] Morgenstein did not even need a Series 65 license to make more money. At least two of the highest producing Financial Advisors in the D.C. branch did not have a Series 65 license. Masci Dep., at 54:16-55:4; Ex. 30, at MSDW 00702-00703; Sales Population for Washington, DC (br 642) (Ex. 38), at MSDW 03471, MSDW 03474.

### b.    Morgan Stanley's adherence to D.C. licensing regulations does not violate the DCHRA.

The U.S. Supreme Court has made clear that an employer who requires an employee to meet applicable federal regulations does not violate the ADA by enforcing those regulations even though the regulatory body itself may have the discretion to waive the requirements in individual cases.  In *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570-72, 577-78, 119 S.Ct. 2162, 2171-72, 2174, 144 L.Ed.2d 518 (1999), the Supreme Court held that the ADA did not prohibit the employer grocery store chain from requiring that its truckers, including the plaintiff, meet the vision requirements imposed by federal regulations.  *Id.*, at 577-78, 119 S.Ct. at 2174.  The Court held that the federal government's power to waive the vision requirements imposed by its regulations did not mean that the ADA prohibited employers from nevertheless requiring that their employees meet those requirements.  *Id.*

D.C. law requires that an individual transacting business in investment advisory services must sit for and pass the Series 65 examination.  DC Code § 31-5602.08(6); DC Reg. 1860.1.  The DISR has complete authority and discretion in granting or denying an exemption from that requirement.  DC Code § 31-5602.08(6); DC Reg. 1860.5; Miles Dep., at 57:4-58:10, 161:3-17.  Under *Albertson's*, the DCHRA does not prohibit Morgan Stanley from insisting that its Financial Advisers meet the licensing requirements imposed by D.C.'s laws and regulations - even if D.C. itself has the power to waive those requirements under certain circumstances.

> **c.    Morgan Stanley did not have the power to effectively accommodate Morgenstein by applying on his behalf for a waiver of the Series 65 license.**

The ADA does not require an employer to grant an employee an accommodation that is dependent on governmental discretion beyond the employer's power to control. *McDaniel v. AlliedSignal, Inc.*, 896 F.Supp. 1482, 1490-91 (W.D. Mo. 1995). Holding that the employer was not required to guarantee that its employee would receive a security clearance, the *McDaniel* Court noted that the employer lacked the power to give the employee the requested accommodation because the government had complete discretion to decide whether to award security clearances. *Id.*

Here too, Morgenstein's requested "accommodation" was not one that Morgan Stanley, as the employer, had the power to grant. Morgenstein's ultimate goal was to obtain a waiver of the D.C. Government's requirement that he take the Series 65 examination in order to transact business in Investment Advisor Services. As set forth above, only the DISR had the discretion and power to grant such a waiver. DC Code § 31-5602.08(6); DC Reg. 1860.5; Miles Dep., at 57:4-58:10, 161:3-17. As a matter of law, therefore, Morgan Stanley could not be required to apply for a waiver of this requirement on Morgenstein's behalf because it ultimately lacked the power to ensure that he received such a waiver. *McDaniel*, 896 F.Supp. at 1490-91.

> **3.    Morgenstein Cannot Establish that he Suffered any Damages as a Result of Morgan Stanley's Refusal to Apply on his Behalf for a Waiver of the Series 65 License.**

Morgenstein cannot establish that he suffered any damages as a result of Morgan Stanley's refusal to seek a waiver on his behalf, because he cannot show that the DISR would have granted the waiver. Morgenstein alleges that he was damaged by Morgan

Stanley's denial of his waiver requests because he was thereby prevented from transacting business in investment advisory services.  However, it is undisputed that in order for Morgenstein to transact such business, he was required to obtain a Series 65 license, and that in order to obtain such a license in D.C., he either had to take the Series 65 examination or obtain a waiver of this examination requirement *from the DSIR*.  It is also undisputed that the DISR had discretion to deny or grant Morgenstein a waiver regardless of whether Morgan Stanley requested it on his behalf.  Miles Dep., at 57:4-58:10, 161:3-17.

Thus, even if Morgenstein could establish that Morgan Stanley was required to seek a waiver of the Series 65 examination on his behalf, he cannot prove that the DSIR would have granted him the waiver.  Absent proof that he would have received the waiver of the Series 65 examination from the DSIR, Morgenstein cannot demonstrate that Morgan Stanley's refusal to apply for this waiver on his behalf caused him any damages.

**4.    Morgenstein's Reasonable Accommodation Claim Must be Dismissed Because He Refused to Participate with Morgan Stanley in the Interactive Process.**

The DCHRA does not require an employer to provide an employee with the accommodation of his choice.  *Pantazes v. Jackson*, 366 F.Supp.2d 57, 69 (D.D.C. 2005) (*citing Hankins v. Gap, Inc.*, 84 F.3d 797, 800-01 (6th Cir. 1996)).  "The employer providing the accommodation has the ultimate discretion to choose between effective accommodations."  *Pantazes*, 366 F.Supp.2d at 69 (*quoting* the ADA regulations (29 C.F.R. § 1630.377)).  When an employer denies an employee's accommodation request, the employer must engage the employee in an "interactive process" in order to determine what accommodation, if any, is appropriate.  *Evans v. Davis Memorial Goodwill*

*Industries*, 133 F.Supp.2d 24, 28 (D.D.C. 2000).  An employee who fails to respond to his employer's attempts to engage in this interactive process cannot later maintain a cause of action for failure to accommodate.  *McGill v. Callear*, 973 F.Supp. 20, 23 (D.D.C. 1997) *overruled in part on other grounds by McGill v. Munoz*, 203 F.3d 843 (D.C. Cir. 2000); *Equal Employment Opportunity Commission v. Sears, Roebuck & Company*, 417 F.3d 789, 806 (7th Cir. 2005); *see also Wells v. Shalala*, 228 F.3d 1137, 1145-46 (10th Cir. 2000) (affirming summary judgment in favor of employer on employee's claim of constructive discharge for failure to accommodate a disability, where employee "simply refused to engage in a good faith, interactive process with [his employer] in an attempt to resolve the problem").

Here, it is undisputed that Morgan Stanley engaged in the interactive process with Morgenstein, and that he refused to participate in that process and instead insisted on receiving the accommodation of his choice.  Shortly after Morgan Stanley first informed Morgenstein that it would not apply on his behalf to the DISR for a waiver of the Series 65 examination requirement, Mr. Masci's assistant, Ms. Andrea Rouse, informed Morgenstein:

> [Y]our request for an accommodation was not denied (that I know of) - your request for a *waiver* was denied.  We can start the process for an accommodation if that is what you want."

Ex. 27.  Ms. Rouse subsequently discussed with Morgenstein some of the possible accommodations available for taking the Series 65 examination, including taking the examination without any time limitations.  Morgenstein Dep., at 220:5-11.  Morgenstein declined to pursue any of the alternative accommodations proposed by Ms. Rouse, and instead continued to seek the accommodation of his choice (namely, that the company

apply for a waiver of the examination).[11]  Morgenstein Dep., at 220:10-13, 222:1-9.

Having refused to engage in good faith in the interactive process, Morgenstein cannot

prevail on his reasonable accommodation claim as a matter of law.

> **D.     Morgan Stanley Is Entitled to Summary Judgment on Morgenstein's Retaliation Claim (Count III).**

Based on the undisputed facts, Morgenstein cannot establish that Morgan Stanley

retaliated against him for asserting any right protected under the DCHRA.  The DCHRA

provides that "it shall be an unlawful discriminatory practice to coerce, threaten, retaliate

against or interfere with any person in the exercise or enjoyment of … any right granted

or protected under this chapter."  D.C. Code § 2-1402.61(a).  In order to establish a *prima*

*facie* case of retaliation, Morgenstein must prove:  (1) that he engaged in statutorily

protected activity; (2) that Morgan Stanley took an adverse personnel action against him;

and (3) that a causal connection existed between the two.  *Lemmons v. Georgetown*

*University Hosp.*, 431 F.Supp.2d 76, 91 (D.D.C. 2006).  If and only if Morgenstein is

able to carry this burden, the burden of production shifts to Morgan Stanley to articulate a

---

[11] Although Morgenstein may assert that no accommodation short of a complete waiver of the Series 65 examination would have been effective, he never provided Morgan Stanley with any medical evidence to support such an assertion.  Dr. Jacobson, whose December 27, 1999 report formed the basis for Morgenstein's claim that he was "disabled," testified that he did not recall ever discussing the Series 65 examination with Morgenstein, and further testified that he did not believe he was qualified to offer an opinion as to what, if any, work related accommodations Morgenstein might need. Jacobson Dep., at 31:3-32:8.  Similarly, Dr. Wachs, who authored the April 17, 2001 report on which Morgenstein also relied in asserting that he was disabled, testified that based on his evaluation of Morgenstein, he could not tell whether a waiver of the Series 65 examination would have been the only effective means of accommodating Morgenstein.  Wachs Dep., at 96:11-98:3.  In fact, Morgenstein testified in his own deposition that he never discussed the issue of what accommodations for his alleged disability might be appropriate with any of his doctors.  Morgenstein Dep., at 69:13-21. Furthermore, the report of Morgenstein's own medical expert, Dr. Kraskin, indicates that allowing Morgenstein additional time on the Series 65 examination would have been an effective method of accommodating his alleged disability.  *See* Ex. 37.

legitimate and nondiscriminatory reason for taking the actions of which Morgenstein complains. *Sullivan v. Catholic University of America*, 387 F.Supp.2d 11, 14 (D.D.C. 2005) (*citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-3, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

If Morgan Stanley is able to meet this burden by producing a credible reason explaining its actions, the presumption of retaliation raised by Morgenstein's *prima facie* case disappears and Morgenstein has the burden to show that Morgan Stanley's proffered reason is in fact pretext for retaliation. *Id.* Morgenstein must present evidence to show that those proffered reasons were not the true reason for the challenged action and that some other discriminatory motive was. *See, e.g., Weigert v. Georgetown University*, 120 F.Supp.2d 1, 22 (D.D.C. 2000). Morgenstein cannot meet this burden simply by offering his own speculations and allegations. *See, e.g., Carpenter v. Federal Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999). Where the evidence of "pretext" on which an employee relies is merely colorable or not significantly probative, the employee's claim will not suffice to withstand summary judgment. *Weigert*, 120 F.Supp.2d at 22 (*citing Johnson v. Digital Equip. Corp.*, 836 F.Supp. 14, 18 (D.D.C. 1993)).

Applying this standard, Morgenstein cannot prevail on his retaliation claim because he cannot make out a *prima facie* case of retaliation, and because there is no evidence that Morgan Stanley's legitimate non-discriminatory reason for discussing his retirement with him in November of 2003 was pretextual.

### 1.    Morgenstein Cannot State A *Prima Facie* Case of Retaliation.

Morgenstein cannot establish any of the elements of a *prima facie* case of retaliation. The undisputed evidence establishes that: (1) Morgenstein's November 20,

2003 resurrection of his request that Morgan Stanley apply on his behalf for a waiver of

the Series 65 examination requirement was not an act protected under the DCHRA; (2)

Morgenstein was not constructively discharged by Morgan Stanley and therefore did not

suffer any adverse employment action; and (3) no causal connection exists between

Morgenstein's alleged protected activity and his retirement.

> **a.    Morgenstein's November 20, 2003 request that Morgan Stanley apply for a waiver of the Series 65 examination requirement was not a "protected act" under the DCHRA.**

A plaintiff cannot maintain a cause of action for retaliation under the DCHRA *in*

*the absence of a right protected by the Act*.  *Passer v. American Chemical Society*, 935

F.2d 322, 332 (D.C. Cir. 1991).  An employee who requests an accommodation, but who

subsequently refuses to engage in the interactive process, does not assert any right

protected under the DCHRA by later insisting on receiving the same accommodation he

originally requested.  *See Peeples v. Coastal Office Products, Inc.*, 203 F.Supp.2d 432,

466 (D.Md.,2002) (an employee does not engage in protected activity where he refuses to

participate in the interactive process, because the interactive process is critical to a proper

invocation of the employee's rights under the ADA).  The employee cannot assert a

retaliation claim under such circumstances.

Here, the undisputed facts show that Morgenstein was not asserting any protected

right in November 2003.  In May 2002, after informing Morgenstein that it would not

apply for a waiver of the Series 65 examination requirement on his behalf, Morgan

Stanley attempted to engage him in the interactive process to identify other possible

accommodations.  Morgenstein refused to participate in this interactive process, instead

insisting that Morgan Stanley grant him the accommodation of his choice.  Thus, on

November 20, 2003, when he once again demanded that Morgan Stanley apply on his behalf for a waiver of the Series 65 examination over a year after having refused Morgan Stanley's efforts to engage in the interactive process, Morgenstein was not engaging in protected activity under the DCHRA. For this reason alone, Morgenstein cannot assert a *prima facie* case of retaliation.[12]

### b.    Morgenstein did not suffer any adverse action.

Morgenstein's retaliation claim also fails because he did not suffer any adverse action. Because an employee's retirement decision is presumed to be a voluntary act (*Keyes v. District of Columbia*, 372 F.3d 434, 439 (D.C. Cir. 2004)), Morgenstein's claim of retaliation necessarily rests on a theory of "constructive discharge" (*Katradis v. Dav-El of Washington, DC*, 846 F.2d 1482, 1485 (D.C. Cir. 1988)). In order to establish that he was constructively discharged, Morgenstein must prove that Morgan Stanley created or tolerated "discriminatory working conditions that would drive a reasonable person to resign." *Mayers v. Laborers' Health & Safety Fund of North America*, 404 F.Supp.2d 59, 61 (D.D.C. 2005) (*quoting Katradis*, 846 F.2d at 1485).

Where such circumstances do not exist, an employee may show that his resignation was involuntary by proving that it was the product of duress. *Keyes*, 372 F.3d at 439. In order to establish that his resignation was the product of duress, Morgenstein must show that: (1) Morgan Stanley imposed the terms of his resignation; (2) Morgenstein's circumstances permitted no alternative but to accept those terms; and (3) those circumstances were the result of improper acts of Morgan Stanley. *Keyes*, 372 F.3d

---

[12] To hold otherwise would permit employees to manufacture retaliation claims at any point in the employment relationship by repeatedly resurrecting stale accommodation requests.

at 439 (*quoting Schultz v. United States Navy,* 810 F.2d 1133, 1136 (Fed.Cir.1987)).

"*[W]here an employee is faced merely with the unpleasant alternatives of resigning or being subject to removal for cause, such limited choices do not make the resulting resignation an involuntary act*." *Id.* (emphasis added).

Morgenstein cannot establish that he was constructively discharged under either analysis. He cannot establish that he was constructively discharged under *Katradis* because it is undisputed that he was not subjected to any *discriminatory conditions*. The only allegedly "discriminatory condition" to which Morgenstein claims he was subjected was Morgan Stanley's refusal to apply on his behalf for a waiver of the Series 65 examination. Because the DCHRA did not require Morgan Stanley to give Morgenstein the "accommodation" of his choice, Morgan Stanley did not subject Morgenstein to any discriminatory conditions necessary to support the legal standards of a constructive discharge.

Nor can Morgenstein establish that his decision to retire was the product of duress. Even accepting as true his assertion that Mr. Masci told him during their November 24, 2003 meeting that he could "resign or be fired,"[13] this assertion is insufficient to establish that his resignation was involuntary. Just as the employee in *Keyes* had a choice to resign or fight her termination, so too could Morgenstein have fought Mr. Masci's alleged proposal to terminate him by filing an internal complaint pursuant to Morgan Stanley's Non-Discrimination and Anti-Harassment policy. Human Resources Employee Guide (Ex. 39), at MSDW 01943-47. However, like the employee in *Keyes*, he elected not to do so.

_____

[13] Morgan Stanley denies that Mr. Masci made any such statement, but accepts Morgenstein's assertion as true for purposes of summary judgment.

Furthermore, following the November 24, 2003 meeting with Mr. Masci, Morgenstein had ample time in which to consider whether or not he would retire. He did not notify Mr. Masci that he had elected to retire a week after their meeting. Ex. 34. And Morgenstein set his proposed retirement date for December 31, 2003, leaving him with ample time to reconsider his decision. *Id.* In addition, at the time Morgenstein claims he was given the choice to "resign or be fired," he already had consulted with legal counsel concerning his employment situation at Morgan Stanley. Morgenstein Dep., at 189:19-190:7, 209:9-20.

Finally, in connection with their retirement discussions, Morgan Stanley offered Morgenstein the opportunity to enter a Sunset Agreement as a retirement incentive. Morgenstein Dep., at 204:9-205:7; Masci Dec., at ¶26. Under the proposed Sunset Agreement, Morgenstein would receive (in addition to his regular retirement benefits) 50% of any revenues generated by his transferred accounts for the rest of his life.[14] Morgenstein Dep., at 198:14-199:10; Ex. 31. Morgenstein chose not to enter the Sunset Agreement. These undisputed facts establish that Morgenstein's decision to retire from Morgan Stanley was not the product of duress.

Because he cannot establish that he suffered any adverse action, Morgenstein cannot establish a *prima facie* case of retaliation.

> **c.    Morgenstein cannot demonstrate the existence of a causal connection between his alleged protected activity and his alleged forced retirement.**

Morgenstein's retaliation claim also fails because he cannot establish the existence of a causal connection between his "protected activity" and "forced" retirement.

---

[14] This was a deal that Morgan Stanley offered especially for Morgenstein. The standard offer was limited to 3 years. Masci Dep., at 49:22-50:7.

Morgenstein's retaliation claim rests solely on his allegation that Mr. Masci "forced him to resign" shortly after he requested that Morgan Stanley apply on his behalf for a waiver of the Series 65 examination.  Complaint, at ¶ 16.  However, it is undisputed that ***Morgan Stanley was well aware that Morgenstein had requested that it apply on his behalf for a waiver of the Series 65 examination requirement for over a year and a half before his alleged forced retirement***.

Morgenstein originally asked Morgan Stanley to apply on his behalf for a waiver of the Series 65 examination requirement in early 2002.  Morgenstein Dep., at 121:3-122:9; Ex. 24.  (And Morgan Stanley first denied his request on March 25, 2002 (if not earlier).  *Id.*)  In fact, Morgenstein admits that by May 2002 he understood that the issue was put to rest.  Morgenstein Dep., at 147:20-149:4.  Yet, Morgenstein's retaliation claim is based on alleged action that Morgan Stanley took over a year and a half later - in November 2003.  Such a long period of time between the alleged protected activity and the alleged adverse act cannot support a retaliation claim.  *See, e.g., Broderick v. Donaldson*, 338 F.Supp.2d 30, 43 (D.D.C. 2004) (*citing Brodetski v. Duffey,* 199 F.R.D. 14, 20 (D.D.C. 2001)) (this Court refusing to infer causation when the time lapse between the employer's discovery of the alleged protected activity and the challenged adverse action is more than a year).  As a matter of law, therefore, Morgenstein cannot establish a causal connection between his alleged protected activity and the alleged adverse action of which he complains.

Even if Morgenstein were to assert that his November 20, 2003 letter to Mr. Masci was the only "protected act" relevant to the question of causation, he still cannot prevail on his retaliation claim.  ***When an employer reaches its decision to take adverse***

***action against an employee or begins to engage in behavior that the employee claims is
retaliatory <u>before</u> the employee engaged in the alleged protected activity, the employee
cannot demonstrate a causal connection between his protected activity and the alleged
adverse action.*** *See, e.g., Welzel v. Bernstein*, 2006 WL 1876524, at *15 (D.D.C. 2006)
(employee could not maintain a cause of action for retaliation where employer had
reached its decision that employee should be terminated before employee's alleged
protected activity); *Bennett v. Henderson*, 15 F.Supp.2d 1097, 1113-14 (D.Kan. 1998)
(employee could not show causal connection between protected activity and adverse
action where employer had engaged in the same behavior before the protected activity).

Here, it is undisputed that Mr. Masci had begun suggesting that Morgenstein
consider retirement options in early 2003 - ***before*** Morgenstein sent Mr. Masci the
November 20, 2003 letter.  Morgenstein Dep., at 199:16-200:5.  Morgenstein admits that
at the time he met with Mr. Masci in November of 2003, "Ron [Masci] was hassling me
about getting out for quite a while." *Id.*, at 199:16-20.  Therefore, it cannot be disputed
that the behavior constituting the alleged adverse action began several months before
Morgenstein resurrected his request for accommodation in November of 2003.

For these reasons, Morgenstein cannot establish a causal connection between his
November 2003 request and the alleged adverse action and therefore cannot establish a
*prima facie* case of retaliation.

> **2.    Morgan Stanley Had Legitimate Non-Discriminatory Reasons
> for Suggesting that Morgenstein Retire, and Morgenstein
> Cannot Show that Those Reasons were Pretextual.**

Even accepting as true Morgenstein's version of his November 24, 2003 meeting
with Mr. Masci, Morgan Stanley had legitimate, non-discriminatory reasons for engaging

38

in this discussion with him.  Morgenstein cannot dispute that his annual gross revenue production for each of the 2001, 2002 and 2003 calendar years fell below the $200,000 annual gross revenue production that Morgan Stanley expected from its Financial Advisors with over eight years of experience.  *See* Ex. 30, at MSDW 00703; Ex. 29, at MSDW 01848.  He cannot dispute that during the final three years of his employment, he was among the lowest producing Financial Advisors in the D.C. branch with over eight years of experience.  Ex. 30, at MSDW 00703.  And he cannot dispute that during the November 24, 2003 meeting, Mr. Masci discussed Morgenstein's low revenue production in connection with Morgenstein's retirement options.  Finally, he cannot dispute that in early 2003 Mr. Masci had begun to suggest that he consider retirement due to his low revenue production.[15]  This undisputed evidence satisfies Morgan Stanley's burden of offering a legitimate non-discriminatory reason for discussing Morgenstein's retirement options with him in November of 2003.

Morgenstein cannot present evidence that Morgan Stanley's proffered reason was not the true reason for the challenged action and that some other discriminatory motive was.  As set forth above, he cannot dispute that his revenue production was low during the final three years of his employment, and particularly so in the last year of his employment.  Ex. 30, at MSDW 00703.  Nor can he dispute that Mr. Masci was having similar retirement discussions with other low-performing Financial Advisors - employees

---

[15] Nor did Mr. Masci single-out Morgenstein as the only employee with whom he discussed the issue of retirement.  Following the 2002 reduction in force, Mr. Masci had grown concerned that Morgenstein and another low-performing Financial Advisor, who was not disabled and who had not requested any disability based accommodations, in the D.C. branch would be vulnerable to termination in any future reduction in force.  Masci Dec., at ¶ 21.  Mr. Masci therefore met with these employees to advise them of their retirement options.  Masci Dec., at ¶ 21.

who had not sought a waiver of the examination on the basis of a disability.  Masci Dec.,

at ¶ 21.  As such, Morgenstein cannot present sufficient facts to challenge as pretextual

Morgan Stanley's legitimate, non-discriminatory reasons for suggesting in November

2003 that he consider retiring.

The mere fact that Morgenstein resurrected his request that Morgan Stanley apply

for a waiver of the Series 65 examination shortly before the November 24, 2003 meeting

is insufficient to show pretext - particularly given the fact that he had made the very same

request on numerous occasions in early- and mid-2002 without suffering any adverse

action.  In *Weigert*, this Court held that a plaintiff alleging ADA retaliation could not

survive summary judgment by simply pointing to evidence of the timing of her discharge,

where the employer presented unrebutted evidence of lengthy, continuous and increasing

problems with the employee's behavior.  120 F.Supp.2d at 22.  The undisputed evidence

in this case provides even less support for a finding of pretext than that in *Weigert*.  As

set forth above, Morgan Stanley was aware of Morgenstein's alleged protected activity

for over a year and a half before November 2003.  And Mr. Masci had begun to have

retirement discussions with Morgenstein in early 2003 - several months before

Morgenstein's November 20, 2003 request.

Because Morgenstein cannot present sufficient evidence to support a showing of

pretext, his retaliation claim must be dismissed.

E.    **Morgan Stanley Is Entitled to Summary Judgment On Morgenstein's**
      **Claim That it Discriminated Against Him in the Terms and**
      **Conditions of His Employment on the Basis of His Alleged Disability**
      **(Count I).**

Finally, summary judgment is appropriate as to Morgenstein's claim that Morgan

Stanley discriminated against him with respect to the terms and conditions of his

employment on the basis of his disability (Count I).  Insofar as Count I is based on

Morgan Stanley's denial of Morgenstein's request that it apply on his behalf for a waiver

of the Series 65 examination requirement, it is duplicative of Morgenstein's "reasonable

accommodation" claim (Count II) and must be dismissed for the same reasons set forth in

Sections III.B and C above.  Insofar as Count I is based on his alleged constructive

discharge, Morgenstein cannot make a *prima facie* case of disability discrimination or

offer sufficient evidence to rebut Morgan Stanley's legitimate, non-discriminatory

reasons for discussing his retirement with him in November of 2003.

To establish a *prima facie* case of disability discrimination, Morgenstein must

show: (1) that he has a disability within the meaning of the DCHRA; (2) that he is

otherwise qualified to perform the essential functions of the position with or without

reasonable accommodations; (3) that he was subject to some form of adverse action and

(4) that a causal connection exists between the alleged disability and the adverse action.

*Weigert*, 120 F.Supp.2d at 6.  The undisputed evidence in this case establishes that

Morgenstein cannot meet the first, third or fourth prongs of this test.

With respect to the first prong, it is undisputed that Morgenstein was not disabled

within the meaning of the DCHRA.  Morgan Stanley incorporates by reference herein its

discussion in Section III.C.1 above with respect to Morgenstein's "reasonable

accommodation" claim (Count II).  With respect to the third prong, it is undisputed that

Morgenstein was not subjected to any adverse action because he voluntarily retired from

his employment.  Morgan Stanley incorporates by reference herein its discussion in

Section III.D.1.b. above with respect to Morgenstein's retaliation claim (Count III).

Finally, with respect to the fourth prong, there is no evidence from which a reasonable

jury could infer that Morgenstein's alleged forced retirement was causally connected to his alleged disability.  It is undisputed that Morgan Stanley was aware of Morgenstein's disability claim for roughly seven years before he retired (during which time it made efforts to accommodate his condition).  Morgenstein Dep., at 24:6-21, 45:8-49:6. Because Morgenstein cannot establish a *prima facie* case of disability discrimination, Count I must be dismissed.

Finally, even if Morgenstein could establish a *prima facie* case of disability discrimination, Morgan Stanley has set forth legitimate, non-discriminatory reasons for discussing Morgenstein's retirement with him in November of 2003; and, as set forth in Section III.D.2. above in Morgan Stanley's discussion of his retaliation claim, Morgenstein cannot show that these reasons were a pretext for discrimination.

For these reasons, Morgan Stanley is entitled to judgment as a matter of law on Count I of Morgenstein's Complaint.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Morgan Stanley respectfully requests that this Court grant its motion for summary judgment in its entirety.

Dated:  August 28, 2006                    Respectfully submitted,


                                           _____/s/_____

                                           John F. Scalia (admitted *pro hac vice*)
                                           Maria E Hallas D.C. Bar 436529
                                           Matthew H. Sorensen D.C. Bar 492130
                                           Greenberg Traurig LLP
                                           800 Connecticut Avenue, N.W.
                                           Suite 500
                                           Washington, D.C.  20006
                                           (202) 533-2312 (office)
                                           (202) 261-2668 (fax)

                                           *Counsel for Defendant*
                                           *Morgan Stanley DW Inc.*

43

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on August 28, 2006, a copy of the

foregoing DEFENDANT MORGAN STANLEY DW, INC.'S  MOTION FOR

SUMMARY JUDGMENT, MEMORANDUM OF POINTS AND AUTHORITIES IN

SUPPORT THEREOF AND EXHIBITS were served by hand delivery and electronic

mail to the following:

Michael G. Kane, Esq,
Cashdan & Kane, PLLC
1150 Connecticut Avenue, N.W.
Suite 900
Washington, D.C. 20036
*Counsel for Plaintiff Norman Morgenstein*

_____/s/_____
Matthew H. Sorensen