# DEFENDANT'S EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| NORMAN L. MORGENSTEIN )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MORGAN STANLEY DW, INC. )<br>)<br>      Defendant. ) | Civil Action No. 05-2123 (JR) |

### DECLARATION OF RONALD MASCI

I, Ronald Masci declare that:

1. I am over the age of eighteen and of sound mind. I have personal knowledge of the facts described below. I have been promised no benefit nor threatened with any harm to supply this declaration. I give this declaration voluntarily and in connection with the case mentioned above.

2. Morgan Stanley is a global financial services firm that maintains market positions in its three business segments: securities; asset management; and credit services. The securities business segment includes both institutional and individual securities operations.

3. Morgan Stanley operates its retail securities business through a network of approximately 450 offices, called Branches, dispersed nationwide. Each of these Branches is managed by a Branch Manager, who is ultimately responsible for the daily operation and administration of the Branch, including all personnel and client-related matters. The Branch is further staffed by a cadre of brokers in training (Financial Adviser Trainees), brokers (Financial Advisers), Sales Assistants and Operations/Compliance personnel.

1

4.  Morgan Stanley provides: (1) full-service brokerage options for investors seeking financial advice, and (2) financial advisory services for high net worth clients. Morgan Stanley offers a broad range of securities and investment products that are supported by the firm's investment banking, research, asset management, execution and operational resources.

5.  I was employed by Morgan Stanley DW, Inc. ("Morgan Stanley") as the Branch Manager of the Washington, D.C. Branch Office from 1978 through approximately 2004, at which point I became Morgan Stanley's Executive Director for the Washington, D.C. area. I held this position until approximately June 30, 2006, when I retired from Morgan Stanley.

6.  From the date I became Branch Manager of the Washington, D.C. Branch Office in 1978 through January, 2005 I was responsible for the supervision of the Financial Advisers in the Washington, D.C. Branch Office, including Norman Morgenstein ("Morgenstein").

7.  During his employment Morgenstein made a number of vague claims that he was "disabled." He did not, however, specifically state what his alleged disability was; nor did he ever provide any medical records explaining the nature of his alleged disability.

8.  In early 2002, Morgenstein made several requests that Morgan Stanley apply on his behalf for a waiver of the Series 65 examination to the District of Columbia Department of Insurance Securities Regulation ("DISR") on the basis of his alleged disability.

9.  On a number of occasions in 2002, Morgan Stanley informed Morgenstein that it would not apply for the waiver as he requested.

10. It was my understanding that, during the period in which Morgenstein made his requests, the laws of the District of Columbia required that individuals who transacted business in investment advisory services, one of the many investment products that Morgan Stanley offers to its clients, register with the DISR by taking and passing the Series 65 examination.

2

11.     Morgenstein was not required to hold a Series 65 license in order to be employed as a Financial Adviser in Morgan Stanley's Washington, D.C. Branch Office.  The only license Morgenstein was required to hold in order to work as a Financial Adviser for Morgan Stanley was the Series 7 license, which he had.

12.     Although Morgan Stanley requires that Financial Advisers who transact business in investment advisory services, obtain the Series 65 license, the ability to transact business in that product area is not essential to the Financial Advisor position.  Furthermore, there are several product areas in which Financial Advisers can transact business that do not require the Series 65 license.  In fact, some of the highest performing and most profitable Financial Advisers in the Washington D.C. Branch Office, including Theodore Hart and John Prosperi, do not have a Series 65 license, and did not have such a license during the time in which Morgenstein made his waiver requests.

13.     I never required Morgenstein or any other Financial Adviser in the Washington, D.C. Branch Office to transact business in investment advisory services, or perform any other work requiring a Series 65 license.

14.     Although Morgenstein never obtained a Series 65 license from the District of Columbia, he continued to work for Morgan Stanley until December 31, 2003, when he retired.

15.     For each of the 2001, 2002, and 2003 calendar years, Morgenstein's gross annual revenue production was less than $150,000 – a very low level of production for a Financial Adviser with his level of experience.  Indeed, from 2001 through 2003, Morgenstein ranked among the lowest producing Financial Advisers with eight or more years of experience in the entire Washington, D.C. Branch Office.

16. During the period from 2001-2003 Morgan Stanley expected its Financial Advisers with eight or more years of experience to produce at least $200,000 in revenue each year. Those Financial Advisers who did not were paid at a lower rate of commission as a penalty. This lower commission rate was commonly referred to within Morgan Stanley as the "penalty box."

17. Morgenstein's low level of production during the final years of his employment resulted in him being placed in the "penalty box."

18. In 2002, Morgan Stanley effected a reduction in force in which one of the groups of employees initially identified for termination consisted of those Financial Advisers with eight or more years of experience who had generated less than $120,000 in gross revenue (annualized for 2002). Although Morgenstein barely managed to escape inclusion in the 2002 reduction in force, his continuing pattern of poor production led me to conclude that, unless he drastically improved his level of productivity immediately, he would likely be included in a future reduction in force.

19. Morgan Stanley's national management is responsible for deciding whether a reduction in force will take place. As a Branch Manager, I did not believe that I had control over whether Morgenstein or any other employee of my Branch Office would be included in a reduction in force.

20. Because a number of retirement options existed which would allow Morgenstein to end his relationship with Morgan Stanley in what I believed to be a more dignified and financially beneficial manner than being included in a reduction in force, I informed Morgenstein of these alternatives.

21. I also had similar conversations with another Financial Adviser who I believed to be in danger of being included in a future reduction in force due to his low level of revenue

production. This other Financial Advisor was not disabled, nor had he made any claim that he was disabled.

22. I first began discussing the possibility of retirement with Morgenstein in early 2003. During these discussions, I informed Morgenstein that his gross annual revenue production was very low.

23. These discussions continued through the summer of 2003, when Morgenstein was presented with a document known as a "Sunset Agreement". The Sunset Agreement was a legal document in which a retiring Morgan Stanley Financial Adviser would partner with a Financial Adviser that was still employed by the firm and transfer the accounts under his management to that Financial Adviser in exchange for fifty percent of any commissions generated by these accounts. Although such agreements normally last only three years, the particular agreement that was offered to Morgenstein would have lasted for the rest of his life.

24. On November 20, 2003, Morgenstein sent me a letter in which he once again repeated his request that Morgan Stanley apply on his behalf for a waiver of the Series 65 examination requirement. This letter concerned me because it left me with the clear impression that Morgenstein was not focused on making immediate efforts to improve his gross annual revenue production, and instead was attempting to resurrect an issue that had long since been resolved.

25. On November 24, 2003, I met with Morgenstein regarding his letter, at which time I informed him that Morgan Stanley had long ago resolved the issue of his request that the firm apply on his behalf for a waiver of the Series 65 examination requirement, and that it would not change its previous decision with regard to this request.

5

26. After responding to Morgenstein's renewed request for a waiver of the Series 65 examination requirement, I again addressed the issue of his possible retirement. During this conversation, I called attention to his low level of production and noted that his numbers left him vulnerable to inclusion in a future reduction in force. I noted that I did not believe that I had the power to prevent the termination of any Financial Adviser who was identified for inclusion in such a reduction in force based on their low productivity. I also suggested that Morgenstein reconsider the retirement package set forth in the "Sunset Agreement" that he and I had previously discussed earlier that year. This retirement option would not have been available to Morgenstein had he been included in a future reduction in force.

27. During the November 24, 2003 meeting I did not insist that Morgenstein resign or be terminated, or otherwise threaten him with termination. Instead, I simply informed him that it was possible that Morgan Stanley might initiate another reduction in force similar to the one that had taken place in 2002, and that given his low level of productivity he might be at risk of termination. I also stated that I believed that retirement was a preferable alternative to facing the possibility of being included in a reduction in force.

28. One week after the November 24, 2003 meeting Morgenstein contacted Morgan Stanley's retirement department and requested a retirement date of December 31, 2003.

29. Around the same time, Morgenstein sent me an e-mail message in which he claimed that I had told him that he could resign or be terminated. This e-mail message mischaracterized the nature of our November 24, 2003 meeting. However, believing that it would be futile to attempt to continue to debate this subject with Morgenstein, I did not respond to his mischaracterization of our November 24, 2003 conversation except to confirm that his proposed retirement date of December 31, 2003 was acceptable.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 21 day of August, 2006.

                                                  _____
                                                            Ronald Masci