# DEFENDANT'S EXHIBIT 12

```
1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2
       - - - - - - - - - - - - -x
3   NORMAN L. MORGENSTEIN,       :
                                 :
4           Plaintiff,           :
                                 :
5        vs                      :  Civil Action
                                 :  No. 05-2123 (JR)
6   MORGAN STANLEY DW, INC.,     :
                                 :
7           Defendant.           :
       - - - - - - - - - - - - -x
8
                         Washington, D.C.
9
                         Monday, June 26, 2006
10
11  Deposition of:
12                  HARRY WACHS
13  called for examination by counsel for Defendant,
14  pursuant to notice, commencing at 2:38 p.m., at
15  the Law Offices of Greenberg Traurig, L.L.P., 815
16  Connecticut Avenue, N.W., 7th Floor, Washington,
17  D.C., before Delores M. Green, a Notary Public in and
18  for the District of Columbia, when were present on
19  behalf of the respective parties:
20
21                                          ORIGINAL
22
```

```
 1   APPEARANCES:
 2        On behalf of the Plaintiff:
 3             MICHAEL G. KANE, ESQ. (via Telephone)
               Cashdan & Kane, P.L.L.C.
 4             1150 Connecticut Avenue, N.W., Suite 900
               Washington, D.C. 20036-4129
 5             (202) 862-4353
 6
          On behalf of the Defendant:
 7
               MATTHEW H. SORENSEN, ESQ.
 8             Greenberg Traurig, L.L.P.
               1750 Tysons Boulevard, Suite 1200
 9             McLean, Virginia 22102
               (703) 749-1348
10
11
12
13
14
15
16
17
18
19
20
21
22
```

1                    I-N-D-E-X

2   WITNESS:                                          PAGE:

3   HARRY WACHS

4       Examination by Mr. Sorensen              4, 124

5       Examination by Mr. Kane                     114

6

7   EXHIBIT:                                          PAGE:

8   No. 1   Subpoena & Notice of Deposition          11

9   No. 2   VCDC Phone Inquiries                     18

10  No. 3   Application to the Vision &
            Conceptual Development Center            23
11

    No. 4   Handwritten Notes                        36
12

    No. 5   Progress Report                          69
13

    No. 6   Handwritten Notes                       127
14

                         - oOo -

15

16

17

18

19

20

21

22

Case 1:05-cv-02123-JR   Document 15-14   Filed 08/28/2006   Page 5 of 16

Page 4

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2    Whereupon,
 3                    HARRY WACHS,
 4    was called as a witness and, having been first duly
 5    sworn by the Notary Public, was examined and
 6    testified as follows:
 7             EXAMINATION BY COUNSEL FOR DEFENDANT
 8             BY MR. SORENSEN:
 9         Q.   Good afternoon, Dr. Wachs.  My name is Matt
10    Sorensen.  I represent Morgan Stanley.  We're the
11    defendant in this case.  With us by phone is
12    plaintiff's counsel, Michael Kane.
13             Dr. Wachs, could you state your name, full
14    name for the record and spell your name.
15         A.   Harry Wachs, H-A-R-R-Y W-A-C-H-S.
16         Q.   And could you state your address for the
17    record, please.
18         A.   2460 Huntingfields Drive, Huntingtown,
19    Maryland 20639.
20         Q.   And could you tell me if you have ever been
21    deposed before?
22         A.   Yes.
```

GregoryEdwards, LLC
1.866.4 Team GE ~ 202.347.9300

1   anything about the work-based accommodation he was

2   seeking?

3       A.   Well I certainly don't recall it and I

4   don't see it in my notes.

5       Q.   And do you recall if Mr. Morgenstein said

6   anything about the Series 65 Examination?

7       A.   This what?

8       Q.   A Series 65 Examination?

9       A.   A Series 65 Examination; is that what

10  you're saying?

11      Q.   Yes.

12      A.   I don't even know what that is.

13      Q.   And you don't recall if Mr. Morgenstein

14  mentioned anything about that?

15      A.   Nothing in my notes.

16      Q.   And you don't have any other independent

17  recollection of whether --

18      A.   No.

19      Q.   How many times did you see Mr. Morgenstein?

20      A.   Just the one time on March 23rd.

21      Q.   And did you have any additional

22  communication with Mr. Morgenstein after the

```
 1   certain ages.  All right.  And that's what he was
 2   measured against.
 3        Q.   So your experience?
 4        A.   Yes.
 5        Q.   And what were the results of the logic
 6   test?
 7        A.   He did very well on that, all on
 8   everything.
 9        Q.   So he did as would have been expected?
10        A.   Maybe better.
11        Q.   And the general movement test, how did he
12   perform on that?
13        A.   Very well.
14        Q.   Any problems with his balance?
15        A.   No.
16        Q.   And how did he do on the speed reading
17   test?
18        A.   A hundred and seventy words a minute at an
19   80 percent comprehension.  That's below what one
20   would expect for a person in his position and of his
21   age.
22        Q.   Is it abnormally low?
```

1   A.   Not abnormally low.  But certainly low.

2   Q.   And as I understand, 80 percent

3  comprehension is sort of on the low end of the median

4  for the college graduate; is that correct?

5   A.   Well, let's see a college graduate.  For a

6  person that's doing the work that he was doing at the

7  time, yeah.  Had he gotten to that level.

8   Q.   So he was on the low end of the median?

9   A.   Yeah.

10  Q.   In terms of his comprehension, that is?

11  A.   No.  That would be speed.  Comprehension

12  is, I would say, 80 to a hundred is expected.  Eighty

13  percent is not real low.

14  Q.   Okay.  So he was on the low end of the

15  median for his speed --

16  A.   Yes.

17  Q.   -- but at average level for his

18  comprehension?

19  A.   Just at average, yeah.

20  Q.   And how did the exam for the health of his

21  eye turn out?

22  A.   Fine.

1    Q.   In terms of speed in which Mr. Morgenstein

2 read, would the fact that he admittedly did not read

3 often, would that potentially impact the speed at

4 which he read?

5    A.   Probably.

6    Q.   And so if he didn't read often, he might

7 read slower than someone who read often?

8    A.   Yes.

9    Q.   And in the speed reading exam, you tested

10 him for comprehension and you said his comprehension

11 was average, correct?

12    A.   Yeah.

13    Q.   And after you concluded your examination of

14 Mr. Morgenstein, did you reach any formal diagnosis

15 of his condition?

16    A.   Well, I couldn't give it a specific

17 diagnosis.  I don't work that way.  But I found gaps

18 in his functioning that could be corrected.  It could

19 be improved, I should say.

20    Q.   And what do you mean by they could be

21 improved?  You said corrected first.  Why did you

22 back off that and say improved?

1   A.   Because corrected is too mechanical a word.

2   Q.   But these areas that Mr. Morgenstein in

3   which he was somewhat deficient, you believe that

4   they could be improved?

5   A.   Yes.

6   Q.   And how much so?

7   A.   Probably a hundred percent.  Let me stop

8   for just a minute.  I do therapy.  And any therapy by

9   definition is very highly weighted toward the

10  person's desire and effort.  So if he really wanted

11  to improve them, they could improve.  If he didn't

12  want to improve them, nothing would happen.

13  Q.   And did you ever form any impression as to

14  whether Mr. Morgenstein really wanted to improve

15  these deficiencies?

16  A.   Well that's hard for me to say, because I

17  didn't see him that much and he never came back.  All

18  I know is that I examined him on 3/23.  I had a

19  conference on 4/4.  I get a call on 7/31 that says

20  don't bother me.  Put me inactive.

21  Q.   And do you believe that he was put on

22  inactive because he did not have any desire to pursue

```
1    specific.  In other words, I wasn't saying you
2    definitely have to see a Cranio-Sacral man.  I said
3    take a look at it.
4         Q.   And do you know whether Mr. Morgenstein
5    ever sought out Cranio-Sacral adjustments?
6         A.   I have no idea.
7         Q.   And do you know whether he sought out
8    occupational therapy?
9         A.   I have no idea.
10        Q.   And do you know if he consulted with the
11   Spectrum Center for auditory integration?
12        A.   I have no idea.
13        Q.   And do you know whether he saw Kelley
14   Dorfman?
15        A.   I have no idea.
16        Q.   And you said that he never sought any
17   additional treatment from you?
18        A.   That's correct.
19        Q.   And do you know if he sought any additional
20   treatment from anyone else?
21        A.   I have no idea.
22        Q.   Well let me back up.  What is your area of
```

1  Series 65, is it?

2     Q.   Yes.

3     A.   -- Series 65 exam is going to involve

4  things that would normally be for an engineer or an

5  architect or nuclear scientist or a person that just

6  does reading.  If his job is just reading, well then,

7  I see no reason why he couldn't have taken that exam.

8  But I don't want to misinform.  I don't think that's

9  putting me in a fair thing, in his favor or against

10 him.

11    Q.   Okay.  Well let me back up and ask the

12 question piece by piece.

13         Without information on what exactly was in

14 the examination, you couldn't tell whether a complete

15 waiver of the examination is the only appropriate

16 accommodation; is that correct?

17    A.   You're absolutely right.

18    Q.   And Mr. Morgenstein never told you what was

19 in the examination?

20    A.   That's correct.

21         MR. KANE:  That's been asked and answered a

22 lot of times.

1       MR. SORENSEN:  Okay.

2       THE WITNESS:  What did he say?

3       MR. SORENSEN:  The objection was asked and

4  answered.

5       BY MR. SORENSEN:

6       Q.   You didn't have any independent information

7  on what was in this Series 65 exam; is that correct?

8       A.   Never heard of it.

9       Q.   Okay.  So having acknowledged that

10 Mr. Morgenstein never told you what was in the exam

11 and that you didn't know independently what was in

12 the exam and having already testified that without

13 knowing that information, you couldn't tell whether a

14 complete waiver of the examination is the only

15 appropriate accommodation?  You could not tell as of

16 the date that you wrote the report that we've labeled

17 as Exhibit 5 whether a complete waiver of the

18 examination was the only appropriate accommodation;

19 is that correct?

20      A.   That's correct.

21      Q.   And in fact, you previously testified that

22 you believed that it's possible that a reader or some

```
 1   other accommodation may be appropriate; is that
 2   correct?
 3        A.   Depending on the type of exam, yes.
 4        Q.   I just have a couple of questions regarding
 5   your background.
 6        A.   My background?
 7        Q.   Yes.  And then I think I'll be done.
 8             What's your educational background?
 9   Actually let me ask that another way.
10             What college did you attend?
11        A.   Pennsylvania State College of Optometry.
12        Q.   And prior to that, did you attend an
13   undergraduate?
14        A.   No.  I was too busy protecting America.
15        Q.   And what branch of the service was that in?
16        A.   The Army Air Force.
17        Q.   And how many years were you in the Army Air
18   Force.
19        A.   Three and a half.
20        Q.   And were you discharged at the end of your
21   3 1/2 years?
22        A.   Yes.
```

1        (A brief break was taken.)

2        BY MR. SORENSEN:

3    Q.   I just wanted to mark this as Exhibit 6.

4 And note that Exhibit 6 was the document to which you

5 were referring when you testified regarding the April

6 4th meeting with Mr. Morgenstein, is that correct,

7 Dr. Wachs?

8    A.   Correct.

9            (Exhibit No. 6 was marked for

10                identification.)

11       MR. SORENSEN: All right. Anything else,

12 Mike?

13       MR. KANE: I have nothing else.

14       MR. SORENSEN: Okay. That's it.

15       Thank you, Dr. Wachs.

16       (At 5:40 p.m., the proceedings were

17 concluded. Reading and signature were waived.)

18

19

20

21

22

CERTIFICATE OF NOTARY PUBLIC


I, DELORES M. GREEN, a Notary Public in and for the District of Columbia, before whom the foregoing deposition was taken, do hereby certify that witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me in shorthand at the time and place mentioned in the caption hereof and thereafter reduced to typewriting under my supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of this action.

                              */s/ Delores M. Green*
                              Delores M. Green
                              Notary Public in and for
                              THE DISTRICT OF COLUMBIA

My commission expires:
January 1, 2010