**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NORMAN L. MORGENSTEIN** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CA No. 05-2123 (JR) |
| | )    PTC:  Oct. 24, 2006 |
| **MORGAN STANLEY DW INC.** | ) |
| | ) |

_____

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT[1]**

Plaintiff Norman Morgenstein worked in the District of Columbia for Morgan Stanley and its predecessor companies for over thirty years as a Financial Advisor. In early 2003, Mr. Morgenstein "inherited" a large number of accounts from his father Alvin who had recently retired from Morgan Stanley. The assets of these accounts totaled approximately Twenty Million $20,000,000. Because of recent changes in the industry, Mr. Morgenstein believed that these accounts would best be served by independent money managers and placed in what is known as "wrap accounts." This would involve Mr. Morgenstein finding an appropriate money manager to handle the accounts. Mr. Morgenstein would be paid a percentage of the assets under management. However, in order to do this, Mr. Morgenstein believed, based on his past experiences with Morgan Stanley, that he needed a Series 65 investment advisor license to engage in this line of business.

Mr. Morgenstein, however, was not registered as an Investment Advisor Representative (IAR) in the District of Columbia. The Series 65 license could be

_____

[1] Plaintiff's Statement of Facts in Dispute follows the brief.

obtained in one of two ways in the District of Columbia.  One could either study for and sit for the exam or one could obtain a waiver from taking the exam if certain conditions were met.

Studying for and taking the exam presented insurmountable problems for Mr. Morgenstein.  In February of 1996, he had a tumor removed from his inner ear.  One of the consequences of this operation was that Mr. Morgenstein's ability to read was substantially limited.  Mr. Morgenstein could not read, focus or absorb the material he would read for a normal length of time.

In November 2003, Mr. Morgenstein decided that he would ask his employer to utilize the waiver provisions of the DC statute and seek a waiver from the requirement to sit for the exam on his behalf so that he could place the accounts he had recently "inherited" from his father into wrap accounts.

Mr. Morgenstein contacted Mr. Ron Masci, the District of Columbia branch manager, via e-mail and asked to meet with him to discuss having the firm apply for a waiver on Mr. Morgenstein's behalf because of his disability.  Within four (4) days, Mr. Masci met with Mr. Morgenstein in his office to discuss the matter of the request.

At the meeting, Mr. Masci was visibly angry.  He told Mr. Morgenstein that the request for a waiver was not going to happen.  Mr. Masci told Mr. Morgenstein that he would fire him if he did not retire immediately.  He told Mr. Morgenstein that if he didn't agree to retire, "he (Mr. Masci) would cut off his workstation, telephone and cancel his other licenses [to do business]."

Mr. Morgenstein left the meeting shaken.  He wrote Mr. Masci an e-mail seeking confirmation that he had no choice but to "retire or be terminated."  Mr. Masci, in his

response, did not deny Mr. Morgenstein's recollection of events.  Having no choice in the matter, Mr. Morgenstein retired.

Mr. Morgenstein, having left Morgan Stanley, was deprived of the opportunity to work on these accounts he had inherited from his father as well as the accounts he had cultivated over a thirty plus (30+) year period.  Over the course of several years these losses would reach into seven figures.

Defendant now moves for summary judgment.  Defendant asks the Court to focus on a set of events from the 2001-2002 time frame in an effort to argue that Mr. Morgenstein's claim is untimely.  But, as discussed below, the events of 2001-2002, while relevant as background information, are a red herring with regard to the timeliness of the claims in the present case.  The Court should deny the motion.  A review of the record shows that there are factual disputes that can only be resolved by the jury.

## I.    FACTUAL BACKGROUND

### Mr. Morgenstein's Position and Duties

Mr.  Morgenstein worked for Morgan Stanley and its predecessor companies for over 32 years.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 1 attached hereto as Ex 32.  For that period of time, Mr. Morgenstein performed the duties of a stockbroker. Morgenstein Declaration (Morgenstein Dec.) at ¶ 2.  In that capacity, Mr. Morgenstein was responsible for investing the assets of his clients in an appropriate manner. Morgenstein Declaration (Morgenstein Dec.) at ¶ 3.

During all of his tenure, Mr. Morgenstein's father Alvin Morgenstein also worked at the firm.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 5.

### MR. MORGENSTEIN'S DISABILITY

In or about December 1995, an acoustic neuroma was discovered on the left side at the distal end of Mr. Morgenstein's inner ear. On February 29, 1996, Mr. Morgenstein had surgery to remove the tumor. Although the tumor was successfully removed, damage to several nerves that the tumor encompassed left Mr. Morgenstein with issues of hearing, balance, facial paralysis and eye muscle control. Morgenstein Declaration (Morgenstein Dec.) at ¶ 6.

Following the surgery Mr. Morgenstein could not read for any normal length of time. When attempting to read, his left eye would blur (it does not blink entirely closed) causing him to loose his place on the page as well as break his concentration and creates great difficulty in absorbing the reading material. He would also have occasional headaches while reading, tire easily and many times would fall asleep.[2] Morgenstein Declaration (Morgenstein Dec.) at ¶ 6.

Despite his limitations, Mr. Morgenstein was able to return to work. Morgenstein Declaration (Morgenstein Dec.) at ¶ 9.

### DEFENDANT INCORRECTLY TELLS MR. MORGENSTEIN THAT HE NEEDS A SERIES 65 LICENSE AND DIRECTS MR. MORGENSTEIN TO APPLY DIRECTLY TO THE DISTRICT OF COLUMBIA IN ORDER TO OBTAIN A WAIVER FROM TAKING THE SERIES 65 EXAMINATION

Mr. Morgenstein held a Series 7 and Series 3 license. Morgenstein Declaration (Morgenstein Dec.) at ¶ 4. Up until 1998, Mr. Morgenstein was also licensed as an Series 65 investment advisor (IAR) in the state of Maryland, which was his state of

---

[2] In addition, Mr. Morgenstein's left side balance nerve was compromised during the procedure, causing Mr. Morgenstein to tire easily due to the necessity of his leg muscles to work harder to maintain balance. Morgenstein Declaration (Morgenstein Dec.) at ¶ 7.

residence. Morgenstein Declaration (Morgenstein Dec.) at ¶ 4. In the early 1990's Mr.

Morgenstein had placed four accounts into Investment Consulting Services (ICS)

program for professional money management. Morgenstein Declaration (Morgenstein

Dec.) at ¶ 14. Mr. Morgenstein received compensation from these accounts on a

transaction basis, meaning he was compensated when a stock or bond was bought or sold.

On March 9, 2001, Mr. Morgenstein was contacted via e-mail by Hugo Jauregui

of MS's National Registration Department. Morgenstein Declaration (Morgenstein Dec.)

at ¶ 15. Mr. Jauregui indicated that Mr. Morgenstein needed to be registered as an IAR in

D.C. in order to be paid compensation on the four accounts that he had placed into ICS in

the early 1990's. Mr. Jauregui's e-mail stated:

> National registration does not have you registered
> as an Investment Advisor in the state where your branch is
> located [the District of Columbia]. ICS sales credits
> therefore will be jeopardized if requirements are not met
> within a timely fashion. Please forward appropriate
> documents to National Registration. Information about this
> topic can be found on the intranet under ICS Headlines.
> ICS Account(s) 642-098051 642-98144 642-112559
> 642-116655 642-149105

Ex. 20 at page 2.

IAR registration in the District of Columbia required either the taking of an exam

or a waiver from the taking of the exam. Ex. 7, D.C. Regs § 1860.5. A waiver could be

granted by the director of the District of Columbia Department of Securities and

Insurance Regulation (DISR). Mr. Morgenstein knew that studying for and taking the

exam would be impossible for him because of his reading disability. Morgenstein Dec. at

¶ 8 (Ex. 32). A copy of the Series 65 study materials has been attached hereto as Ex. 31.

Within days of Mr. Jauregui's e-mail, Defendant, through its representative Paul Garipoli of MS National registration contacted Mr. Morgenstein and informed him that he (Mr. Garipoli) had tried to have Mr. Morgenstein's Series 65 license reinstated in the state of Maryland and/or registered in the District of Columbia, but that he was not successful.  Morgenstein Dec. at ¶ 18.

Mr. Morgenstein advised Mr. Garipoli of his reading disability and his assessment that he would not be able to study for the Series 65 exam.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 19.

Mr. Garipoli directed Mr. Morgenstein to contact Mr. Theodore Miles, the Director of the DISR, and request a waiver of the Series 65 examination.  Mr. Garipoli assured Mr. Morgenstein that he would assist in the preparation of the waiver request. Morgenstein Dec. at ¶ 20.

Defendant's representative, Mr. Garipoli, assisted Mr. Morgenstein in drafting the letter requesting the waiver, which was dated April 4, 2001.  Mr. Morgenstein copied Mr. Garipoli on the letter.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 21;  Ex. 20 at Morgenstein 3-6.  D.C. regulations specifically provided for a waiver, regardless of disability, from the examination if the Commissioner, in his discretion, believed that such a waiver was warranted.  The factors the Commissioner was to consider included:

(a) whether the applicant has disciplinary history
(b) Whether the applicant has certified to Department staff persons that the applicant has reviewed the act and this title.
(c) Whether the applicant has substantial long-term and continuous experience as a principal, agent or employee, other than in a clerical capacity of a broker-dealer or investment adviser.  Staff persons also will consider whether the applicant has similar experience in a responsible position, other than in a clerical capacity, in the securities, banking, finance or other related business.
(d) Whether the applicant has some continuous experience in a responsible position, other than in a clerical capacity, in the securities, banking, finance or other related

business and also possesses educational credentials or professions designations such as one of the following:

    a.  An advanced degree obtained through graduation from a formal degree program of an accredited educational institution with a concentration in economics, finance, mathematics, business, business administration or similar subjects.

DISR regulations at §1860.5 Ex. 7.

At no time did MS suggest that Mr. Morgenstein was not providing enough medical information to the DISR in order to obtain the waiver. Morgenstein Declaration (Morgenstein Dec.) at ¶ 22. Mr. Morgenstein, in his letter, wrote that he believed he met the standards of the waiver and, in addition, that he believed that a waiver was justified because of his disability. Ex. 20 at page 3 (Mr. Morgenstein's letter to DISR and 5 fax confirmation to Mr. Garipoli in MS' New York headquarters). Morgenstein Declaration (Morgenstein Dec.) at ¶ 22.

Thereafter, over the next several months, DISR had a series of interactions with Mr. Morgenstein, some in writing and some via telephone in which it requested information from him, which Mr. Morgenstein supplied as best he could. Lilah Blackstone, then the Assistant General Counsel at DISR, worked with Mr. Morgenstein during this time. Mr. Morgenstein, meanwhile, kept MS aware of the entire process by faxing copies of correspondence to Mr. Garipoli in New York and talking to him on the phone about the matter. Morgenstein Declaration (Morgenstein Dec.) at ¶ 23. Ex 20 at Morgenstein 6 and Morgenstein 13.

In a letter dated October 2, 2001, the DISR, by Mr. Miles denied Mr. Morgenstein's request for a waiver from the exam. The DISR concluded that it could not grant Mr. Morgenstein a waiver because it found with regard to the four accounts that he had placed under management in the 1990s that he was in violation of the District's

regulations because he should have had a Series 65 license before placing these accounts under management.  Ex. 10.  Morgenstein Dec at ¶ 24.

The DISR letter of October 2001 did not address Mr. Morgenstein's disability.

For unknown reasons Mr. Morgenstein did not find out about the DISR's decision until December 2001.  Morgenstein Dec at ¶ 26.

Once he learned of the DISR's decision, Mr. Morgenstein contacted Ms. Blackstone, the Assistant General Counsel at DISR, and asked for a meeting with DISR. Mr. Morgenstein informed Mr. Garipoli in New York about this request.  Ms. Blackstone arranged the meeting with Mr. Morgenstein, Mr. Miles, Mr. Sheppard, Mr. Goff and Ms. Blackstone in DISR's offices.  Morgenstein Dec. at ¶ 27-28.

At the meeting, DISR advised Mr. Morgenstein of what Ms. Blackstone had previously advised him on the telephone, i.e. that it would like to give him the waiver. DISR further told him that MS did not follow protocol and should have applied for the waiver on his behalf.  It advised Mr. Morgenstein that it (DISR) would ask MS to apply for the waiver on Mr. Morgenstein's behalf.  Morgenstein Dec at ¶ 27-28.

DISR, through Ms. Blackstone, informed Mr. Morgenstein on May 21, 2002 that MS would not apply for a waiver on his behalf.  Morgenstein Dec at ¶ 29;  Ex 11 at Morgenstein 57 and Morgenstein 571.  Mr. Morgenstein was never told the reason why MS would not make the waiver request on his behalf.  Morgenstein Dec. at ¶ 29.

At the same time, DISR contacted MS's New York office in an effort to obtain information concerning the accounts Mr. Morgenstein had placed in ICS in the 1990s. Ex. 11 at Morgenstein 533 (the Lowe e-mail).  In connection with this, MS investigated

whether the DISR was, in fact, correct that Mr. Morgenstein was in violation of regulations when he placed the four accounts under management. *Id.*

Following an investigation, MS concluded that Mr. Morgenstein had not been involved in any improper activity and that he had not been required to have a Series 65 license in order to place the 1990s accounts and to receive compensation from them. In a September 19 2002 e-mail to DISR, Douglas Lowe, the Executive Director of MS' law division maintained that Mr. Morgenstein had not violated any regulation because he was paid on a transaction basis and so qualified for the broker dealer exception to the Series 65 requirement. *Id.*

DISR, when it received MS' e-mail assigned an employee to reevaluate the matter. Miles dep. At 168:6-22;  169: 1-170 (Ex. 5). This person left DISR before completing his assignment and the Morgenstein waiver application "fell through the cracks." Miles Deposition at 171 (Ex. 5).

Carolyn Greenhalgh, the branch administrative manager advised Mr. Morgenstein of MS's conclusion that he did not need the Series 65 license in order to receive compensation on the 1990s accounts. Greenhalgh deposition at pages 45-46 (Ex. 1). Mr. Morgenstein continued to receive compensation on these accounts thereafter. Morgenstein Dec at ¶ 31.

Given MS's legal analysis that Mr. Morgenstein did not need the Series 65 license to receive compensation on the 1990s accounts, which was the reason the entire process started, Mr. Morgenstein did not pursue the Series 65 matter further. Morgenstein Dec at ¶ 31.

### MR. MORGENSTEIN "INHERITS" SIZEABLE ACCOUNTS FROM HIS FATHER.

In late 2002, following the events described above, Mr. Morgenstein's father Alvin was 92 years old and had been working at MS and its predecessor companies for some 38 years. He had numerous sizeable client accounts totaling approximately ($20,000,000) dollars. Alvin decided to retire. He handed over his accounts to Mr. Morgenstein. Morgenstein Dec at ¶ 32-33.

Mr. Morgenstein concluded that many of the accounts he had "inherited" needed to be "professionally managed." In the 1990's the nature of Morgan Stanley's retail business started to change. Traditionally, brokers such as Mr. Morgenstein would buy or sell stocks at the client's direction. Morgenstein Dec at ¶ 34. In the 1990's, with the advent of internet trading, that business model began to change. Morgan Stanley encouraged moving accounts of substantial size (minimum $100,000) into the ICS management program in which fees would be bundled into a percentage of the assets managed for all services rendered under the program. i.e. management of the assets and cost of transactions. In this model Mr. Morgenstein would be paid on a fee basis as opposed to a transaction basis. Morgenstein Dec at ¶ 34. Masci Deposition at 23-24 (Ex. 3).

Because Mr. Morgenstein contemplated being paid on a fee basis, as opposed to a transaction basis, Mr. Lowe's explanation for why Mr. Morgenstein did not need the Series 65 for the 1990s accounts did not apply to the "inherited" accounts. Mr. Morgenstein therefore believed that he would need the Series 65 and that he would have

to revisit the issue.  At the time, Mr. Morgenstein was unaware of any other exception to the Series 65 requirement.[3]  Morgenstein Dec at ¶ 35.

Mr. Morgenstein still had the same concern, however, that he could not study for the Series 65 exam because of his reading disability.  Mr. Morgenstein reasoned that he should go to his supervisor Ron Masci, who was aware that Mr. Morgenstein had recently inherited these accounts, and discuss with him the possibility of MS applying for the waiver on his behalf because of his disability.  Morgenstein Dec at ¶ 36-37.  With that in mind, Mr. Morgenstein sent the following letter and e-mail to Mr. Masci on or around November 20, 2003:

> As I'm sure you are aware, I have recently completed my 32nd year with the firm.  Looking back at the changing direction of the industry over the last several years, and looking forward, I have come to the conclusion that in order to be more productive for the firm and myself, and to stay in line with the firm's direction of fee based managed accounts, I find it imperative to obtain a Series 65 license.
>
> Under normal circumstances, and prior to February 1996, I would simply study for, and obtain my license through the normal channel of examination.  However, you are also aware of my medical history and that my 1996 surgery has created a disability and made it virtually impossible for me to obtain the Series 65 licensing through normal channels.  Because of my disability, I am requesting that you file the necessary documents on my behalf with the District of Columbia Department of Insurance and Securities Regulation, following protocol and formally requesting an exemption to the examination, so that I can obtain the Series 65 license.

(Ex. 3) attached to Masci dep as Ex. 2 11/20/03 e-mail.  Morgenstein Dec at ¶ 38.

---

[3] Mr. Morgenstein has since learned that he would more than likely have been able to place the inherited accounts into wrap accounts even without the Series 65 license because he did not meet the definition of Investment Advisers Representative under the Advisers Act.  See Expert Reports of Marie Ann Pisari at 8 (Ex 32).

Within four (4) days on November 24 2003, Mr. Masci called Mr. Morgenstein into his office in order to discuss the e-mail.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 39.  During the meeting, Mr. Masci was visibly angry.  Without discussion, Mr. Masci told Mr. Morgenstein that the waiver was not going to happen.  He told Mr. Morgenstein that he had a "choice" of retiring or being fired.  Morgenstein Dec at ¶ 39. Mr. Masci threatened Mr. Morgenstein that if he did not retire he would disconnect Mr. Morgenstein's telephone and workstation and cancel his other licenses.  Morgenstein Dec at ¶ 39.

Mr. Morgenstein left the meeting shaken.  He decided to confirm that Mr. Masci was really insisting that he leave the firm or that he would be fired and on December 1, 2003,  he sent an e-mail which stated in part:

> So there will be no misunderstanding as to the contents of our meeting on November 24th at which Matt was present, and your follow up call on or around November 25th, the following is my understanding.
>
> First, it is your final decision that you will not make application on my behalf, to the DC Licensing body for an exemption to the Series 65 exam.  Secondly, I have two (2) choices in the immediate future.  The two choices are that "either I retire, or you will discharge me."
>
> To this end, and since I have no other choice in this matter, I have contacted Josephine in our retirement department at the number you supplied, and have requested a retirement package.  I have given her a departure date of December 31, 2003 so that accurate calculations can be made.
> So that I know we are on the same page, I would appreciate a reply by email or letter.

(Ex. 2) 12/1/03 e-mail from Mr. Morgenstein to Mr. Masci (emphasis added) attached to the Ridnouer deposition as Ex. 2.  Morgenstein Dec at ¶ 40-41.

Mr. Masci, in responding did not dispute Mr. Morgenstein's characterization of the meeting.  Instead, he wrote on 12/15/03:

> Your assumption of the date is correct.  You should plan accordingly.  Ron Masci

See 12/15/03 response, Ridnouer dep ex. 2 (Ex. 2).

Having no choice in the matter, Mr. Morgenstein resigned.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 42.

### THE COUNTS ALLEGED IN THE LAWSUIT

The First Amended Complaint contained the following counts.  Count I alleged disability discrimination in violation of the D.C. Human Rights Act.  The Count stated in relevant part:

> Plaintiff suffered from a disability as that term is defined in the D.C. Human Rights Act and/or Defendant perceived that Plaintiff suffered from a disability protected by the Act.
>
> MS discriminated against Plaintiff in the terms and conditions of his employment on the basis of disability, in violation of D.C. Code § 2-1402.11 when it terminated **and** refused to grant his reasonable accommodation, among other things.

Id. at ¶¶ 22-23 (emphasis added).

Count II alleges MS discriminated against Plaintiff in the terms and conditions of his employment when it refused to grant him a reasonable accommodation in violation of D.C. Code § 2-1402.11 in late 2003.  Id. at ¶ 26.  The reasonable accommodation Mr. Morgenstein  sought was to have MS apply for a waiver of the Series 65 exam.

Finally, Count III alleged that MS retaliated against Plaintiff because he asserted rights protected by the D.C. Human Rights Act in violation of D.C. Code § 2-1402.61

when it terminated him. Defendant's actions amounted to a constructive discharge of Plaintiff and resulted in his involuntary retirement. Id. at ¶ 29.

## II.    ARGUMENT

### A.    MS HAS NOT MET ITS BURDEN UNDER THE STANDARD FOR SUMMARY JUDGMENT.

To prevail on a motion for summary judgment, Defendant has the burden of demonstrating that there is no genuine issue of material disputed fact and that it is entitled to judgment as a matter of law. *See Taylor v. Rice*, 451 F.3d 898, 900 (D.C. Cir. 2006); *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005), *Blount v. National Center For Tobacco-Free Kids*, 775 A.2d 1110, 1114 (D.C. 2001). The evidence must be viewed in the light most favorable to Mr. Morgenstein. 451 F.3d at 900; *See Blount*, 775 A.2d at 1114. "The papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated." *Blount*, 775 A.2d at 1114 (internal citations omitted). *See also*, *Salazar v. Washington Metropolitan Transit Authority,* 401 F.3d 504, 507 and 511 (D.C. Cir. 2005) ("considering [plaintiff's] evidence all together and giving him the benefit of every reasonable inference, we think a reasonable jury could find pretext.")

As the Supreme Court explained in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of [the] judge . . . *The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.*" *Id.* (emphasis added). The determination of a defendant's state of mind presents a question of fact, and where, as in the present case, the dispositive issue turns on the

existence, *vel non,* of a prohibited motive, summary judgment is rarely appropriate. *See* 451 F.3d at 912 (D.C. Cir. 2006);   775 A.2d at 1114 (D.C. 2001).

As explained in Fed. R. Civ. Pro 56(e) 1963 Amendment:  'Where an issue as to a material fact cannot by resolved without observations of the demeanor of the witnesses in order evaluate their credibility, summary judgment is not appropriate…"

A motion for summary judgment is defeated merely by showing the presence of a genuine issue of material fact.  *See Anderson*, 477 U.S. 242 (1986), *Celotex*, 477 U.S. 317 (1986).  The Supreme Court has found that evidence sufficient to discredit an employer's proffered nondiscriminatory reasons for its actions, taken together with the complainant's *prima facie* case, may be sufficient to support a finding of discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 120 S. Ct. 2097 (2000) (holding "the court . . . must disregard all evidence favorable to the moving party that the jury is not required to believe.")

Moreover, the Court makes no distinction between circumstantial and direct evidence.  Either type of evidence is sufficient to make the showing that an impermissible motive was a motivating factor in the employment decision.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (U.S. 2003).

The Courts are especially vigilante and sensitive in dealing with a complaint of alleged discrimination because of the strong policies underlying the District of Columbia Human Rights Act ("DCHRA").  "It is especially in civil rights disputes that we ought to be chary of disposing of [cases]" on the pleadings, for "courts do in fact have a predilection for allowing civil rights cases to proceed until a comprehensive record is available to either support or negate the facts alleged." *[citation omitted]*.  Civil rights

statutes are accorded a "generous construction" to ensure their "vitality." 775 A.2d at 1114-1115 (D.C. 2001), *citing*, *Trafficante*, 409 U.S. 205, 212 (1972).

The U.S. Supreme Court has also held that

> [T]here may be some cases where the plaintiff's initial evidence (the evidence establishing a prima facie case) combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 247, 255, n. 10 (1981).

In deciding whether there is a genuine issue of material fact before it, the Court <u>must</u> <u>assume</u> <u>the</u> <u>truth</u> of all statements proffered by the party opposing summary judgment. *See Greene v. Dalton*, 164 F.3d 671, 674 (D.C. Cir. 1999). This is the case even when the court may entertain grave doubts about such a statement; like the weighing of evidence generally, the task of determining the credibility of a witness is the exclusive domain of the finder of fact. *See id.* Accordingly, Mr. Morgenstein's testimony in his deposition and Affidavit, and other testimony and evidence that contradict Defendant's recitation of the facts, are more than sufficient to create genuine issues of fact to preclude summary judgment.

**B.    THERE IS A FACTUAL DISPUTE OVER COUNT III (RETALIATION).**

There is a factual dispute over whether MS retaliated against Mr. Morgenstein when Mr. Masci demanded that he resign or be fired soon after Mr. Morgenstein requested that the firm apply for a waiver from the Series 65 exam on his behalf.

**MR. MORGENSTEIN HAS MADE OUT A PRIMA FACIE CASE.**

The DCHRA makes it an unlawful discriminatory practice for an employer to retaliate against an employee for exercising or enjoying rights granted or protected by the DCHRA.  The anti-retaliation provision of the DCHRA states:

> It shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter.

D.C. Code § 2-1402.61 (a) (2001) (emphasis added), formerly D.C. Code § 1-2525 (a), cited in *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 585-586 (D.C. 2001).

To make out a prima facie case of retaliation, the plaintiff must establish: "(1) she was engaged in a protected activity, […]  under the DCHRA; (2) the employer took an adverse personnel action against her; and (3) a causal connection existed between the two."  786 A.2d at 585-586.  *See also*, *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) ("At the prima facie stage of a retaliation claim, a plaintiff's burden "is not great; [she] merely needs to establish facts adequate to permit an inference of retaliatory motive.")

The Supreme Court has recently held that the focus is on whether the retaliatory act would discourage the reasonable person from availing himself of the anti-discrimination law's protections.  *Burlington Northern & Santa Fe Ry. v. White*, 165 L. Ed. 2d 345, 359 (U.S. 2006).  It is the retaliatory act that is examined not the underlying conduct that forms the basis of the discrimination complaint.  165 L. Ed. 2d at 361 (U.S. 2006).

**Mr. Morgenstein was engaged in protected activity**

Mr. Morgenstein engaged in protected activity when he sent the November 20 2003 e-mail to Mr. Masci requesting that the firm seek a waiver from the requirement that he sit for the Series 65 exam because of his disability. In doing so, he was exercising or enjoying a right – to request an accommodation – granted by the DCHRA. In *Grant*, for example, the DC Court of Appeals found that the plaintiff was engaging in protected activity by "exercising her rights under the DC HRA to requested accommodations … ." 786 A.2d at 586.[4]

It is not necessary for Mr. Morgenstein to actually show that he had a disability in order to make out a prima facie case of retaliation. The D.C. Court of Appeals has held that to make out a retaliation claim Plaintiff need only show that he was acting in good faith. 786 A.2d at 586 (D.C. 2001).

Applied to the facts of this case, Mr. Morgenstein has to show that he was acting in good faith when he made his request of Mr. Masci. The fact-finder may reasonably conclude that Mr. Morgenstein believed that he was disabled.

Mr. Morgenstein's own testimony supports the conclusion that he reasonably believed that he was substantially limited in his ability to read:

> Following the removal of the tumor behind my ear in 1996, I was left with several adverse consequences from the surgery. Most disturbing was my inability to read for a normal length of time. Following my surgery my left eyelid would not blink normally. This led to tearing in the eye. When I would sit down to read I could only concentrate for 10-15 minutes. Further I could not retain everything I was reading. When I read, many times, I would have to re-read passages several times before I

---

[4] *See also Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (request for accommodation constituted protected activity.)

absorbed the meaning of what I was reading. This was drastically different than how I read before.

Morgenstein Declaration (Morgenstein Dec.) at ¶ 6; See, *Haynes v. Williams*, 392 F.3d 478, 483 (D.C. Cir. 2004) (rejecting idea that plaintiff must present expert testimony of his disability and holding that plaintiff can use his own testimony to show that the limitation in terms of his own experience is substantial relying on *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 198, 151 L. Ed. 2d 615, 122 S. Ct. 681 (2002))

Contemporaneous records show that Mr. Morgenstein believed he had a disability. In February 2001, prior to learning that MS told him he needed the Series 65, Mr. Morgenstein, on his own initiative, sought out the treatment of Dr. Harry Wachs, O.D of the Vision & Conceptual Development Center. In the questionnaire he filled out, Mr. Morgenstein notes that he has a reading disability and wants to know if it can be corrected. (Ex. 14). Mr. Morgenstein notes that he is required to read for his job and that it is difficult for him to read the information. Mr. Morgenstein comments that he can "no longer handle the volume of reading information." Mr. Morgenstein notes that he has blurred vision when he tries to read and that his eyes get tired when he tries to read. Mr. Morgenstein complains that he sometimes sees double, his vision is blurred at distances and near, that bright lights bother him, and that his left eyelid does not blink completely down. Mr. Morgenstein also noted that he loses focus when reading each time he blinks and skips words and has to re-read words all the time. Mr. Morgenstein summed up his situation in Feb 2001 by writing that

> My acoustic neuroma surgery left me with a partial
> paralysis on the left side of my face as well as about 95%
> deaf on my left ear.  I cannot blink fully with my left eye
> which causes strain and it twitches periodically.

Ex. 13 (noting reading disability is affecting life and work) and Ex. 14.

Mr. Morgenstein was subsequently examined by Dr. Wachs, in March 2001.

Following a visuo-cognitive exam Dr. Wachs observed that Mr. Morgenstein's

> "major areas of need are in the Visual Thinking and
> Receptive-Expressive Visuo-Verbal communication from
> the written word.  When reading instructions, Mr.
> Morgenstein gets confused with right and left directional.
> Graphic Representational Thought is far below age
> expectancy.  A cursory evaluation of reading speed and
> accuracy shows that he is reading at 170 words a minute
> with 80 percent accuracy.  The average for college should
> be 350 words a minute with 80 to 90 percent accuracy."

(Ex. 15 at 3).

Dr. Wachs also noted that he would need at least 10 sessions with Mr.

Morgenstein before he could even give an estimate of how long the treatment would take.

Dr. Wachs thought it prudent for Mr. Morgenstein to seek out other professionals for

nutrition, auditory integration training, occupational therapy and cranio-sacral

adjustments.  *Id.*

Dr. Wachs was not optimistic that Mr. Morgenstein's reading disability could be

cured and Mr. Morgenstein left Dr. Wachs' office in 2001 deeply discouraged.

Morgenstein Dec at ¶ 10.

During the 2000-2005 time period, Mr. Morgenstein also was treated by the

optometrist Dr. Richard Simon for his reading problems.  (Ex. 25).  Morgenstein Dec at ¶

11.

During this litigation, Mr. Morgenstein retained the services of Dr. Jeffrey L. Kraskin as an expert on his reading disability.  Dr. Kraskin observed:

> Further binocular function testing recorded significantly reduced performance ranges of binocular integration with reduced convergence abilities, and difficulty sustaining integration of both eyes due to interferences in ocular motor planning.  Testing of convergence and divergence integration were as follows:
> Distance:  Convergence – Break:8 / Recovery:  4 (Expected 19 / 10)
>        Divergence  –  Break:  6  /  Recovery:  1 (Expected:  9 / 5)
>
>        Near:  Convergence – Break: 10 /   Recovery: 8 (Expected: 21 / 15)
>        Divergence – Break:   14 / Recovery:  12 (Expected:  22 / 18)

Dr. Kraskin concluded that

> It is my opinion that the optometric examination is evidence of a stress induced visual problem as a manifestation of an ocular-motor dysfunction.  Further, it is my opinion that the resulting visual disability has directly impacted Mr. Morgenstein's ability to effectively and efficiently visually function for sustained concentrated periods at the near point as required for such tasks as desk work, reading, computer, etc.
> The ocular motor dysfunction has resulted in reduced visual performance ranges.  His visual processing of information derived through the visual system is directly impacted and would therefore result in reduced work performance, both general and visual fatigue, and the inability to sustain focus to the task.  Visual problems which interfere in daily life activities will become noticed when the visual demands are increased greater that the visual abilities to meet the demands.    The visual dysfunction will contribute to, possibly creating, problems in visual processing and could be referred to as a "vocational-related visual problem."
> It is my opinion that this reduction in visual performance has a direct relationship to the tumor as discussed in the history, and that the resulting reduced

> visual performance and function has existed since prior to
> 1999 as noted by Dr. Harry Wachs in his report dated
> March 2001.

See, Kraskin expert report (Ex. 17).

Mr. Morgenstein has also produced enough evidence from which the fact-finder may conclude that he had a good faith belief that the accommodation he requested was reasonable.  For example, DSIR regulations specifically provide for waivers from the Series 65 exam.  DISR Reg 1860.5 (Ex. 7).  Here, Mr. Morgenstein had good reason to think he was qualified for the waiver.  He fit the criteria listed in the regulation given his years of experience.  In fact, he had had the Series 65 license for years in the state of Maryland until MS let it lapse in 1998.  Moreover, Mr. Morgenstein's belief that he was in conformance with all laws was bolstered by the fact that his employer concluded that he had done nothing wrong when placing the 1990s accounts.

The fact-finder will also consider, as well, the fact that MS's own registration department in the form of Paul Garipoli, believed that Mr. Morgenstein should get a waiver from the necessity of sitting for the exam and assist him in that task.  Morgenstein Declaration at ¶ 20-21.

Mr. Morgenstein's belief that his employer should apply (rather than himself) for the waiver was reasonable.  Representatives of DISR had previously advised him that the proper protocol was to have the employer apply for the waiver on the employee's behalf.  Morgenstein Dec at ¶ 28-29.  And the DISR had invited MS to apply for a waiver.  MS, as well, had advised Mr. Morgenstein, following his first attempt to get a waiver, that all future contact with governmental bodies should come through MS.  EX 29 (MSDW 3669).

Also relevant to the question of whether Mr. Morgenstein was acting in good faith was the fact that his professional circumstances had dramatically changed over the past year in that Mr. Morgenstein now had in excess of $20,000,000 of assets to invest properly due to his father's retirement.  As a financial advisor it was his duty to invest that money in the best manner for the client as well as in a manner that would benefit MS.  Ex. 3 (Masci dep. at 9, 11, 16).  Mr. Morgenstein reasonably thought he needed the Series 65 license in order to properly handle the accounts that he had recently inherited from his father because Mr. Morgenstein would be compensated on a fee basis as opposed to a transactional basis, which was different than how he had been compensated on the 1990s accounts.  Given the changed circumstances it made sense for Mr. Morgenstein to raise the issue.  From these facts, a reasonable jury could conclude, MS' s contentions non-withstanding, that Mr. Morgenstein has raised a material dispute over whether he was engaged in protected conduct.  Morgenstein Dec at ¶ 33-37.

Finally, MS had never stated to Mr. Morgenstein the reason why it would not apply for the waiver on his behalf a year earlier.  It was reasonable for Mr. Morgenstein to think, because of the new inherited accounts that he should ask about the Series 65 waiver and that his changed circumstances might change MS's evaluation of the issue. Morgenstein Dec at ¶ 35-37.

Defendant asserts that plaintiff was not asserting any protected right in Nov 2003 because he allegedly refused to engage in the interactive process a year earlier. Defendant's Brief at 33-34.  This is a novel theory that is unsupported by the law and the facts.  As an initial matter, in November 2003, Mr. Morgenstein was just beginning the interactive process.  After he sent the e-mail requesting the accommodation, he was

waiting for Mr. Masci's response.  Mr. Morgenstein never had a chance to engage in the interactive process because Mr. Masci fired him four days later without even discussing the reasons why MS would not request a waiver on his behalf.  Morgenstein Dec at ¶ 39-42.

In arguing its points, Defendant can't get its facts straight.  Mr. Morgenstein never requested a waiver from MS in 2002.  Rather, DISR asked MS to apply on Mr. Morgenstein's behalf, for a waiver from the Series 65 exam.  Ex. 11 at Morgenstein 57 and 571.  MS refused.  But it never explained why it would not apply for the waiver.  Moreover, MS never sought to address Mr. Morgenstein's concerns that he could not study for the exam because of his reading disability.  For example, it did not offer a tutor, or a reader or any technology that might make studying for the exam easier.  Morgenstein Dec. at ¶ 44-46.

In addition, MS never asked Mr. Morgenstein for medical information so Mr. Morgenstein could not have refused to provide it, as MS contends.  Morgenstein Dec. at ¶ 44.  At one time Ms. Rouse forwarded to Mr. Morgenstein an accommodation form from the NASD, which is the regulatory body that administers the test that would allow Mr. Morgenstein to request certain accommodation for taking the test.  But in doing this MS was acting as nothing more than a messenger.  MS was not actually offering an accommodation and the NASD accommodation form was silent as to problems with studying for the test.  Morgenstein Dec at ¶ 45.  In short, a reasonable fact finder would likely conclude that it was MS that failed to engage in the required interactive process.

On the latter point, assuming Mr. Morgenstein declined to participate in an interactive process in 2002, there is no authority to the effect that he would be unprotected a year later in his November 2003 request.[5]

In sum, there is sufficient evidence from which the fact-finder may conclude that Mr. Morgenstein was engaging in activity protected by the anti-retaliation provisions of the D.C. Human Rights Act.

**MS Took an Adverse Personnel Action Against Mr. Morgenstein**

In their meeting on November 24, 2003, MS took an adverse personnel action against Mr. Morgenstein when it told him to retire or be fired. Notably, MS concedes for purposes of its Motion that Mr. Morgenstein's version of the meeting is accurate. Defendant's brief. At 35, n. 13**.**

The reasonable fact-finder would likely view this as a straight out termination rendering a constructive discharge analysis superfluous. Indeed, when one's boss says if you don't resign I will fire you, the reasonable person would likely conclude that her employment is over. Indeed, this conclusion would be well supported by Mr. Masci's threats to cut off Mr. Morgenstein phone lines, workstation, and cancel his other licenses thus making work as a Financial Advisor impossible.

To the extent a constructive discharge analysis is required there is no doubt that a reasonable person would feel compelled to resign when presented with the ultimatum Mr.

---

[5] The case cited by MS, *Peeples v. Coastal Office Products, Inc*. 203 F.Supp.2d 432 (D.Md. 2002) is easily distinguishable. In Peeples the ADA's opposition clause was at issue. The Court found that the plaintiff, stating in an e-mail that he may be covered by the ADA, was not protected activity. The fact that the plaintiff, in that case, did not engage in the inter-active process was not dispositive. Here, there is no question that Mr. Morgenstein exercised his rights under the DCHRA to request a reasonable accommodation.

Morgenstein faced. *Darrow v. Dillingham & Murphy*, LLP, 902 A.2d 135, 138 (D.C. 2006) (noting a constructive discharge occurs when a reasonable person is forced to resign and that this is a "question for the trier of fact.")  Several courts have held that "an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired." *Burks v. Oklahoma Pub. Co.*, 81 F.3d 975, 978 (10th Cir.), *cert. denied*, 136 L. Ed. 2d 220, 117 S. Ct. 302 (1996)) (*citing Acrey v. American Sheep Indus. Ass'n,* 981 F.2d 1569, 1573-74 (10th Cir.1992)) (employee was constructively discharged when told to resign or she would be fired); *Spulak v. K-Mart Corp.*, 894 F.2d 1150, 1154 (10th Cir.1990) (employee was constructively discharged when faced with choice between early retirement or being fired)).

Indeed, the evidence supports the inference that Mr. Morgenstein reasonably thought that he did not have a choice.  Mr. Masci was visibly angry when he told Mr. Morgenstein if he did not resign his phone and workstation would be disconnected and his other licenses revoked.  Mr. Morgenstein wrote to Mr. Masci describing his recollection of the meeting.  Mr. Masci did not dispute Mr. Morgenstein's recollection and implied it was accurate.  Morgenstein Dec at ¶ 38-42.

Mr. Morgenstein's testimony that his choice was to resign or be fired is enough evidence from which the trier of fact could reasonably conclude that MS forced Mr. Morgenstein into an involuntary quit.  Accordingly, summary judgment is not appropriate.

Incongruously, MS argues that Mr. Morgenstein's resignation was voluntary by relying on a line of cases dealing with government employees who have a property interest in their employment.  *See, e.g.* Defendant's Brief at 34 and its reliance on *Keyes*

*v. District of Columbia*, 372 F.3d 434, 439 (D.C. Cir. 2004).   MS claims that Mr. Morgenstein was simply subject to unpleasant alternatives of resigning or being "subject to removal for cause."  Id.  Of course, the fatal flaw in this argument was that Mr. Morgenstein was an "at-will" employee and could be terminated at any time for any reason.  Morgenstein Dec at ¶ 47.  In contrast, the government employees that MS relies on, unlike an employee at will, had hearing rights and due process rights prior to their termination.  An at-will employee has no such rights.[6]  MS' point that Mr. Morgenstein could have fought his termination is disingenuous.  He would have been fighting from the unemployment line.

The Court should find that Mr. Morgenstein has produced enough evidence from which the jury could conclude that his termination was not voluntary but was a constructive discharge and, as such, he suffered an adverse personnel action.

### A CAUSAL CONNECTION EXISTS BETWEEN MR. MORGENSTEIN PROTECTED ACTIVITY AND THE ADVERSE PERSONNEL ACTION

There is a fact dispute over whether Mr. Morgenstein was forced to retire in retaliation for his request for an accommodation for his disability.   Mr. Masci's ultimatum that plaintiff retire or be fired came just four (4) days after Mr. Morgenstein's request for an accommodation.  In such situations where the adverse action is so close to the protected activity, courts have held that timing alone is sufficient to raise an inference of causation.  *See, Singletary*, 351 F.3d at 525 ("this circuit has held that a close temporal relationship may alone establish the required causal connection. And here the temporal proximity was quite close: Singletary was denied promotion to the acting

---

[6] *See La France v. Georgetown University Hosp.*, 1988 U.S. Dist. LEXIS 17514, 7-9 (D.D.C. 1988) (observing that "an at will employee is much more subject to the whim of his employer, because the employer can fire him for any reason or no reason … .")

supervisor position in June 1993, the month after he filed his appeal with the D.C. Court of Appeals. Whether such proximity was enough in this case is, in the first instance, a question for the finder of fact rather than the appellate court.")[7]

Other facts, however, in addition to timing, show that causation can be inferred. Mr. Masci, during his meeting with Mr. Morgenstein was irate. He was visibly angry and made threats at Mr. Morgenstein including threatening to cut off his phone, workstation and revoke his license. Mr. Masci had earlier expressed anger towards Mr. Morgenstein for discussing with the District his request for the Series 65 waiver. Greenhalgh dep at 63-64 (Ex. 1). A jury could reasonably conclude that Mr. Morgenstein's November 2003 request was the straw that broke the camel's back. *Borgo v. Goldin*, 204 F.3d 251, 258 (D.C. Cir. 2000) ("What was the straw that broke the camel's back? The answer, we conclude, is for the jury to decide.)

MS argues that causation is not shown because the Court should look at the request for accommodation Mr. Morgenstein made in early 2002 not the request he made in November 2003. There are fatal problems with the argument. First, Mr. Morgenstein made his request for a waiver directly to the DISR at MS' direction. There is no evidence that he made the request in early 2002 directly to Mr. Masci or MS. Second, in

---

[7] *Castle v. Bentsen,* 867 F.Supp. 1, 3 (D.D.C.1994) (holding that three to five months is a short enough time lapse between EEO activity and act of reprisal to establish a causal connection); *Goos v. Nat'l Ass'n of Realtors,* 715 F.Supp. 2, 3-4 (D.D.C.1989) (holding that five weeks constituted a short enough time lapse to establish a causal connection). Moreover, the D.C. Circuit has held that a causal connection may be shown based on when the plaintiff first became vulnerable to retaliation. *Hayes v. Shalala,* 902 F.Supp. 259, 264 (D.D.C.1995) (holding that a causal connection existed based on the time plaintiff first became vulnerable to retaliation, even though that time occurred three years after plaintiff engaged in protected activity)). *See also, Globus v. Skinner,* 721 F.Supp. 329, 334-35 (D.D.C.1989) (two year lag between protected activity and personnel action was sufficient to support inference of reprisal where plaintiff's participation in litigation lasted until shortly before she was laid off).

retaliation cases, courts look at all the protected conduct not just the initial protected conduct. *Singletary,* 351 F.3d at 524 (D.C. Cir. 2003) ("In concluding that there was insufficient temporal proximity between the defendants' alleged retaliatory actions and Singletary's protected activity, the district court failed to take account of protected activity that Singletary undertook long after "the original protected activity in 1987 and 1990" and well into 1993.") Accordingly, the Court should focus on the November 2003 protected conduct.

MS' other argument is that there was no causation because Mr. Masci was suggesting that plaintiff retire before the meeting. Def's brief at 28. But this argument doesn't make sense because MS is resting its argument on the premise that Mr. Masci had "suggested" (not demanded) retirement options before their Nov 2003 meeting. The key word here is "suggesting." Prior to Mr. Morgenstein's November request for a reasonable accommodation, Mr. Masci had never demanded that Mr. Morgenstein resign or be fired. To the contrary, prior to November 2003 meeting, Mr. Morgenstein, like all eligible employees, was made aware of the option to take a voluntary – not mandatory – early retirement option. The fact is that Mr. Masci demanded – not suggested -- that he retire or be fired. At summary judgment stage, the Court must credit Mr. Morgenstein's testimony. *Greene,* 164 F.3d at 674. Previously, Mr. Masci had only suggested retirement as an option. Morgenstein Dec at ¶ 48. Again the issue is what was the straw that broke the camel's back that turned Mr. Masci's suggestion into a demand. Only the jury can decide the answer to that question.

Having shown that there is a prima facie case, Mr. Morgenstein has raised an inference of retaliation.

**DEFENDANT'S LEGITIMATE NON-DISCRIMINATORY REASONS FOR ITS ACTIONS ARE IN DISPUTE WITH REGARD TO THE RETALIATION CLAIM.**

Once Plaintiff raises a prima facie case, Defendant must come forward with a legitimate non-discriminatory reason for its actions.[8]

Defendant's argument is logically inconsistent. In the first sentence of its section on legitimate, non-discriminatory reasons it states that it accepts as true Mr. Morgenstein's version of his November 24, 2003 meeting with Mr. Masci. This means that Defendant is accepting Mr. Morgenstein's testimony that he had had no choice but to retire or be fired. Yet, on the very next page of its brief, Defendant changes its stance on the meeting and argues that it was nothing more than a discussion of Mr. Morgenstein's retirement options. Compare Defendant's Memorandum of Points and Authorities in Support of its Summary Judgment Motion at 38 ("accepting as true Morgenstein's version of his November 24, 2003 meeting with Mr. Masci …") with page 39 (calling the meeting a discussion of "retirement options.")

Defendant cannot have it both ways. It cannot concede that Mr. Masci demanded that Mr. Morgenstein resign or be fired and then argue that just the opposite occurred, i.e. that there was nothing more than a discussion of Mr. Morgenstein's "options." The point is that Mr. Morgenstein did not have an option. Indeed, in his e-mail to Mr. Masci confirming the meeting Mr. Morgenstein expressly said he was retiring because he had no other choice in the matter. A characterization that Mr. Masci consciously decided not to dispute. See, Defendant's Ex. 1, Masci Declaration at ¶ 29.

---

[8] According to *George v. Leavitt*, 407 F.3d at 410 the Court is not concerned with the prima facie case once defendant puts forward a legitimate, non-discriminatory reason. Rather the question is discrimination *vel non*.

Defendant argues that Mr. Masci had similar discussions with other allegedly poor performers. This is unlikely given that Mr. Masci testified that he had no control over who would be RIF'd. Masci aff at ¶ 19 (Def.'s Ex 1). But this argument fails because Defendant is not conceding that Mr. Masci told these unidentified "others" that he would fire them if they did not resign. So they are not similarly situated. Assuming the conversations happened at all, which the Court should not assume, given that lack of detail provided by Defendant, they are irrelevant because those other unidentified employees were not given an ultimatum of retiring or being fired.

Defendant has not carried its burden of production. It cannot produce a reason for why Mr. Masci demanded that Mr. Morgenstein retire or be fired because, despite what it says, it does not acknowledge that Mr. Masci actually made the demand of Mr. Morgenstein. Instead, it produces a reason why Mr. Masci discussed retirement options with Mr. Morgenstein, which is not what actually happened at the meeting. *Taylor v. Rice*, 451 F.3d 898, 912 (D.C. Cir. 2006) ("[I]n suits charging . . . disability discrimination, summary judgment often has been denied because of the presence of material fact questions involving motive or intent.")(footnote omitted).

In sum, there is a fact issue as to whether Mr. Morgenstein was forced to retire in retaliation for enjoying the rights protected by the DCHRA.

## C.    THERE IS A FACTUAL DISPUTE AS TO WHETHER MS FAILED TO REASONABLY ACCOMMODATE MR. MORGENSTEIN.

Count II alleges that Morgan Stanley violated Mr. Morgenstein's rights to a reasonable accommodation when it refused to apply for a waiver from the Series 65 exam requirements on his behalf in November 2003 and refused to engage in the flexible,

interactive process required by the DCHRA.  *Pantazes v. Jackson,* 366 F. Supp. 2d 57,70 (D.D.C. 2005).

In order to establish a prima facie case of failure to accommodate under the DCHRA, Mr. Morgenstein must show that he has a disability and that a reasonable accommodation could have been made by MS for that disability. See *American Univ. v. District of Columbia Comm'n on Human Rights*, 598 A.2d 416, 422 (D.C. 1991).  *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C. 2001) The DCHRA defines "disability" as a "physical or mental impairment that substantially limits one or more of the major life activities of an individual having a record of such an impairment or being regarded as having such an impairment." D.C. Code § 2-1401.02(5A). The District of Columbia Court of Appeals has held that definition of "disability" provided in the DCHRA is substantially similar to that provided for in the Americans with Disability Act ("ADA"), 42 U.S.C. § 12102(2), and "considers decisions construing the ADA as persuasive in [the court's] decisions construing comparable sections of DCHRA." *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C. 2001) (citations omitted).  Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Grant*, 786 A.2d at 584 (citation omitted).  Reading is widely recognized as a major life activity.  *Bartlett v. New York State Bd. of Law Examiners*, 226 F.3d 69, 74-75 (2d Cir. 2000) ("we remand for the district court to determine, in the first instance, whether Bartlett is substantially limited in the major life activity of reading by her slow reading speed, or by any other "conditions, manner, or duration" that limits her reading "in comparison to most people." See 28 C.F.R. Pt. 35, App. A, § 35.104 (1999)).   The duty to accommodate is a

continuing duty that is not exhausted by one effort. *Humphrey v. Memorial Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001).

### MR. MORGENSTEIN IS SUBSTANTIALLY LIMITED IN THE MAJOR LIFE ACTIVITY OF READING.

MS does not dispute that reading is a major life function or that Mr. Morgenstein's reading problems were a physical impairment. What it does dispute is that Mr. Morgenstein's ability to read was substantially limited. MS is wrong. Mr. Morgenstein has offered sufficient evidence to raise a material fact issue over whether he was substantially limited in the major life activity of reading. This evidence includes Mr. Morgenstein's own testimony, Mr. Morgenstein's questionnaire to Dr. Wachs in 2001, Dr. Wachs' evaluation in 2001, and the expert report of Dr. Kraskin. Mr. Morgenstein describes this evidence at Page 18-22 supra.

A jury could conclude from this evidence that Mr. Morgenstein's ability to read is worse than that of "most people." *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 2001 U.S. Dist. LEXIS 11926 (D.N.Y. 2001) ("I find that plaintiff has proven that she is an individual with a disability under the ADA because she is substantially limited in the major life activity of reading when compared to most people.")

MS cannot dispute the substance of this argument so it focuses on what it purports to be a procedural flaw. Specifically, MS reasons that Mr. Morgenstein could not have been disabled in 2003 because he had to provide MS with medical reports at the time of his request for an accommodation in order to be protected by the DCHRA. MS is wrong on the facts as well as the law.

With regard to the November 2003 request, MS never afforded Mr. Morgenstein the opportunity to provide medical records because Mr. Masci demanded that he retire without engaging Mr. Morgenstein is any dialogue about why he needed the accommodation.  In other words Mr. Masci never asked for the medical information MS says Mr. Morgenstein did not provide.

While it is true that medical information may be required that is only the case "When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation.'" Id. (citing 42 U.S.C. § 12111(9); 29 C.F.R. app. § 1630.9 (1996)).[9]   In the present case, Mr. Masci never asked Mr. Morgenstein for documentation – probably because he was well aware of Mr. Morgenstein's disabilities.  See Greenhaugh dep at 17-18 (Ex. 1) and Masci deps at 17-18 (Ex. 3).  Simply put, there is no requirement in the law for an employee to volunteer contemporaneous medical records in connection with a reasonable accommodation request.

Further, MS is simply being disingenuous when it claims that Mr. Morgenstein did not provide it any medical documentation when the issue of a waiver first came up in the 2001 – early 2002 timeframe.  At that time, Mr. Morgenstein was requesting the

---

[9] The D.C. Circuit has rejected the holding of *Kalekristos v. CTF Hotel Management Corp.*, 958 F. Supp. 641 (D.D.C. 1997), which held that medical information created after the employee has left employment cannot serve as the evidentiary basis for an alleged disability.  The district court's holding is inconsistent with Supreme Court precedent that the plaintiff's own testimony may be sufficient to establish a disability.  *Haynes v. Williams*, 392 F.3d 478, 482, relying on *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 198, 151 L. Ed. 2d 615, 122 S. Ct. 681 (2002) ("Whatever the comparative credibility of medical versus personal testimony, a plaintiff's personal testimony cannot be inadequate to raise a genuine issue regarding his "own experience.")

waiver himself directly from DSIR and was doing so at the direction of MS' own registration department.  At no time did MS ask Mr. Morgenstein for medical information related to his waiver request to the DSIR.  In fact, MS's own employee knew of the documentation that Mr. Morgenstein was providing DSIR and never mentioned that MS thought it was insufficient.  Morgenstein Dec. at ¶ 22.

Even when DISR directly asked MS to apply for the waiver on Mr. Morgenstein's behalf MS still did not seek any information concerning Mr. Morgenstein's disability.  They summarily denied DISR's request without explanation.  (Ex. 27)  3/26/02;  Morg 571.

Setting aside these factual problems with MS' argument, MS also fails to explain what was insufficient with Dr. Wachs' report which Mr. Morgenstein provided to DSIR in connection with his direct request to DISR and copied to MS.  See, Ex. 20 Morgenstein 8, 10, 13.  The Wachs report certainly indicated that Mr. Morgenstein was having substantial problems with his vision.  As discussed supra 20, Dr. Wachs opined that he would need at least 10 sessions to even diagnose Mr. Morgenstein's problems and Mr. Morgenstein was reading at half the speed of an average college graduate.[10]

MS' focus on Dr. Jacobsen and Dr. Fitzgerald is irrelevant.  MS deposed these doctors years after they had seen Mr. Morgenstein in 1996 which was seven years before the request for accommodation for the acoustic neuroma.  Their job was to remove the

---

[10] MS claims that Dr. Wachs said that Mr. Morgenstein's reading was average in his deposition.  This is not accurate.  Dr. Wachs testified five years after his examination of Mr. Morgenstein and stated that his reading was low but not abnormally low.  Wachs dep at 65-66 (Ex. 12).

tumor.   They were not experts in Mr. Morgenstein's eye problems nor were they competent to diagnose them.[11]

Plaintiff has produced sufficient evidence to show that he is substantially limited in the major life activity of reading.   Accordingly, the Court should deny summary judgment.

### THE SERIES 65 WAS AN ESSENTIAL FUNCTION FOR FINANCIAL ADVISORS WHO WANTED TO PLACE THEIR CLIENTS' ASSETS INTO WRAP ACCOUNTS.

MS could have reasonably accommodated Mr. Morgenstein's disability by applying for a waiver on his behalf from the DISR.  The first question is whether having a Series 65 license was an essential function of Mr. Morgenstein's job as a financial advisor if he wanted to place client accounts under management on a fee basis.  Essential functions are "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). To determine which job duties are fundamental, one must consider, among other things, the Defendant's "judgment as to what functions of a job are essential," 42 U.S.C. § 12111(8), "[t]he work experience of past incumbents in the job," 29 C.F.R. § 1630.2(n)(3)(vi), and "[t]he current work experience of incumbents in similar jobs," id. § 1630.2(n)(3)(vii). *Taylor v. Rice*, 451 F.3d 898, 906 (D.C. Cir. 2006).   The essential function at issue here is whether or not the Plaintiff needed a Series 65 license in order to properly service the accounts he inherited from his Father.

MS maintains that having the Series 65 license was only an essential function of the job if the financial advisor wanted to place his clients assets with money managers

---

[11] For example, Dr. Fitzgerald, an ear, nose and throat doctor last saw Mr. Morgenstein in 1996.  Dep at 11, 44 (Ex. 18).  Dr. Jacobsen last saw him in December 1999.  Dep at 8 (Ex. 19).  At that time, Plaintiff complained of visual blurring.  Dep at 9 (Ex. 19).

and be compensated on a fee basis.  MS claims that only the Series 7 license was required.  MS is taking an extremely narrow view of the duties of an FA.  Looking at MS' own definition of the essential functions, Mr. Morgenstein's clients he inherited from his father, trends in the industry and the experience of other FAs shows that Mr. Morgenstein was reasonable in concluding that he needed a Series 65 in order to do his job.

According to MS's 30(b)(6) witness on the essential functions, Ron Masci, the essential functions of the FA include taking care of the client, making money for the company and the shareholders.  Masci dep at 15-16 (Ex. 3).

Mr. Morgenstein, in his professional judgment in order to properly take care of his clients and make money for MS and its shareholders decided that his clients, in particular the clients he had inherited from his father, needed to be in managed accounts.  Morgenstein Dec. at ¶ 33-34.  Absent the exception that Mr. Morgenstein did not learn about until he started this lawsuit, the relevant regulations required Mr. Morgenstein to have the Series 65 license to place client money under management and be compensated for same.

In seeking to place the client accounts under managed money, Mr. Morgenstein was merely following the industry trend toward managed money.  As described by Mr. Masci, the investment advisory business went from "nothing" when Mr. Morgenstein started in the business to being 50% to 60% of the revenues taken in by MS.  Masci dep at 22-23 (Ex. 3).

Moreover, it is significant that the overwhelming majority of the FAs in Mr. Morgenstein's office had the Series 65 license.  Of the FAs employed in the D.C. branch

as of December 31, 2003, 84% had either the Series 65 or the Series 66, which was the Series 65 equivalent for FAs already holding a Series 7.  See, Declaration of Katherine Russell and MSDW 03469-03475 filed under seal by MS.  Clearly, Mr. Morgenstein was in the minority.  (Ex. 33).

This shows that the FAs in Mr. Morgenstein's office also believed that placing their clients into managed money was the right and necessary thing to do.

Finally, MS does not dispute that if a FA seeks to place client assets into money management on a fee basis, which is what Mr. Morgenstein sought to do, that FA must have a Series 65 (or 66 in the case of an employee who already holds a Series 7 license).  See, Ex. 29 MSDW 3676.[12]

The factfinder could reasonably conclude, based on these facts, that an FA, like Mr. Morgenstein, who wanted to place their clients under management would need to have the Series 65.

### REQUESTING THAT MS APPLY FOR THE WAIVER ON HIS BEHALF WAS A REASONABLE ACCOMMODATION

The fact-finder may also find that the accommodation sought – that MS apply for the waiver on Mr. Morgenstein's behalf was reasonable. *US Airways, Inc. v. Barnett* 535 U.S. 391, 398, 122 S.Ct. 1516, 1521 (U.S. 2002) ("The simple fact that an accommodation would provide a "preference"--in the sense that it would permit the worker with a disability to violate a rule that others must obey--cannot, in and of itself, automatically show that the accommodation is not "reasonable."")

---

[12] MS argues that Mr. Morgenstein did not need the Series 65 to make money and points to two successful FAs who do not have the Series 65.  But MS fails to provide any detail about how these individuals earn their income so they are not similarly situated to Mr. Morgenstein.

The Supreme Court has noted that "a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases" and that "[o]nce the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Id.* at 1523.

There are a number of reasons why the requested accommodation was reasonable on its face. First, the regulations themselves allow for a waiver from the Series 65 exam. See DC Reg §1860.5.[13]

Second, the DSIR specifically requested MS to apply for the waiver on Mr. Morgenstein behalf in Spring of 2002. Clearly, there was a precedent for DISR being responsive to a request for the waiver from MS.

---

[13] MS argues that its adherence to DISR regulations means it cannot be liable. Defendant's brief at 27 relying on *Albertson's, Inc. v. Kirkinburg*, 527 U.S. 555 (1999), But *Albertson's, Inc.* is *sui generis*. In that case, the employer fired the employee truck driver because his vision did not meet basic Department of Transportation standards. Following his termination, the employee obtained a waiver from the DOT standards for applicants with deficient vision. The employer, however, refused to hire him back even with the waiver because he could still not meet the basic DOT vision standards. The question before the Court was whether an employer who requires as a job qualification that an employee meet an otherwise applicable federal safety regulation must justify enforcing the regulation solely because the regulation's standard may be waived in an individual case. The Court ruled that the employer did not have to make such a justification because the waiver program in question was experimental and did not modify the content of the basic visual acuity standard in a way that disentitled an employer to insist upon the basic visual acuity standard 527 U.S. 555, 576 (U.S. 1999). The Court held that nothing required the employer to participate in the experiment. 527 U.S. 555, 577-578 (U.S. 1999). By contrast, in the present case, the waiver procedure was not experimental and was part of the regulations themselves. Moreover, the regulatory body itself, the DISR, expressly asked MS to apply for a waiver on Mr. Morgenstein's behalf.

Third, MS itself thought a waiver was appropriate. Its own registration department worked with Mr. Morgenstein in 2001 to 2002 in an effort to get DISR to grant him the waiver. It was only after Mr. Masci got involved that the request for a waiver was inexplicably denied.

MS' claim that it did not have the power to grant the waiver is besides the point. The accommodation requested was that MS apply for the waiver on Mr. Morgenstein's behalf – not that MS grant the waiver. Ultimately, the decision on whether the waiver would be granted would be the DISR's but given the facts described above including DISR's invitation to MS to apply for the waiver on Mr. Morgenstein's behalf it was highly likely that DISR would have granted the waiver.[14]

Based on the foregoing, the fact-finder may reasonably conclude that Mr. Morgenstein accommodation request was reasonable.[15]

*The Reasonable Accommodation Claim is Not Time Barred*

MS also argues that Mr. Morgenstein's reasonable accommodation claim of Count II is untimely because the Court should look at the series of events in 2001-2002 as

---

[14]Defendant's reliance on *McDaniel v. AlliedSignal, Inc.*, 896 F. Supp. 1482 (D. Mo. 1995) is misplaced. In that case, the plaintiff, who suffered from depression and alcoholism, argued that his government contractor employer should accommodate him by curing or mitigating his disabilities so that he could successfully obtain a security clearance from the federal government. In the present case, plaintiff is not requesting that Defendant cure or mitigate his disability. Further, in *McDaniel*, there was no waiver program and no request from the government that the employer apply for the waiver on behalf of the employee.

[15] MS also argues that he cannot show actual damages because there was a chance that he would not get the waiver. Defendant's brief at 29. But the fact that Mr. Morgenstein may or may not be able to show actual damages is besides the point. The DCHRA allows for injunctive relief, compensatory damages and punitive damages for a failure to reasonably accommodate. A violation of the law does not turn on whether there has been actual damages. *Compare*, *Burlington Northern & Santa Fe Ry. v. White,* 126 S. Ct. 2405, 2417 (U.S. 2006).

the start of the running of the statute and not the November 2003 meeting with Mr. Masci, relying on *Stewart v. District of Columbia*, 2006 WL 626921 (D.D.C. March 12, 2006). In *Stewart*, the plaintiff requested a transfer out of St. Elizabeth's in January 2002 because her disability, a mental impairment, was worsened by working in a dangerous ward. He request was denied without explanation. Over the ensuing months, the plaintiff's condition worsened because of her exposure to the conditions on the ward where she worked. She again asked for a transfer and the transfer was, once again, denied.

The Court held that plaintiff's reasonable accommodation claim accrued on January 2002 when he first request was denied and not in June 2002 when her second request was denied. Based on that the Court held that plaintiff's reasonable accommodation claim was untimely.

There are two main reasons why the Court should not follow *Stewart*. First, it was wrongly decided and, second, it is distinguishable on its facts.

Regarding the first reason, the Court's mechanical approach might be appropriate for termination decisions[16] where there is a discrete decision but the approach runs contrary to the reasonable accommodation scheme which contemplates an ongoing interactive process, which requires an individualized assessment of the disabled person's circumstances and the employer's reasons for not granting the accommodation. *Singh v. George Wash. Univ.*, 368 F. Supp. 2d 58, 67 (D.D.C. 2005) (whether a person has a disability under the ADA is an individualized inquiry.) *Pantazes v. Jackson,* 366 F. Supp.

---

[16] Notably, the cases the Court relied on were cases where there was a classic employment decision like termination or demotion. See, e.g. Stewart at *4 and cases cited therein

2d 57,70 (D.D.C. 2005) (ADA requires a flexible, interactive process); *Humphrey*, 239 at 1138 (accommodation is a continuing duty).

As applied to Stewart, it might have been the case that the employee was not disabled for purposes of the ADA when she made her first request in January 2002 and that was the reason the employer denied her request. But in the ensuing months her disability – not being a static condition – may have worsened such that she now had a disability recognized by the ADA, which would trigger the employer's reasonable accommodation duty. Under this scenario the correct time to start the limitations period would be during the second request. Only the fact finder could determine what really happened.

Stewart is also distinguishable on its facts. MS calls Mr. Morgenstein's request directly to Mr. Masci in November 2003 a "repetition" of his earlier request. This is just not so. In early 2001-2002, it was MS that set in motion the entire request for waiver process when it told Mr. Morgenstein that he needed to have the Series 65 in order to service the four accounts he had placed in the 1990s. It was also MS that determined, after presumably investigating the matter, that Mr. Morgenstein did not, in fact, need the Series 65 to be compensated on those four accounts because they were transaction based compensation. This information was shared with Mr. Morgenstein by Ms. Greenhalgh. Mr. Morgenstein continued to receive compensation on the accounts. It was in this context that MS declined DISR's invitation to apply for a waiver of the Series 65 exam on Mr. Morgenstein's behalf. It is important to note that Mr. Morgenstein never directed his request directly to MS. See discussion supra.

Given that Mr. Morgenstein did not need the Series 65 to receive compensation on these four accounts it did not make any sense for Mr. Morgenstein to take the matter further. Indeed, he was reasonable in thinking that the reason for MS's denial was that the reason MS started the process and Mr. Garipoli assisted him – its incorrect belief that he needed the Series 65 – was not accurate.

But in early 2003, circumstances changed. Mr. Morgenstein inherited his father's accounts. Mr. Morgenstein believed it best to place these accounts into wrap accounts from which he would receive fee based compensation. The transaction compensation distinction used by MS regarding the four 1990s accounts would not apply. Mr. Morgenstein reasoned that MS might now be willing to seek a waiver with the assistance of Mr. Garipoli given these changed circumstances. Morgenstein Dec. at ¶ 35-37. Following Mr. Masci's denial in November 2003, Mr. Morgenstein filed a charge with the D.C. Office of Human Rights within one year.

In analyzing a statute of limitations issue under the D.C. Human Rights Act, it is important to remember that the D.C. Court of Appeals has

> stated, in relation to cases brought pursuant to the Human Rights Act, that "if there is any reasonable doubt in a statute of limitations problem, the court will resolve the question in favor of the complaint standing and against the challenge." *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 887 (D.C. 2003) (en banc) (quoting *Simpson v. District of Columbia Office of Human Rights,* 597 A.2d 392, 401 (D.C. 1991)) (citations in Simpson omitted).

*Zuurbier v. Medstar Health, Inc.*, 895 A.2d 905, 908 (D.C. 2006).

Indeed, the D.C. Human Rights Act is to be generously construed. *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 398 (D.C. 1991).[17]

Given these facts, the Court should find that there is a genuine dispute of material fact over whether the limitations period runs from November 2003 or 2002.

**D.    THERE ARE FACT ISSUES THAT PRECLUDE SUMMARY JUDGMENT ON COUNT I DISABILITY DISCRIMINATION**

In Count I Plaintiff argues that his termination was discriminatory based on disability and/or perceived disability.[18]  In order to make out this claim Mr. Morgenstein must show facts that he was disabled or perceived to be disabled, that he was otherwise qualified to perform his job, that he suffered an adverse action and that there is a causal connection.

_____

[17] In these circumstances courts have found either a continuing violation or have started the clock as of the last request for accommodation. *Bloom v. New York City Bd. of Educ. Teachers' Retirement System of Cty of New York*, 2003 WL 1740528, at *7-10 (S.D.N.Y. 2003); *Cox v. Rumsfeld*, 2003 WL 21691044, at *7 (W.D. Wis. 2003) (separate requests for different accommodations in different circumstances were each discrete acts with their own time limits, but various actions taken to follow-up on a particular request are continuing conduct); *Ferguson v. Wal-Mart Stores, Inc.*, 114 F. Supp. 2d 1057, 1066 (E.D. Wash. 2000) (alleged failure to accommodate involved a series of related acts that constituted a continuing violation); *Smith v. Midland Brake, Inc.*, 98 F.Supp. 2d 1233, 1242-1243 (D. Kan. 2000) (sufficient evidence of continuing violation, including numerous requests for reassignment); *Malone v. Specialty Products & Insulation Co.*, 85 F. Supp. 2d 503, 505-506 (E.D. Pa. 2000) (at least one of the requests for accommodation was timely); *Lewis v. Board of Trustees of Alabama State University*, 874 F. Supp. 1299 (M.D. Ala. 1995) (employer's repeated denials of requests for schedule changes constituted "series of discriminatory acts" amounting to continuing violation); *Richards v. CH2M Hill, Inc.*, 26 Cal.4th 798, 823, 111 Cal. Rptr. 2d 87, 106, 29 P.3d 175 (2001) (applying Title VII case law to state disability discrimination claim, and holding that employer's persistent failure to reasonably accommodate a disability, or to eliminate a hostile work environment targeting employee with a disability, may be a continuing violation).

[18] As written, Count I also mentions reasonable accommodation and "terms and conditions"  Plaintiff clarifies that Count I is limited to an allegation that his termination was based on disability discrimination.

As discussed supra pages 18-22, there is sufficient evidence from which the fact-finder could conclude that Mr. Morgenstein was disabled or perceived as disabled by MS. MS does not dispute the second prong.  With respect to the third prong Mr. Morgenstein has shown that he was constructively terminated.  See discussion at 25-27.  Finally, Mr. Morgenstein has produced facts from which the fact-finder could conclude that there was a causal connection between Mr. Morgenstein disability and termination.  See pages 27-30.  Finally, there are fact disputes over MS' reasons for its action because MS cannot explain why Mr. Masci demanded that Mr. Morgenstein retire as it does not accept that that is what occurred.  See discussion at 30-32.

**CONCLUSION**

The D.C. Circuit has cautioned that disability cases require "extensive fact finding." *Breen v. DOT*, 282 F.3d 839, 843 (D.C. Cir. 2002).  A great deal of this case comes down to what was said in the meeting between Mr. Masci and Mr. Morgenstein in November 2003.  The Court cannot resolve that dispute on summary judgment.  Accordingly, the Court should deny summary judgment.

Respectfully submitted,

_____
Michael G. Kane, Bar No. 435121
David R. Cashdan, Bar No 051342
CASHDAN & KANE, PLLC
1150 Connecticut Avenue, N.W.
Suite 900
Washington, D.C. 20036-4104
Tel. (202) 862-4330

*Attorneys for Plaintiff*

Dated:   September 15, 2006