# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF COLUMBIA

**NORMAN L. MORGENSTEIN**           )
                                    )
              Plaintiff,            )
                                    )
       v.                           )        CA No. 05-2123 (JR)
                                    )        PTC: Oct. 24, 2006
**MORGAN STANLEY DW INC.**          )
                                    )
_____

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

Pursuant to Local Rule 7(h), Plaintiff sets forth the following disputed facts. Insert from brief and responds to Defendant's Statement of Facts not in dispute.

1.      Mr. Morgenstein worked for Morgan Stanley and its predecessor companies for over 32 years.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 1 attached hereto as Ex 32.

2.      For that period of time, Mr. Morgenstein performed the duties of a stockbroker.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 2.

3.      In that capacity, Mr. Morgenstein was responsible for investing the assets of his clients in an appropriate manner.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 3.

4.      During all of his tenure, Mr. Morgenstein's father Alvin Morgenstein also worked at the firm.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 5.

5.      In or about December 1995, an acoustic neuroma was discovered on the left side at the distal end of Mr. Morgenstein's inner ear.  On February 29, 1996, Mr. Morgenstein had surgery to remove the tumor. Although the tumor was successfully

removed, damage to several nerves that the tumor encompassed left Mr. Morgenstein with issues of hearing, balance, facial paralysis and eye muscle control. Morgenstein Dec at ¶ 6.

6.      Following the surgery Mr. Morgenstein could not read for any normal length of time. When attempting to read, his left eye would blur (it does not blink entirely closed) causing him to loose his place on the page as well as break his concentration and creates great difficulty in absorbing the reading material. He would also have occasional headaches while reading, tire easily and many times would fall asleep. Morgenstein Declaration (Morgenstein Dec.) at ¶ 6.

7.      Despite his limitations, Mr. Morgenstein was able to return to work. Morgenstein Declaration (Morgenstein Dec.) at ¶ 9.

***DEFENDANT INCORRECTLY TELLS MR. MORGENSTEIN THAT HE NEEDS A SERIES 65 LICENSE AND DIRECTS MR. MORGENSTEIN TO APPLY DIRECTLY TO THE DISTRICT OF COLUMBIA IN ORDER TO OBTAIN A WAIVER FROM TAKING THE SERIES 65 EXAMINATION***

8.      Mr. Morgenstein held a Series 7 and Series 3 license. Morgenstein Declaration (Morgenstein Dec.) at ¶ 4.

9.      Up until 1998, Mr. Morgenstein was also licensed as an Series 65 investment advisor (IAR) in the state of Maryland, which was his state of residence. Morgenstein Declaration (Morgenstein Dec.) at ¶ 4.

10.     In the early 1990's Mr. Morgenstein had placed four accounts into Investment Consulting Services (ICS) program for professional money management. Mr. Morgenstein received compensation from these accounts on a transaction basis, meaning

he was compensated when a stock or bond was bought or sold.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 14.

11.    On March 9, 2001, Mr. Morgenstein was contacted via e-mail by Hugo Jauregui of MS's National Registration Department.    Morgenstein Declaration (Morgenstein Dec.) at ¶ 15.

12.    Mr. Jauregui indicated that Mr. Morgenstein needed to be registered as an IAR in D.C. in order to be paid compensation on the four accounts that he had placed into ICS in the early 1990's.  Mr. Jauregui's e-mail stated:

> National registration does not have you registered as an Investment Advisor in the state where your branch is located [the District of Columbia].  ICS sales credits therefore will be jeopardized if requirements are not met within a timely fashion.  Please forward appropriate documents to National Registration.  Information about this topic can be found on the intranet under ICS Headlines. ICS Account(s)  642-098051   642-98144   642-112559 642-116655   642-149105

Ex. 20 at page 2.

13.    IAR registration in the District of Columbia required either the taking of an exam or a waiver from the taking of the exam.  Ex. 7, D.C. Regs § 1860.5.

14.    A waiver could be granted by the director of the District of Columbia Department of Securities and Insurance Regulation (DISR).  Mr. Morgenstein knew that studying for and taking the exam would be impossible for him because of his reading disability.  Morgenstein Dec. at ¶ 8 (Ex. 32).  A copy of the Series 65 study materials has been attached hereto as Ex. 31.

15.    Within days of Mr. Jauregui's e-mail, Defendant, through its representative Paul Garipoli of MS National registration contacted Mr. Morgenstein and

informed him that he (Mr. Garipoli) had tried to have Mr. Morgenstein's Series 65 license reinstated in the state of Maryland and/or registered in the District of Columbia, but that he was not successful.  Morgenstein Dec. at ¶ 18.

16.    Mr. Morgenstein advised Mr. Garipoli of his reading disability and his assessment that he would not be able to study for the Series 65 exam.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 19.

17.    Mr. Garipoli directed Mr. Morgenstein to contact Mr. Theodore Miles, the Director of the DISR, and request a waiver of the Series 65 examination.  Mr. Garipoli assured Mr. Morgenstein that he would assist in the preparation of the waiver request. Morgenstein Dec. at ¶ 20.

18.    Defendant's representative, Mr. Garipoli, assisted Mr. Morgenstein in drafting the letter requesting the waiver, which was dated April 4, 2001.  Mr. Morgenstein copied Mr. Garipoli on the letter.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 21;  Ex. 20 at Morgenstein 3-6.

19.    D.C. regulations specifically provided for a waiver, regardless of disability, from the examination if the Commissioner, in his discretion, believed that such a waiver was warranted.  The factors the Commissioner was to consider included:

- whether the applicant has disciplinary history

- Whether the applicant has certified to Department staff persons that the applicant has reviewed the act and this title.

- Whether the applicant has substantial long-term and continuous experience as a principal, agent or employee, other than in a clerical capacity of a broker-dealer or investment adviser.  Staff persons also will consider whether the applicant has similar experience in a responsible position, other than in a clerical capacity, in the securities, banking, finance or other related business.

- Whether the applicant has some continuous experience in a responsible position, other than in a clerical capacity, in the securities, banking, finance or other related business and also possesses educational credentials or professions designations such as one of the following:
- An advanced degree obtained through graduation from a formal degree program of an accredited educational institution with a concentration in economics, finance, mathematics, business, business administration or similar subjects.

DISR regulations at §1860.5 Ex. 7.

20.     At no time did MS suggest that Mr. Morgenstein was not providing enough medical information to the DISR in order to obtain the waiver.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 22.

21.     Mr. Morgenstein, in his letter, wrote that he believed he met the standards of the waiver and, in addition, that he believed that a waiver was justified because of his disability.  Ex. 20 at page 3 (Mr. Morgenstein's letter to DISR and 5 fax confirmation to Mr. Garipoli in MS' New York headquarters).  Morgenstein Declaration (Morgenstein Dec.) at ¶ 22.

22.     Thereafter, over the next several months, DISR had a series of interactions with Mr. Morgenstein, some in writing and some via telephone in which it requested information from him, which Mr. Morgenstein supplied as best he could.  Lilah Blackstone, then the Assistant General Counsel at DISR, worked with Mr. Morgenstein during this time.  Mr. Morgenstein, meanwhile, kept MS aware of the entire process by faxing copies of correspondence to Mr. Garipoli in New York and talking to him on the phone about the matter.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 23.  Ex 20 at Morgenstein 6 and Morgenstein 13.

23.     In a letter dated October 2, 2001, the DISR, by Mr. Miles denied Mr. Morgenstein's request for a waiver from the exam.  The DISR concluded that it could not

grant Mr. Morgenstein a waiver because it found with regard to the four accounts that he had placed under management in the 1990s that he was in violation of the District's regulations because he should have had a Series 65 license before placing these accounts under management. Ex. 10. Morgenstein Dec at ¶ 24.

24.    The DISR letter of October 2001 did not address Mr. Morgenstein's disability.

25.    For unknown reasons Mr. Morgenstein did not find out about the DISR's decision until December 2001. Morgenstein Dec at ¶ 26.

26.    Once he learned of the DISR's decision, Mr. Morgenstein contacted Ms. Blackstone, the Assistant General Counsel at DISR, and asked for a meeting with DISR. Mr. Morgenstein informed Mr. Garipoli in New York about this request. Ms. Blackstone arranged the meeting with Mr. Morgenstein, Mr. Miles, Mr. Sheppard, Mr. Goff and Ms. Blackstone in DISR's offices. Morgenstein Dec. at ¶ 27-28.

27.    At the meeting, DISR advised Mr. Morgenstein of what Ms. Blackstone had previously advised him on the telephone, i.e. that it would like to give him the waiver. DISR further told him that MS did not follow protocol and should have applied for the waiver on his behalf. It advised Mr. Morgenstein that it (DISR) would ask MS to apply for the waiver on Mr. Morgenstein's behalf. Morgenstein Dec at ¶ 27-28.

28.    DISR, through Ms. Blackstone, informed Mr. Morgenstein on May 21, 2002 that MS would not apply for a waiver on his behalf. Morgenstein Dec at ¶ 29; Ex 11 at Morgenstein 57 and Morgenstein 571.

29.    Mr. Morgenstein was never told the reason why MS would not make the waiver request on his behalf. Morgenstein Dec. at ¶ 29.

30.     At the same time, DISR contacted MS's New York office in an effort to obtain information concerning the accounts Mr. Morgenstein had placed in ICS in the 1990s.  Ex. 11 at Morgenstein 533 (the Lowe e-mail).

31.     In connection with this, MS investigated whether the DISR was, in fact, correct that Mr. Morgenstein was in violation of regulations when he placed the four accounts under management.  *Id.*

32.     Following an investigation, MS concluded that Mr. Morgenstein had not been involved in any improper activity and that he had not been required to have a Series 65 license in order to place the 1990s accounts and to receive compensation from them. In a September 19 2002 e-mail to DISR, Douglas Lowe, the Executive Director of MS' law division maintained that Mr. Morgenstein had not violated any regulation because he was paid on a transaction basis and so qualified for the broker dealer exception to the Series 65 requirement.  *Id*.

33.     DISR, when it received MS' e-mail assigned an employee to reevaluate the matter.  Miles dep. At 168:6-22;  169: 1-170 (Ex. 5).

34.     This person left DISR before completing his assignment and the Morgenstein waiver application "fell through the cracks."  Miles Deposition at 171 (Ex. 5).

35.     Carolyn Greenhalgh, the branch administrative manager advised Mr. Morgenstein of MS's conclusion that he did not need the Series 65 license in order to receive compensation on the 1990s accounts.  Greenhalgh deposition at pages 45-46 (Ex. 1).

36.     Mr. Morgenstein continued to receive compensation on these accounts thereafter.  Morgenstein Dec at ¶ 31.

37.     Given MS's legal analysis that Mr. Morgenstein did not need the Series 65 license to receive compensation on the 1990s accounts, which was the reason the entire process started, Mr. Morgenstein did not pursue the Series 65 matter further. Morgenstein Dec at ¶ 31.

**MR. MORGENSTEIN "INHERITS" SIZEABLE ACCOUNTS FROM HIS FATHER.**

38.     In late 2002, following the events described above, Mr. Morgenstein's father Alvin was 92 years old and had been working at MS and its predecessor companies for some 38 years.  He had numerous sizeable client accounts totaling approximately ($20,000,000) dollars.  Alvin decided to retire.  He handed over his accounts to Mr. Morgenstein.  Morgenstein Dec at ¶ 32-33.

39.     Mr. Morgenstein concluded that many of the accounts he had "inherited" needed to be "professionally managed."   In the 1990's the nature of Morgan Stanley's retail business started to change.  Traditionally, brokers such as Mr. Morgenstein would buy or sell stocks at the client's direction.  Morgenstein Dec at ¶ 34.

40.     In the 1990's, with the advent of internet trading, that business model began to change.  Morgan Stanley encouraged moving accounts of substantial size (minimum $100,000) into the ICS management program in which fees would be bundled into a percentage of the assets managed for all services rendered under the program. i.e. management of the assets and cost of transactions.  In this model Mr. Morgenstein would be paid on a fee basis as opposed to a transaction basis.  Morgenstein Dec at ¶ 34.  Masci Deposition at 23-24 (Ex. 3).

41.    Because Mr. Morgenstein contemplated being paid on a fee basis, as opposed to a transaction basis, Mr. Lowe's explanation for why Mr. Morgenstein did not need the Series 65 for the 1990s accounts did not apply to the "inherited" accounts.  Mr. Morgenstein therefore believed that he would need the Series 65 and that he would have to revisit the issue.  At the time, Mr. Morgenstein was unaware of any other exception to the Series 65 requirement.  Morgenstein Dec at ¶ 35.

42.    Mr. Morgenstein still had the same concern, however, that he could not study for the Series 65 exam because of his reading disability.  Mr. Morgenstein reasoned that he should go to his supervisor Ron Masci, who was aware that Mr. Morgenstein had recently inherited these accounts, and discuss with him the possibility of MS applying for the waiver on his behalf because of his disability.  Morgenstein Dec at ¶ 36-37.

43.    With that in mind, Mr. Morgenstein sent the following letter and e-mail to Mr. Masci on or around November 20, 2003:

> As I'm sure you are aware, I have recently completed my 32nd year with the firm.  Looking back at the changing direction of the industry over the last several years, and looking forward, I have come to the conclusion that in order to be more productive for the firm and myself, and to stay in line with the firm's direction of fee based managed accounts, I find it imperative to obtain a Series 65 license.
>
> Under normal circumstances, and prior to February 1996, I would simply study for, and obtain my license through the normal channel of examination.  However, you are also aware of my medical history and that my 1996 surgery has created a disability and made it virtually impossible for me to obtain the Series 65 licensing through normal channels. Because of my disability, I am requesting that you file the necessary documents on my behalf with the District of Columbia Department of Insurance and Securities Regulation, following protocol and formally requesting an exemption to the examination, so that I can obtain the Series 65 license.

(Ex. 3) attached to Masci dep as Ex. 2 11/20/03 e-mail.  Morgenstein Dec at ¶ 38.

44.    Within four (4) days on November 24 2003, Mr. Masci called Mr. Morgenstein into his office in order to discuss the e-mail.   Morgenstein Declaration (Morgenstein Dec.) at ¶ 39.

45.    During the meeting, Mr. Masci was visibly angry.  Without  discussion, Mr. Masci told Mr. Morgenstein that the waiver was not going to happen.  He told Mr. Morgenstein that he had a "choice" of retiring or being fired.  Morgenstein Dec at ¶ 39.

46.    Mr. Masci threatened Mr. Morgenstein that if he did not retire he would disconnect Mr. Morgenstein's telephone and workstation and cancel his other licenses. Morgenstein Dec at ¶ 39.

47.    Mr. Morgenstein left the meeting shaken.  He decided to confirm that Mr. Masci was really insisting that he leave the firm or that he would be fired and on December 1, 2003,  he sent an e-mail which stated in part:

> So there will be no misunderstanding as to the contents of our meeting on November 24th at which Matt was present, and your follow up call on or around November 25th, the following is my understanding.
>
> First, it is your final decision that you will not make application on my behalf, to the DC Licensing body for an exemption to the Series 65 exam.  Secondly, I have two (2) choices in the immediate future.  The two choices are that "either I retire, or you will discharge me."
>
> To this end, and since I have no other choice in this matter, I have contacted Josephine in our retirement department at the number you supplied, and have requested a retirement package.  I have given her a departure date of December 31, 2003 so that accurate calculations can be made.
> So that I know we are on the same page, I would appreciate a reply by email or letter.

(Ex. 2) 12/1/03 e-mail from Mr. Morgenstein to Mr. Masci (emphasis added) attached to the Ridnouer deposition as Ex. 2.  Morgenstein Dec at ¶ 40-41.

48.    Mr. Masci, in responding did not dispute Mr. Morgenstein's characterization of the meeting.  Instead, he wrote on 12/15/03:

> Your assumption of the date is correct.  You should plan accordingly.  Ron Masci

See 12/15/03 response, Ridnouer dep ex. 2 (Ex. 2).

49.    Having no choice in the matter, Mr. Morgenstein resigned.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 42.

50.    The above facts support Plaintiff's allegations in this lawsuit and raise a factual dispute about whether Mr. Morgenstein was disabled under the DCHRA, whether MS retaliated and/or discriminated against him and whether MS refused to reasonably accommodate him.  Morgenstein Declaration (Morgenstein Dec.) at ¶ 1-48;  Ex. 13 (noting reading disability is affecting life and work) and Ex. 14. (Ex. 15 at 3);  (Ex. 25); Kraskin expert report (Ex. 17);  DISR Reg 1860.5 (Ex. 7);  EX 29 (MSDW 3669);  Ex. 11 at Morgenstein 57 and 571;  Greenhalgh dep at 63-64 (Ex. 1);  (Ex. 27)  3/26/02; Morg 571;  Masci dep at 15-16 (Ex. 3).  Morgenstein Dec. at  ¶ 33-34.  Masci dep 22-23 (Ex. 3).  See, Declaration of Katherine Russell and MSDW 03469-03475 filed under seal by MS.  (Ex. 33);  Ex. 29 MSDW 3676.

### RESPONSE TO DEFENDANT'S STATEMENT OF FACTS NOT IN DISPUTE:

> Morgan Stanley is a global financial services firm providing a broad range of securities and other investment services and products. Declaration of Ronald Masci ("Masci Dec."), attached hereto as Exhibit ("Ex") 1, at ¶¶ 2,4.

Undisputed.

> It operates its retail securities business through a nationwide network of approximately 450 branch offices. *Id.,* at ¶ 3. Each branch is managed by a Branch Manager responsible for its daily operation and administration, including all personnel and client-related matters. *Id.* at ¶ 3. Branches typically are staffed by a cadre of brokers in training (Financial Advisor Trainees), brokers (Financial Advisors), Sales Assistants and Operations/Compliance personnel. *Id.,*. at ¶ 3.

Undisputed.

> Morgan Stanley at all relevant times has required its Financial Advisors to comply with any and all licensing and registration requirements imposed by state and federal regulatory bodies. See Morgan Stanley Dean Witter Compliance Guide (Ex. 2), at MSDW 02188.

Disputed.  The evidence relied upon is a compliance guide.  It is not probative of whether, in practice, MS requires that its FAs actually comply with applicable regulations.

> In particular, Morgan Stanley requires all of its Financial Advisors to hold the Full Registration/General Securities Representative (Series 7) license as a condition of employment. *See* Ex. 2, at MSDW 02189; Deposition of Ronald Masci ("Masci Dep") (Ex. 3), at 10:20-11:2.

Undisputed.

> Because securities regulations impose additional licensing and registration requirements on individuals who offer services in certain product areas (such as Investment Advisory Services and Managed Money Accounts),

Morgan Stanley has also required that its Financial Advisers comply with those additional requirements in order to transact business in product areas, including Investment Advisory Services; nor has it ever required that its Financial Advisers obtain any registrations or licenses for those product areas if they are not transacting any business in them. Masci Dec., at ¶¶ 11-13.

Undisputed.

Morgan Stanley employed Morgenstein as a Financial Advisor in its Washington, D.C. branch office from the early 1970's until his retirement on December 31, 2003. Deposition of Norman Morgenstein ("Morgenstein Dep") (Ex. 4), at 21:10-15; Plaintiff's Responses to Defendant's Interrogatories (Ex. 5), Resp. to Int. No. 2. Defendant's Responses to Plaintiff's First Set of Interrogatories (Ex. 6), Resp. to Int. No. 9.

Undisputed except that Plaintiff maintains that his retirement was not voluntary.

From approximately 1978 through the date of Morgenstein's retirement, Ronald Masci was the Branch Manager of the D.C. branch office. Masci Dec., at ¶ 6. Morgenstein's primary duties as a Financial Adviser consisted of researching the financial history, risk tolerance, financial objectives, asset allocation, interests, prejudices, and financial goals of his clients, and advising those clients as to the instruments and product areas best-suited to their investment goals. Masci Dep., at 11:7-12:6.

Undisputed.

Morgenstein was a below-average performer throughout his employment. Ex. 6, Resp. to Int. No. 9.

Disputed. Defendant's responses to interrogatories are not admissible evidence as they are hearsay. Mr. Morgenstein has had many successful years at MS. Morgenstein

Dec at ¶  50.  Indeed, in December 2003, Mr. Morgenstein received a letter from the

President of MS thanking him for his "commitment to excellence" and awarding him a

residual.  Ex. 24 at Morgenstein 68.

> As a Branch Manager, Mr. Masci tolerated Morgenstein's
> low productivity out of a sense of loyalty to Morgenstein's
> father, who was a long-time and well-loved Financial
> Adviser in the D.C. branch. Masci Dep., at 59:16-60:13.

Disputed.  Mr. Morgenstein disputes that he had "low productivity" or that Ms.

Masci kept him employed out of a sense of loyalty.  The jury is not required to believe

Mr.Masci's comments.  *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S. Ct. 2097

(2000) (holding "the court . . . must disregard all evidence favorable to the moving party

that the jury is not required to believe.")  In fact, Mr. Morgenstein's production exceeded

FA's who remained at MS after his forced departure.  Morgenstein Dec at ¶ 53.

> In 1996, Morgenstein underwent surgery to remove
> a left acoustic neuroma (a non-cancerous tumor of the inner
> ear); Morgan Stanley granted him a four- or five-month
> medical leave of absence. Ex. 5, Resp. to Int. No. 4;
> Plaintiff's Responses to Defendant's Second Set of
> Interrogatories (Ex. 7), Resp. to Int. No 21; Morgenstein
> Dep., at 8:19-9:4, 24:6-21. After Morgenstein's leave of
> absence, Morgan Stanley returned him to his Financial
> Adviser position and the same client accounts he had
> managed before his surgery. Morgenstein Dep., at 24:22-
> 25:7.

Undisputed.

> Morgenstein claims that following his surgery, he
> began suffering a number of physical difficulties.
> Complaint, ¶  8. He evidently made post-operative
> complaints to his treating surgeons, Drs. Jeff Jacobson and
> Denis Fitzgerald, about difficulties with his stamina,

walking in a straight line, partial facial paralysis on the left side of his face, partial hearing loss in his left ear, visual blurring, and some memory deficit for recent events. Deposition of Dennis Fitzgerald ("Fitzgerald Dep.") (Ex. 8), at 47:17-49:1; Deposition of Jeff Jacobson ("Jacobson Dep.") (Ex. 9), at 11:21-12:11; December 27, 1999 Supplementary Neurosurgical Report of Jeff Jacobson, M.D. (Ex. 10).

Undisputed.

According to Dr. Jacobson, Morgenstein's partial facial paralysis was moderate and primarily cosmetic in nature (Jacobson Dep., at 10:11-19) and any impairment in Morgenstein's ability to walk was minor (Jacobson Dep., at 33:20-34:10). Dr. Jacobson noted that with the exception of Morgenstein's partial facial weakness and partial left ear hearing loss, "the remainder of his neurological examination is for the most part normal." Ex. 10. Dr. Jacobson concluded that Morgenstein's overall abilities were not dramatically diminished. *Id.*

Disputed as to relevance. The last time Dr. Jacobsen examined Mr. Morgenstein was in 1999, which was four years before the events in question.

Notably, at no time during his employment or this litigation has Morgenstein presented any evidence that Dr. Jacobson and/or Dr. Fitzgerald ever diagnosed him with a vision-related reading disability. Dr. Jacobson's report makes no mention of any reading disability, and Dr. Jacobson has testified in his deposition that he was not medically qualified to determine whether and the extent to which Morgenstein's condition might impair his ability to work or read. Ex. 10; Jacobson Dep., at 33:16-19, 34:16-19.

Disputed that this is relevant evidence. Dr. Fitzgerald did not see Mr. Morgenstein after 1996. Mr. Morgenstein did provide Defendant with a copy of Dr. Wachs medical report showing that he had visual problems.

And Dr. Fitzgerald testified in his deposition Morgenstein never complained to him about having problems reading, studying, or retaining information. Fitzgerald Dep., at 50:17-51:4.

Undisputed.

Moreover, although Dr. Jacobson's December 27, 1999 report surmises that "some accommodation is likely going to need to be made at his workplace so that he can continue to be productive," the report contains no information as to what medical condition needed to be accommodated or what accommodation might be necessary. Ex. 10. In his deposition, Dr. Jacobson made clear that he did not have the proper medical expertise to opine as to what accommodations Morgenstein might have needed. Jacobson Dep., at 31:9-32:8.

Undisputed but irrelevant.  Mr. Morgenstein did not consult these doctors in connection with his 2003 request for a reasonable accommodation.

In March 2001, years after his 1996 surgery, Morgenstein saw Dr. Harry Wachs, a developmental optometrist, in connection with his alleged vision problems. Dr. Wachs determined that Morgenstein's prescription eye glasses were sufficient to meet his needs, and that Morgenstein's eye-health was normal. April 17, 2001 Progress Report of Harry Wachs, O.D. (Ex. 11); Deposition of Harry Wachs ("Wachs Dep.") (Ex. 12), at 66:20-22.

The document speaks for itself.

According to Dr. Wachs, Morgenstein's reading speed and accuracy were not abnormally low for a person of his age (Wachs Dep., at 65:16-66:1) and his reading comprehension was average (Wachs Dep., at 66:12-19).

Undisputed.

Dr. Wachs also testified that one possible explanation for Morgenstein's slower reading was the fact

that he admittedly did not read often. Wachs Dep., at 67: 1-8. Dr. Wachs concluded that he would need to see Morgenstein for at least 10 sessions before he could render a complete prognosis for treatment. Ex. 11. However, Morgenstein did not seek any further treatment for his alleged vision problems from Dr. Wachs or any other eye-care specialist until after he had resigned from Morgan Stanley and initiated the instant lawsuit. Wachs Dep., at 75:16-18; Morgenstein Dep., at 56:3-57:11, 59:16-60:5.

Disputed.  Mr. Morgenstein consulted with Dr. Roger Simon, an optometrist from 2001 to 2005 concerning his eye problems.   Mr. Morgenstein also consulted two ophthalmologists at George Washington University.  Morgenstein Dec at ¶  11.

In the mid- to late-1990's, Investment Advisory Services underwent increased regulation at the federal and state levels. Ex. 6, Resp. to Int. No. 9. In particular, the new regulatory scheme required any individual whose principal office was in D.C. and who sought to transact business in Investment Advisory Services (for fees based on the amount of client assets under management) to hold a Series 65 or Series 66 license in addition to the Series 7 license. *Id.;* Masci Dep., at 20:5-21:4.

Undisputed.

A March 2001 internal review of Morgan Stanley's Financial Advisers' registrations revealed that Morgenstein was not registered to transact Investment Advisory Services in D.C. Ex. 5, Resp. to Int. No. 2.

Undisputed.

The review also revealed that Morgenstein had placed five accounts under the management of an Investment Adviser. *See* March 9, 2001 e-mail exchange between Norman Morgenstein and Hugo Jauregui (Ex. 13). Morgan Stanley's national ICS Operations department informed Morgenstein that his failure to comply with the licensing and registration requirements for such business

would jeopardize the sales credits generated by those accounts. *Id.*

Undisputed.

It was at this time that Morgan Stanley first informed Morgenstein that he would need to take and pass the Series 65 examination in order to become registered to transact Investment Advisory Services in D.C. Ex. 5, Resp. to Int. No. 2.

Disputed.    Mr. Garipoli of MS National Registration Department told Mr. Morgenstein that he could apply for a waiver and that MS would assist him in that process. Morgenstein Dec at ¶ 18-23.

Rather than take the Series 65 examination, Morgenstein asked the DISR (the agency responsible for regulating the securities business in D.C.) to grant him a waiver of the Series 65 examination requirement on the basis of his alleged disability. April 4, 2001 letter from Norman Morgenstein to Theodore Miles (Ex. 14).

Undisputed.    But Mr. Morgenstein only did this at the direction of MS. Morgenstein Dec at ¶ 18-23.

The DISR informed Morgenstein that it would not grant his waiver request because he had not provided sufficient information regarding the extent to which his medical condition affected his ability to act as an Investment Adviser. May 15, 2001 letter from Dana Sheppard to Norman Morgenstein (Ex. 15).

The letter speaks for itself.

The DISR asked Morgenstein to provide additional information regarding his medical condition and its impact on his ability to serve his clients. *Id.*

Undisputed.

In response, Morgenstein sent the DISR another copy of Dr. Jacobson's December 1999 Supplementary Neurosurgical Report and a copy of Dr. Wachs' April 17, 2001 Progress Report. May 21, 2001 letter from Norman Morgenstein to Dana G. Sheppard (Ex. 16). Although, in two subsequent letters to the DISR, Morgenstein provided his own additional opinions and thoughts about his work activities, he never provided the DISR with any additional information or documentation from a medical professional. June 4, 2001 letter from Norman Morgenstein to Lilah Blackstone (Ex. 17); August 22, 2001 letter from Norman Morgenstein to Lilah Blackstone (Ex. 18); Morgenstein Dep., at 69:22-70:4.

Undisputed.

The DISR denied Morgenstein's waiver request by letter dated October 2, 2001. October 2, 2001 letter from Theodore A. Miles to Norman Morgenstein (Ex. 19).

Undisputed.  But it was not denied because of any issues related to disability.  It was denied because DSIR concluded, incorrectly, that Mr. Morgenstein had placed accounts without a license.  See Ex. 19.

In March 2002, Morgenstein met with DISR to pursue his waiver request. *See* May 21, 2002 e-mail from Lilah Blackstone to Norman Morgenstein (Ex. 22). The DISR once again informed him that it was unable to grant his request. *Id.* The DISR also stated that it would not re-consider the matter unless Morgan Stanley requested the waiver on his behalf. *Id.*

Disputed.  This is not a complete description of what Mr. Morgenstein was told. See, Morgenstein Dec at ¶  27-30.

Morgenstein subsequently began asking Morgan Stanley to apply on his behalf to the DISR for a waiver of the Series 65 examination requirement as an accommodation for his alleged disability. Morgenstein made the first of these requests in late 2001 or early 2002 to Carolyn Greenhalgh, the Branch Administrative Manager for the D.C. branch. Deposition of Carolyn Greenhalgh ("Greenhalgh Dep.") (Ex. 23), at 12:3-20, 21:19-22:17, 62:18-22.

Disputed. Mr. Morgenstein made no such requests of Ms. Greenhalgh. Morgenstein Dec. at ¶ 51. In her deposition, Ms. Greenhalgh refers to a grandfathering of the Maryland license, not a waiver of the Series 65 license.

In response, Ms. Greenhalgh consulted Helen Dachtler of Morgan Stanley's national registration department and Patty Unz of Morgan Stanley's national legal department, and learned from them that the company would not apply for a waiver because the company did not want to expose itself to potential legal liability of any dissatisfied customers of Morgenstein. Greenhalgh Dep., at 33:22-35:8.

Disputed. This fact operates on the incorrect assumption that Mr. Morgenstein requested a waiver from Ms. Greenhalgh, which he did not. Also, what Ms. Greenhalgh was told by the persons in New York is hearsay and, therefore, inadmissible.

Based on that information, Ms. Greenhalgh informed Morgenstein that Morgan Stanley would not seek a waiver on his behalf. Greenhalgh Dep., at 36:11-14.

Disputed. Mr. Morgenstein did not ask Ms. Greenhalgh for a waiver. Further, Ms. Greenhalgh never told Mr. Morgenstein that MS would not seek a waiver on his

behalf.  Ms. Rouse told Mr. Morgenstein this in a March 2002 e-mail.  Plaintiff's Ex 28

at MSDW 690.


> Mr. Masci's assistant, Andrea Rouse, also informed him of the fact by e-mail dated March 25, 2002. Morgenstein Dep., at 121:3-122:9; March 25, 2002 e-mail from Andrea Rouse to Norman Morgenstein (Ex. 24).

Disputed.  Ms. Rouse's e-mail was sent in response to the DISR's request that MS

apply for a waiver on behalf of Mr. Morgenstein.


> Morgenstein admits that his receipt of Ms. Rouse's March 25, 2002 e-mail was when he became aware that Morgan Stanley was unwilling to seek a waiver of the Series 65 examination on his behalf. *Id.*

Undisputed.


> In response to Morgan Stanley's denial of his request, Morgenstein filed a complaint with Janice Marks of Morgan Stanley's Human Resources department, stating that Morgan Stanley had discriminated against him on the basis of his alleged disability. March 27, 2002 e-mail exchange between Janice Marks and Norman Morgenstein (Ex. 25); Morgenstein Dep., at 128:7-129:5.

Disputed.  The referenced document states that Mr. Morgenstein is complaining

that MS let his Maryland investment advisory license lapse in 1998 not that the firm

would not apply for a waiver on his behalf.

Ms. Marks instructed Morgenstein to provide her with information about his medical condition. Ex. 25; Morgenstein Dep., at 131:16-133:2.

Disputed.  The referenced e-mail asked what the disability was.  It did not ask for information about his medical condition.

Morgenstein never gave Ms. Marks (or any other Morgan Stanley representative) any such information. *Id.*

Disputed.  The quoted material does not support this statement.  Mr. Morgenstein made it clear to MS, and in particular, Mr. Garipoli that he had a reading disability. Morgenstein Dec at ¶ 18-23.

Instead, he once again raised the issue with Ms. Greenhalgh.  April 23, 2002 e-mail exchange between Catherine Kreger and Norman Morgenstein (Ex. 26).

Disputed.  Defendant is attempting to contrive a sequence of events not supported by the facts.  The cited e-mail speaks for itself.  It was not sent "instead" of something else.

Ms. Greenhalgh once again informed Morgenstein that his request had been denied. *Id.*

The document speaks for itself.

Even though it denied his request that it apply on his behalf for a waiver of the Series 65 examination,

Disputed.  Mr. Morgenstein did not make this request.  DSIR made a request to MS that MS apply for a waiver of Mr. Morgenstein behalf.  Morgenstein Dec at ¶ 28-30.

Morgan Stanley made efforts to identify appropriate accommodations that would enable Morgenstein to take the Series 65 examination.

Disputed.  MS simply forwarded to Mr. Morgenstein a application from NASD to take the exam with examinations.  Morgenstein Dec at ¶ 45-46.

On May 3, 2002, Andrea Rouse informed Morgenstein that "your request for an accommodation was not denied (that I know of ) – your request for a *waiver* was denied. We can start the process for an accommodation if that is what you want." May 3, 2002 e-mail exchange between Andrea Rouse and Norman Morgenstein (Ex. 27). Ms. Rouse and Morgenstein subsequently discussed possible accommodations for taking the Series 65 examination, including taking the examination without time limitations. Morgenstein Dep., at 220:5-11.

Undisputed.

But Morgenstein refused to pursue any of those possible accommodations. Morgenstein Dep., at 220:10-13, 222:1-9; May 6, 2002 e-mail exchange between Norman Morgenstein and Andrea Rouse (Ex. 28).

Disputed.  Mr. Morgenstein did not refuse to pursue an untimed examination.  He considered it and determined based on his limitations that an untimed exam would not work because his main problem was in studying for the exam.

Morgenstein admits that he was not interested in obtaining accommodations to take the examination, and only was interested in an outright waiver of the examination. Morgenstein Dep., at 221:17-222:9.

Disputed.    Defendant is not accurately reflecting the testimony.    The accommodation discussed was taking an untimed exam.  This would not work because it did not address Mr. Morgenstein's concern that he could not study for the exam.

> Refusing to work with Morgan Stanley to identify accommodations for taking the Series 65 examination, Morgenstein once again contacted the DISR to request a waiver. *See* Morgenstein Dep., at 142:4-147:19; Ex. 22.

Disputed.  Mr. Morgenstein never refused to work with MS.  The e-mail trails show he was in constant communication with MS in the May 2002 timeframe.  See, Plaintiff's Ex. 23, 28, 29 (at Ex. 29 MSDW3671 asks what the lead time for taking the exam was).    Moreover, MS is conflating the issue of taking the exam with the issue of studying for the exam.  The study part of the exam problem was never addressed by MS.

> In a May 21, 2002 e-mail, the DISR informed Morgenstein that based on its understanding that Morgan Stanley would not seek a waiver on his behalf, its October 2, 2001 denial of his waiver request remained in effect. Morgenstein Dep., at 147:20-148:7; Ex. 22.

The document speaks for itself.

> Morgenstein admits that the DISR's May 21, 2002 e-mail put "to rest" the issue of his request that Morgan Stanley apply on his behalf for a waiver of the Series 65 examination requirement.

Disputed, Mr. Morgenstein did not request MS to apply for the waiver.  DSIR made the request.  Morgenstein Dec at ¶ 27-29.

> Although he did not obtain a Series 65 license, Morgenstein nonetheless continued to perform his Financial Advisor duties until his retirement in December 2003.

Undisputed except the plaintiff maintains that his retirement was coerced.

His revenue production during the last three years of his employment remained low. Morgan Stanley at all relevant times required all Financial Advisors, such as Morgenstein, with eight or more years of experience to produce at least $200,000 in gross annual revenue in order to avoid being penalized by receiving a lower commission rate for their work. *See* Morgan Stanley Financial Advisor Compensation and Recognition Programs (Ex. 29), at MSDW 01848; Masci Dec., at ¶ 16.

Undisputed.

Morgenstein's annual revenue production was well below the $200,000 threshold in each of his last three years of employment. Summary of Revenues of Morgan Stanley Financial Advisors in Branch 642 (Washington, DC) (Ex. 30), at MSDW 00703; Masci Dec., at ¶ 15.

Disputed that his production was "well below" $200,000. For example, in 2000, plaintiff's revenue was $194,000. Numerous other FAs on the list Defendant cites had less production than plaintiff. In addition, the numbers Defendant relies upon do not take into account the new assets that Plaintiff had inherited from his father, which would have increased his production.

In 2002, Morgan Stanley effected a nationwide reduction in force pursuant to which it terminated the employment of all Financial Advisors with eight or more years of experience and with less than $120,000 in gross revenue (annualized for 2002). Ex. 6, Resp. to Int. No. 1.

Disputed. This fact is not based on admissible evidence because it rests on Defendant's responses to interrogatories, which are hearsay.

Although Morgenstein survived the 2002 reduction in force based on his gross revenue numbers, Mr. Masci grew concerned that Morgenstein's continuing low revenue production made him vulnerable to any future reduction in force.  Masci Dec., at ¶ 18.

Disputed.  The Court cannot credit Mr. Masci's concern at summary judgment.

*Reeves v. Sanderson Plumbing Products, Inc.*, 120 S. Ct. 2097 (2000) (holding "the court

. . . must disregard all evidence favorable to the moving party that the jury is not required

to believe.")

Accordingly, beginning in March or April of 2003, Mr. Masci began discussing possible retirement options with Morgenstein. Morgenstein Dep., at 199:19-200:5; Masci Dec., at ¶ 22.

Undisputed that Mr. Masci discussed retirement options with Mr. Morgenstein.

Disputed that it was because of any genuine concern that Mr. Masci had.

These retirement discussions continued through the summer of 2003, when Morgan Stanley presented Morgenstein with a proposed "Sunset Agreement." Morgenstein Dep., at 198:14-199:10; Memorandum Re: Payments to Qualified Retiring Financial Advisor/Norman Morgenstein (RFA), Washington, DC (Ex. 31). The Sunset Agreement is a retirement incentive that enables a retiring Financial Advisor to transfer his accounts to a Financial Advisor still employed by the company in exchange for fifty percent of any commissions generated by those accounts. *Id.* Although such agreements normally last only a few years, the Sunset Agreement presented to Morgenstein entitled him to fifty percent of the commissions for the rest of his life. Masci Dep., at 49:22-50:14. The proposed Sunset Agreement also set a retirement date of December 31, 2003. Ex. 31. Morgenstein ultimately turned down the proposed Sunset Agreement.

Undisputed that Mr. Morgenstein turned down the proposed sunset agreement.

Prior to the November 2003 meeting he was not pressured to resign.

> On November 20, 2003, Morgenstein sent a letter to Mr. Masci renewing his request that Morgan Stanley apply on his behalf for a waiver of the Series 65 examination requirement. November 20, 2003 letter from Norman Morgenstein to Ronald Masci (Ex. 32).

Disputed.  Mr. Morgenstein could not renew his request since he never made the

request before to MS.  As noted, DSIR had earlier requested that MS apply for a waiver

of Mr. Morgenstein's behalf.

> At that time, Morgenstein was fully aware that the company had already denied his request nearly a year and a half earlier. Morgenstein Dep., at 188:8-13.

Disputed.  Mr. Morgenstein made a request to DSIR.  It was DSIR, not Mr.

Morgenstein, who requested that MS apply for a waiver on his behalf.

> On November 24, 2003, Mr. Masci met with Morgenstein to discuss the November 20, 2003 letter. Masci Dep., at 49:12-16.

Undisputed.

> Reiterating that Morgan Stanley would not grant Morgenstein's request, Mr. Masci called attention to Morgenstein's low production (Morgenstein Dep., 197:19-198:1) and once again encouraged Morgenstein to consider the proposed Sunset Agreement (Masci Dep., at 49:12-51:8; Morgenstein Dep., at 204:9-205:7). *Id.*

Disputed.  See Plaintiff's recollection of the meeting.  Morgenstein Dec at ¶ 37-

42.

> One week later, Morgenstein contacted Morgan Stanley's retirement department and requested a retirement

date of December 31, 2003. December 15, 2003 e-mail exchange between Ronald Masci and Norman Morgenstein (Ex. 34).

The document speaks for itself.

Morgenstein retired effective December 31, 2003. Ex. 34.

Undisputed, except that Plaintiff maintains that his retirement was involuntary. Mr. Morgenstein never accepted the so-called sunset agreement.

After retiring from Morgan Stanley, Morgenstein undertook no job search for alternative employment in the securities industry. Morgenstein Dep., at 244:13-245:18; 245:19-246:10).

Disputed. Mr. Morgenstein spoke with Charles Schwab about employment there but was told that a Series 65 was needed. In addition, Mr. Morgenstein received a letter from a headhunter indicating that a Series 65 license would be necessary. Morgenstein Dec at ¶ 52. Ex. 24 at Morgenstein 67.

Morgenstein suffered a recurrence of his left acoustic neuroma in February 2004. Morgenstein Dep., at 11:12-17. The recurrent tumor was treated with radiation therapy in late July 2004. *Id.*

Undisputed.

According to Morgenstein, his vision-related reading problems have worsened following the recurrence of his tumor. *Id.,* at 10:15-11:22.

Undisputed.

He testified that following the recurrence, he is unable to work for Morgan Stanley or any other employer (*id.* at 239:17-240:21) and has made no attempt to find any employment whatsoever (*id.* at 246:15-18).

Disputed.  Mr. Morgenstein testified that he could have continued working at MS.

See Morgenstein dep at 241:16 – 243:1-22.

On November 15, 2004, nearly one year after he retired from Morgan Stanley, Morgenstein filed a charge of discrimination with the DC Office of Human Rights ("DCOHR").  *See* District of Columbia Office of Human Rights Charge of Discrimination (Ex. 35).

Undisputed.

Notably, in the in-take questionnaire, he stated that Morgan Stanley had refused to apply on his behalf for an exemption to the Series 65 examination requirement "approximately 1.5 years prior to 11/24/03." District of Columbia Office of Human Rights Intake Questions, Constructive Discharge (Ex. 36).

Undisputed.

On or about August 11, 2005, Morgenstein withdrew the DCOHR charge and filed his original Complaint in the Superior Court for the District of Columbia.

Undisputed.

Respectfully submitted,

_____
Michael G. Kane, Bar No. 435121
David R. Cashdan
CASHDAN & KANE, PLLC
1150 Connecticut Avenue, N.W.
Suite 900
Washington, D.C. 20036-4104
Tel. (202) 862-4330

*Attorneys for Plaintiff*

Dated:   September 15, 2006