**Misty Klapper & Associates**
7900 Andrus Road
Suite 11
Alexandria, Virginia   22306
(703) 780-9559


July 6, 2006


TO:  John Scalia, Esquire

RE:  Morganstein v. Morgan Stanley


Dear Mr. Scalia:

        Enclosed with your copy of the deposition of Carolyn
Greenhalgh is the original signature page and the errata sheet.
Kindly have the witness read your copy of his/her deposition and
sign these pages.  This should be done within 30 days of the date
of this letter, as after this time period, signature is
automatically considered waived.

        Please forward the referenced pages, after signature,
directly to Michael Kane, Esquire, who is in possession of the
original transcript.

                          Sincerely,


                          Misty Klapper & Associates



cc:  Michael Kane, Esquire

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - - x

4    NORMAN L. MORGENSTEIN,            :        ORIGINAL

5             Plaintiff,               :

6    vs.                              : Case No.:
                                         05-2123(JR)
7    MORGAN STANLEY DW INC.,           :

8             Defendant.               :

9    - - - - - - - - - - - - - - - - x

10                   June 23, 2006

11                   Washington, D.C.

12   DEPOSITION OF:

13               CAROLYN GREENHALGH

14       Was called for examination by counsel for the

15   Plaintiff, pursuant to notice, in the offices of,

16   Cashdan & Kane, 1150 Connecticut Avenue, N.W., Suite

17   900, Washington, D.C., commencing at 11:06 a.m.,

18   before Carolyn Friend, a Notary Public in and for

19   the District of Columbia, when were present on

20   behalf of the respective parties:

21

22

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 2

1   APPEARANCES:

2           MICHAEL KANE, ATTORNEY-AT-LAW
            Cashdan & Kane
3           1150 Connecticut Avenue, N.W.
            Suite 900
4           Washington, D.C. 20036
            (202) 862-4330
5           COUNSEL FOR THE PLAINTIFF

6

            JOHN F. SCALIA, ATTORNEY-AT-LAW
7           Greenberg Traurig, LLP
            1750 Tysons Boulevard
8           Suite 1200
            McLean, Virginia 22102
9           (703) 749-1380
            COUNSEL FOR THE DEFENDANT
10

11


12              C O N T E N T S

13   WITNESS:           EXAMINATION BY:          PAGE:

14   Carolyn Greenhalgh        Mr. Kane             3

15


16              E X H I B I T S

17   NO.:      DESCRIPTION:                       PAGE:

18   1         e-mail                              24

19   2         e-mail                              48

20   3         e-mail                              53

21   4         e-mail                              59

22

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

1              P R O C E E D I N G S

2    Whereupon:

3                    CAROLYN GREENHALGH,

4        Was called for examination, and, after being

5        duly sworn, was examined and testified as

6        follows:

7                            EXAMINATION BY COUNSEL FOR

8                            PLAINTIFF

9              BY MR. KANE:

10       Q     Good morning, Ms. Greenhalgh.

11       A     Good morning.  How are you?

12       Q     Good.  How are you?

13       A     Fine.  Thank you.

14       Q     Good.  Can you state your full name for

15   the record.

16       A     Carolyn Greenhalgh.

17       Q     And your home address?

18       A     P.O. Box 1202, Middleburg, Virginia.

19       Q     And your date of birth?

20       A     4/4/54.

21       Q     Have you ever been deposed before?

22       A     Yes.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 4

1    Q    How many times have you been deposed?

2    A    Three, four, maybe.

3    Q    When was the last time you were deposed?

4    A    Probably ten years.  That's a guess.

5    Q    What was the nature of that case.

6    A    Lawsuit with a client.

7    Q    A client was suing Morgan Stanley?

8    A    Morgan Stanley was suing the client.

9    Q    And what were they suing the client for?

10   A    A ruling on a custodial account.

11   Q    And were you a fact witness in that?

12   A    A fact witness.

13   Q    So that's ten years ago, and then prior

14   to that, you were deposed maybe two or three times

15   before that?

16   A    One was a lawsuit with our landlord.

17   Q    It was a personal lawsuit with your

18   landlord or with Morgan Stanley?

19   A    Morgan Stanley.  I've never personally --

20   Q    So you are relating depositions you had

21   in connection with your employment at Morgan

22   Stanley?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 5

1      A      Correct.

2      Q      So there was the lawsuit over the

3  landlord and what other issues or what other

4  lawsuits were you deposed in?

5      A      They would have been client related.  The

6  other was the client sued us for -- they had an

7  employee who was stealing from them and somehow

8  thought that should have been our responsibility to

9  know that.  The case was thrown out.

10     Q      So you have some familiarity, I suppose,

11 with this process?

12     A      I do.

13     Q      But I will just refresh your recollection

14 since it's been about ten years.  I will be asking

15 you a series of questions today.  And your responses

16 are under oath.

17     A      Yes.

18     Q      And your responses have to be verbal, so

19 um-hmms and shakes and all those kinds of things

20 aren't going to be picked up by the Court Reporter.

21 So please use yes, no, or some other verbal

22 response.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 6

1      A      Okay.

2      Q      Or okay.  That's fine.  Aside from

3  talking to your counsel, Mr. Scalia, have you talked

4  to anyone else about your deposition today?

5      A      No.

6      Q      Did you review any documents in

7  preparation for your deposition today?

8      A      Yes.

9      Q      What documents did you review?

10      A      I guess all the discovery documents; not

11  all of them.  Any that may have related to my

12  knowledge of the case.

13      Q      Were those documents produced by Morgan

14  Stanley in this case?

15      A      I don't know the answer to that.  They

16  probably were produced by both sides.

17      Q      Sitting here today, do you recall any

18  specific documents you looked at?

19      A      E-mails, memos, letters, forms.

20      Q      Did you review the Defendant's Responses

21  to Plaintiff's Interrogatories?

22      A      Not recently.  That was done some time

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

1    ago.

2         Q    When did you review those?

3         A    When I received them, so whenever that

4    was.  I don't recall the exact date.  In March

5    maybe.

6         Q    Did you have input into their drafting?

7         A    No, I did not.

8         Q    Do you know who did aside from counsel.

9         A    I do not.

10        Q    Did you review them before they were sent

11   to the Plaintiffs?

12        A    I did not.

13        Q    Are you still employed by Morgan Stanley?

14        A    Part time.  Hourly, as needed.

15        Q    How long have you been in that capacity?

16        A    July of 2002.

17        Q    And since July of 2002, is there an

18   average of hours you work per month or per week?

19        A    No, there's not.  I might work for three

20   months and not work again for seven months.

21        Q    Is that pretty much how it has worked out

22   over the past three years or four years?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 8

1        A      There have been four projects that I have

2    worked on in that time frame.

3        Q      So is it sort of a project based

4    employment, where they or?

5        A      The firm calls if they need me to work on

6    something and I have said yes.

7        Q      When you do that, who do you report to?

8        A      In all three cases, three different

9    people.

10       Q      Who were those folks?

11       A      Regional director, in two of the times

12   Ron Masci.

13       Q      Is Ron Masci the regional director?

14       A      No, he is not.

15       Q      Who is the regional director?

16       A      It was Susan Head.

17       Q      So you reported to her on one project?

18       A      Two.

19       Q      Two projects.  And then the other

20   project?

21       A      Ron Masci.

22       Q      And any other projects?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

1    A    The fourth was Jerry Castro.

2    Q    What was the project you worked with Ron

3  Masci on?

4    A    The potential merger of two Washington

5  branches.

6    Q    Two Washington branches of Morgan

7  Stanley?

8    A    Correct.

9    Q    So there is one branch at Morgan Stanley,

10  the one where Mr. Morgenstein worked at, and then --

11    A    That was one.  At the time, there were

12  two.

13    Q    And where is the other branch?

14    A    The other one was at 15th Street, 555.

15    Q    Were those two branches merged?

16    A    Yes, they were.

17    Q    When did that happen?

18    A    Two years ago, year-and-a-half ago.

19    Q    Prior to 2002, when you started doing

20  this as needed basis employment, you were a full

21  time employee of Morgan Stanley?

22    A    Yes, I was.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 10

1      Q      When did you start working at Morgan

2    Stanley.

3      A      1978.

4      Q      Was that in Washington?

5      A      No.  It was in Arlington.

6      Q      And was a branch Morgan Stanley had in

7    Arlington?

8      A      Yes.

9      Q      And at some point, did you come to the

10   District?

11     A      I did.

12     Q      When was that?

13     A      1982.

14     Q      Was that in the same branch

15   Mr. Morgenstein worked?

16     A      Yes.

17     Q      So would it be fair to say that from 1982

18   until the time Mr. Morgenstein left, you worked in

19   the same office as Mr. Morgenstein?

20     A      In the time until I left.  He left after

21   I did.

22     Q      Because you left in July '02?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 11

1    A    Correct.

2    Q    Were you working there at all in November

3  03?

4    A    I don't know.  I don't think so.  I'd

5  have to look at my records.

6    Q    When you do these as needed projects, do

7  you do them from home, do you go into the office?

8  Does it vary?

9    A    Mainly from home.  I might go into the

10  office a few times, if I'm working in that office.

11  I might be in another office.  Not all of those

12  projects have been in the Washington office.

13    Q    With the regional director, were those

14  somewhere else?

15    A    Yes, they were.

16    Q    Where were they?

17    A    Chevy Chase and the Alexandria office.

18    Q    Just give me a brief idea of your

19  educational background.

20    A    High school.

21    Q    High school diploma?

22    A    Yes.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 12

1      Q      Any post high school course work?

2      A      No.

3      Q      And also, tell me your employment --

4   starting in Morgan Stanley in '82, let's say, what

5   were the positions you held?

6      A      In 1982, I was the branch administrative

7   manager.  Well, let me correct that.  That title had

8   not been -- the job function was the same.  That

9   title had not been created at that time.  And I

10  don't honestly remember what it was before that.

11     Q      What were the functions of that job?

12     A      Administrative function in the branch.

13  Most of it would be coordinating between the office

14  employees, brokers, and New York legal and

15  compliance.  I was also responsible for the general

16  ledger, the branch general ledger, and the branch

17  expenses, overseeing to make sure that those weren't

18  out of hand.  That pretty much was it.

19     Q      How long did you hold those functions?

20     A      Until I left.

21     Q      You mentioned there was -- you work with

22  New York legal?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

1    A    Yes.

2    Q    Tell me about that.

3    A    And compliance, which falls under the

4  legal department.  Inquiries that they may have.

5  Regulators may have inquiries as to certain

6  transactions, and they would come to one central

7  person in the branch.

8         And then that individual would go and

9  find out from the financial advisor what happened,

10  what the story was, so the response could be made

11  back.

12    Q    Did you have any duties with regard to

13  the licensing of brokers in the D.C. branch?

14    A    Yes.

15    Q    Tell me about that.

16    A    Again, it would be acting as a middle

17  man, so to speak, between the registration

18  department, which also falls under compliance and

19  legal.  That's all one area.

20         Any questions, any concerns.  If a broker

21  wanted to be licensed in a state, they would come to

22  me and I would make that request to New York and any

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

1    paperwork that was required to make that request.

2    Any questions that may have come up.  It was pretty

3    minor, actually.

4        Q    Was the broker responsible for

5    maintaining his own licenses?

6        A    No.  The firm maintained the licenses.

7        Q    And what does that mean, to maintain the

8    license?

9        A    The renewal process.  They all expire --

10   well, they're all required to be renewed on an

11   annual basis.

12       Q    And the firm is responsible for doing

13   that?

14       A    That is correct.

15       Q    What is involved in renewing the license?

16       A    I don't know.  I didn't do that function.

17   That was done in New York.

18       Q    That was done in New York by the

19   registration department?

20       A    That is correct.

21       Q    During your time from 1982 until you left

22   in July '02, were you always reporting to Ron Masci?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 15

1          A       Yes.

2          Q       Did you consider Ron Masci a friend?

3          A       Yes.

4          Q       Like in the 2000-2001 time frame, would

5     you say he was a friend?

6          A       Yes.

7          Q       Had you been to his house?

8          A       Yes.

9          Q       Had he been to your house?

10         A       No.

11         Q       Would he confide in you things that --

12    concerns that he had at work or about work?

13         A       Yes.

14         Q       Did he ever talk to you about Norman

15    Morgenstein?

16         A       Yes.

17         Q       Tell me what he talked to you about with

18    regard to Mr. Morgenstein?

19         A       Could you be more specific?  You are

20    talking about a 20-some-year period.

21         Q       Sure.  I will narrow it down.  Let's say

22    in the 2001-2002 time period, up until the time when

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 16

1    you left.

2        A    I'm sorry.  You would have to be more

3    specific.  There were 150 people in that office.  I

4    can't honestly remember conversations that may have

5    taken place in a workday.

6        Q    Did Mr. Masci ever talk to you about

7    medical issues Mr. Morgenstein was having?

8        A    Not that I recall specifically.

9        Q    Just anything in general that came up?

10       A    General --

11       Q    That he mentioned about Mr. Morgenstein

12   and medical issues?

13       A    I cannot recall any specific

14   conversation.

15       Q    Do you have just a general sense, a

16   general recollection of discussing that topic with

17   Mr. Masci?

18       A    I can answer that by saying probably, but

19   if you ask me what those conversations were, I will

20   not be able to tell you.

21       Q    So you probably had conversations with

22   Mr. Masci about Mr. Morgenstein's medical condition,

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 17

1    but you just cant' recall, sitting here today?

2         A    I don't recall specifically discussing

3    his medical condition.

4         Q    Well, are you aware that Mr. Morgenstein

5    had a tumor removed in the late '90s, mid to late

6    '90s?

7         A    Yes, I am.

8         Q    How were you aware of that?

9         A    Mr. Morgenstein told me.

10        Q    Did he tell you that in that time period,

11   mid to late '90s or when it happened?

12        A    When it happened or before -- right

13   before it happened.

14        Q    Do you know why he told you that?

15        A    That he would be out of the office

16   because he was having surgery.

17        Q    And when Mr. Morgenstein came back, did

18   you have any knowledge of any medical problems he

19   was having after returning from that surgery?

20        A    Not specific, no.

21        Q    Just anything in general?

22        A    He was recovering from surgery.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 18

1        Q       Do you recall any issues that came up

2    with a modem that he wanted to keep at home?

3        A       Yes.

4        Q       What do you recall about that?

5        A       That he requested while he recovered that

6    he be able to have access to the firm's systems

7    while he was at home.

8        Q       Did you talk to Mr. Masci about that

9    issue?

10       A       No, I did not.  I did not handle it.

11       Q       Who handled that?

12       A       I don't recall in that time frame who our

13   computer person was.  It may have been Matt

14   Ridnauer, but I don't recall.

15       Q       Is it Ridnauer?

16       A       Ridnauer.

17       Q       Ridnauer.  What is his position, or what

18   was his position in, let's say, the 2000 to 2002

19   time frame?

20       A       I don't recall.  He was the computer

21   person in the office, and then he was the sales

22   manager.  And I don't know at what time frame that

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

1  switch was made.  I don't recall when that actually

2  happened.

3       Q     He became the sales manager?

4       A     Um-hmm.

5       Q     What does that mean?

6       A     The sales manager's function is to

7  coordinate and distribute sales ideas from New York

8  from our research department, talking to financial

9  advisors, helping them out when he can or she can.

10      Q     Did you ever talk to Mr. Ridnauer about

11  Mr. Morgenstein?

12      A     Probably.

13      Q     Any conversations you recall?

14      A     I do not, no.

15      Q     Did Mr. Ridnauer ever share any

16  recollections he had of a conversation he attended

17  with Mr. Masci and Mr. Morgenstein in November of

18  03?

19      A     No.

20      Q     You mentioned there were 150 employees in

21  the branch where you worked?

22      A     Correct.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 20

1        Q        And was that the case in 2000 to 2003 or

2    2002?

3        A        It was the case in 1998 through 2000.

4    After that, it may have dropped off some.

5        Q        How many of those employee were brokers?

6        A        A hundred and twenty-five approximately.

7        Q        Do you know how many of those brokers had

8    a series 65 license?

9        A        No.

10        Q        Or a series 66 license?

11        A        No.

12        Q        Did a majority of them have those

13    licenses?

14        A        The 65, I would say maybe half.

15        Q        And what about the 66?

16        A        Is that the all-state?

17        Q        I think the series 66 is a license that

18    you get instead of a series 65 if you already have

19    the series 7.  That's my understanding.

20        A        So are they the same license?

21        Q        I believe they give you the ability to do

22    the same thing.  That's my understanding.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

1      A      Then I guess it's half, approximately.

2      Q      Were there records kept of who had what

3  license?

4      A      Yes.  All you had to do was -- every

5  broker has a number.  And all you had to do on the

6  screen was punch up that individual's number, and it

7  would tell you the license they carried.

8      Q      Did you ever have any supervisory

9  responsibilities over Mr. Morgenstein?

10     A      No.

11     Q      Did you ever evaluate his work?

12     A      No.

13     Q      Did you ever have conversations with

14  Mr. Masci about Mr. Morgenstein's work?

15     A      Not that I recall.

16     Q      So it's possible you did and you just

17  don't recall those conversations?

18     A      Correct.

19     Q      I want to direct your attention to, I

20  guess, the 2001-2002 time frame.  Did you become

21  aware of an issue of Mr. Morgenstein wanting to get

22  a series 65 license?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 22

1       A       Yes.

2       Q       How did you become aware of that?

3       A       Mr. Morgenstein came to me and asked if

4    he could get a waiver for that exam.

5       Q       When did he come to you about that?

6       A       I don't recall the date.

7       Q       But you recall him actually physically

8    coming to you?

9       A       Yes.

10      Q       Was this in your office?

11      A       Yes.

12      Q       What exactly did he say?

13      A       He asked if he could get a waiver for the

14   series 65.  Actually, I believe the term he asked

15   for was to be grandfathered for the series 65 exam

16   so he could receive commissions in a partnership

17   with another financial advisor.

18      Q       And when was this?

19      A       I don't recall.

20      Q       Do you recall the year?

21      A       I don't.

22      Q       And what did you say to him in response?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 23

1       A       I told him, I would check.

2       Q       Did this request just come out of the

3  blue, or was there some back story to this, that you

4  were aware of, with regard to the series 65?

5       A       I was not aware of any back story.

6       Q       So prior to Mr. Morgenstein coming into

7  your office and asking you about this

8  grandfathering, you were not aware of any attempts

9  he had made to get a series 65?

10      A       No.

11      Q       Did you at some point become aware of

12  attempts Mr. Morgenstein had made to get a series

13  65, other than just the conversation he had with

14  you?

15      A       Can you repeat that?

16      Q       Yeah.  I mean, you testified that prior

17  to this conversation with Mr. Morgenstein, you were

18  not aware of any attempts Mr. Morgenstein had made

19  to get a series 65 license.

20      A       Correct.

21      Q       And my question is, subsequent to this

22  conversation, did you become aware of other attempts

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 24

1    that Mr. Morgenstein had made independent of his

2    conversation with you to get a series 65 license?

3        A    Yes.

4        Q    How did you become aware of that?

5        A    The firm received a letter from the D.C.

6    securities division requesting information from the

7    firm regarding an attempt Mr. Morgenstein had made

8    directly with them away from the firm -- around the

9    firm.

10            MR. KANE:   I will ask the Reporter to

11   mark this as Exhibit 1.

12                    (Whereupon, Deposition

13                    Exhibit Number 1 was marked

14                    for Identification.)

15            BY MR. KANE:

16       Q    I'm handing you what has been marked as

17   Exhibit 1.  Have you had a chance to take a look at

18   that document?

19       A    Yes.

20       Q    This is an e-mail from Mary Robertson at

21   Morgan Stanley sent on March 28, 2002, to Lilah

22   Blackstone at the D.C. government.  And you are

Page 25

1    copied on this e-mail.  Is this an e-mail you

2    received back in March of 2002?

3        A    Yes.

4        Q    And this e-mail from Ms. Robertson says

5    that Mr. Masci has been notified of the state's

6    request.  It has been confirmed that Mr. Morgenstein

7    has been notified that he must take and pass the

8    series 65.

9            Prior to receiving this copy of this

10   e-mail in March of '02, did you have any awareness

11   of this issue or Mr. Morgenstein trying to get a

12   series 65 license?

13       A    Yes.

14       Q    And tell me about your knowledge, prior

15   to this March 28, '02 e-mail?

16       A    Well, Mr. Morgenstein came to me prior to

17   this, requesting a waiver or grandfather for the

18   series 65.  Sometime after that, I received a

19   telephone call from our law department wanting to

20   know what was going on.

21            They were quite upset that

22   Mr. Morgenstein had violated firm policy and gone

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 26

1    directly to the D.C. securities division in order to

2    get the waiver after the firm had told him that they

3    would not do that, they would not grant a waiver,

4    they would not assist in that.  They didn't have the

5    ability to grant it.  They wouldn't assist in it.

6         Q       Who did you talk to in legal?

7         A       I believe it was Patty Unz.

8         Q       How do you spell that last name?

9         A       U-N-Z.

10        Q       So it's your understanding that

11   Mr. Morgenstein first came to you with this request

12   to be grandfathered and subsequent to that, he

13   started the process of going directly to D.C.?

14        A       I don't know when he began that process.

15        Q       And you said violated firm policy?

16        A       Correct.

17        Q       What policy are you talking about?

18        A       The employee handbook specifically

19   states, no employee may have any dealings with

20   regulators without the firm's knowledge and consent.

21        Q       And do you know whether the firm had

22   knowledge or consent of what Mr. Morgenstein was

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 27

1    doing?

2        A      They did not.

3        Q      How do you know that?

4        A      They told me they didn't.

5        Q      Who told you?

6        A      The registration department and the legal

7    department.

8        Q      Who in those departments told you?

9        A      Mary Robertson, Helen Dachtler.  There

10   was another gentleman.  Doug Lowe, Patty Unz.  The

11   firm considered this a very serious problem.

12       Q      This being Mr. Morgenstein going directly

13   to the District?

14       A      Correct.

15       Q      And why was that a serious problem?

16       A      Because the firm had no knowledge of it,

17   and the District's -- the letter that we received

18   back from the District of Columbia raised several

19   issues that caused the firm a lot of concern.

20       Q      Now, do you know Paul Garopoli?

21       A      That was the name I couldn't remember.  I

22   don't know him, but I know of him.

Page 28

1      Q     Do you know whether he directed -- and

2  who is he?

3      A     He is a clerk in the registration

4  department.

5      Q     Do you know whether he directed

6  Mr. Morgenstein to contact the District?

7      A     He -- no, I do not know that.  He claims

8  that he did not.

9      Q     I'm sorry.  What do you mean?  Who claims

10  what?

11      A     There was a conference call with Doug

12  Lowe and Paul's boss questioning him on this.

13      Q     Questioning Paul?

14      A     Yes, on the fact whether -- on whether he

15  gave Mr. Morgenstein permission or not.  He

16  adamantly denied it.

17      Q     Paul Garopoli adamantly denied that he

18  gave Mr. Morgenstein permission to go to the

19  District?

20      A     Correct.

21      Q     Were you on that conference call?

22      A     I was.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 29

1      Q      When was that?

2      A      I don't recall the date.  It was shortly

3   after we were made aware -- the firm was made aware

4   of the situation.

5      Q      So it would have been prior to March of

6   '02?

7      A      Yes.

8      Q      Do you know when exactly, if not the

9   date, the month?

10     A      No.  I would have to look at the letter

11  that we received from the District to see what the

12  date of that was.

13     Q      So there was a conference call.  You were

14  on the conference call, Paul Garopoli was on the

15  conference call?

16     A      Yes.

17     Q      Who else?

18     A      Doug Lowe.

19     Q      Anyone else?

20     A      Mary Robertson, Helen Dachtler.

21     Q      Anyone else?

22     A      Not that I recall.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 30

1      Q      Is Mary Robertson Paul Garopoli's

2    superior?

3      A      Yes.

4      Q      And Helen Dachtler is in the legal

5    department?

6      A      No.  Helen Dachtler is the manager of the

7    registration department.  So both Paul and Mary

8    Robertson report to her.

9      Q      Tell me everything you recall about this

10   conference call.

11     A      When Mr. Morgenstein was asked what he

12   had submitted to the District, what he had said to

13   them, what he had done, because the firm had no

14   knowledge of any of this, he claimed that Paul had

15   given him -- one of the things he told was that Paul

16   had given him permission.

17            And that prompted the conference call to

18   talk to Paul to find out, in fact, if he had given

19   permission.  And he, as I said, in that conference

20   call adamantly denied.  He recalled speaking with

21   Mr. Morgenstein and told him he would have to see

22   his branch manager and talk to him on the subject,

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 31

1    but that he never gave him permission to go to the

2    District without the firm's knowledge or consent.

3        Q       Did anyone ask him whether he had

4    received copies of correspondence that

5    Mr. Morgenstein sent to the District?

6        A       Not at that time, no.

7        Q       Did that come up subsequently?

8        A       It did.  It came up once Mr. Morgenstein

9    provided us with what information he had that he had

10   sent or given to the District of Columbia that two,

11   I believe, or a few items had Paul copied in on

12   them.

13            And he was asked -- this was not a

14   conference call.  Helen Dachtler asked him if he had

15   received those, and he said no.

16       Q       Were you privy to that conversation?

17       A       No, I was not.  I received that

18   information from Helen Dachtler.

19       Q       In a subsequent phone call?

20       A       Correct.

21       Q       Did Ms. Dachtler indicate whether she

22   believed Mr. Garopoli or not?

Page 32

1      A      Yes, she did believe him?

2      Q      Did she say why she believed him?

3      A      She believed him because he had been

4   with -- in his position long enough to know that he

5   didn't have the authority, first of all, to give

6   anyone the right to go to a regulator and that he

7   knew very clearly what the rules were and that he

8   would have no motivation, whatsoever, to violate

9   them.

10     Q      Did he say whether he, Paul Garopoli, had

11  had any direct contact with the District?

12     A      I don't know that.

13     Q      This conference call you testified about

14  with Doug Lowe, Mary Robertson, Helen Dachtler, was

15  that before or after this conversation you testified

16  to earlier where Mr. Morgenstein came into your

17  office and asked if he could be grandfathered?

18     A      After.

19     Q      And the conversation you testified to

20  with Mr. Morgenstein coming into your office and

21  asking for the grandfathering, was that before or

22  after you received the correspondence from the

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 33

1    District alerting you to the fact that Mr.

2    Morgenstein had made this request?

3        A      Before.

4        Q      The conversation was before?

5        A      The conversation with me was before.

6        Q      It was before the letter from D.C.?

7        A      Correct.

8        Q      So when Mr. Morgenstein came in and asked

9    you about the grandfathering, you had no knowledge

10   that he had already gone to the District himself?

11       A      Correct.

12       Q      Did he tell you he had?

13       A      No.

14       Q      So your testimony is that he didn't give

15   you any indication that he had had this previous

16   correspondence or history with the District

17   directly?

18       A      Absolutely not.

19       Q      Your response then was simply, I will

20   check on it?

21       A      Correct.

22       Q      Did you check on it?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 34

1      A      I did.

2      Q      What did you do?

3      A      I called Helen Dachtler first.  She was

4  told that the firm -- Helen told me, the firm does

5  not grant waivers for exams.  I then spoke with

6  Patty Unz and asked the same question and was given

7  the same answer, in as many words.

8      Q      That the firm doesn't grant waivers?

9      A      The firm does not grant waivers.

10     Q      Did they say whether the firm would apply

11 for a waiver?

12     A      I'm sorry.  I misspoke.  I'm using those

13 as the same.  The firm can't grant it.  The firm

14 wouldn't apply for it.  I apologize for the use of

15 that word.

16     Q      So when they said that, did they give you

17 any reason for why the firm wouldn't apply for a

18 waiver?

19     A      Patty Unz explained that the exposure to

20 the company was way too great to ever consider

21 something like that.

22     Q      Did she elaborate on what she meant by

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

1    the exposure?

2        A    I believe our conversation was, if any

3    customer of Mr. Morgenstein's were to file a

4    complaint against us, and the customer's attorney

5    found out that Mr. Morgenstein had not taken the

6    series 65, we would write a check.  We would have no

7    defense of any complaint because he -- there was no

8    proof that he was knowledgeable in the product.

9        Q    And this is something Ms. Unz actually

10   said to you?

11       A    Yes, in as many words.  I'm not directly

12   quoting her because I don't recall.

13       Q    So when did that phone call with Patty

14   Unz and Helen Dachtler take place in relation to

15   this conversation you had with Mr. Morgenstein where

16   he asked about being grandfathered?

17            MR. SCALIA:  Objection.  Mischaracterizes

18   prior testimony.

19            BY MR. KANE:

20       Q    Let me rephrase it.  You had -- after

21   Mr. Morgenstein came to you about the

22   grandfathering, you had a conversation -- you

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 36

1    checked on it by speaking to Helen Dachtler?

2        A    Correct.

3        Q    And was there also a separate call with

4    Patty Unz?

5        A    Correct.

6        Q    And how soon after the conversation with

7    Mr. Morgenstein did you have these conversations?

8        A    I would guess within a week, within five

9    business days, perhaps.  I cannot be sure.  I don't

10   recall.

11       Q    And did you do anything after you learned

12   this information from Helen Dachtler and Patty Unz?

13       A    I told Mr. Morgenstein that the firm

14   would not apply for a waiver.

15       Q    How did you do that?  How did you tell

16   him that?

17       A    I don't recall if I called him on the

18   phone, if I went to his office.  I don't recall.

19       Q    And did he say anything in response?

20       A    I don't recall.

21       Q    Did you make any notes of that

22   conversation?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 37

1        A       I don't recall.

2        Q       Or any memo to the file, an e-mail,

3    anything that would memorialize what you said to

4    Mr. Morgenstein?

5        A       I don't recall.

6        Q       You testified about what Patty Unz said

7    about the firm not applying for a waiver.  What did

8    Helen Dachtler say about not applying for a waiver?

9        A       As I recall, Helen said the firm doesn't

10   do it.

11       Q       Is that all she said?

12       A       (Nodding head yes.)

13       Q       You have to say yes or no.

14       A       Yes.  It was a pretty simple --

15       Q       Why did you speak to Helen and Patty on

16   this?

17       A       Helen being the manager of the

18   registration department was my first stop.  There

19   was no flexibility in her response to me.  And I

20   took it one step further to the legal department to

21   see if there was any flexibility.  There was not.

22       Q       And you testified that you told

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 38

1    Mr. Morgenstein the results of your inquiries.   And

2    what happened next in this series 65 issue, if

3    anything, with regard to Mr. Morgenstein?

4              MR. SCALIA:   Objection.   Vague.

5              BY MR. KANE:

6        Q    Do you understand the question?

7        A    I don't.

8        Q    Well, did you have any more involvement

9    with this series 65 issue?

10       A    When we received the letter from the

11   District of Columbia, I did.

12       Q    Was this letter addressed to you?

13       A    No.

14       Q    Who was it addressed to?

15       A    Without seeing them, one of them went to

16   our legal department and I believe I have seen one

17   that was addressed to Mr. Morgenstein.

18       Q    How did you get involved in responding to

19   that letter?

20       A    I received a call from the legal

21   department, asking me what was going on.   They were

22   not happy.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 39

1    Q    And when was this phone call?

2    A    I don't recall.

3    Q    Was this a call from Douglas Lowe?

4    A    I don't recall if Patty Unz was still

5    handling it.  It was turned over to Douglas Lowe.  I

6    believe that Patty Unz made the first phone call to

7    me.  And after that, I spoke with Doug Lowe about

8    it.  Patty turned it over to Doug Lowe.

9    Q    Was there any discussion about your

10   earlier inquiry about Mr. Morgenstein obtaining a

11   waiver from taking the exam?  When you got a call

12   from either Patty Unz or Doug Lowe about this letter

13   from the District, did you have any discussion about

14   the fact that Mr. Morgenstein had come to you

15   directly?

16   A    Yes.

17   Q    Tell me about that.

18   A    Patty Unz said to me, is this the same

19   broker you called me about before?  And I said, yes,

20   it is.  And she said, what was he thinking?  And I

21   said, I don't know.

22   Q    Anything else you recall about that

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 40

1    conversation?

2        A    No, but it was pretty heated.

3        Q    What do you mean it was pretty heated?

4        A    She was very unhappy.

5        Q    She wasn't unhappy with you?

6        A    No, but I was the one on the other end of

7    the telephone.

8        Q    Did she raise her voice or?

9        A    Yes.

10        Q    What did she say?  What was she

11    communicating to you?

12        A    What was he thinking?  Has he lost his

13    mind?  He knows he can't go to the District or to

14    any regulator without the firm's knowledge and

15    consent.

16            And I assured her I had no knowledge of

17    it, and that I would ask Mr. Morgenstein to provide

18    us with whatever documentation that he had regarding

19    this and send it to her.

20        Q    Did she ask you to do anything, or did

21    she direct you to do anything?

22        A    Get the information from Mr. Morgenstein

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

1    and send it to her.

2        Q     And then you did that?

3        A     I did that.

4        Q     How did you do that?

5        A     I asked Mr. Morgenstein for the

6    information.

7        Q     And what did he do?

8        A     Gave me what later turned out to be about

9    half of the information.

10       Q     Half of the information?

11       A     Yes.  He said he couldn't find it.

12       Q     So he gave you some paperwork and he

13   represented to you that this was half of the actual

14   paperwork?

15       A     I don't recall if he represented to me

16   that it was half, but it -- after the correspondence

17   or whether that was written or verbal between New

18   York and the District, I don't know that.

19             It turned out the District had more

20   information from Mr. Morgenstein than he had

21   provided us.

22       Q     And how did you learn that?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 42

1      A      Another telephone call from the legal

2   department.

3      Q      When you had this initial conversation

4   with Mr. Morgenstein about grandfathering, did he

5   mention his disability at all or his medical

6   condition at all?

7      A      I believe he said to me that he could

8   not -- it would be hard for him to study for the

9   exam.  I don't recall -- I don't recall if he used

10  the word disability or not.

11     Q      But did he explain why it would be hard

12  for him to study?

13     A      I don't recall.

14     Q      So it's possible he did; you just don't

15  recall?

16     A      It's possible.

17     Q      And you are telling me that legal called

18  you and said, well, there's actually more

19  information that he provided the District that he

20  didn't give you or words to that effect?

21     A      Yes.

22     Q      And do you know how they found that out?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 43

1      A      The information they received from the

2  District.

3      Q      And did you do anything in response to

4  that phone call?

5      A      No.  I received a phone call.

6      Q      You received a phone call from legal?

7      A      Correct.

8      Q      The substance of which was actually more

9  stuff?

10      A      Yes.

11      Q      Were they just giving you a heads-up

12  about that?  Or were they asking you to do anything

13  about that?

14      A      They were asking me to find out why

15  Mr. Morgenstein didn't give us all the information

16  that they had requested the first time.

17      Q      And did you do anything in regard to

18  that?

19      A      I asked Mr. Morgenstein, and he told me

20  he didn't -- he couldn't find it.

21      Q      Do you know what it was that he couldn't

22  find?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 44

1      A      I do not.

2      Q      Did you ever find out what it was that he

3  didn't provide you?

4      A      No, I don't believe I did.

5      Q      After that phone call, the one you just

6  testified about, did you have any more involvement

7  in this series 65 issue with Mr. Morgenstein?

8      A      There were some questions that we

9  assisted legal in in responding to the District, the

10  drafting of the letter to respond to the District of

11  Columbia.

12      Q      And you said we.  Was there you and

13  somebody else, or was it just you?

14      A      I believe the operations manager answered

15  some questions.

16      Q      Who is the operations manager?

17      A      Doug Frantz, I believe, was the

18  operations manager at the time.

19      Q      What did you provide -- what information

20  did you provide?

21      A      A list of accounts that Brandeis, the

22  money manager, had.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 45

1      Q      Did you reach any conclusion as to

2  whether Mr. Morgenstein was performing any

3  activities that required a series 65 license?

4      A      We determined he was not.

5      Q      That he was not performing any activities

6  that required a series 65 license?

7      A      That is correct.

8      Q      And how did you reach that determination?

9      A      The lawyer reached that determination.

10     Q      Doug Lowe?

11     A      Yes.

12     Q      Was that information conveyed to the

13  District?

14     A      Yes, it was.

15     Q      Was that information ever conveyed to

16  Mr. Morgenstein.

17     A      It was, and I don't recall if it was a

18  copy of the letter responding to the District of

19  Columbia or whether it was verbal.  I don't know if

20  Mr. Morgenstein had any conversations with Doug

21  Lowe.

22     Q      Are you sure Mr. Morgenstein was made

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 46

1    aware of that, though?

2         A     Yes.

3         Q     And you are sure because of what?

4         A     A copy of the letter in response to the

5    District was given to him.

6         Q     How do you know that?

7         A     I gave it to him.

8         Q     And that was a letter from who?

9         A     Doug Lowe.

10        Q     Are you sure Doug Lowe made a letter --

11   or wrote a letter?

12        A     It may have been an e-mail.  It was

13   correspondence.

14        Q     And you think you gave that e-mail to

15   Mr. Morgenstein?

16        A     I received a copy of it and I put a copy

17   in Mr. Morgenstein's mail slot.

18        Q     You have a specific recollection of doing

19   that?

20        A     Yes, I do.

21        Q     So after this involvement or this

22   activity where you assisted in the lawyer's response

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

1   to the District, did you have any other involvement

2   in Mr. Morgenstein's request for a series 65 waiver?

3       A       Not that I recall.

4       Q       Did you have any conversations with Ron

5   Masci about the issue, about Mr. Morgenstein

6   requesting a waiver?

7       A       Yes.

8       Q       Tell me about those conversations.

9       A       I told Mr. Masci that Norm had come to

10  me, asked to be grandfathered.  I had spoken with

11  Helen and with Patty Unz.  I told him what their

12  responses were, and that was the conversation.

13      Q       Did Mr. Masci have any response?

14      A       Not that I recall.

15      Q       Sitting here today, you don't recall what

16  he said?

17      A       I believe it was on a list of things that

18  I just kept him up to date on that were happening in

19  the office.  I don't recall any response that he may

20  have had to that.

21      Q       Do you know if Mr. Masci ever made any

22  decision as to whether Morgan Stanley would apply

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 48

1    for a waiver of the series 65 license on

2    Mr. Morgenstein's behalf?

3        A    Mr. Masci didn't have that authority.

4        Q    Well, that wasn't my question.  Do you

5    know if he made any decisions about that?

6        A    No, I do not.

7            MR. KANE:  Let's take a ten-minute break.

8                    (Thereupon, a brief recess was

9                    taken.)

10           BY MR. KANE:

11       Q    Ms. Greenhalgh, are you aware of any

12   requests that Mr. Morgenstein may have made in 1998

13   or 1999 for Morgan Stanley to apply for a waiver on

14   his behalf to the series 65?

15       A    Not that I recall.

16       Q    Let me have you identify some of these

17   e-mails.

18           MR. KANE:  Mark this as 2.

19                    (Whereupon, Deposition

20                    Exhibit Number 2 was marked

21                    for Identification.)

22

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

1      BY MR. KANE:

2      Q    The Reporter has handed you what has been

3  marked as Exhibit 2.  And this looks like an e-mail

4  you sent to Mr. Morgenstein on April 1, 2002, a

5  couple of days after Exhibit 1.  Do you want to take

6  a look at this.  Let me know when you are finished

7  reviewing that?

8      A    Okay.

9      Q    You represent in this e-mail that you are

10  responding to questions that Mr. Morgenstein had for

11  somebody else.  In that first paragraph you say, the

12  branch cancelled MDIA.  Is that Maryland Investment

13  Advisor?

14      A    It is.

15      Q    And you say, branch cancelled Maryland

16  Investment Advisor registrations for all employees

17  that carried them in 1998.  And you go on to make

18  some other statements.

19          The District of Columbia requires the 65

20  exam for Investment Advisor registration and every

21  employee who had not taken the 65 and wanted to use

22  managed money was required to take this 65 exam in

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 50

1    our office.

2            Where did you gain this information?

3    Where did you learn this information?

4        A    The registration department.

5        Q    They told you this?  Was this like --

6    just before you sent this e-mail, you had a

7    conversation with someone in registration, or you

8    knew this?

9        A    No.  The firm had made it very clear to

10   everybody from wide e-mails that the regulations had

11   changed and that if you wanted to act as an

12   investment advisor you must take the series 65 exam.

13       Q    When had the firm done that?

14       A    I don't recall.

15       Q    It would have been sometime before the

16   date of this e-mail, though?

17       A    Correct.

18       Q    And the --

19       A    Oh, I'm sorry.  Yes, yes.

20       Q    Because this is 2002?

21       A    Correct.

22       Q    And you are referring to events that

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 51

1    occurred in 1998?

2        A    Correct.

3        Q    And that second paragraph says, the State

4    of Maryland did not require the 65 exam and we

5    Investment Advisor, licensed F/A's in the state who

6    resided in that state.

7            Does that mean they had the series 65

8    license in Maryland if they resided in Maryland?

9        A    The State of Maryland gave anybody

10   licensed to do business in the State of Maryland the

11   65 exam until 1998 or 1997.

12       Q    So did Mr. Morgenstein have the series 65

13   license in Maryland up until 1998?

14       A    He did.

15       Q    Even though he didn't take the exam?

16       A    Correct.

17       Q    And if he had worked in Maryland, would

18   he have continued to have the series 65 license?

19       A    As I understand it, no.

20       Q    What is your understanding?

21       A    My understanding is that Maryland then

22   required the exam because the regulators did.  It

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 52

1  was no longer states governing the exam, but the

2  NASD.

3      Q    What is the basis for that understanding?

4      A    Our registration department.

5      Q    Someone told you that from registration?

6      A    Yes.

7      Q    Who told you that?

8      A    I don't recall if it was Helen Dachtler

9  or Mary Robertson.

10      Q    And your recollection, though, is that

11  Mr. Morgenstein had come to you before April 1, 2002

12  and requested this grandfathering into the series

13  65?

14      A    Yes.

15      Q    And had not told you about all this other

16  correspondence he had with the District?

17      A    Correct.

18      Q    Did you make any notes of that

19  conversation?

20      A    Not that I recall.

21      Q    Did you make any notes to the file that

22  Mr. Morgenstein came in or Norm came in and asked

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 53

1    about this, anything to that effect?

2        A    I don't understand the question.

3        Q    Did you make any note to the file that

4    Norm came in and asked about getting a series 65

5    license or grandfathered into a series 65 license?

6        A    Not that I recall.

7        Q    When you followed up with those phone

8    calls to Patty Unz and Helen Dachtler, did you make

9    any notes of those conversations?

10       A    Not that I recall.

11       Q    Do you have any notes?  Do you have any

12   personal notes that have not been produced in this

13   litigation?

14       A    I do not.

15            MR. KANE:  I will ask the Reporter to

16   mark this as 3.

17                        (Whereupon, Deposition

18                        Exhibit Number 3 was marked

19                        for Identification.)

20            BY MR. KANE:

21       Q    The Reporter has handed you what has been

22   marked as Exhibit 3.  And this is an e-mail chain

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 54

1    between you and Mr. Morgenstein around the April

2    2002 time frame.  Just for the record, I think the

3    second page probably is a different e-mail chain.

4    It looks like a different date, April 10th and April

5    9th.

6        A    Okay.

7        Q    But just directing your attention to the

8    first page of Exhibit 3.  Was this information

9    Mr. Morgenstein was providing to you in response to

10   your request that he tell you what accounts he had

11   been working on that might be managed money?

12       A    It says, as per your request, so I will

13   answer, yes.

14       Q    And you were asking him that because the

15   District had asked Morgan Stanley to provide the

16   information?

17       A    The legal department had requested that I

18   provide them with the information.

19       Q    And then you sent an e-mail to Mark.  You

20   refer to Mark in that top line.  Do you know who

21   that is?  Mark, please, call me to discuss.

22       A    I don't recall who that is.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 55

1      Q      But you sent the e-mail to Norman

2    Morgenstein.  Was that a typo, or did you mean to

3    say Norm?

4      A      I don't know.

5      Q      At the time this e-mail was sent, do you

6    know if Mr. Morgenstein knew whether the District

7    had denied his request that --

8      A      I don't know.

9      Q      Let me finish the question.  Do you

10   know -- at the time Mr. Morgenstein sent you this

11   e-mail in Exhibit 3, do you know whether he knew

12   that the District had denied his request for a

13   waiver from taking the exam?

14     A      I don't know.

15     Q      What is the ICS program?

16     A      I honestly don't know what ICS stands

17   for, but it's -- the firm does its due diligence and

18   selects money managers that brokers can show to

19   their clients that are interested in that type of

20   product.

21     Q      A financial advisor who has accounts in

22   the ICS program, does he have to have a series 65

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 56

1    license?

2         A     Yes, he does.

3         Q     And is that a firm policy?

4         A     A regulatory requirement.

5         Q     How do you know that?

6         A     I don't recall if it was information

7    received from the firm on their e-mail system or in

8    an SEC memo.  I don't recall.

9         Q     I'm sorry.  You said SEC memo and the

10   first thing I didn't understand that.

11        A     The firm's internal e-mail system is

12   where a majority of our information in the branch

13   system comes from.  So it may have been on that.

14        Q     So was ICS a software program?

15        A     No.  It was a department of the firm.

16        Q     Did it have a web site or a computer --

17   accounts on a computer system?

18        A     I don't know.  I didn't handle accounts.

19   It would not have been --

20        Q     But do you know how a financial advisor

21   would go about calling up an ICS account on their

22   computer screen?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 57

1      A      I don't understand the question.

2      Q      Let's say a broker or a financial advisor

3 wanted to see some account that was in the ICS

4 program.

5      A      Okay.

6      Q      Could they do that by going on to their

7 computer screen typing that into the computer and

8 calling up the account?

9      A      Yes.

10      Q      Would they only be able to get into that

11 if they had a series 65 license?

12      A      They wouldn't have accounts in the ICS

13 system without a 65 license.

14      Q      Was the computer set up, though, so that

15 if you didn't have a 65 license, you couldn't get

16 into ICS accounts?

17      A      I can't answer that.

18      Q      Who would be able to answer that?

19      A      A financial advisor has accounts that are

20 under his or her financial advisor's numbers --

21 number.  You have access as that financial advisor

22 to those accounts and those accounts only.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 58

1          If you are not properly licensed to

2     maintain those accounts, they are no longer under

3     your financial advisor's number.

4          Q     Is there someone at the branch who might

5     have more information about this issue of how to

6     access ICS accounts?

7          A     Yes.

8          Q     Who would that be?

9          A     Every financial advisor in the office.

10         Q     You mentioned in earlier testimony that

11    there were about 150 brokers or financial advisors

12    in the office.

13         A     Correct.

14         Q     And that was like in the 2000, 2001, 2002

15    time frame?

16         A     I believe what I said was the 1999 to

17    2000 time frame.

18         Q     How many of those financial advisors had

19    been there more than ten years?

20         A     Fifty percent, as a guess.

21         Q     What was the attrition rate like at the

22    office for financial advisors?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 59

1      A      Very low.

2      Q      Meaning there wasn't a lot of turnover?

3      A      Yes.

4      Q      Meaning people who came as financial

5  advisors didn't leave with any frequency?

6      A      Correct.

7      Q      When you say 150 financial advisors, are

8  you including trainees?

9      A      No.

10     Q      Who are you including in that definition?

11            MR. SCALIA:  Objection.  Vague.

12            THE WITNESS:  Licensed financial

13  advisors.

14            MR. KANE:  Let's mark this as 4.

15                     (Whereupon, Deposition

16                      Exhibit Number 4 was marked

17                      for Identification.)

18            BY MR. KANE:

19     Q      You have had a chance to review the

20  document?

21     A      Um-hmm.

22     Q      You have to say yes or no.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 60

1        A        Yes.

2        Q        And this is an e-mail chain between you

3    and Mr. Morgenstein?

4        A        Correct.

5        Q        Who is Catherine Kreiger?

6        A        The woman that was going to be my

7    replacement, but wasn't.

8        Q        And Mr. Morgenstein in this e-mail refers

9    to a stapled packet of documents, communications he

10   had with DCSD.  I assume that's the District agency.

11       A        Correct.

12       Q        Was this a complete set of documents, or

13   is this the half packet you were referring to

14   earlier?

15       A        I don't recall.

16       Q        And then he writes, I made a follow-up

17   call to check on the resolution of my exemption

18   request, as they told me they would have an answer

19   for me by, on March 8th.  I played phone tag with

20   Lilah Blackstone.  And then Mr. Morgenstein found

21   out Paul Garopoli was under Mary Robertson.

22                But it sounds like Mr. Morgenstein still

Page 61

1    doesn't know that a decision has been made on his

2    request.  Does looking at this refresh your

3    recollection about whether Mr. Morgenstein knew --

4    at this time whether he knew that his request for a

5    waiver had been denied?

6         MR. SCALIA:  Objection.  Calls for

7    speculation.

8         THE WITNESS:  Mr. Morgenstein was very

9    clear that Morgan Stanley had denied his request.  I

10   can only look at this and think that he was not --

11   he was not aware what the District had decided.

12        BY MR. KANE:

13   Q     When you say Mr. Morgenstein was very

14   aware that Morgan Stanley had denied his request,

15   what are you referring to?

16   A     My conversation with him after his

17   request for a waiver and my conversation with Helen

18   Dachtler and Patty Unz.

19   Q     Did he ever relate to you the substance

20   of his meeting with the District in that March '02

21   meeting that's referenced?

22   A     Not that I recall.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 62

1      Q      Do you know what prompted Mr. Morgenstein

2   to seek the waiver to get the series 65 license?

3      A      No.

4      Q      Do you have any knowledge of

5   Mr. Morgenstein's request that Morgan Stanley apply

6   for a waiver on his behalf from the examination

7   requirements of the series 65 license in the

8   November 2003 time frame?

9      A      Repeat the question.

10     Q      I was hoping you wouldn't ask that.  Do

11  you have any knowledge of Mr. Morgenstein asking for

12  a -- let's call it a waiver request in the late 2003

13  time frame?

14     A      I do not.

15     Q      So you had no conversations with anyone

16  about that issue?

17     A      Not that I recall.

18     Q      So as far as you know, Mr. Morgenstein

19  had -- his request for a waiver from the exam came

20  up in maybe the late 2001, early 2002 time period,

21  and that's all you have information about?

22     A      Correct.

Page 63

1     Q     Was there any discussion -- with regards

2   to Mr. Garopoli saying that he had not authorized

3   Mr. Morgenstein to talk directly with the District,

4   was there any conversation about Mr. Morgenstein

5   being disciplined for that?

6     A     I don't recall.

7     Q     Did you have any conversations with

8   Mr. Masci about Mr. Morgenstein going directly to

9   the District?

10    A     Yes, I did.

11    Q     Tell me about that.

12    A     I advised him that the legal department

13  was quite upset that this had occurred, that it may

14  potentially jeopardize the firm's license in the

15  District of Columbia and that he should be aware of

16  it and who in the legal department was working on it

17  and that if I heard anything else, I would let him

18  know.

19    Q     That's what you said to Mr. Masci?

20    A     Not necessarily in those exact words, but

21  yes.

22    Q     And did Mr. Masci say anything in

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 64

1    response?

2        A    Yes, he did.

3        Q    What did he say?

4        A    I don't believe those are words that we

5    can use here.

6        Q    Don't worry.  You can use them.

7        A    He was not happy.

8        Q    Okay.

9        A    To appreciate the fact that the District

10   of Columbia has the power and authority to disrupt

11   the entire firm's ability to do business in the

12   District of Columbia is a financial loss that I

13   wouldn't even want to guess, plus every individual

14   that works there income would be disrupted because

15   of one individual's decision to violate firm policy

16   after being told no.

17            So I don't recall Mr. Masci's exact

18   words, but I can assure they were pretty strong and

19   probably pretty loud.

20       Q    Well, did he talk about disciplining

21   Mr. Morgenstein?

22       A    I don't recall.

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 65

1      Q    And you don't know for a fact whether

2  Mr. Garopoli had actually instructed Mr. Morgenstein

3  to contact the District directly?

4      A    No, I don't.

5      Q    So Mr. Morgenstein may have been acting

6  in good faith when he was contacting the District

7  directly?

8           MR. SCALIA:  Objection.  Calls for

9  speculation.

10          THE WITNESS:  I believe what Paul told me

11  that day on the telephone, on the conference call.

12  I believe Paul.  I do not believe Norman.

13          BY MR. KANE:

14     Q    Why don't you believe Norman?

15     A    Because of the whole series of events and

16 how they occurred, I believe what Paul told us that

17 day on the conference call.

18     Q    Did you ever ask Mr. Morgenstein about

19 this issue?

20     A    I did.

21     Q    What did you ask him?

22     A    I asked him, why he violated the policy

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 66

1    and went to the District and put the firm in this

2    sort of exposure?

3        Q      When did you ask him that?

4        A      After the lawyer called, when I requested

5    that he provide us all the documentation that he had

6    relating to the District.

7        Q      So that would have been in the April 2002

8    time frame, March or April of 2002?

9        A      Best recollection, yes.

10       Q      Was that in a face-to-face conversation?

11       A      I don't recall.

12       Q      What did Mr. Morgenstein say?

13       A      I don't recall that it was a

14   conversation.  I think it was more, I can't believe

15   you did what you did.  Give me everything you have,

16   and the lawyers are now handling it.  I don't

17   believe that I waited for a response.

18       Q      So would it be fair to say you never got

19   Mr. Morgenstein's side of the story?

20       A      That's correct.

21       Q      Did you ever actually review the

22   correspondence Mr. Morgenstein personally sent to

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 67

1    the District?

2        A    I believe I read it.

3        Q    Did you notice that he copied

4    Mr. Garopoli on the correspondence?

5        A    I don't recall that, although I am aware

6    of it because of the conference call.

7        Q    You are aware that he copied

8    Mr. Garopoli?

9        A    I'm aware from the conference call that

10   he told someone that he copied Mr. Garopoli.

11       Q    You are referring to the conference call

12   with Mr. Garopoli on the line?

13       A    Correct.

14       Q    Did anyone have the actual documents that

15   Mr. Morgenstein had sent directly to the District?

16       A    I don't recall, but I believe that they

17   were referred to in the conference call.

18       Q    And did anyone say, it says right here

19   you were copied on it?  Did anyone ask Mr. Garopoli

20   whether he received those copies?

21       A    Yes, and he denied that.

22       Q    He denied that he received the copies?

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 68

1      A      That is correct.

2      Q      Who asked him that question?

3      A      I don't recall who on the conference call

4  asked that question.

5      Q      After Mr. Lowe sent his e-mail to the

6  District, I guess -- just to paraphrase it, saying

7  that Mr. Morgenstein didn't need a series 65 license

8  to handle the accounts he had, do you know of any

9  other contact the District had with Morgan Stanley

10  over this issue with Mr. Morgenstein?

11      A      Not that I'm aware of.

12      Q      Do you know why the District denied

13  Mr. Morgenstein's request for a waiver from taking

14  the series 65 exam?

15      A      I do not.

16            MR. KANE:  Let's take a short break and

17  wrap up.

18            MR. SCALIA:  Okay.

19                        (Thereupon, a brief recess was

20                        taken.)

21            BY MR. KANE:

22      Q      I just have a couple of questions.  You

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 69

1    have testified today about some conversations you

2    had with Ron Masci.  Are there any other

3    conversations you had with Mr. Masci concerning

4    Mr. Morgenstein that you haven't told me about?

5        A    Not that I recall.

6        Q    Have you ever requested that

7    Mr. Morgenstein provide any medical information?

8        A    On many occasions.

9        Q    Okay.  Well, let's start in 2000.  What

10    have you asked him to provide?

11        A    Anytime that Mr. Morgenstein would say he

12    was disabled, I would request him to, please,

13    provide us with the proper documents, and he never

14    did that.

15        Q    Tell me all the times that happened.

16        A    I couldn't even begin to tell you all the

17    times that happened or in the time frame to which it

18    happened.

19        Q    Why not?

20        A    Because I wouldn't recall whether it was

21    10 times or 40 times and what those times were.  But

22    anytime that Mr. Morgenstein said, I can't do this

b8bfa7b4-bcf8-4ac0-b901-a8b80541ae4b

Page 70

1    or I won't do this because I'm disabled, I would

2    request him to, please, provide us with

3    documentation, and he, as I said, never did it.

4        Q    And sitting here today, you can't provide

5    me with any specifics?

6        A    I'm sorry.  I can't.

7        Q    You testified earlier that you had a

8    conversation with Mr. Morgenstein where he asked to

9    be grandfathered into the series 65.

10       A    Correct.

11       Q    Did you ask him for any medical

12   information at that time?

13       A    I don't recall.

14            MR. KANE:  I have no further questions.

15            MR. SCALIA:  I have no questions.  We

16   will read.

17                        (Whereupon, signature having

18                        not been waived, at 12:55 p.m.

19                        the deposition concluded.)

20

21

22

" "

```
1              CERTIFICATE OF NOTARY PUBLIC
2              I, Carolyn E. Friend, the Officer
3      before whom the foregoing Deposition was taken,
4      do hereby certify that the witness whose
5      testimony appears in the foregoing Deposition
6      was duly sworn by me; that the testimony of said
7      witness was taken by me in stenotypy and
8      thereafter reduced to typewriting by me; that
9      the said Deposition is a true record of the
10     testimony given by said witness; that I am
11     neither counsel for, related to, nor employed by
12     any of the parties to this litigation; and
13     further that I am not a relative or an employee
14     of any attorney or counsel employed by
15     theparties hereto, nor financially or otherwise
16     interested in the outcome of this matter.
17
18
19     _____
                   Notary Public in and for
20                 the District of Columbia
21     My Commission Expires:
       November 1, 2008
22
```

MISTY KLAPPER & ASSOCIATES
(703) 780-9559

Blackstone, Lilah (DISB)

| | |
|---|---|
| From: | Robertson, Mary [Mary.Robertson@morganstanley.com] |
| Sent: | Thursday, March 28, 2002 12:49 PM |
| To: | 'lilah.blackstone@dc.gov' |
| ∴: | Masci, Ron; Greenhalgh, Carolyn ; Dachtler, Helen |
| Subject: | Norman Morgenstein |


Hi Lilah,

Please be advised that Mr. Morgenstein's branch manager, Ron Masci, has been notified of the state's request. It has been confirmed that Mr. Morgenstein has been notified that he must take and pass the series 65 in order to become investment adviser rep registered in DC.

Should you have any questions, please feel free to contact me at 212-762-4862. Thank you for your cooperation in this matter.

Sincerely,
Mary Robertson


**** Important Notice to Recipients **** It is important that you do not use e-mail to request, authorize or effect the purchase or sale of any security or commodity, to send fund transfer instructions, or to effect any other transactions. Any such request, orders, or instructions that you send will not be accepted and will not be processed by Morgan Stanley.
**********************************





Morgenstein 530

-----Original Message-----
**From:** Greenhalgh, Carolyn
**Sent:** Monday, April 01, 2002 11:41 AM
**To:** Morgenstein, Norman
**Cc:** 'Benjamin.Bair@morganstanley.com'
**Subject:** DCIA

Norman:

I'm responding to your e-mail to Andrea regarding you DCIA.

1. The branch cancelled MDIA registrations for all employees that carried them in 1998. The laws changed and every F/A had to be IA registered in the state where the office they worked in was located, which meant that MDIA was no longer necessary for any employee in our office. The Disctrict of Columbia requires the 65 exam for IA registration and every employee who had not taken the 65 and wanted to use managed money was required to take the 65 exam in our office, including you.

2. The State of Maryland did not require the 65 exam and we IA licensed F/A's in the state who resided in that state. Having or not having the MDIA did not have any effect on the requirement other states had for the 65 exam.

3. The reason you have to take the 65 exam is because the District of Columbia requires it.

4. Morgan Stanley does not have the ability to grant a waiver.

5. Your licenses are carried by Morgan Stanley and all communication/correspondance goes throuogh our Natrional Registration Department. In addition, The District of Columbia is questioning what business you did after 1998 without a DCIA license. Please give me copies of all correspondance you had with DC, a list of any accounts you have that are/were managed between 1998 and the present, and a list of how you were paid on those accounts and the amounts you were paid so we can respond.

Feel free to have your attorney contact Benjamin Bair, Morgan Stanley's attorney regarding the e-mail and licensing issues.

Carolyn Greenhalgh

2



MORGENSTEIN 38

## Morgenstein, Norman

**From:** Greenhaigh, Carolyn
**Sent:** Wednesday, April 03, 2002 11:14 AM
**To:** Morgenstein, Norman
**Subject:** RE: DCIA

Mark:

Please give me a call to discuss.

Thanks
C

----Original Message----
**From:** Morgenstein, Norman
**Sent:** Tuesday, April 02, 2002 2:03 PM
**To:** Greenhaigh, Carolyn
**Subject:** RE: DCIA

Dear Carolyn,

As per your request, I have placed a copy of all written correspondence between myself and Director Theodore Miles' office, on your desk.

Ever since I've been working for Morgan Stanley, and it's predecessor companies, the firm has always handled my registration. I'm sure you can understand that I'm most distressed over a situation which I have not created and I look to Morgan Stanley to rectify the problem.

Concerning the "business" I did and the commissions I was paid after 1998; we are not legally required to keep records of this information.

To the best of my recollection, the accounts managed by Brandes within the ICS system were/are as follows:

642-098145-23  Mark Sandground, Jr (2nd cousin) Last trade 4/13/99.  Brandes was dismissed shortly thereafter and positions journaled to 642-98619

642-098051-23  My personal account, still managed by Brandes.

642-149105-23  Robin M. Fields Rev. Trust (1st cousin) . Journal from 642-98858, a personal account on or around 12/3/99 to the trust account. Still Managed by Brandes

642-112559-23  Marcia Sandground Rev. Trust (1st cousin)  Brandes was dismissed on or around 12/1/01.

642-098144-23  Marcia Sandground IRA (1st cousin).  Still managed by Brandes

642-116655-23  Richard Sheiben.  Brandes was dismissed immediately after a purchase on 3/17/99.

Lastly, how do I get in touch with Benjamin Bair?

Sincerely,

Norm

1



MORGENSTEIN 41

642-112559 - who hired Brandes to manage the account and who terminated the relationship with Brandes?

642-098144 - who hired Brandes to manage the account?

642-116655 - who hired Brandes to manage the account and who terminated the relationship with Brandes?

-----Original Message-----
**From:** Morgenstein, Norman
**Sent:** Wednesday, April 10, 2002 11:50 AM
**To:** Greenhalgh, Carolyn
**Subject:** RE: DC Securities Department Inquiry

Dear Carolyn,

In answer to your questions; none of the accounts are fee based, bills for management fees are sent directly to me by Brandes and are paid directly from the accounts to Brandes via LOA, my account started with Brandes 4/10/92 because of their record and my cousins followed suit in 1994 after reviewing results. The account of Richard Sheiben was directed to me by Brandes through their leads.

Sincerely,

Norm

-----Original Message-----
**From:** Greenhalgh, Carolyn
**Sent:** Tuesday, April 09, 2002 4:57 PM
**To:** Morgenstein, Norman
**Subject:** DC Securities Department Inquiry

Norman:

Are any accounts under your F/A # fee based accounts?

Did you recommend Brandes to your clients or did they choose Brandes?

**Tracking:**

| Recipient | Read |
|---|---|
| Greenhalgh, Carolyn | Read: 4/15/02 11:18 AM |

2

MORGENSTEIN 42

-----Original Message-----
**From:**      Morgenstein, Norman
**Sent:**      Monday, April 22, 2002 4:07 PM
**To:**        Greenhalgh, Carolyn
**Subject:**   RE: Information

Dear Carolyn,

On April 2, 2002, and at your request, I place a stapled packet on you desk of all communications I had with DCSD. For identification purposes, the first page was a fax cover to Mary Robertson @MS Registration, dated March 14/22. If you will review any document I sent to DCSD, you will see a 'cc' to Paul Garipole, Registration Dept. MSDW.

So you will know the sequence of events; the week after my March 5, 2002 meeting with DCSD, I made a follow up call to check on the resolution of my exemption request, as they told me they would have an answer for me by (on) March 8th. I played phone tag with Lilah Blackstone and the message she left was she was in touch with Mary Robertson at MS. I phone Mary Robertson and explained the situation. It was at this time that I found that Mary was the head of the department, and Paul Garipole was under her.

Sincerely,

Norm

-----Original Message-----
**From:**      Greenhalgh, Carolyn
**Sent:**      Monday, April 22, 2002 2:19 PM
**To:**        Morgenstein, Norman
**Cc:**        Lowe, Douglas
**Subject:**   RE: Information

I was not aware that you has spoken with any one in ICS licensing. Please give me the name of the individual you were working with.

I will forward you the request from DCSD.

Carolyn

-----Original Message-----
**From:**      Morgenstein, Norman
**Sent:**      Monday, April 22, 2002 12:55 PM
**To:**        Greenhalgh, Carolyn
**Subject:**   Information

Dear Carolyn,

On 4/15/02, I requested copies of the information requests from the DC Securities Department concerning my Series 65 license, so that I can properly address their requests for information. To date, I have not received a response from you. For 11 months, I communicated directly with DCSD under the supervision of the ICS licensing department in New York. There is no reason that I should not be kept informed, since this is my future. Therefore, please advise me that you will provide the documents, or that you refuse to provide the documents.

Your immediate attention is appreciated.

Sincerely,

Norm

**Tracking:**        **Recipient**                      **Read**
                     Kreger, Catherine                   Read: 4/23/02 1:56 PM

2



