**Misty Klapper & Associates**
7900 Andrus Road
Suite 11
Alexandria, Virginia   22306
(703) 780-9559

July 31, 2006


To:  John Scalia, Esquire

Re:  Morgenstein v. Morgan Stanley

Dear Mr. Scalia:

Enclosed with your copy of the deposition(s) of Matthew Ridnouer and Ronald Masci is/are the original signature page(s) and errata sheet(s).   Kindly have the witness(es) read your copy of their respective deposition(s) and sign these pages.   This should be done within 30 days of the date of this letter, as after this time period signature is automatically considered waived.

Please forward the referenced pages, after signature, directly to Michael Kane, Esquire, who is in possession of the original transcript(s).

                    Sincerely,


                    Misty Klapper & Associates


cc:  Michael Kane, Esquire

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x

NORMAN L. MORGENSTEIN,            :            ORIGINAL

      Plaintiff,               :

   v.                          : C.A. NO. 05-2123 (JR)

MORGAN STANLEY DW, INC.,          :

      Defendant.               :

- - - - - - - - - - - - - - - x

                    Washington, D.C.

                    Tuesday, July 18, 2006

DEPOSITION OF:

MATTHEW T. RIDNOUER

called for examination by counsel for the Plaintiff,

pursuant to notice, taken at the law offices of Cashdan

and Kane, PLLC, 1150 Connecticut Avenue, N.W., Suite 900,

Washington, D.C., commencing at 9:08 a.m., before Maureen

S. Bennie, a Notary Public in and for the District of

Columbia, when were present on behalf of the respective

parties:

2

APPEARANCES:

On behalf of the Plaintiff:

    MICHAEL G. KANE, ESQUIRE
    CASHDAN & KANE, PLLC
    1150 Connecticut Avenue, N.W.
    Suite 900
    Washington, D.C. 20036
    (202) 862-4330

On behalf of the Defendant:

    JOHN F. SCALIA, ESQUIRE
    MATTHEW H. SORENSEN, ESQUIRE
    GREENBERG TRAURIG, LLP
    1750 Tysons Boulevard
    Suite 1200
    McLean, Virginia 22102
    (703) 749-1380

Also Present:

    NORMAN MORGENSTEIN
    PETER M. SCHULTZ

3

# C O N T E N T S

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| Matthew T. Ridnouer | Mr. Kane | 4 |

# E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|-------------|-------------|------|
| 1 | Series of e-mails dated 3/25/02 and 3/26/02 | 22 |
| 2 | E-mail, Morgenstein to Masci dated 12/1/03 | 30 |
| 3 | Handwritten notes | 36 |
| 4 | Series of e-mails dated 1/27/04 and 1/28/04 | 37 |
| 5 | Memo, Hawksby to Masci, dated 11/29/01 | 41 |

NOTE:  EXHIBITS MARKED AND ATTACHED.

4

1                    P R O C E E D I N G S

2   Whereupon,

3                    MATTHEW T. RIDNOUER

4   was called for examination, and, after being duly sworn by

5   the Notary Public, was examined and testified as follows:

6            EXAMINATION BY COUNSEL FOR PLAINTIFF

7            BY MR. KANE:

8        Q   Good morning, Mr. Ridnouer.  Am I pronouncing

9   that correctly?

10       A   Ridnouer.

11       Q   Ridnouer?

12       A   Uh-huh.

13       Q   And could you just state your full name for the

14  record?

15       A   Sure.  Matthew T. Ridnouer.

16       Q   And what's your home address?

17       A   708 Falls Creek Court, Chesapeake, Virginia

18  32233.

19       Q   And your home phone number?

20       A   (757) 548-1198.

21       Q   And are you currently employed?

22       A   Yes.

5

1        Q    And who are you employed by?

2        A    Morgan Stanley.

3        Q    And where do you work?

4        A    In the Washington, D.C. office -- I'm in a

5    transition-type mode -- as a financial advisor.

6        Q    And where are you a financial advisor?

7        A    In the Washington, D.C. office of Morgan

8    Stanley.  I'm at 1775 Eye Street.

9        Q    And your position there is financial advisor?

10       A    That's correct.

11       Q    And how long have you held that position?

12       A    Since the first of the year, January 2006.

13       Q    And what was your position before that?

14       A    I was a branch manager in the Virginia Beach

15   office.

16       Q    And how long were you a branch manager?

17       A    Approximately a year-and-a-half.

18       Q    And was that all in Virginia Beach?

19       A    Correct.

20       Q    And where were you before that?

21       A    I was in this same Washington, D.C. office.

22       Q    In what capacity?

6

1      A    Sales manager.  I was there for approximately

2  14 years.  I started my career in 1989.

3      Q    And what's your date of birth?

4      A    11/12/64.

5      Q    Have you ever been deposed before?

6      A    No.

7      Q    All right.  Just briefly, I am going to be

8  asking you a series of questions like I have just been

9  asking you.  Your responses are all under oath.  You are

10  obligated to tell the truth.

11          Do you understand the importance of the oath?

12      A    Yes.

13      Q    And if I ask you a question and you have trouble

14  understanding it, you can always ask me to rephrase it.

15  Let me know what you are having trouble with, and I will

16  try and do that, try and rephrase it.

17      A    Okay.

18      Q    Do you understand that?

19      A    Yes.

20      Q    And your answers have to be audible, yes/no.

21  You can't shake your head or nod your head.

22      A    Yes.

7

1      Q    Did you review any documents before your

2   deposition today?

3      A    Yes.

4      Q    All right.  What documents did you review?

5           THE WITNESS:  Is that a --

6           BY MR. KANE:

7      Q    You can't get help from the audience.

8           MR. SCALIA:  He is looking at me because he

9   wonders whether it is attorney-client privilege.

10          Go ahead.

11          THE WITNESS:  Correct.

12          BY MR. KANE:

13     Q    Well, your counsel will object if there is an

14  attorney-client privilege.

15     A    I don't remember.  It was when we were preparing

16  a couple weeks ago or three weeks -- when we were supposed

17  to have it before.

18     Q    Do you recall how many documents you reviewed,

19  approximately?

20     A    Two.

21     Q    All right.  Sitting here today, can you recall

22  what those two documents were?

8

1       A    No.

2       Q    And when you say you prepared, was that with

3   your counsel, Mr. Scalia?

4       A    Yes.

5       Q    Was there anyone else present?

6       A    No.  Oh, yes.  Matt.

7       Q    Matt Sorensen?

8       A    Yes.

9       Q    And how long did that meeting last?

10      A    Forty-five minutes.

11      Q    Aside from speaking with Mr. Scalia and

12   Mr. Sorensen, did you speak with anyone else about your

13   deposition today?

14      A    No.

15      Q    Did you talk to Mr. Masci about your deposition?

16      A    No.

17      Q    When was the last time you spoke to Mr. Masci?

18      A    Yesterday.

19      Q    And was that on the phone?

20      A    Yes.

21      Q    Did you call him?

22      A    Yes.

9

1     Q    And why did you call him?

2     A    One of his colleagues resigned, and I thought he

3  should know about it since he is no longer attached to the

4  office.

5     Q    And who was that?

6     A    It was the head of mutual funds, red-haired guy.

7  You killed my -- I had it in my head.  I guess I don't

8  recall.

9     Q    Okay.

10    A    What's his name?  Jack Kemp.

11    Q    Jack Kemp?

12    A    Yes.

13    Q    Not the Jack Kemp?

14    A    Not the presidential candidate, correct.

15    Q    All right.

16         MR. SCALIA:  Not the quarterback?

17         THE WITNESS:  No.  Well, he was a quarterback at

18  University of Colorado many moons ago.

19         BY MR. KANE:

20    Q    But Jack Kemp at Morgan Stanley?

21    A    Uh-huh.

22    Q    Okay.  And did you talk about your deposition at

10

1    all when you spoke to Mr. Masci?

2        A    No.

3        Q    And prior to yesterday, when was the last time

4    you had spoken to Mr. Masci?

5        A    The week before last.  He was in town for a

6    David Darst seminar.

7        Q    What is a David Darst seminar?

8        A    David Darst is our strategist.  We had a client

9    seminar and he was attending that.

10       Q    Does Mr. Masci work at Morgan Stanley anymore?

11       A    No.

12       Q    Is he retired?

13       A    Yes.

14       Q    Do you know if that was a voluntary retirement?

15       A    Yes.

16       Q    When did he retire?

17       A    July 1st.

18       Q    Of this year?

19       A    Yes.

20       Q    And when did you start at Morgan Stanley?

21       A    April of '89.

22       Q    And in what office?

11

1      A     The same office.  It was located on a different

2   street or address, but same office.

3      Q     In the D.C. office?

4      A     Yes.

5      Q     And was Mr. Morgenstein in that office?

6      A     Yes.

7      Q     And when you started, what was your title?

8      A     Sales assistant.

9      Q     And how long were you a sales assistant?

10     A     Approximately five to seven years.  I don't

11  recall exactly the date, because my title fluctuated.

12     Q     And what did you do as a sales assistant?

13     A     Assisted brokers in administering their

14  business.

15     Q     And what did you do next after being a sales

16  assistant?

17     A     I was the branch technology person.

18     Q     What did you do in that capacity?

19     A     They went through a technology change and I

20  helped teach, train, set up marketing programs, database

21  manipulation, that type of stuff, with the new

22  workstations.

12

1     Q     And how long were you in that capacity?

2     A     Approximately three years.

3     Q     And what did you do next?

4     A     I was the assistant branch manager.

5     Q     And you were assistant to who?

6     A     To Ron Masci.

7     Q     And what did you do as an assistant branch

8  manager?

9     A     In that capacity I still had the technology

10  role, and then I was in charge of training and hiring new

11  FAs and I helped the senior FAs with random issues with

12  administration of their accounts and I was a signer for,

13  you know, opening new accounts and all that administrative

14  oversight that a manager is responsible for.

15    Q     And who hired you at Morgan Stanley?

16    A     Ron Masci.

17    Q     And who promoted you into these other positions?

18    A     Ron Masci.

19    Q     And after being assistant branch manager, what

20  did you become?

21    A     Sales manager.

22    Q     And that was in the D.C. office?

13

1      A     That's correct.

2      Q     And then after that you went down to the

3   Virginia Beach office?

4      A     That's correct.

5      Q     And tell me about your educational background.

6      A     I have a bachelor of science in economics from

7   George Mason.

8      Q     Any postgraduate work?

9      A     No, just your standard licenses to do the job.

10     Q     When did you get your B.S.?

11     A     I graduated in December of '88.

12     Q     And what was the concentration?

13     A     Economics.

14     Q     And you said you took some courses or licenses

15   after you graduated, I guess, over the years?

16     A     The licenses for our industry.

17     Q     What licenses do you hold?

18     A     The 7, 63, 65, 8 and 9 and a Virginia life and

19   health.

20     Q     And you studied for and took all those exams?

21     A     Yes.

22     Q     I want to direct your attention to the 2002-2003

14

1    time period.  At that time in the D.C. office, was there

2    an ICS program?

3        A    Yes.

4        Q    And what is that?

5        A    It's a managed money program where you hire an

6    outside manager to manage a client's assets.

7        Q    And when you say you hire an outside manager, is

8    that a financial advisor who does that?

9        A    Yes.  It's much like -- there's a series of

10   choices of managers that you can choose from, and you

11   choose those managers and, you know, do all the paperwork

12   for that manager to manage the money with discretion.

13       Q    And does the FA who chooses the managed money

14   program, do they have to have a Series 65 license?

15       A    Series 65 or 66.

16       Q    And why is that?

17       A    It's the rules of the industry that you have to

18   have that license, because you are hiring somebody to use

19   discretion and manage -- essentially manage the money, and

20   to do that, you are required to have both those licenses.

21       Q    And what is the Vision program?

22       A    It's the same type of program, but the minimums

15

1    are higher.

2         Q    You mean like the minimum assets you have to

3    have?

4         A    You have to have to have them manage the money.

5         Q    And what are the minimum assets?

6         A    Well, it varies per manager.  The Access or ICS

7    program that you were talking about earlier, they all have

8    a $100,000 minimum.  Vision has higher minimums from that.

9         Q    And was there a way to access ICS or Vision from

10   an FA's computer?

11             MR. SCALIA:  Objection, vague.

12             BY MR. KANE:

13        Q    Did you understand my question?

14        A    No.

15        Q    Well, if an FA is sitting at his computer, can

16   he access an ICS account?

17             MR. SCALIA:  Objection, vague.

18             THE WITNESS:  From my experience, yes.

19             BY MR. KANE:

20        Q    Okay.  And how would he do that?

21        A    You need to be more specific.

22        Q    Well, let's say an FA has a client --

16

1      A    I don't understand what you mean by access.

2      Q    Call it up onto his computer to see what amount

3  is in the account and how it did the previous day.

4           MR. SCALIA:  Objection, vague.

5           THE WITNESS:  Yes.

6           BY MR. KANE:

7      Q    Okay.  How would they do that?

8      A    They would have to -- they would put in a verb

9  -- it's just like looking up any other account.  There's

10 no difference in looking up the account than a regular

11 account.

12     Q    Okay.  Describe for me how that would happen.

13     A    What do you mean?

14     Q    Would they sit down at their computer and type

15 in --

16     A    A verb, A, space and the account number, and the

17 account will come up.

18     Q    And would the account number have something

19 signifying that it was an ICS account?  Would there be

20 some, like, prefix to the account?

21     A    No.  There would be a -- on that particular

22 page, the A page, there would be a code and it would say

17

1    access.

2        Q    And in order to access that particular account

3    if it was in ICS, would the FA have to have a Series 65

4    license?

5        A    To view it?

6        Q    Yes.

7        A    No, because the sales assistants could view it

8    just as well as -- to open it, yes.

9        Q    To open it they would need a Series 65?

10       A    Yes.

11       Q    How would they go about opening the account?

12       A    Could you be more specific to time?

13       Q    Well, like in the early 2000s; you know, 2001,

14   2002, 2003, that time period.  If an FA wanted to open an

15   account in ICS, how would they go about doing it?

16            MR. SCALIA:  Objection, vague.

17            THE WITNESS:  When you say that, do I answer it?

18            MR. SCALIA:  Go ahead and answer unless I

19   instruct you not to.

20            THE WITNESS:  Okay.  You would open an account

21   as a standard account and then you would go through a

22   questionnaire for a due diligence, as far as does the

1    client qualify for this type of account and the manager

2    that you are selecting for them.  That prints out a

3    contract.  The client signs the contract.  Then you have

4    to take it to your supervisor for review.  That can be a

5    designated Series 8 person in the office.  They review it

6    and make sure that the person who is submitting the

7    account under their financial advisor number has all the

8    proper licenses that -- you know, that the financials

9    match up with the questionnaire, and you submit the

10   contract.  The contract goes to the money manager, and

11   then the money manager begins trading the account or

12   investing the account.

13            BY MR. KANE:

14       Q    And is the FA's role pretty much over at that

15   point?

16       A    Other than monitoring, you know, the

17   performance, yes.  They don't trade.

18       Q    And how is the FA compensated on that account?

19       A    It's a fee-based account.  It's an annualized

20   contract, but it's paid quarterly.

21       Q    And what does that mean, fee-based?

22       A    It means the client has agreed to pay a fee in

19

1   lieu of commissions on the transactions.  Part of the fee

2   goes to the manager and part of the fee goes to the firm,

3   which the FA shares in.

4       Q    Do you have any knowledge of Mr. Morgenstein's

5   attempts to obtain a Series 65 license?

6       A    Yes.

7       Q    Tell me what you know about that.

8       A    I know that he wanted to take the exam to get

9   the license, and I know that he never took the test, and I

10  know that he did a great deal of investigating on how to

11  avoid taking the test with his medical issues.

12      Q    What did you know about Mr. Morgenstein's

13  medical issues?

14      A    Just whatever he told me.  You know, he has a --

15  he had some kind of tumor removed that made it difficult

16  to do -- or so he stated -- certain things, such as

17  hearing.  I don't know what else it limited him to, but

18  that, you know, it slowed things down for him, I guess, is

19  the biggest thing.

20      Q    Did you have any awareness that his ability to

21  read was affected?

22      A    No.

20

1    Q    You had never heard of that?

2    A    No.

3    Q    Had he ever told you that?

4    A    No.  He had -- on a couple of occasions, through

5    just, you know, meeting in the hallway or me stopping by

6    his office to see how he was doing or his dad was doing

7    and so on and so forth, he had mentioned that, you know,

8    it would be hard for him to take the test with, you know,

9    this issue.  He never explained, you know, why it would be

10   hard.  You know, it was just -- and that he was seeking an

11   exemption for -- to bypass the test.

12   Q    Did you have any duties as far as evaluating a

13   request for an accommodation from an employee?

14   A    No.

15   Q    Who did?

16   A    I would guess the manager would take care of

17   that type of request.

18   Q    The manager being Ron Masci?

19   A    Right.  And then he probably, you know, would go

20   to New York for guidance on that.

21   Q    You mentioned Mr. Morgenstein's father.  Who is

22   that?

21

1      A    Al Morgenstein.

2      Q    And did he work at Morgan Stanley?

3      A    Yes.

4      Q    And he had been there for quite some time?

5      A    Correct.

6      Q    And did you understand that he retired in '03 or

7  '02?

8      A    Yes.

9      Q    Did you have any involvement with what happened

10  to the senior Morgenstein's accounts?

11      A    No.

12      Q    Do you know who did?

13      A    That would be Ron Masci, the manager.

14      Q    Are you familiar with an issue over a modem that

15  Mr. Morgenstein wanted?

16      A    No.

17      Q    It doesn't ring a bell that he wanted a modem to

18  work from home?

19      A    Vaguely.

20      Q    Tell me what you recall about that.

21      A    That he wanted a modem to work from home.

22      Q    Anything else that you recall?

22

1      A    It was obviously not able to be done.

2      Q    It was not?

3      A    No.

4      Q    Why was that?

5      A    The firm changed its policy to having no analog

6    lines in the office except for fax machines that were

7    designated by the branch and approved by the firm.

8          MR. KANE:  Could I have this marked as Exhibit

9    1?

10              (Whereupon, Ridnouer Exhibit No. 1

11                    was marked for identification.)

12          MR. SCALIA:  Could we take a short break

13    before --

14          MR. KANE:  Yes.

15          (Whereupon, a recess was taken from 9:30 a.m. to

16    9:33 a.m.)

17          BY MR. KANE:

18      Q    We just had a short break, Mr. Ridnouer.  I

19    understand there was some testimony you wanted to clarify.

20      A    Yes.  A broker needs to have either a Series 65

21    or 66 license to do the ICS product or any managed money

22    product.  That's all.

1       Q    All right.  And just directing your attention to

2   what has been marked as Exhibit 1, I want to direct your

3   attention to the second page of that document, which is an

4   e-mail from Andrea Rouse dated March 25th 2002 that is to

5   Mr. Morgenstein.  And it talks about Ron asked me to

6   advise you that in order to get your DCIA license, you

7   will have to take your Series 65 exam, and it goes on to

8   state some other things.

9            Do you want to take a minute and look at that?

10      A    Sure.

11      Q    All right.  You have had a chance to review

12  that?

13      A    Uh-huh.

14      Q    Do you have any information about the contents

15  of this e-mail?

16      A    No.

17      Q    Did you have any input into drafting it?

18      A    No.

19      Q    Let me direct your attention to the first page

20  of the document.  And in the middle of the page, there is

21  an e-mail from Andrea Rouse to Carolyn Greenhalgh and it

22  reads:  How do I respond to this?  This is in response to

24

1   the e-mail that Matt asked me to send on behalf of you and

2   Ron.

3           Do you see that?

4       A    Yes.

5       Q    Does that refresh your recollection about

6   whether you had any input into the e-mail?

7       A    I don't recall drafting any such e-mail or

8   having any input into this e-mail.

9       Q    All right.  Well, just setting aside the e-mail,

10  do you have any recollection of in this time period or

11  early '02 anything having to do with Mr. Morgenstein

12  attempting to get a waiver from taking the Series 65 exam?

13      A    No, other than, you know, as I testified

14  earlier, discussions that Norman and I had in casual

15  conversation.

16      Q    Did Mr. Morgenstein ever come to you and ask you

17  to apply for a waiver on his behalf for the Series 65

18  exam?

19      A    In that casual conversation he asked me if there

20  was a way to get a waiver to take the Series 65, yes.

21      Q    And when was that?

22      A    I do not recall.

25

1       Q    What did you tell him?

2       A    If you figure it out, tell me, so I don't have

3   to take it.

4       Q    And did you make any notes of any conversations

5   you had with Mr. Morgenstein?

6       A    No.  It was water cooler conversation.

7       Q    So I just want to make sure I'm clear on this.

8   Have you told me everything you recall about any efforts

9   Mr. Morgenstein made in '01 or '02 to try to get a waiver

10  from taking the Series 65 exam?

11      A    Restate the question.

12      Q    Have you told me everything you recall about

13  Mr. Morgenstein trying to get a waiver from taking the

14  Series 65 exam in the '01-'02 time period?

15      A    Yes.

16      Q    And you understand when I say waiver from taking

17  the Series 65 I'm talking about taking the -- you know,

18  getting the Series 65 license.

19      A    Without taking the exam.

20      Q    Right.

21      A    Yes.

22      Q    Okay.

26

1      A    I understand that.

2      Q    All right.  Did you have any conversations with

3   Mr. Masci about Mr. Morgenstein trying to get the Series

4   65 license?

5      A    No.

6      Q    Did you have conversations with anyone about

7   Mr. Morgenstein trying to get the Series 65 license?

8      A    It was probably mentioned in casual

9   conversation, but I don't recall with whom or -- I know it

10  was a subject that was out there.

11     Q    But sitting here today, you don't recall

12  anything?

13     A    I don't recall the specifics or with whom I may

14  have had those conversations with.

15     Q    Is there anything that might refresh your

16  recollection?

17     A    No.  This was not my role in the office,

18  licensing.

19     Q    Were you present in a meeting in the

20  November-December 2003 time frame with Mr. Masci and

21  Mr. Morgenstein?

22     A    Yes.

27

1     Q     And was this a meeting in Mr. Masci's office?

2     A     Yes.

3     Q     And do you know what the purpose of the meeting

4  was?

5     A     Yes.

6     Q     What was the purpose of the meeting?

7     A     To inform Norman of what future choices he may

8  have to make.

9     Q     And how do you know that that was the purpose of

10  the meeting?

11     A     I was sitting on the couch listening to the

12  conversation.

13     Q     How did you come to be sitting on the couch

14  listening to the conversation?

15     A     Mr. Masci called Norman in and Ron asked me to

16  stay after Norman arrived.  I stayed and witnessed the

17  conversation.

18     Q     Did Mr. Masci say why he wanted you to stay?

19     A     No.

20     Q     Did he indicate to you that he wanted you to be

21  a witness to the conversation?

22     A     No.

28

1     Q   Well, tell me everything you recall being said

2 at that meeting.

3     A   That the year before, we had gone through a RIF

4 process of Morgan Stanley drawing a line and everybody

5 below that line was released.  We were in that same time

6 period the following year, and Ron didn't want anybody to

7 be surprised that if they draw that line again and the

8 line happens to be drawn a little higher that, you know,

9 you could be ending your career on a not-so-pleasant note,

10 and he wanted to make sure that those people that he felt

11 could possibly be close to that line were made aware of

12 their choices.

13     Q   Now, is this something he actually said in the

14 meeting to Mr. Morgenstein?

15     A   Yes.

16     Q   And what were the choices?

17     A   Well, the choice would be to retire or create --

18 participate in the Morgan Stanley sunshine program, which

19 is a retirement program where you partner with another FA.

20 You go off into the sunset, but you still share in the

21 revenue generated from your portion of the book, per se.

22     Q   Those choices sound like the same thing.  You

29

1    said retire or do the sunset program.  Aren't those both

2    retirement?

3        A    Uh-huh.  Well, you can still be active in the

4    book.  You can go on appointments.  You can solicit.  You

5    can sell.  You can participate in that number on the book,

6    but you are now part of a team.

7        Q    Was Mr. Morgenstein given any other choices?

8        A    I don't believe so, no.

9        Q    So the choices you recall --

10       A    You know, he could -- the third choice would be

11   just to take your chances on -- you know, when they do

12   another RIF, reduction in force.

13       Q    Do you recall Mr. Masci saying that?

14       A    Those were the three things that he went over,

15   those three choices.

16       Q    And you recall him saying those three things?

17       A    Yes.

18       Q    Were you present at any other meetings with FAs

19   where the same subject matter was discussed?

20       A    No.

21       Q    Do you recall anything else being said at that

22   meeting?

30

1      A    No.  It was, maybe, eight to ten minutes long.

2   It wasn't -- no.

3      Q    Did you make any notes at the meeting?

4      A    No.

5      Q    Or after the meeting?

6      A    No.

7      Q    Did you talk to Mr. Masci after the meeting?

8           MR. SCALIA:  Objection, vague.

9           THE WITNESS:  No.

10          BY MR. KANE:

11     Q    Did you talk to him about what had transpired at

12   the meeting?

13     A    I left very shortly after Norman left.

14     Q    So is that a no, you didn't talk to him?

15     A    No.

16          MR. KANE:  Could we have this marked as 2?

17                    (Whereupon, Ridnouer Exhibit No. 2

18                     was marked for identification.)

19          BY MR. KANE:

20     Q    The reporter has handed you what has been marked

21   as Exhibit 2.  I want to direct your attention to the

22   bottom part of this, which is a message from

31

1    Mr. Morgenstein to Ron Masci.

2        A    Uh-huh.

3        Q    And if you can just review the contents of that.

4             MR. KANE:    And, for the record, this is

5    MSDW 3668.

6             THE WITNESS:    Okay.

7             BY MR. KANE:

8        Q    Is Mr. Morgenstein accurately recounting the

9    conversation you were present at?

10       A    No.

11       Q    So you disagree with him that Mr. Masci said

12   either I retire or you will discharge me?

13       A    No.  He did not say those words.

14       Q    Mr. Masci didn't say those words?

15       A    No.

16       Q    Did Mr. Masci talk to you about this e-mail?

17       A    No.  This is the first I've seen of it.

18       Q    You have never seen this e-mail before?

19       A    No.

20       Q    Or this e-mail exchange?

21       A    No.

22       Q    Do you have any idea why Mr. Morgenstein would

1    not -- would have put something in this e-mail that didn't

2    actually happen in the meeting?

3              MR. SCALIA:  Calls for speculation.

4              THE WITNESS:  No.

5              BY MR. KANE:

6       Q    And you don't have any recollection of Mr. Masci

7    coming to you and saying anything about Mr. Morgenstein

8    writing an e-mail or a letter about the meeting you

9    attended?

10             MR. SCALIA:  Objection, vague.

11             THE WITNESS:  I don't recall.

12             BY MR. KANE:

13      Q    Well, is there anything that might refresh your

14   recollection about that?

15      A    No.

16      Q    Does that November 24th date accurately reflect

17   the date of the meeting that you have told me about?

18      A    I don't recall the specific date, but that's the

19   time frame, yes.

20      Q    Did you communicate with Mr. Masci by e-mail at

21   times?

22      A    Sure.  Yes.

33

1    Q    And was that the case in 2003?

2    A    Can you be more specific?

3    Q    In 2003, would you occasionally send e-mails to

4    Mr. Masci, would he send them to you?

5    A    Yes.

6    Q    And have you searched your e-mails for e-mails

7    responsive to the Plaintiff's document requests?

8    A    No.

9    Q    Has anyone asked you to do that?

10    A    No.

11    Q    How is your e-mail -- what do you use, Outlook

12    or Outlook Express?

13    A    Outlook.

14    Q    And when you get e-mails, what do you usually do

15    with them?

16    A    Delete them or put them in my old mail.

17    Q    Do you keep folders?

18    A    No.

19    Q    Subject matter folders?

20    A    No.

21    Q    So if Mr. Masci sent you an e-mail in November

22    or December '03, you would either have deleted it or put

34

1    it in your old files or old e-mails?

2         A    If they didn't get lost when I moved to Virginia

3    Beach.

4         Q    Do you have any idea why it would get lost, why

5    the e-mails would get lost when you moved?

6         A    I shouldn't use the word lost, but they didn't

7    follow me.

8         Q    All right.  Your computer stayed in D.C.?

9         A    My computer stayed in D.C. and a lot of my -- I

10   don't even -- my old mailbox, I don't know how far back it

11   goes.

12        Q    When you deleted your e-mails, do you know what

13   happened to them?

14        A    Yeah.  They go in the deleted file.

15        Q    Okay.  Do you know if there was a server that

16   retained those e-mails?

17        A    I don't know.

18        Q    Well, you were the technology guy for a while.

19   Did you have any involvement in --

20        A    Not with corporate e-mail.

21        Q    Okay.  Was your e-mail hooked up with corporate,

22   like out of New York?

35

1      A    Yes.

2      Q    Do you know where the server was kept?

3      A    No.

4      Q    Do you know if there were backup tapes made of

5  the e-mails?

6      A    No.

7      MR. KANE:  Well, just for the record, Plaintiff

8  would request that any e-mails Mr. Ridnouer may have sent

9  be reviewed.  I don't know if that has happened or not,

10  but the witness has indicated that he wasn't requested to

11  search for those.

12      BY MR. KANE:

13      Q    So did you print out any e-mails that you sent

14  or received from Mr. Masci?

15      A    No.  Yes.

16      Q    What about in the 2003 time frame?

17      A    Yes.

18      Q    Did you print out any that concerned

19  Mr. Morgenstein?

20      A    No.

21      Q    Or any that concerned the Series 65 waiver

22  issue?

36

1       A      No.

2       Q      Have you told me everything you recall about

3    the November 24th meeting between Mr. Masci and

4    Mr. Morgenstein where you were present?

5       A      Everything I recall, yes.

6              MR. KANE:  Let's mark this as 3.

7                        (Whereupon, Ridnouer Exhibit No. 3

8                         was marked for identification.)

9              BY MR. KANE:

10      Q      Do you recognize the handwriting on these notes?

11      A      No.

12      Q      Do you see up top it looks like it is a fax

13   header that says Morgan Stanley S.E. Region?

14      A      Uh-huh.

15      Q      Is that the Southeast region?

16      A      Yes.  I recognize the fax number.

17      Q      Where is that?

18      A      Atlanta.

19      Q      But you don't recognize the handwriting?

20      A      No.

21      Q      Regarding that meeting on November 24th where

22   you were present, do you know if that was held in response

```
 1    to a request from Mr. Morgenstein to have Mr. Masci or

 2    Morgan Stanley apply for a waiver from taking the Series

 3    65 exam because of his disability?

 4         A    No.

 5         Q    You don't know one way or the other?

 6         A    It was to inform Mr. Morgenstein of how

 7    Mr. Masci saw the future.

 8         Q    And how did you gain that understanding?

 9         A    Through the two of them talking.

10         Q    But do you know why the meeting took place at

11    all?  I mean, do you know if it was in response to this

12    letter or e-mail that Mr. Morgenstein wrote?

13              MR. SCALIA:  Objection, vague.

14              THE WITNESS:  I don't know.

15              MR. KANE:  Let's mark this as 4.

16                        (Whereupon, Ridnouer Exhibit No. 4

17                         was marked for identification.)

18              BY MR. KANE:

19         Q    I am going to ask you to review this document.

20    It's MSDW 603.  Starting at the bottom, January 27, 2004,

21    is a message from Patrick O'Keeffe to Ron Masci.

22    Apparently, Mr. Morgenstein is due commissions.  And it
```

38

1    looks like you were sent an e-mail from Christine Cardwell

2    asking do we want to give FA Comp authorization to pay

3    Norman's commissions and you responded no.

4                Do you know why you responded no?

5        A    No.

6        Q    Do you have any recollection of this at all?

7        A    No.

8        Q    Based on your knowledge, do you have any

9    information about why you would not pay out an FA's

10   commissions?

11       A    If they had a deficit that needed to paid off,

12   the commission would go towards the deficit.

13       Q    Aside from that, do you know of any other

14   reasons?

15       A    No.

16       Q    Do you know if Mr. Morgenstein had a deficit?

17       A    I do not recall.

18       Q    Why were you being asked this question?

19            MR. SCALIA:  Calls for speculation.

20            THE WITNESS:  Don't know.

21            BY MR. KANE:

22       Q    Were you responsible --

39

1      A    Don't recall.

2      Q    Were you responsible for making these kinds of

3  decisions?

4           MR. SCALIA:  Objection, vague.

5           THE WITNESS:  Yes.

6           BY MR. KANE:

7      Q    Did you talk to anyone about this e-mail

8  exchange, about the subject matter of this e-mail

9  exchange?

10     A    I don't recall.

11     Q    Did you talk to Mr. Masci about it?

12     A    Don't recall.

13     Q    You were an assistant to Mr. Masci, an assistant

14  manager, in '03 or '02?

15     A    I was the sales manager during that time period.

16     Q    During '02-'03?

17     A    Yes.

18     Q    And what was your next position?

19     A    Branch manager.

20     Q    And when did you become the branch manager?

21     A    May 19th of '04.

22     Q    When did you learn you were going to get that

40

1    position?

2        A    If the 19th was a Monday, the Friday before.

3        Q    And that involved you moving down to Virginia

4    Beach?

5        A    Yes.

6        Q    And had you had any conversations with Mr. Masci

7    about becoming a branch manager prior to May of '04?

8        A    Yes.

9        Q    All right.  Tell me about those conversations.

10       A    Well, that's the normal step for a sales manager

11   to make, is to become a branch manager.

12       Q    Okay.  And tell me about what you talked to

13   Mr. Masci about about becoming a branch manager.

14       A    Other than -- mainly about branch selection, you

15   know, the type of branch you want to go to, those types of

16   things.

17       Q    Did that start in, like, January or February of

18   '04?

19       A    It started in 1998 when I got my Series 8.  We

20   had them all the time.  Because that's the next step that

21   I wanted to make.

22       Q    The branch manager step?

41

1      A    Correct.

2      Q    But was there a bit more communication in the

3   early '04 time period?

4      A    No, just the same.  This opportunity, branches

5   pop up.  You know, if something happens, a manager gets

6   promoted and you either put your name in the hat or you

7   don't.  So we would have the conversations when branches

8   would be available.

9           MR. KANE:  Let's mark this as 5.

10                      (Whereupon, Ridnouer Exhibit No. 5

11                      was marked for identification.)

12          BY MR. KANE:

13     Q    I am showing you what has been marked as Exhibit

14   5.  Do you understand what this document is?

15     A    No.

16     Q    Do you know what an outside activity request is?

17     A    Yes.

18     Q    What is that?

19     A    It's when you are going to be participating

20   either in another job, on a board, in an organization, you

21   have to get approval from the firm to participate in those

22   functions.

42

```
 1        Q     How long have you known Mr. Morgenstein?

 2        A     Since I began at Morgan Stanley in 1989.

 3        Q     Did you consider him to be a friend?

 4        A     Sure.

 5        Q     Did you find him to be a trustworthy person?

 6        A     I had no reason to judge otherwise.

 7        Q     Did you think he was a credible person?

 8        A     From my experience, yes.

 9              MR. KANE:  Let's take a short break.

10              MR. SCALIA:  Okay.

11              (Whereupon, a recess was taken from 10:00 a.m.

12    to 10:08 a.m.)

13              BY MR. KANE:

14        Q     Just describe briefly for me your duties as a

15    sales manager.

16        A     Promote sales or generate -- help the FAs

17    generate revenue.  I also have the technology

18    responsibilities of the office -- I have seemed to carry

19    that throughout my career -- and to help do branch

20    administration where I can sign documents, approve orders,

21    approve new accounts, approve a variety of different

22    things that require a Series 8, 9 person to be able to
```

43

1    authorize.

2        Q    Would that involve reviewing documents?

3        A    Such as e-mails?

4        Q    E-mails or sales leads or --

5        A    I did not have the document reviewing

6    responsibilities.

7        Q    Okay.  In the meeting on November 24th, were you

8    reviewing any documents at that meeting?

9            MR. SCALIA:  Objection.  It assumes facts not in

10   evidence and mischaracterizes his prior testimony.

11           You can go ahead and answer.

12           THE WITNESS:  No, not that I recall.

13           BY MR. KANE:

14       Q    And I'm talking about the meeting where you were

15   present with Mr. Masci and Mr. Morgenstein, the meeting

16   you have already talked about or you testified about

17   earlier.

18       A    To the best of my knowledge, there were no

19   documents involved.

20       Q    Where were you in the room?

21       A    Sitting on the couch.

22       Q    And you were just sitting there listening?

44

1      A    Correct.

2      Q    You don't have any recollection of looking at

3  documents?

4      A    No.

5      Q    So if Mr. Morgenstein said he has a recollection

6  of you looking at documents, you would disagree with that?

7      A    I don't recall looking at documents.

8      Q    So you wouldn't disagree, you just don't recall?

9      A    Correct.

10          MR. KANE:  I have no further questions.

11          MR. SCALIA:  I have no questions.  We'll read.

12          (Whereupon, at approximately 10:10 a.m., the

13  taking of the deposition was concluded.)

14          (Signature required.)

15

16

17

18

19

20

21

22

CERTIFICATE OF NOTARY

I, MAUREEN S. BENNIE, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me stenographically and thereafter reduced to typewriting by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Maureen S. Bennie
Notary Public in and for
the District of Columbia

My Commission Expires:

2/14/08

**Robertson, Mary (CORE COMPLIANCE)**

| | |
|---|---|
| **From:** | Greenhalgh, Carolyn |
| **Sent:** | Tuesday, March 26, 2002 1:32 PM |
| **To:** | Robertson, Mary |
| **Subject:** | FW: DCIA License |



DEPOSITION EXHIBIT

*1*

*Ridnouer*

Confidential Correspondence

Mary:

Please read this and give me a call to discuss. I want to make sure that I answer his questions correctly.

Thanks
Carolyn
(202)862-9055

-----Original Message-----
**From:** Rouse, Andrea
**Sent:** Tuesday, March 26, 2002 1:04 PM
**To:** Greenhalgh, Carolyn
**Subject:** FW: DCIA License

How do I respond to this? This is in response to the email that Matt asked me to send on behalf of you and Ron. All of these things below took place years before I got here. I have no idea why he was not waived.

-----Original Message-----
**From:** Morgenstein, Norman
**Sent:** Tuesday, March 26, 2002 12:59 PM
**To:** Rouse, Andrea
**Cc:** Masci, Ron
**Subject:** RE: DCIA License

Dear Andrea,

1) Please confirm that the company was responsible for the failure to renew my MDIA license.

2) Please confirm that the company was aware that my ability to function as an IA in DC was dependent upon my maintaining my MDIA license.

3) Please confirm that the reason I have to take the Series 65 exam to obtain the DCIA license is because you neglected to renew my MDIA license.

4) Please provide a full and detailed explanation for the reason my request for waiver was denied by you and the New York Registration Department.

MSDW 00689

1/4/2006

5)   Please provide me with the reason(s) of your instruction that I am "not permitted to communicate directly with any regulatory body."

It is my sincere desire to avoid the necessity of involving counsel in this matter. To that end, I would appreciate a prompt and direct response to my inquiry.

Sincerely,

Norm

-----Original Message-----
**From:** Rouse, Andrea
**Sent:** Monday, March 25, 2002 11:27 AM
**To:** Morgenstein, Norman
**Subject:** DCIA License

Ron asked me to advise you that in order to get your DCIA license, you will have to take your Series 65 exam. In the mid-90s the State of Maryland waived the 65 exams for anyone registered in the state. In 1998, the laws changed and anyone that received commissions from managed money had to be licensed in their home state. Home state is the location of the office you work in. The District of Columbia requires the 65 exam. The firm did not keep your MDIA because it was not necessary after 1998. The registration department has reviewed your request for a waiver and discussed with Ron. The request has been denied.

We have also been told to advise you that any correspondence or communication with DC or any other state must be submitted to me and I will forward it to our registration department if needed for response. You are not permitted to communicate directly with any regulatory body.

Morgan Stanley

Andrea Rouse
P: 202-862-9051
F: 202-862-9158

**MSDW 00690**

---

**From:** Masci, Ron [Ron.Masci@morganstanley.com]
**Sent:** Monday, December 15, 2003 4:00 PM
**To:** Morgenstein, Norman [Norman.Morgenstein@morganstanley.com]
**Subject:** RE: Our Nove. 24th Meeting & Follow up.

Your assumption of the date is correct.You should plan accordingly.   Ron Masci
-----Original Message-----
**From:** Morgenstein, Norman
**Sent:** Monday, December 01, 2003 1:57 PM
**To:** Masci, Ron
**Subject:** Our Nove. 24th Meeting & Follow up.

December 1, 2003



Mr. Ronald Masci,
Senior Vice President & Branch Manger
Morgan Stanley
1775 Eye Street, NW
Washington, DC 20006

VIA Email & Interoffice Mail

RE:    Our November 24th Meeting & Your Follow Up Call.

Dear Ron,

        So there will be no misunderstanding as to the contents of our meeting on November 24th
at which Matt was present, and your follow up call on or around November 25th, the following is
my understanding.

        First, it is your final decision that you will not make application on my behalf, to the DC
Licensing body for an exemption to the Series 65 exam.  Secondly, I have two (2) choices in the
immediate future.  The two choices are that "either I retire, or you will discharge me."

        To this end, and since I have no other choice in this matter, I have contacted Josephine in
our retirement department at the number you supplied, and have requested a retirement package.  I
have given her a departure date of December 31, 2003 so that accurate calculations can be made.

        So that I know we are on the same page, I would appreciate a reply by email or letter.

                Sincerely,


                Norman L. Morgenstein
                Associate Vice President
                Financial Advisor

                                                    **MSDW03668**

7/12/2006



#642

Norman Morganstern
20 + 30 yr employee
Broker - does little to no business
Not loyal to the company - in the past
sent memos from ho - to other firm
Recently - 2 issues

1 - Sent email - he was trying to
log on of continuing. Ed - sent email
vendor w/ curse word - legal +
compliance requested he apologize -
He said it those f--bing not f---s.
So we shld apologize

2. Licensing issue - in
1998 - series 65 came into being - it
was not designed to FA reg commision
on fee based acct. MS grandfathered
anyone for than for afe - MS Instruct
Advisor man - licensed anyone living
in MS

1998 - rules Gd - had to have exam in
state whr ee works - se Dec - canceled
MSICA - broker told if wanted to do that
kind of bus had to take exam - had to
take series 65 - Norman didn't - after he
says that because ee cancelled too
impact on DK - - wants to turn over 8.

Has surgery of lower ear -
Atty - Benjamin Bear

DEPOSITION
EXHIBIT
3
PENGAD 800-631-6989
Ridnouer

**MSDW 02134**



4-2-02

Called Norman Morganstein 1040-cm cm

MSDW 02135



4-3-02

10⁰⁰ Kesha        446 4215

10⁵⁰ Whitley — refresh — KHJ — check i-box

11¹⁵ Norma   Morganten (202) 862 – 9094

11³⁰ Natalie

11⁴⁰ Julie Skew  Green Sro  NC
              336 - 545 - 7000

Arlene Sanders — Agency — Augan w.l. sa
              404 252 – 8255

Randy Martin 901 – 766 – 8653

1:15 Julie 651 back from lunch tel cp. today
336 558 - 700

—— Randy Martin
Question — how to review file (personnel)?
— Regarding — interviewed someone 3yrs ago
talked w/ Julie abt her getting sers 7-11
flunked test — paying @ rate of Registered -A-
ate had several problems — took test +
failed 3ooh time passed then test to take
afterward — supposed to take wk after — took a

CreditSource® offers flexibility to control debt.

MorganStanley CreditSource
800-473-5584

**MSDW 02136**

Julie Skeen - filling out comp
agreement for new trainee - not sure
how to fill it out.

4-3-02

2ﬣ Norman Morgenstein - been through a
lot in last 9 mths w/ the firm
MDIA - MJ IA - Investment Advisors' License-
had MDIA license - series 65 license -
lost one in the 1990's was grand fathered in-
we have 60 investment advisors - Had acct
there in 1992 - had a license in 2000 was
told no longer had license or not renewed
in 1988. About to take 1998 law bd. Needed
Dc IA license - didn't have one since 1998-
this came out in 2000 early - ICS licenses -
dept in NY tried to get him back in the -
could be grand fathered based on class (by
1996 - Had tumor on the inner ear removed
dept with - reading specialist
Don't have decent reading ability - eye
decent focus - left eye doesn't blurry left
side deaf. Report faxed to Alan Bernardin
NY early 2000 - haven't heard from him since-
in H. Resources. Problem is with series 65 -
to conduct managed money business -
ability to read is poor. Memory not what
it used to be since surgery. Can't pass

MSDW 02137



MAR-21-2006  14:11    MORGAN STANLEY S.E.REGION    404 814 6304    P.006

exam. Told not to contact District of
Columbia a Regulatory Body. E6 2001 -
ICS licensing told to contact DC
directly - talked to them to get license -
told not to communicate w) them
any more. Family has $100 million acct
given to BOA last week. Cant take
the exam. Fatigue easily as left
side doesn't balance. Also has visual
blurring. Ophthalmologist rec't didn't sleep
as much.

26 yrs ago removed large intestine etc
Had illioscopy

Referred him back to Registration

Jeff Lemnoff - having Alexa +
Melinda looking @ email. will
get back to me. Jeff on vacation

**Christine Cardwell**
Branch Manager's Assistant
Morgan Stanley
1775 Eye Street, NW  Suite 200
Washington, DC 20006
Phone: (202) 862-9051
Fax: (202) 862-9158



# Fax

| To: Janice Marks | From: Christine Cardwell |
|---|---|
| Fax: 404-239-5987 | Pages: 4 |
| Phone: 404-266-4817 | Date: 12/3/3 |
| Re: | CC: |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

● Comments:

These are our observations of Norman Morgenstein over the years.

MSDW 02139

**Cardwell, Christine**

| | |
|---|---|
| **From:** | Cardwell, Christine |
| **Sent:** | Wednesday, January 28, 2004 5:16 PM |
| **To:** | O'Keeffe, Patrick |
| **Subject:** | RE: Termed FA |

Do not pay out the commissions for Norman Morgenstein, 642-023.

Sincerely,
Christine Cardwell
642 Office



-----Original Message-----
**From:** Ridnouer, Matthew
**Sent:** Wednesday, January 28, 2004 4:39 PM
**To:** Cardwell, Christine
**Subject:** RE: Termed FA

NO

-----Original Message-----
**From:** Cardwell, Christine
**Sent:** Wednesday, January 28, 2004 10:40 AM
**To:** Ridnouer, Matthew
**Subject:** FW: Termed FA

Matt: Do we want to give FA Comp authorization to pay Norman's commissions?

Sincerely,
Christine

-----Original Message-----
**From:** O'Keeffe, Patrick
**Sent:** Tuesday, January 27, 2004 2:28 PM
**To:** Masci, Ron
**Cc:** Cardwell, Christine
**Subject:** Termed FA

*Ron,*
*We are showing that Norman Morgenstein, 642-023, is owed commissions in the amount of $1,349.23. We will need authorization from the Branch in order to have this FA paid out.*

*Thanks,*
*Patrick*

1

MSDW 00603

**Rouse, Andrea**

| | |
|---|---|
| **From:** | Hawksby, Annemarie |
| **Sent:** | Thursday, November 29, 2001 2:53 PM |
| | Masci, Ron |
| **Cc:** | Morgenstein, Norman ; Head, Suzn; Dachtler, Helen |
| **Subject:** | Outside Activity Request |

| Λorgan Stanley | Memorandum |
|---|---|

| **Law Division:** 1221 Avenue of the Americas, 44th Floor, NY, NY 10020 | |
|---|---|
| **To:** Ronald Masci, Washington, DC 642 Office | **Date:** November 29, 2001 |
| **From:** Ann-Marie Hawksby | |
| **Subject:** Outside Activity Request - Norman Morgenstein **Corrected Memo** | |

This memorandum will serve as approval by Compliance for **Norman Morgenstein** to serve as partner on Cox Family Computer. Approval is granted, provided **Mr. Morgenstein** understands and agrees to the following terms:

- **Mr. Morgenstein's** participation is with the consent only and not at the firm's direction or request.

- Morgan Stanley will not provide indemnification or insurance coverage for claims that may arise due to activities with **Mr. Morgenstein's** relationship with this organization.

  **Mr. Morgenstein** must advise the Compliance Department in writing, immediately, of any material change in his relationship with this organization.

- He must advise the Compliance Department immediately if the organization offers securities (public or non-public).

- There may be no active solicitation of Morgan Stanley clients for any **Cox Family Computer** purposes.

- There may be no active solicitation of people who are affiliated with the **Cox Family Computer** for Morgan Stanley purposes.

- While serving in this capacity, **Mr. Morgenstein** may not serve as FA of record should the Organization wish to open an account.



1

MSDW 00498