1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x

NORMAN L. MORGENSTEIN,       :          ORIGINAL

       Plaintiff,        :

   v.              : C.A. NO. 05-2123 (JR)

MORGAN STANLEY DW, INC.,   :

       Defendant.      :

- - - - - - - - - - - - - - - x

Washington, D.C.

Tuesday, July 18, 2006

DEPOSITION OF:

RONALD MASCI

called for examination by counsel for the Plaintiff,

pursuant to notice, taken at the law offices of Cashdan

and Kane, PLLC, 1150 Connecticut Avenue, N.W., Suite 900,

Washington, D.C., commencing at 11:06 a.m., before Maureen

S. Bennie, a Notary Public in and for the District of

Columbia, when were present on behalf of the respective

parties:

APPEARANCES:

On behalf of the Plaintiff:

    MICHAEL G. KANE, ESQUIRE
    CASHDAN & KANE, PLLC
    1150 Connecticut Avenue, N.W.
    Suite 900
    Washington, D.C. 20036
    (202) 862-4330

On behalf of the Defendant:

    JOHN F. SCALIA, ESQUIRE
    MATTHEW H. SORENSEN, ESQUIRE
    GREENBERG TRAURIG, LLP
    1750 Tysons Boulevard
    Suite 1200
    McLean, Virginia 22102
    (703) 749-1380

Also Present:

    NORMAN MORGENSTEIN
    PETER M. SCHULTZ

3

# C O N T E N T S

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| Ronald Masci | Mr. Kane | 4 |

# E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|-------------|-------------|------|
| 1 | Notice of 30(b)(6) Deposition | 15 |
| 2 | E-mail, Morgenstein to Masci (11/20/03) | 41 |

NOTE:  EXHIBITS MARKED AND ATTACHED.

*   *   *   *   *

| EXHIBITS REFERRED TO: | PAGE |
|-----------------------|------|
| Ridnouer Exhibit No. 2 | 55, 68 |
| Ridnouer Exhibit No. 4 | 66 |

4

1                    P R O C E E D I N G S

2     Whereupon,

3                       RONALD MASCI

4     was called for examination, and, after being duly sworn by

5     the Notary Public, was examined and testified as follows:

6             EXAMINATION BY COUNSEL FOR PLAINTIFF

7             BY MR. KANE:

8         Q    Good morning, Mr. Masci.

9         A    Good morning.

10        Q    Could you state your full name for the record?

11        A    Ronald Dominic Masci.

12        Q    And your date of birth?

13        A    12/21/38.

14        Q    And your home address?

15        A    43397 Cedar Pond Place, Chantilly, Virginia

16    20152.

17        Q    Mr. Masci, my name is Michael Kane, as you know.

18    I represent the Plaintiff in this lawsuit.  Have you ever

19    been deposed before?

20        A    Yes.

21        Q    How many times have you been deposed?

22        A    Less than five.

5

1          Q      And was that in different cases or one case?

2          A      No.  There were different cases of clients'

3     situations.

4          Q      Were they all related to clients?

5          A      Yes.  They were client complaints.

6          Q      Do you know if those were in arbitration or were

7     they in court?

8          A      I think I have been to, maybe, five

9     arbitrations, two mediations, and I only went to court

10    once.

11         Q      When was the last time you were deposed?

12         A      Probably four or five years ago.

13         Q      So you are somewhat familiar with this process,

14    but just briefly, I will go over what's going to happen.

15    I'm going to ask you a series of questions today about

16    this lawsuit, and your responses are under oath.

17             Do you understand the importance of the oath?

18         A      Sure.

19         Q      You understand you are obligated to tell the

20    truth?

21         A      Uh-huh.

22         Q      You have to say yes or no.

1      A     Yes.

2      Q     And my other point is you have to give audible

3  responses, yes or no or some other audible response.  No

4  shakes of the head, nods of the head.

5      A     Okay.

6      Q     Describe for me briefly your educational

7  background.

8      A     I got a bachelor's degree from William and Mary,

9  graduated from there in 1960, spent the next three years

10  as an officer in the Coast Guard and various schools that

11  related to that.  Then I joined my present term in 1965

12  and went through -- at that time, it was Reynolds and

13  Company's training program, which was approximately six

14  months of studying here, and of that three months in a New

15  York classroom, preparation for the Series 65.  Then I

16  have been to numerous Morgan Stanley executive training

17  programs.

18      Q     And when you say my present company, are you

19  referring to Morgan Stanley?

20      A     Yeah.  It was Morgan Stanley, then

21  DeanWitterReynolds, and then Morgan Stanley Dean Witter

22  and then they dropped the Dean Witter.  But it has been

7

1    essentially the same firm for the last 41 years.

2        Q    And are you retired now or do you still work at

3    Morgan Stanley?

4        A    Got my last check on the 30th of June.  I'm

5    retired, yes.

6        Q    Congratulations.

7        A    Thank you.

8        Q    And do you have any consulting agreement with

9    Morgan Stanley or any --

10        A    No, I have no relationship whatsoever.

11        Q    Did you review anything in preparation for your

12    deposition today?

13        A    Did I review anything?

14        Q    Review any documents.

15        A    No.

16        Q    Have you reviewed any documents today in

17    preparation for your deposition?

18        A    No.

19        Q    Aside from counsel, have you spoken to anyone?

20        A    No.

21        Q    And what was your most recent title before you

22    retired from Morgan Stanley?

1        A     I was the executive director of the Washington,

2   D.C. area.

3        Q     And how long did you hold that title?

4        A     I was the branch manager of the Washington

5   branch starting in 1978.  I think it was probably three

6   years ago that the firm decided to change the structure,

7   where we were a branch that reported to a region and they

8   instituted a structure where they created areas.  So a

9   branch would report to an area manager, who then would

10  report to the region.  I had a dual job of branch manager

11  of Washington, D.C. and area executive for the

12  metropolitan area, and I would say that was probably for

13  three years.

14       Q     And did additional people report to you once you

15  became the executive director?

16       A     Yes.  Other branch managers reported to me.

17       Q     And who did you report to?

18       A     Stephen Page in Atlanta.  He was the Southeast

19  regional director.

20       Q     And D.C. is considered Southeast region?

21       A     It was then.

22       Q     What is it considered now?

9

1      A    I think it's Middle Atlantic.  They report to

2   New York now.

3      Q    You said you were branch manager in '78?  That's

4   when you became branch manager?

5      A    Of this branch, yes.

6      Q    Of D.C.?

7      A    Yes.

8      Q    What were your positions before becoming branch

9   manager?

10     A    I was a branch manager in Arlington, Virginia.

11     Q    And how long were you in Arlington, Virginia?

12     A    From 1969 to 1978.  I became the branch manager

13  in 1970.

14     Q    And just briefly describe for me what a branch

15  manager does.

16     A    Well, the branch manager is, obviously, the

17  representative of Morgan Stanley in that particular

18  location.  It's my job to hire, train, develop account

19  executives.  It's the branch manager's job to see that all

20  operational matters are taken care of efficiently,

21  clients' orders are executed properly, virtually all of

22  their, what we would call, dividends, checking margin

1    balances.

2          The branch manager has a very severe compliance

3    requirement where we are regulated by the New York Stock

4    Exchange, the SEC, the NASD, Municipal Board, yada, yada,

5    yada -- you probably know of those -- and we have to make

6    sure that our account executives follow the rules that are

7    established in the conduct of our business.  That requires

8    a great deal of supervision, and we have a staff that

9    helps us with that.  We have administrative managers and

10   we have compliance managers in the branch that help with

11   that.  It's our requirement that our clients be treated

12   the way they should be treated, that the brokers help them

13   achieve their financial objectives by knowing a great deal

14   about the client and knowing a great deal about the

15   financial instruments that would help the client reach

16   their objective.

17         It's basically to see to the proper running of a

18   branch of a company and at the end of the day earn a

19   profit for our stockholders.

20     Q    And when you refer to brokers, is that the same

21   thing as a financial associate?

22     A    Actually, it was broker, then it became account

11

1    executive and now they are called financial advisors, but

2    it's all the same thing.  It's a Series 7-licensed person.

3        Q    And were you responsible for supervising the

4    financial advisors?

5        A    Yes, and also all of the administrative people

6    as well.

7        Q    And are you familiar with the financial

8    advisor's job duties?

9        A    Well, yeah.

10        Q    And tell me what those are.

11        A    In a nutshell, a financial advisor doing his job

12    properly follows Rule 405 of the New York Stock Exchange

13    first, and that is to know your customer.  So in whatever

14    method, a financial advisor meets with a client and spends

15    whatever time is necessary -- nowadays, pretty much

16    filling out questionnaires about a client's history, their

17    risk tolerance, their financial objectives, asset

18    allocation, prejudices -- and then once you know that

19    about the client, then you use your information and the

20    knowledge that you have about all of the financial

21    instruments that are at our disposal and you may recommend

22    what would fit for that particular client.

1          In a typical first meeting you would spend a lot

2     of time on the history and then you would go back and make

3     recommendations.  And then from there forward, you follow

4     how those recommendations are proceeding.  You sell the

5     bad ones, you buy the good ones, and you hope that the

6     client achieves their goals.

7          Q     Any other duties that a financial advisor has?

8          A     Any other duties?  Typically, a financial

9     advisor -- it's like a doctor or a lawyer or any

10    professional; there is a continuing ed requirement, and

11    financial advisors really need to do whatever it takes to

12    stay current, to understand the way the world is moving.

13    Right now, for example, you have got a geopolitical issue

14    that's more important than the economic issue in the

15    market.

16          So you need to stay up on current events.  You

17    need to constantly attend meetings to understand what's

18    changing, what new items the firm is offering to clients.

19    There is always financial instruments that are being

20    created that deal with current economic conditions.  In my

21    opinion, it's the duty of a financial advisor to stay

22    absolutely current on whatever is going on in the world,

1    and the way you do that is you attend meetings in the

2    branch.  We have those once a week.  We have continuing

3    education meetings.  We have specialists come from our

4    firm in New York, as well as specialists that come from

5    outside the firm to meet with our brokers.  They sit down

6    in brokers' offices and work with them one on one on new

7    issues, as well as new technologies.

8         So, you know, it's not any different than it is

9    in any profession where you have to constantly stay on

10   your toes and be aware of what's happening in the world of

11   finance and the world of politics.

12        Q    Does a financial advisor have an obligation to

13   make money for Morgan Stanley?

14        A    An obligation?  The way I describe that is it's

15   a three-legged stool.  In order for the system to function

16   properly, first the client has to win, then the firm has

17   to win, and then the stockholder has to win.  If one of

18   those legs drops, then we are out of business.  You know,

19   we have an obligation to our stockholders.  We have an

20   obligation to the firm.  But most of all, we have an

21   obligation to the client.  If the client loses, we're out

22   of business.  If the firm loses money, we are out of

1   business.

2        So if you run a business properly and everybody

3   wins, then, you know, I think that's how you achieve your

4   goals.  That's what my goal was.

5        Q    And is Morgan Stanley, when -- if the broker is

6   making money for Morgan Stanley?

7        A    I think that's obvious, yes.

8        Q    Okay.

9             MR. SCALIA:  Michael, before you go on, we

10  probably should have clarified at the beginning of the

11  deposition that Mr. Masci has been designated as the

12  corporate designee with respect to Plaintiff's notice of

13  the 30(b)(6) deposition dated May 24, 2006 on subject

14  areas 10 and 12.  I think you are getting into his -- a

15  little bit into category 12 in the prior Q&A.

16            THE WITNESS:  By the way, I have got to leave

17  here at quarter after -- it's quarter of 3:00 -- about

18  3:45 today at the latest.  So if we need to proceed after

19  that then we will, but I can't stay after that.

20            BY MR. KANE:

21       Q    What do you have going on after --

22       A    That's personal.

15

1    Q    Well, hopefully, we will be done, Mr. Masci, but

2   you are obligated to stay here until we're finished.  But

3   we will try to accommodate you.  So you may want to give

4   shorter answers.

5    A    Okay.

6    Q    All right.  Let me go to this 30(b)(6), because

7   we were, as Mr. Scalia mentioned, touching on topic area

8   number 12.

9        MR. KANE:  Actually, let's take a break.  I will

10   make a couple of copies of this and we can mark it.  Just

11   give me two minutes.

12        (Whereupon, a recess was taken from 11:20 a.m.

13   to 11:22 a.m.)

14        MR. KANE:  Let's mark this as Masci 1.

15            (Whereupon, Masci Exhibit No. 1

16            was marked for identification.)

17        BY MR. KANE:

18    Q    And I am showing you what has been marked as

19   Masci 1.  I am showing you this document.  This is the

20   30(b)(6) Notice of Deposition.  I am going to ask you to

21   turn your attention to page 6, number 12 on that page.

22        Are you prepared to testify as a 30(b)(6)

16

1    deponent on the essential functions of the financial

2    advisor position held by Mr. Morgenstein?

3        A    Sure.

4        Q    Okay.  And have you already described to me what

5    you have perceived to be the essential functions of the

6    job?

7        A    I did.

8        Q    And would it be fair to say that one of the

9    essential functions of a financial advisor is for the

10   financial advisor to make money for Morgan Stanley?

11       A    I would say the essential thing that a financial

12   advisor does, if you say essential, is the first thing is

13   take care of the client.

14       Q    And what's the second thing?

15       A    Make money for the company and our stockholders.

16       Q    And how long have you known Mr. Morgenstein?

17       A    Since the day I came to that branch.

18       Q    Mr. Morgenstein was already employed there?

19       A    Yes.

20       Q    And were you Mr. Morgenstein's supervisor?

21       A    That is correct.

22       Q    Did there come a time you became aware that

17

1   Mr. Morgenstein was having some medical issues?

2        A    Did there come a time?

3        Q    Yes.

4        A    Yes.

5        Q    And when was that?

6        A    Late '90s.

7        Q    What did you become aware of?

8        A    He told me that he had a melanoma or a --

9        Q    Acoustic neuroma?

10       A    Yes, in his left ear, and that he would be

11  probably indisposed to the office for some time.  We

12  didn't know how long, but it was going to require a very

13  delicate operation, and that he would be back when he came

14  back.  And I said hey, best of luck to you, we'll cover

15  you while you're gone.

16       Q    When Mr. Morgenstein came back, were there any

17  issues that came up as a result of the surgery?

18       A    I'm not sure when exactly it was, but eventually

19  I know that he asked for an accommodation because of the

20  trauma that he went through.  And basically the

21  accommodation was that he could come and go pretty much on

22  his own, that he could determine the hours that he needed

18

1    to work.  I never checked on him, whether he -- the only

2    thing I cared about was whether he took care of his

3    clients.  If his clients were doing okay, that was fine

4    with me.  So we did make an accommodation for him, yes.

5         Q    Just to backtrack, prior to this operation on

6    the acoustic neuroma, were you familiar with an operation

7    Mr. Morgenstein had in, like, the late '70s?

8         A    Yes.

9         Q    What do you know about that?

10        A    I'm pretty sure he had a colostomy.

11        Q    Did you understand that that impacted his life

12   in certain ways?

13        A    He never said anything to me about that, no.

14        Q    Was there an issue about him having to wear a

15   tie or not being able to wear a tie on some occasions?  Do

16   you recall anything about that?

17        A    That was, yes, early on.  Again, because of the

18   fatigue issue, we gave him an exemption to the dress code,

19   but that was not permanent.

20        Q    When you say that was not permanent, what do you

21   mean?  It was --

22        A    Well, eventually he recovered from that, and he

19

1    was pretty normal after that.  I don't remember exactly

2    how long it took, but there were many years, probably 15,

3    where Norman was fine.  I mean, people go through that and

4    function.

5        Q    And just getting back now to this accommodation

6    you had mentioned that was about the hours.  Aside from

7    that issue of the hours that he came in, were there any

8    other accommodation issues that came up?

9        A    I don't recall.

10       Q    Did you become aware at some point that

11   Mr. Morgenstein was seeking to obtain a Series 65 license?

12       A    Sure, yes.

13       Q    And when did you become aware of that?

14       A    I believe it was -- again, you have the notes.

15   Somewhere in the mid '90s what had happened in our

16   industry, investment advisory services -- which really had

17   not really been part of our world up to the '90s -- again,

18   to really grow, where brokers were introducing their

19   clients to outside advisors and those outside advisors

20   would charge the client a fee and our remuneration for

21   that would be the advisor would execute the orders in that

22   account through us.  And all that required was a Series 7

20

1    license, because all we were doing was executing buy and

2    sell orders.  The power of attorney was given by the

3    client to the advisor, ABC, an investment advisory

4    company.

5         That began to proliferate to the point where the

6    SEC became concerned that there were unlicensed financial

7    advisors -- back then it was account executives -- making

8    recommendations without really knowing enough about the

9    business.  So they changed the rules, and they require

10   brokers now to take a Series 65 exam to be licensed as an

11   investment advisor in order that they may recommend an

12   investment advisory firm outside of Morgan Stanley to the

13   client.  And we all, if we chose to do that business, had

14   to take and pass that exam, and all -- all -- business

15   done prior to that that did not require a 65 was basically

16   null and void.

17        Q    What do you mean, it was null and void?

18        A    Well, if you didn't have the 65 and you were

19   doing business like that in the past, it had to be

20   stopped.  If you had clients that were in that world

21   before you had the 65, it was not illegal.  But once the

22   65 was placed, then you had to be registered in your state

1   where you worked, your home office -- in this case, D.C.

2   -- in order to have those kind of accounts.  If you didn't

3   have the 65 those accounts had to be discontinued, and no

4   future accounts could be opened.

5       Q    And were you the person who would make that

6   decision?

7       A    No, sir.  That was a senior senior headquarters

8   decision that was nothing more than a compliance with the

9   SEC's regulations.

10      Q    So you are giving me your understanding of the

11  rules?

12      A    No, I'm giving you the facts.

13      Q    But were you responsible for enforcing those

14  rules in your office?

15      A    Well, yes.  I'm the branch manager.  But the

16  firm -- let me go back.

17           Once the SEC or the NASD passes a regulation,

18  either we comply or we're out of business.  I mean, you

19  couldn't say to the SEC well, you know, I don't think

20  we're going to do that part.  It's over.  I mean, you just

21  do what they tell you to do or you are going to be fined

22  millions of dollars.  So we complied with the new laws.

22

1    It was just my job to do what everybody in the industry

2    had to do.

3         Q    Well, did you personally decide that some

4    financial advisors who had placed clients into investment

5    advisor accounts could no longer keep those clients in

6    those investment advisor accounts?

7         A    That was not my decision.  That was a

8    headquarters decision.

9         Q    And that would be New York?

10        A    Yes.

11        Q    Which department in New York?

12        A    Registration.

13        Q    Would you be involved in that decision at all?

14        A    Not at all.

15        Q    You say investment advisors began to grow or

16   that part of the business began to grow in the '90s?

17        A    Yes.

18        Q    Do you know why that was?

19        A    It was becoming appealing to have the client and

20   the financial advisor on one side of the table and the

21   advisory firm on the other side of the table.  It

22   eliminated any thought in the client's mind of a conflict

1   where the broker being paid for advice -- actually, the

2   broker never gets paid for advice -- where the broker was

3   being paid a commission to act as a client's agent and at

4   the same time recommending what to buy and sell.  So it

5   became appealing to have a power of attorney to a

6   financial advisory firm that had no axe to grind in the

7   buying and selling commission to be on the other side of

8   the table, and so it was the broker's job then to study

9   all the advisors in our universe and recommend to the

10  client which advisor to use and then just be compensated

11  as a percentage of the fees that were earned.  And it was

12  very appealing to the clients.

13      Q    And has the investment advisor business

14  continued to --

15      A    Oh, it's huge.  It's gone from -- well, when I

16  started in the business and when Norman started in the

17  business, there was nothing.  We had none of that.  Now

18  it's easily 50 to 60 percent of our industry's revenues.

19      Q    And if a financial advisor wants to participate

20  in the investment advisor business, they have to have

21  either a Series 65 license or a Series 66 license?

22      A    I think now it's a 63.  It's a combination of

1  the state license and the investment advisory.

2      Q    So that would be either a 65 or a 63 or --

3      A    Like I say, I think right now the 63 covers both

4  the state requirement to have a license and the investment

5  advisory.  They have joined the tests together and issue

6  one license, and I think that's probably three or four

7  years ago.

8      Q    What was it before then?

9      A    Just the 65.

10     Q    Was it the 65 or 66?

11     A    The 65 was the investment advisory.  I don't

12  remember the number for the state license.  The state

13  license was never an issue.  I mean, if you could pass the

14  7, which was murder, you certainly could pass the state

15  test.

16     Q    All right.  I think we had started talking about

17  Mr. Morgenstein seeking to get a Series 65 license.  Do

18  you recall when he first tried to do that?

19     A    No.  I generally know what happened.  I can't

20  tell you the date.

21     Q    Does, say, the March 2002 time frame ring a

22  bell?

25

 1      A    Oh, it was way before that.

 2      Q    Well, when did you think it was?

 3      A    When we all did it.  You know, we all had to

 4    pass the Series 65 in the mid '90s in order to continue to

 5    do that business.  I think what you're talking about was

 6    when he was trying to get exemptions on his own to taking

 7    the exam, because he wouldn't -- he wouldn't take the exam

 8    when everybody else did.

 9      Q    Do you have a recollection of Mr. Morgenstein

10    attempting to get the Series 65 prior to 2002?

11      A    Yeah, I'm pretty sure.  I mean, again,

12    Ms. Greenhalgh was in charge of that.  She was the branch

13    administrative manager.  But we --

14      Q    I'm asking you, though, if you have a

15    recollection.

16      A    I don't.

17      Q    So sitting here today, you don't have a

18    recollection of Mr. Morgenstein trying to get the Series

19    65 prior to 2002?

20      A    When you say get the 65, explain that.

21      Q    To obtain a Series 65 license.

22      A    Well, how do you do that?

26

1      Q    You tell me.  How do you do that?

2      A    Well, you apply through Morgan Stanley to be

3  assigned a date to go to the testing center to take the

4  test.  You pass the test, you get the 65.  There's no

5  other way.

6      Q    Okay.  So sitting here today, do you have a

7  personal recollection of Mr. Morgenstein trying to get

8  that Series 65 license prior to 2002?

9           MR. SCALIA:  Objection, vague, asked and

10  answered.

11          THE WITNESS:  I don't know what he is talking

12  about, John.

13          BY MR. KANE:

14     Q    What are you having trouble with?

15     A    You are missing the process.  You know, I don't

16  know what you are trying to accomplish with the question,

17  but you are missing the process.  The process is really

18  simple, Mr. Kane, really simple.  If you want a license,

19  you ask us for the materials, we get you the study

20  materials, you study for the exam, the firm sets up a time

21  for you to go sit at a testing center, you take the test,

22  you pass it, you get a license.  It's that simple.  If you

27

 1    don't do that, you don't get the license.

 2              I mean, you took the Bar.  Could you be a lawyer

 3    without it?

 4        Q    Do you have a personal recollection of

 5    Mr. Morgenstein participating in the process you just

 6    described prior to 2002?

 7        A    Yes.  The one thing I do recall is that we did

 8    set up a time for him to take the exam.

 9        Q    Prior to 2002?

10        A    Correct.

11        Q    And when was that?

12        A    I don't know.

13        Q    But you personally set up a time for him to --

14        A    I did not.

15        Q    Let me finish my question.

16        A    Okay.

17        Q    You personally recall setting up a time for him

18    to take the Series 65 exam prior to 2002?

19        A    I did not.

20        Q    Who did?

21        A    Andrea Rouse.

22        Q    When did she do that?

28

1      A    I don't know.

2      Q    How is it that you recall Ms. Rouse setting up a

3   time for Mr. Morgenstein to take the Series 65 exam prior

4   to 2002?

5      A    She worked for me.  She probably told me about

6   it.

7      Q    Do you know if she did or not?

8           MR. SCALIA:  Asked and answered.

9           BY MR. KANE:

10     Q    Do you know if she did or not?

11     A    I don't.  Look in the paperwork.  You know, you

12   asked me a question and I'm giving you the best I can.  I

13   don't know whether --

14     Q    I want your recollection of what you remember.

15     A    I don't remember.

16     Q    Okay.  So you don't remember Mr. Morgenstein

17   participating in that process you described regarding the

18   Series 65 license prior to 2002?

19     A    I do know that he attempted through us to set up

20   a time to take the exam, and I do know that he didn't do

21   it.

22     Q    Prior to 2002?

29

1      A    Yes.

2      Q    How do you know that?

3      A    I don't recall.

4      Q    What do you recall?

5      A    That I was told that he was going to sit down

6  and take the exam with the rest of us and he determined

7  not to do it.

8      Q    Who told you that?

9      A    Ms. Rouse.

10     Q    And when did she tell you that?

11     A    I don't know.

12     Q    But sitting here today, you have a recollection

13  that it was prior to 2002?

14     A    No, I don't.

15     Q    When did Ms. Rouse begin working for you?

16     A    I don't recall.

17     Q    Was it prior to 2002?

18     A    She took the job after Carolyn was promoted as

19  the branch, basically, HR person and my personal

20  secretary, but I don't have the record.  I really don't

21  remember.

22     Q    Do you think it was after 2000?

30

1       A     Yeah.

2       Q     Do you have any recollection of Mr. Morgenstein

3    seeking to obtain the Series 65 license by getting a

4    waiver from taking the exam?

5       A     Did he try to get a license with an exemption?

6       Q     Do you have a recollection of that?

7       A     Yes, of course.

8       Q     All right.  Tell me what your recollection is.

9       A     He told, I think it was, Ms. Greenhalgh at the

10   time that, because of his condition, he couldn't

11   concentrate or focus, and therefore, he couldn't read the

12   material -- he couldn't study the necessary material in

13   order for him to be able to effectively take the exam.

14      Q     How do you know he told Ms. Greenhalgh that?

15      A     She told me.

16      Q     When did she tell you?

17      A     I don't know.  Mr. Kane, we are going to go

18   around and around and around.  I've been doing this for 41

19   years.  I don't remember from one year to the next, and

20   you are asking me dates.  It's not going to happen.  I

21   mean --

22      Q     That's all right.

1       A       -- all of that's in the records.

2       Q       I just want your recollection.

3       A       Okay.

4       Q       Okay.  So if you don't know the date --

5       A       Okay.

6       Q       I'm not being critical of you.  I have to ask --

7       A       Thank you.

8       Q       -- what you remember.

9       A       Okay.

10      Q       Okay?

11      A       I can live with that.  But, I mean, it just --

12      let's be reasonable.  Okay?

13      Q       So you have a recollection that Ms. Greenhalgh

14      told you about a conversation she had with Mr. Morgenstein

15      concerning seeking a waiver from taking the Series 65

16      exam?

17      A       Mr. Kane, this went on and on and on.

18      Q       If you could just answer that question.

19      A       Yes.

20      Q       But you don't recall when that was?

21      A       No, I don't.

22      Q       Was it in a face-to-face meeting with

32

1    Ms. Greenhalgh?

2         A    Yes.

3         Q    Was it in your office?

4         A    Yes.

5         Q    And you are sure of that?

6         A    Yes.

7         Q    And what did you say to Ms. Greenhalgh?

8         A    We don't grant exceptions, the firm will never

9    go for that, but, you know, check with New York.  And so

10   she called the registration department in New York and

11   they said no, we will not grant an exception to any

12   licensing for a person who can't take the exam.  That's a

13   firm policy.

14        Q    How do you know New York said that?

15        A    She told me.

16        Q    Ms. Greenhalgh told you?

17        A    Yes.

18        Q    And when did she tell you that?

19        A    She had spoken to -- I'm pretty sure her name

20   was Helen Dachler, who ran the registration department.

21   Again, if you are asking me for a date, I have no clue.  I

22   am just telling you I know that the first time this came

33

1    up we gave Norman the courtesy of checking, and they told

2    us no.

3        Q    You used the phrase, I think, the firm wouldn't

4    grant an exemption.

5        A    Correct.

6        Q    Is that the same as the firm applying to the

7    District of Columbia for a waiver?

8        A    No.

9        Q    Okay.  Did you ever inquire as to whether Morgan

10   Stanley would apply to the District of Columbia for a

11   waiver from the requirement to sit for the exam?

12       A    I wouldn't do that, no.

13       Q    Who would do that?

14       A    No one in my office.

15       Q    Would New York do that?

16       A    I'm not sure.  I don't know what they would do.

17   Apparently, they didn't.

18       Q    But you don't know one way or the other?

19       A    All I can tell you is they told us there are no

20   exceptions.  Now, whether they did it or didn't, I wasn't

21   there.  But as far as I'm concerned, they would never do

22   that, and as far as I'm concerned, I would never do that.

34

1    Q    Mr. Morgenstein's father worked with you for

2    many years as well?

3    A    Yes.

4    Q    And his name was Alvin?

5    A    Yes.

6    Q    When did Alvin retire?

7    A    2001, something like that, early --

8    Q    Late 2002, maybe?

9    A    Yeah.  It's somewhere in there.

10    Q    Somewhere in that time frame?

11    A    Yeah.

12    Q    Do you know what happened to the accounts Alvin

13    had?

14    A    I think -- again, I was not involved in that

15    process, but I think -- I know one, the big account,

16    Dr. Hosny, was given to John Prosperi, and I am sure some

17    of them were given to Norman.

18    Q    John Prosperi?

19    A    Yes.

20    Q    And he was a financial advisor at Morgan

21    Stanley?

22    A    Yes.

1       Q     Are you sure that the account was given to him?

2       A     No, I'm not sure, but I'm --

3             MR. SCALIA:  Do you want to take a break?

4             THE WITNESS:  No.

5             MR. SCALIA:  Let's take a short break.

6             THE WITNESS:  I don't know how important this

7    is.

8             (Whereupon, a recess was taken from 11:45 a.m.

9    to 11:47 a.m.)

10            BY MR. KANE:

11      Q     We took a short break, Mr. Masci.  Was there any

12   part of your testimony you wanted to clarify?

13      A     No.

14      Q     And you mentioned that some of Alvin's accounts

15   went to Mr. Morgenstein, his son.

16      A     I'm pretty sure.

17            MR. SCALIA:  Objection, mischaracterizes the

18   witness' testimony.

19            BY MR. KANE:

20      Q     You can respond.

21      A     At that time Al was well along in age, and so

22   there really was -- there were really not accounts of

1    consequence, so it wasn't, you know, a major decision

2    about what to do with this.  But as I recall, the

3    Dr. Hosny account was being managed by John Prosperi at

4    the time.  That was Al's biggest account.

5        Q    How big was the Hosny account?

6        A    It's probably a couple million in equity.

7        Q    And did Mr. Prosperi have a Series 65 license?

8        A    I don't think John did, no.

9        Q    Did you consider whether the Hosny account

10   should be placed into an investment advisor account?

11       A    No, it wouldn't be.  He was a trader.  He loved

12   to buy and sell on his own.  He wouldn't have placed his

13   account with someone else who made the decisions.

14       Q    Did you ever talk to Dr. Hosny about that?

15       A    No.  I spoke to Dr. Hosny about his account.  As

16   the supervisor, it was my job to interview clients that

17   had accounts of that nature.  I just asked him how the

18   service was going, how he was doing, was he happy with his

19   -- that kind of thing.

20       Q    You testified earlier -- and I'm paraphrasing

21   here -- that Ms. Greenhalgh had come to you and mentioned

22   that Mr. Morgenstein had inquired as to whether the firm

37

1    would grant an exemption to the requirement that he had

2    the Series 65 license and you had indicated that that's

3    not going to happen or something to that effect, but you

4    can check with New York and see what they say.  Is that a

5    fair --

6         A    That's essentially true, yes.

7         Q    Okay.  Was it your decision to not grant an

8    exemption from the requirement that Mr. Morgenstein have a

9    Series 65 license or was it New York's decision?

10        A    New York.

11        Q    And do you know who in New York would be --

12        A    It would be Helen Dachler.

13        Q    But what department?

14        A    Registration.  Now, she may have checked with

15   her supervisor, who is the director of compliance.  I

16   don't know that she would make that decision, but I'm

17   99 percent certain that she could make that decision on

18   her own.

19        Q    After Mr. Alvin Morgenstein retired, did there

20   come another time where this issue of a Series 65 license

21   and Mr. Morgenstein came up again?

22        A    Yes.

38

1      Q    All right.  Tell me about that.

2      A    I think the next thing that occurred is that we

3   had heard that Norman attempted to get an exemption

4   through the District of Columbia on his own.  He went

5   around the firm and applied, I think, for an exemption

6   directly to the corporate commission of the District of

7   Columbia.  We had heard back from them that he had done

8   that, and of course we told him you can't do that, we

9   don't allow that.

10     Q    Why did you conclude that he had done it without

11  the firm's permission?

12     A    The District told us that.  We saw the paperwork

13  that said he had done this on his own and that they would

14  not allow that.

15     Q    The District would not allow that?

16     A    Correct.

17     Q    Someone in the District told you that or told

18  Morgan Stanley that?

19     A    I'm pretty sure I saw paperwork on it.  The

20  rules of our industry are pretty much the same as the

21  rules of your industry.  You know, if you want to get

22  licensed as a representative of Morgan Stanley, you have

1   to go through Morgan Stanley to get that license.  Can you

2   imagine the chaos with 10,000 brokers going to their own

3   securities commissioners to get their own licenses?  That

4   would never happen.  Never.

5       Q    Do you know if Paul Garapoli of Morgan Stanley

6   worked with Mr. Morgenstein on his request for a waiver to

7   the District?

8       A    I don't.

9       Q    I had asked about a request for a waiver after

10  Mr. Alvin Morgenstein had retired, and I think the time

11  period you gave me was before he had actually retired.  I

12  think Mr. Morgenstein retired in late '02.  After that

13  period, which would bring us into '03, do you remember the

14  subject of Mr. Morgenstein applying for a Series 65 coming

15  up again?

16      A    Again, I don't want to be combative with you

17  about the dates.  I just know exactly the way things were

18  in terms of applying for an exemption.  I don't know when

19  they happened.  I can just tell you I feel in my heart

20  that probably we had three confrontations about this, and

21  they were all the same.  There are no exemptions.

22      Q    You called them three confrontations.

1    A    Yes.  They were aware -- Norman asked us, I'm

2  pretty sure, the first time to apply.  We said we couldn't

3  do that, you have to take the exam.  I'm pretty sure the

4  next time he went on his own and they came back and told

5  him he couldn't do that.  As a matter of fact, in the

6  records you will see that there is a letter where he is

7  now banned from an exemption because he was violating the

8  District's policy by having accounts without a license.

9  And then, you know, there was the last conversation that

10  we had, asking again for an exemption to taking the exam.

11         I don't know how much more clear I can make it

12  that this is just not something I would do.  It has

13  nothing to do with Norman.  You know, this thing appears

14  to be personal, and it's not.

15    Q    When you say this thing, what do you mean, this

16  thing?

17    A    This issue.  It's like this thing between Norman

18  and me that I was preventing him from making a living.  I

19  was his supervisor.  I was required as a representative of

20  Morgan Stanley to make sure that we followed the rules and

21  regulations of the industry and the firm, and that's

22  simply all that I did.

41

1    Q    Let's just backtrack here.  You said the first

2    confrontation.  Was that the incident where Ms. Greenhalgh

3    came to you and said Mr. Morgenstein had asked about this?

4    A    Yes.

5    Q    And then the second confrontation was when --

6    A    He tried --

7    Q    -- he went on his own and tried to do it?

8    A    Yes.

9    Q    And did you ever talk to him about that?

10   A    I personally, no.

11   Q    All right.  And then this third confrontation

12   was the most recent thing that happened before he --

13   A    Again, I don't remember the date, but we had a

14   last conversation before he retired.

15   Q    Did you ever keep any personal notes at all

16   about any of this?

17   A    No.

18        MR. KANE:  Let's have this marked as Masci 2.

19             (Whereupon, Masci Exhibit No. 2

20             was marked for identification.)

21        BY MR. KANE:

22   Q    The reporter has handed you what has been marked

42

1   as Masci 2.  I would just ask that you take a look at

2   that.

3            (Whereupon, there was an interruption to the

4   proceedings.)

5            (Whereupon, there was a brief discussion off the

6   record.)

7            BY MR. KANE:

8       Q    Just take a look at that, Exhibit 2.

9       A    Okay.

10      Q    All right.  You have had a chance to look at

11  that?

12      A    Yes.

13      Q    And this is an e-mail dated November 20th 2003

14  from Mr. Morgenstein to you?

15      A    Yes.

16      Q    The subject is license, and it says Dear Ron, as

17  I'm sure you are aware, I have completed my 32nd year with

18  the firm.  It goes on to talk about the Series 65 license

19  and then he requests that you file the necessary documents

20  on his behalf with the D.C. Department of Insurance and

21  Securities Regulation and formally request an exemption to

22  the examination so that I can obtain the Series 65

43

1   license.

2       A    Yes.

3       Q    I'm reading from the letter.

4            What did you do when you got this letter?

5       A    Same as I did every other time, just said we

6   can't do this.

7       Q    Well, when you received this e-mail, did you

8   talk to anyone about it?

9       A    I probably talked to Carolyn Greenhalgh about

10  it.

11      Q    Well, don't tell me what you probably did.  I

12  want to know what you did.

13      A    I spoke to Carolyn Greenhalgh about it and said

14  we can't do this.

15      Q    Are you sure she was still working at Morgan

16  Stanley at this time in 2003?

17      A    No, she wasn't.  I'm not exactly sure, then, who

18  I spoke to about it.  But that's really not the issue.

19  The issue is this is, again, a request for the same

20  exemption to the rules that we already told him no to

21  before.  This didn't require a great deal of committee

22  meetings.  This is a no, period.

44

1     Q     So sitting here today, you can't recall talking

2   to anyone about this e-mail, Exhibit 2?

3     A     No.

4     Q     But you decided it was a no, his request?

5           MR. SCALIA:  Objection, vague.

6           THE WITNESS:  Mr. Kane, I asked years ago about

7   this and the answer was no.  Then again, when he went

8   around us to do it on his own, the headquarters said no.

9   Now, how many times do we have to say no to the same

10  question?

11          I don't know how to deal with this.  You keep

12  coming back to the same issue.  It's not personal.

13          BY MR. KANE:

14    Q     I'm not asking you anything personal.  Did you

15  decide to not grant this request?

16    A     It was not my prerogative to decide that.

17    Q     Whose prerogative was it?

18    A     The firm had already decided that.

19    Q     Well, did you elevate it to anyone in the firm

20  other than yourself?

21          MR. SCALIA:  Objection, vague.

22          THE WITNESS:  I don't recall.

1         BY MR. KANE:

2         Q    All right.  And why did you consider this to be

3    a no?

4         A    Because it was a no the other two times.

5         Q    Okay.  Why was it a no the other two times?

6         A    Because the firm doesn't grant exemptions to

7    exam requirements.  Let me -- I'll give you an example.

8    If Norman got an exemption through us to the 65 licensing

9    and therefore was able to do business in this area and if

10   something went wrong and a client was damaged and the

11   client sued the firm, what grounds would we have to say

12   that Norman was qualified to do investment advisory

13   business when he didn't even have a license?  It's just

14   something that the firm will never do.  You can't let

15   somebody practice a business for which they are not

16   licensed.

17        I mean, he admitted that he couldn't even study

18   the material.  So how was he supposed to know what was

19   required if he couldn't even read the material?  To me

20   this is very elementary, Mr. Kane.

21        Q    Well, would the firm apply for a waiver from the

22   exam requirement on an employee's behalf?

46

1     A   I don't know that they have ever done that.  I

2  never did.

3     Q   Is it a possibility?

4     A   I doubt it.

5     Q   You may doubt it, but is it a possibility?

6     A   Well, what can I tell you?  You know, there are

7  10,000 brokers in the firm.  Ask them.

8     Q   I'm asking you.

9     A   I don't know.

10     MR. SCALIA:  Calls for speculation.

11     BY MR. KANE:

12     Q   So sitting here today, you don't know whether

13  the firm would apply for a waiver from the exam

14  requirement for the Series 65?

15     A   They told me that they wouldn't.  They told me

16  that they wouldn't the first time.  It wasn't about

17  Norman.  It was about the firm's rules and regulations.  I

18  have answered that question probably five or six times

19  already.

20     Q   All right.  I'm asking you something different.

21  You had talked about whether the firm would grant an

22  exemption.  I'm asking you whether the firm would apply

47

1    for a waiver from the Series 65.

2         A    Oh, okay.  No, they would not.  To me they were

3    interchangeable.

4         Q    Why wouldn't they do this other question?

5         A    Because of the financial exposure, the risk that

6    the firm would run.

7         Q    Do you know that for a fact?

8         A    Absolutely.

9         Q    Who told you that?

10        A    I have been there.  You know, I don't need to --

11   nobody needs to tell me that, Mr. Kane.

12        Q    So nobody told you that?  That was your own

13   assumption?

14        A    Yes.

15        Q    Were you aware that District law allowed waivers

16   from the Series 65 exam?

17        A    I had heard that, yes.

18             MR. SCALIA:  Objection, assumes facts not in

19   evidence, calls for speculation.

20             BY MR. KANE:

21        Q    When you say you had heard that the District

22   allowed for waivers from the 65 exam, what was the extent

1  of your knowledge of that?

2      A    I think when Norman applied on his own that they

3  wrote him back and said that you would have to go through

4  your firm to do that.

5      Q    And that was the extent of your knowledge about

6  that?

7      A    Yes.  And then I saw another letter that came,

8  I'm pretty sure, after that that denied him because he had

9  been practicing without a license.  He had four accounts

10  that were in that world.

11      Q    Do you know if Morgan Stanley agreed with that

12  conclusion from the District?

13      A    Which conclusion?

14      Q    That he had been practicing without a license.

15      A    No, I don't.

16      Q    Did this Exhibit 2 prompt you to call a meeting

17  with Mr. Morgenstein?

18      A    I'm pretty sure this is the one.  When did he

19  retire?

20      Q    At the end of '03.

21      A    Yeah.  So that would have been -- that would

22  have been the letter.

49

1      Q    This would have been the letter, Exhibit 2, that

2    prompted you to have a meeting with him?

3      A    That's correct.

4      Q    And was the purpose of the meeting then to

5    discuss Mr. Morgenstein's letter that he had sent to you?

6      A    Yes.  That's the original purpose, correct.

7      Q    And you actually had the meeting?  You had a

8    meeting with him?

9      A    We did.

10      Q    And who was present at the meeting?

11      A    Matt Ridnouer, myself and Norman.

12      Q    And tell me what was said at the meeting.

13      A    To my best recollection, we discussed this

14    letter first and said Norman, this is fruitless, the firm

15    will never apply for a waiver for your 65 test, here is my

16    recommendation.  There is a thing called a sunset

17    agreement where you can form a partnership with the

18    Pear/Handow group, which we have discussed before.  They,

19    because they are licensed with a 65, can, with your help,

20    place your clients with investment advisors and you will

21    be able to share the revenue from those accounts.

22         Now, normally, a sunset agreement runs for three

1   years.  Once you retire, the people to whom you have given

2   your accounts will pay you half of the revenues generated

3   by those accounts of yours for three years.  Pear and

4   Handow told Norman that they would pay him for the rest of

5   his life.  That's an unprecedented deal.  To me it was the

6   deal of a lifetime; don't work and make, like, multiples

7   of what you are making now.  He said I'll think about it.

8   And so, as I recall, he was given the agreement, he looked

9   it over and he refused to enter the agreement because

10  there was a paragraph in there that said if you disparage

11  the firm this agreement can be terminated, and he said I'm

12  not going to sign it.  I said well, Norman, you know,

13  don't disparage the firm.  He said no, I can't do that.

14  So that deal didn't go through.

15       Q    Have you told me everything you recall being

16  said in that meeting?

17       A    I'm pretty sure it was also at that meeting that

18  we discussed what his options were, and I told him -- we

19  had just been through a cut where the firm eliminated

20  producers that were below a certain level.  And as I

21  recall, Norman was at that time just on the cusp.  His

22  income was probably in the low 20s at the time.  He was

1    the lowest producing broker in the city for his length of

2    service, and I told him that when the next cut came I

3    didn't think he was going to make it, and that if it were

4    me, rather than be called in on a Friday afternoon and

5    told to pack your boxes and get out, I would rather go out

6    in a more dignified way -- which I did personally -- and

7    that's what he chose, he chose to retire.  And he got a

8    pension, 401K benefits, the whole nine yards.

9        Q    Anything else you recall about this November

10   meeting?

11       A    No.

12       Q    Why was Mr. Ridnouer there?

13       A    With Norman, I always had a witness.

14       Q    Why is that?

15       A    Norman is not an easy person to deal with.  He

16   confuses things.  I don't know.  Maybe it's part of his

17   problem, you know, his medical problem.  But issues

18   between Norman and I just -- we would agree to something

19   and then he wouldn't do it.  It was very disappointing

20   being Norman's supervisor.  He was very uncooperative, he

21   never came to meetings, he wouldn't sign things because of

22   his suspicion.

52

1           As I recall, one of the worst confrontations was

2     over a serious administrative matter.  He told me he had

3     never heard about it.  This was about a travel -- a T&E

4     reimbursement, and he created kind of a little stir with

5     the regional director.  I told Norman that we had

6     e-mailed everybody about this months before.  Well, Norman

7     never had an e-mail opening because he refused to agree to

8     the terms of e-mail, so he had no way of receiving

9     information from us.  He never came to meetings, he didn't

10    have e-mail.  We very rarely spoke to each other.  So

11    whenever I met with Norman I tended to have a witness with

12    me, because there was no telling what he would recall.

13        Q    Did you tell Mr. Morgenstein that if he didn't

14    retire, he would be fired?

15        A    No.

16        Q    Or words to that effect?

17        A    No.

18        Q    Did any other employees ever come to you and

19    request that the firm apply for a waiver from the

20    requirement to sit for the Series 65 exam?

21        A    Yes.

22        Q    Who?

53

1    A    Ed Baroody.

2    Q    When did that happen?

3    A    About the same time, I think.  We all had to

4  take the exam at the same time.

5    Q    You mean the late '90s?

6    A    Yeah.  Probably earlier than that.  I just don't

7  remember when the 65 came into being.

8    Q    So it could be as early as the mid '90s?

9    A    Yeah.

10    Q    So your recollection is that sometime in the mid

11  '90s Mr. Baroody came to you and asked you -- for Morgan

12  Stanley to apply for a waiver from sitting for the exam?

13    A    Well, he asked me, he said Ron, I don't want to

14  do this; I mean, it's too hard to study, yada, yada, yada,

15  and I said look, that's life, I can't give you an

16  exemption to this.  He had been in the business longer

17  than Norman.  Ed was in the business probably 40 years at

18  that time.

19    Q    How old is he?

20    A    Ed?

21    Q    Yes.

22    A    Early 70s.

1       Q     Where is Ed now?

2       A     He is still working.

3       Q     Still working at Morgan Stanley?

4       A     Yeah.

5       Q     So did he say I just don't want to take the exam

6   or did he say I want you to apply for a waiver or I'm

7   asking that you apply for a waiver from --

8       A     He asked me if he could get the license without

9   taking the exam and I said no.  So essentially what Ed did

10  with the clients that he had that were appropriate for

11  that was he just gave them to Dave Pear.

12      Q     And that was back in the '90s?

13      A     He doesn't get paid for them, obviously.  He

14  can't.

15      Q     And that was back in the mid '90s, you think?

16      A     Yeah.  The brokers in my office, there's a

17  handful that never took the exam, and there are several --

18  not several, but probably half of those guys are

19  President's Club, million-dollar-plus producers that are

20  doing perfectly well.  They are in the top, probably,

21  decile of the firm without a 65 license.  Obviously, you

22  don't need that license to make a nice living.

55

1    Q    And who --

2    A    Some of them chose not to take the exam.  I

3  think Ted Hart.  I think John Prosperi.  Those are the two

4  that come to mind right off the bat.

5    Q    Anyone else you can think of?

6    A    No.

7    Q    I am going to ask you to look at Exhibit 2 -- I

8  am going to show you what was marked as Exhibit 2 in Matt

9  Ridnouer's deposition.

10                    (Whereupon, Ridnouer Exhibit No. 2

11                     was referred to.)

12          BY MR. KANE:

13    Q    And this is an e-mail exchange between you and

14  Mr. Morgenstein?

15    A    Yes.

16    Q    And it's MSDW 3668.  Is this an e-mail exchange

17  that you had with Mr. Morgenstein?

18    A    Yes.

19    Q    And Mr. Morgenstein states in his e-mail:  So

20  there will be no misunderstanding as to the contents of

21  our meeting on November 24th at which Matt was present and

22  your follow-up call on or around November 25th, the

1   following is my understanding.  First, it is your final

2   decision that you will not make application on my behalf

3   to the D.C. licensing body for an exemption to the Series

4   65 exam.  Secondly, I have two choices in the immediate

5   future.  The two choices are that either I retire or you

6   will discharge me.  To this end, and since I have no other

7   choice in this matter, I have contacted Josephine in our

8   retirement department at the number you supplied and have

9   requested a retirement package.  I have given her a

10  departure date of December 31, 2003 so that accurate

11  calculations can be made.  So I know we are on the same

12  page, I would appreciate a reply by e-mail or letter.

13  Sincerely, Norman Morgenstein.

14          And then you responded:  Your assumption of the

15  date is correct.  You should plan accordingly.  Ron Masci.

16          That was your response?

17      A    Correct.

18      Q    What did you mean, your assumption of the date

19  is correct?

20      A    That you need to choose a retirement date.  I

21  just went through that.  I had to tell the firm when I was

22  going to retire.  When you do that, various mechanisms go

57

1    into place.  The pension check has to be prepared.  You

2    have to wait 21 days from the date you retire in order to

3    get your IRA rollover from your 401K.  So him telling me

4    that he was going to retire, I think, on the 31st of

5    December was what I was talking about there.  And the

6    assumption being correct is I'm not going to apply for the

7    waiver again.

8         Q    So you read the e-mail before you responded?

9    You read his e-mail before you responded to it?

10        A    I hope so.

11        Q    So did you agree with his description of the

12   meeting?

13        A    Well, obviously when I'm looking at this, I

14   should have been more specific and said, you know, leave

15   out the discharge me part.  But I'm telling you what I

16   know to be a fact, which is we agreed on a retirement date

17   and we agreed that I would not apply for a waiver.

18             What he is confusing -- as he usually does -- is

19   when I said Norman, you are not going to make the cut the

20   next time the firm does this, which could be any day, he

21   assumed that that meant I was going to fire him.  That's

22   not the case.

58

1      Q    Why didn't you tell him that wasn't the case in

2   your response?

3      A    I thought my response was clear.  He told me he

4   was going to retire.  He left the room telling me that he

5   would call Josephine and ask for retirement, and I said

6   okay, your date is correct and you should plan

7   accordingly.  That's a big administrative matter,

8   Mr. Kane, retiring.  It's not like just saying okay, I'm

9   not coming to work anymore.  And, like I told him, it

10  beats the heck out of being told on a Friday afternoon

11  it's over, you know, pack up your office.

12     Q    Well, Mr. Morgenstein wrote in here the two

13  choices are that, quote, either I retire or you will

14  discharge me, closed quote.  You didn't dispute that in

15  your response.

16     A    No, I didn't.

17     Q    Why not?

18     A    I thought what I said was enough.  He had agreed

19  with me that he would retire, so I'm just saying your

20  assumption is correct.

21     Q    He also wrote since I have no other choice in

22  the matter.  You didn't tell him he did have a choice.

59

1    Why not?

2        A    I thought I made it perfectly clear to him

3    during the conversation that we had that he wouldn't make

4    the cut the next time around, and to me, it would be more

5    dignified to take the retirement option.  I thought we had

6    an understanding.

7        Q    Well, didn't you look at this e-mail and think

8    he is asking for clarification as to what my options are?

9    And he is asking you, basically, are we on the same page;

10   do I have a choice, are you telling me that I --

11       A    Well, he always had a choice, Mr. Kane.  You

12   know, all he had to do was say okay, then fire me.  You

13   know, that was a choice.  If that's what he thought the

14   choice was, he could have chosen that.  He didn't.

15       Q    And you would have fired him?

16       A    No.  I had worked with Norman for, I don't know,

17   30-something years.  I thought I had really been a very,

18   very understanding boss with Norman.  I had given him

19   accommodations beyond description.  There are things that

20   he did that were really intolerable to most people, but I

21   had loyalty to him and his father because they were there

22   in the beginning when I got there.  Al was a very, very

1   good man and Norman was his son, and so I just treated

2   them respectfully, in spite of the fact that there were

3   things that he did that really were beyond the pale.

4          So why would I choose at the moment of truth to

5   change my whole approach?  My approach has always been do

6   this for yourself, this is the easy way out; you get a

7   pension and you get a 401K plan and it's going to be more

8   money than you make.  I gave him the option to join the

9   Pear/Handow team and be compensated for the rest of his

10  life.  I mean, everything that I had done had been in his

11  best interests.  Now, he might not agree with that.

12      Q    When you got his letter of November 20th 2003,

13  what we have identified as Masci 2, where he asked again

14  about the waiver --

15      A    Yes.

16      Q    -- were you angry when you got that?

17      A    I saw something in the paperwork where there was

18  a claim of retaliation, that I fired Norman as retaliation

19  for this.  This started probably eight or ten years ago,

20  prior to this.  I didn't fire him then.  I didn't fire him

21  when he went around the firm and tried to get a waiver on

22  his own.  I didn't.  Why would the third time be the charm

61

1  and I would call him in and say okay, Norman, this is

2  enough, you are fired?  That did not happen.

3      Q    My question was were you angry when you got that

4  letter.

5      A    Was I angry?  I wasn't happy, but, no, I was not

6  angry.

7      Q    When you say you weren't happy, what do you

8  mean, you weren't happy?  What was it about the letter

9  that made you not happy?

10     A    Going through this again, Mr. Kane, it was

11  just -- it was just a redundancy that was unnecessary.  I

12  think everybody in the known world knew the firm's

13  position on this.  It just seemed silly to go through it

14  again.

15     Q    You said in your testimony that retirement is a

16  big deal.  I think that's what you said.

17     A    It is.

18     Q    And obviously, Mr. Morgenstein wrote this

19  Exhibit 2, Ridnouer Exhibit 2.  Part of it was concerning

20  the retirement, whether he was going to make that big

21  decision --

22     A    Correct.

62

1    Q    -- and he was looking to you to make sure he

2    knew where he stood, wasn't he, and wasn't he asking you

3    do I have a choice in this matter?

4    A    Well, again, I'll repeat.  The choice was retire

5    or be cut the next time the firm made that move, which

6    could have been anytime.  We knew -- after the first cut,

7    they told us to be prepared for another cut, and they were

8    going to raise the bar from -- I don't remember what it

9    was -- to probably $20,000 or $30,000 above Norman's

10   level.  I think he was producing at the time about

11   $120,000 gross, which was, like I say, not going to make

12   it.  And so I was offering him advice as to what his

13   choices were.

14   Q    But wasn't he concerned about a more immediate

15   dismissal?  In this e-mail he says you said either retire

16   or you will discharge me.

17   A    Well --

18   Q    He thought --

19   A    He could have made that choice, then, and we

20   would be here on another matter.

21   Q    He thought you were going to discharge him.

22   That's what he told you in this e-mail.

63

1    A    Well, that's his interpretation of it.

2    Q    So why didn't you correct him?

3    A    Correct him where?

4    Q    Why didn't you tell him I'm not going to

5    discharge you, you can stay here?

6    A    I couldn't tell him that.  I didn't know whether

7    he was going to make it or not or when the cut was going

8    to come.

9         I'm sorry, Mr. Kane.  You are trying to make a

10   mountain out of a molehill here.

11   Q    Well, don't you read this, Mr. Morgenstein's

12   e-mail, to indicate that Mr. Morgenstein thinks his

13   discharge is going to be a little more immediate than down

14   the road somewhere?

15   A    That was not my intention.

16   Q    And he even tells you that he feels he has no

17   other choice.

18        MR. SCALIA:  There is no question pending.

19        THE WITNESS:  I answered the question.

20        BY MR. KANE:

21   Q    Did he have a choice?

22   A    Yes.  Absolutely.  He chose to retire.  I don't

1  know what else to say.

2      Q    So what was the choice, the choice between

3  retirement and what?

4          MR. SCALIA:  Asked and answered.

5          THE WITNESS:  And being cut.  I'll say that for

6  the last time.  And being cut.  The firm was doing RIFs.

7  Two of his friends already had been cut.  One of his seat

8  mates, the guy sitting next to him in the office, got cut.

9          BY MR. KANE:

10     Q    Who would be responsible for deciding who was

11 going to be RIF'd?

12     A    Headquarters.

13     Q    That would be New York?

14     A    Yes.  You know, the president of the company.

15         And, by the way, just as a clarification of

16 that, because of the world that we live in today, again,

17 there are no exceptions.  When we get a list, all people

18 on that list on Friday afternoon at 4:00 all go together.

19 There are no exceptions because, if there are, then one

20 person says well, what about me.  And so when they do a

21 cut -- probably, I think not too long ago, 1,000 people

22 were let go on a Friday afternoon at 4:00.  So there is no

1   negotiating once that happens, and that's part of the

2   urgency that I tried to explain to Norman.

3           I mean, you do realize where Norman was in his

4   contemporary world, right?

5       Q   I'm sorry.  In his what?

6       A   In his world of producers.

7           MR. SCALIA:  Wait for a question to be posed.

8           THE WITNESS:  Okay.

9           BY MR. KANE:

10      Q   When you received this Exhibit 2, the December

11  1, 2003 e-mail that you responded to, your assumption of

12  the date is correct, did you talk to anyone about this

13  e-mail?

14      A   I'm sorry.  Which one?

15      Q   Ridnouer 2.

16      A   Did I discuss this with anyone?

17      Q   Yes.

18      A   No.

19      Q   Did you talk to anyone before you made your

20  response?

21      A   No.

22          MR. SCALIA:  How are you doing?  Do you want to

1  take a break?

2           THE WITNESS:  No.  I'm good.

3           MR. KANE:  Why don't we take a short break.  I'm

4  just going to go through my notes.

5           (Whereupon, a recess was taken from 12:28 p.m.

6  to 12:44 p.m.)

7           BY MR. KANE:

8      Q    Let me show you what has been marked as Exhibit

9  4 from the Ridnouer deposition this morning, and this

10  concerns the payout of commissions after Mr. Morgenstein

11  left Morgan Stanley.

12                      (Whereupon, Ridnouer Exhibit No. 4

13                       was referred to.)

14           BY MR. KANE:

15      Q    Do you know why Mr. Morgenstein was not paid

16  those commissions?

17      A    I have no idea.

18      Q    Were you consulted about that at all?

19      A    No.

20      Q    Well, if you look at the bottom e-mail, it shows

21  that there's a message from O'Keeffe to you, Ron Masci,

22  showing that Morgenstein is owed commissions in the amount

67

1    of $1,349.23.  Do you recall that at all?

2        A    I don't.

3        Q    Do you know why -- do you have any idea why

4    Mr. Morgenstein would not have been paid those

5    commissions?

6            MR. SCALIA:  Objection, assumes facts not in

7    evidence.

8            THE WITNESS:  No.

9            BY MR. KANE:

10       Q    Did you have any conversations with Mary

11   Robertson about Mr. Morgenstein?

12       A    Who is Mary Robertson?

13       Q    She is the compliance director with Morgan

14   Stanley.

15       A    Where?

16       Q    In New York.

17       A    I don't recall.

18       Q    Have you told me about all the conversations you

19   recall concerning Mr. Morgenstein and the Series 65 issue?

20       A    I think so.

21       Q    Let me go back to Ridnouer 2, which should still

22   be in front of you.

68

1          (Whereupon, Ridnouer Exhibit No. 2

2          was referred to.)

3          THE WITNESS:  Okay.

4          BY MR. KANE:

5      Q    Would it be reasonable for someone to read your

6  response to Mr. Morgenstein as indicating that you were in

7  agreement with what Mr. Morgenstein was saying?

8          MR. SCALIA:  Objection, vague, calls for

9  speculation.

10         THE WITNESS:  I can't answer that.

11         BY MR. KANE:

12     Q    Why not?

13     A    You are asking me whether something is

14  reasonable?

15     Q    Yes.

16     A    I'm not going to answer that.

17     Q    Why not?  Why aren't you going to answer it?

18     A    Because it requires some sort of a conclusion

19  that's not a fact.  I don't -- it doesn't matter to me

20  whether it's reasonable or not.  All I know is what I told

21  him.  What his assumption is is not my business.

22     Q    Well, when you communicate with someone, you are

69

1    trying to convey some unambiguous response, aren't you?

2    You're not --

3         A    I thought that I did.

4         Q    Well, my question I'd like you to answer is

5    whether it would be reasonable for someone to conclude

6    that your response showed that you were in agreement with

7    what Mr. Morgenstein said in his e-mail.

8              MR. SCALIA:  Same objections.

9              THE WITNESS:  It's not reasonable to me.  I'm

10   not going to answer the question.

11             BY MR. KANE:

12        Q    Okay.  To me, you just said two different

13   things.  You said it's not reasonable to you and you are

14   not going to answer the question.

15        A    Ask me a question that deals with the facts and

16   I'll give you the best answer I can, but don't ask me to

17   just make up something.  I'm not going to do that.

18        Q    So sitting here today, you can't say whether

19   that would be a reasonable conclusion or not?

20        A    In my opinion, it's not necessary for me to

21   answer that question.

22        Q    You've got to answer that question, Mr. Masci.

70

1          MR. SCALIA:  You have an obligation to answer

2     the question to the extent you can.

3          And I am going to preserve my objections to the

4     questions.

5          THE WITNESS:  To me, it requires me to answer

6     the question on an opinion that's really not involved.  Is

7     it reasonable for him to assume something out of this?

8     How am I going to answer how he would feel about --

9          BY MR. KANE:

10     Q    I'm not asking about Mr. Morgenstein.  I'm

11     saying is it reasonable for a person -- would a reasonable

12     person conclude from your response that you agreed with

13     what Mr. Morgenstein said in his e-mail to you?

14          MR. SCALIA:  Same objection.  I think you are

15     asking him to speculate about how someone else might read

16     this e-mail.

17          THE WITNESS:  I'm not going to speculate about

18     it.

19          BY MR. KANE:

20     Q    You are obligated to answer the question.

21     A    I'm answering the question.

22     Q    No, you're not.  You are telling me you're not

71

1    answering the question.

2        MR. SCALIA:  Are you able to answer the

3    question?

4        THE WITNESS:  I'm not.

5        BY MR. KANE:

6    Q    So sitting here today, you are not able to tell

7    me whether a reasonable person reading your response would

8    conclude that you were in agreement with what

9    Mr. Morgenstein said?

10    A    I don't even know what you mean by a reasonable

11    person.

12    Q    Well, let me rephrase it.  Would it be

13    reasonable for one to conclude that your response

14    indicated that you were in agreement with what

15    Mr. Morgenstein said in his e-mail to you?

16        MR. SCALIA:  Objection, calls for speculation,

17    vague.

18        THE WITNESS:  It's not reasonable on my part.

19    There is no question in my mind, none, what I meant by my

20    e-mail.  I told you that.  What conclusion Norman came to

21    I can't tell you.  I can only tell you I looked at the

22    e-mail, I said your assumption of the date is correct,

72

1    choose to retire and do what you have to do.  He told me

2    he was going to retire, and so I told him to contact the

3    retirement department and they will start to arrange when

4    you are going to get your benefits.

5              BY MR. KANE:

6        Q    When you say he told me I was going to retire,

7    are you referring to this e-mail or are you referring to

8    some other conversation?

9        A    That was another conversation when he told me he

10   chose to retire.

11       Q    You are saying on November 24th, in that

12   conversation, he told you he was going to retire or some

13   other conversation?

14       A    You know, I really don't recall.  My

15   recollection is on that day when we met, we had the

16   conversation about his options.  He then left and sent me

17   back this e-mail, told me that he was going to retire, and

18   I said your assumption is correct.  I don't know what else

19   I can tell you.

20       Q    All right.  I need to go back to the question I

21   asked about reasonableness.  Would it be reasonable in

22   your opinion for one to conclude, based on your response,

1    that you agreed with what Mr. Morgenstein put in this

2    e-mail?

3            MR. SCALIA:  Objection, asked and answered.  He

4    has already testified he is not able to answer that

5    question.

6            MR. KANE:  You are mischaracterizing his

7    testimony.

8            THE WITNESS:  I think I have already answered

9    the question.

10           BY MR. KANE:

11      Q    Could you answer the question, please?  It's a

12   pretty simple question.

13           MR. SCALIA:  Let me object and just preserve the

14   same objections; calls for speculation, vague.

15           BY MR. KANE:

16      Q    Is it reasonable or is it unreasonable?

17      A    I guess it would be reasonable for somebody to

18   assume that.

19      Q    You refer in this e-mail to a follow-up call.

20   Or, I'm sorry, Mr. Morgenstein refers to a follow-up call.

21   Do you see that in the second line under Dear Ron,

22   follow-up call on or around November 25th?

74

1      A    Yeah, I see that.

2      Q    Okay.  Do you recall that call?

3      A    No, I don't.

4      Q    After you sent Mr. Morgenstein your response --

5   it looks like you sent it on December 15th -- did you have

6   any subsequent conversations with Mr. Morgenstein?

7      A    I don't think so.

8      Q    Did you have any conversations with anyone else

9   about Mr. Morgenstein?

10      A    I don't recall.

11      Q    Did you ever talk to Mr. Ridnouer about the

12   November 24th meeting?

13      A    No.

14      Q    Did you ask Mr. Ridnouer about this e-mail that

15   Mr. Morgenstein sent you?

16      A    You know, I really don't recall this e-mail.

17   The only time that I know about this was when we were

18   going through some of the paperwork during our

19   preparation.

20      Q    Was there a RIF after Mr. Morgenstein retired?

21      A    Yes.

22      Q    When was the RIF after?

75

1       A    I really don't recall, but it was -- one of

2  Norman's seat mates was cut, Cary Gold.

3       Q    But sitting here today, you don't recall when

4  that was?

5       A    I really don't.

6       Q    And you said Cary Gold?

7       A    Yes.

8       Q    That's C-A-R-Y?

9       A    Yes.  There were 1,000 brokers, I think.

10      Q    Nationwide?

11      A    Yes.

12      Q    Do you recall any conversations with Helen

13  Dachler that you personally had?

14      A    No.

15      Q    Do you recall any conversations with Douglas

16  Lowe that you personally had?

17      A    I don't know Douglas Lowe.

18           MR. KANE:  I'm just going to take a real quick

19  break, and I'm going to see if we can finish up.

20           (Whereupon, a recess was taken from 12:55 p.m.

21  to 1:01 p.m.)

22           BY MR. KANE:

1      Q    Just a couple of follow-up things, Mr. Masci,

2    and then you can get out of here.

3      A    Thank you.

4      Q    You testified earlier about three

5    confrontations.  Have you told me everything you recall

6    about the first confrontation?

7      A    Yes.

8      Q    All right.  Have you told me everything you

9    recall about the second confrontation?

10     A    Yes.

11     Q    Have you told me everything you recall about the

12   third confrontation?

13     A    Yes.

14     Q    All right.

15          MR. KANE:  I have no further questions.

16          MR. SCALIA:  I don't have any questions.  We'll

17   read.

18          (Whereupon, at approximately 1:01 p.m., the

19   taking of the deposition was concluded.)

20          (Signature required.)

21

22

CERTIFICATE OF NOTARY

I, MAUREEN S. BENNIE, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me stenographically and thereafter reduced to typewriting by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

_____
Maureen S. Bennie
Notary Public in and for
the District of Columbia

My Commission Expires:

2/14/08

## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF COLUMBIA

NORMAN L. MORGENSTEIN                )
                                     )
            Plaintiff,               )
                                     )
     v.                              )        CA No. 05-2123 (JR)
                                     )        Discovery Closes
MORGAN STANLEY DW INC.               )        July 11, 2006
                                     )

---

### PLAINTIFF'S NOTICE OF 30(B)(6) DEPOSITION

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, notice is hereby given that Plaintiff, Norman Morgenstein, through his undersigned counsel, Cashdan & Kane, PLLC, will take the deposition upon oral examination of designated representative(s) of Defendant **Morgan Stanley DW Inc.** ("MS"). The Deposition shall begin at **11:00 A.M. on June 16, 2006**, at the offices of Plaintiff's counsel, Cashdan & Kane, PLLC, 1150 Connecticut Avenue, N.W., Suite 900, Washington, D.C. 20036. The deposition of Defendant will be taken by Plaintiff pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. In accordance with Rule 30(b)(6), Defendant shall designate one or more officials, officers, managing agents or other persons who agree to testify on its behalf and, for each such individual, Defendant shall designate the matters about which he or she will testify.

The deposition shall continue from one day to the next until completed, excluding weekends and holidays. Testimony shall be recorded by a court reporter authorized to administer oaths in the District of Columbia.

### DEFINITIONS AND INSTRUCTIONS

A. The terms "MS," as well as any pronoun referring to Morgan Stanley DW Inc, includes its employees, agents, representatives, attorneys, and other persons acting or purporting to act on its behalf.

B. "Identify" means the person's full name, present or last known business and residence addresses, present or last known business and residence telephone numbers, present or last known occupation and position, present or last known employer or business affiliation, occupation, position and job duties at the time in question as specified in the particular area of inquiry.

C. "Document" means any written, recorded or graphic matter, however produced or reproduced, including, without limitation, letters, telegrams, memoranda, agreements, records, notes, diaries, photocopies, charts, and all other papers and writings, including drafts, originals, and copies, and any photographs, films, visual or audio or otherwise taped recordings, and any information filed on computer drives and disks or printed out, including e-mail, in your possession or in your agents', attorneys' or representatives' possession, or of which you have knowledge, wherever located.

The duties incumbent upon MS in response to this notice are as follows:

First, the deponent has a duty of being knowledgeable on the subject matter identified as the area of inquiry.

Second, the designating party is under the duty to designate more than one deponent if it would be necessary to do so in order to respond to the relevant areas of inquiry that are specified with reasonable particularity by the plaintiff.

2

Third, the designating party has a duty to prepare the witness to testify on matters not only known by the deponent, but those that should be reasonably known by the designating party.

Fourth, the designating party has a duty to substitute an appropriate deponent when it becomes apparent that the previous deponent is unable to respond to certain relevant areas of inquiry.

Fifth, the ultimate underlying purposes of Rule 30(b)(6) is to prevent serial depositions of various witnesses without knowledge within an organization and eliminating "bandying," which is the name given to the practice in which people are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to the organization itself.

Source: *Alexander v. Federal Bureau of Investigation*, 186 F.R.D. 148 (D.D.C. 1999).

### AREAS OF INQUIRY

1.     Information concerning the operation of Defendant's computer system (specifically the Washington DC Office), from January 1, 2002 to the present, specifically including, but not limited to, the programs used, the methods used to store and back up data, and the accessibility of and retrievability of stored and backed up data.

2.     Information concerning the operation of Defendant's e-mail system from January 1, 2002 to the present specifically including, but not limited to, the manner in which e-mail is maintained, stored, and backed up, the accessibility and retreivability of stored and backed up e-mail, the existence of "audit trails" and/or "computer logs" (*i.e.*, computerized records regarding network usage), the existence of "non-printing information" (*e.g.*, recorded revision(s) of messages as typed, and "hidden messages"),

and efforts to locate e-mails and drafts of e-mails in response to Plaintiff's discovery requests.

3.      The contents of all document retention policies used by MS. This would include instructions on how to maintain files including but not limited to e-mails.

4.      The commissions generated from any source, including but not limited to access fees, vision fees, 12-B1 fees, trailers, stock commissions, managed futures and choice accounts, margin interest residuals, and residuals from both proprietary and non-proprietary mutual funds, for all accounts bearing the plaintiff's production number in 2003 through the present, including, but not limited to, accounts that may have been moved to another office and additional accounts established following Plaintiff's departure from the Defendant's employ.  These accounts include, but are not limited to the following:  M & R Cohen Foundation (account number 54835, 115226, 142833), Norman Morgenstein (99075, 98051, 98915, 152823, 98855), Steve Morgan (98597), Mel Morgenstern (98760, 132654), Marcia Sanground (112557, 112558, 112559, 98144, 98630, 98631, 98632), Sharon Resnick (04963), Susan Heyman (98904), Robin Fields (149105, 149106, 144926), Edgar Lacayo (22411), Maria Lacayo (22412), Salah Hosny (39132, 55134, 87097), Jennifer and Amanda Hosny (116686), Adam Hosny (44918), Jennifer and Adam Hosny (129383), Leonard Freedman Trust, Maury Abraham, Gail Abraham, Rogers Foundation, John Lippert, Shawki Al-Attar, Daniel Solomon, Diane Solomon, Woodbury Foundation, Naomi and Nehenia Cohen Foundation, Do'lkyte Foundation.

5.      The total assets by client, broken down by account number, of all accounts in the FL 693 and 642 Potomac offices as of the dates 12/31/04 and 12/31/05 that bore

the Plaintiff's production number (or that bore his account number prior to his termination) including, but not limited to, accounts that may have been moved to another office and additional accounts established following Plaintiff's departure from the Defendant's employ. These accounts are listed in topic 4.

      6.     Referring to document 2139 produced by Defendant – dated December 2003 –Deponent shall be prepared to testify concerning the identity of the author, the reason for the documents' existence, the time and date of its creation.

      7.     What Plaintiff's earnings and benefits would have been, had he been allowed to continue working at MS and been allowed to place the following accounts in wrap accounts:  M & R Cohen Foundation (account number 54835, 115226, 142833), Norman Morgenstein (99075, 98051, 98915, 152823, 98855), Steve Morgan (98597), Mel Morgenstern (98760, 132654), Marcia Sanground (112557, 112558, 112559, 98144, 98630, 98631, 98632), Sharon Resnick (04963), Susan Heyman (98904), Robin Fields (149105, 149106, 144926), Edgar Lacayo (22411), Maria Lacayo (22412), Salah Hosny (39132, 55134, 87097), Jennifer and Amanda Hosny (116686), Adam Hosny (44918), Jennifer and Adam Hosny (129383).

      8.     The manner in which Defendant is supposed to handle a request for reasonable accommodation from one of its employees.

      9.     The number of financial advisors who work in Defendant's DC office.  Of these persons, the number who have a Series 65 or comparable license.

      10.     All requests by persons that Defendant apply for an exemption on that person's behalf from the requirement that the person sit for the Series 65 exam.  The deponent shall be prepared to testify concerning the name of the person, their position, to

whom they directed the request and the response to their request and the reason for the response.

11.    Defendant's policy regarding whether it will apply for waivers to the requirement that a person sit for the Series 65 exam. The deponent shall be prepared to testify as to whether this policy is documented and, if so, where it is documented.

12.    The essential functions of the financial advisor position held by Mr. Morgenstein.

13.    The identity of the person(s) who received Mr. Morgenstein's accounts after he left Defendant's employ and whether these person(s) were disabled.

Respectfully submitted,

**CASHDAN & KANE, PLLC**

Michael G. Kane, Bar No. 435121
1150 Connecticut Avenue, N.W.
Suite 900
Washington, D.C. 20036-4104
(202) 862-4330

*Attorneys for Plaintiff Norman Morgenstein.*

Dated:  May 24, 2006

**Masci, Ron**

**From:** Morgenstein, Norman
**Sent:** Thursday, November 20, 2003 3:26 PM
**To:** Masci, Ron
**Subject:** License

November 20, 2003

Mr. Ronald Masci,
Senior Vice President & Branch Manger
Morgan Stanley
1775 Eye Street, NW
Washington, DC 20006

VIA Email & Interoffice Mail

Dear Ron,

As I'm sure you are aware, I have recently completed my 32nd year with the firm. Looking back at the changing direction of the industry over the last several years, and looking forward, I have come to the conclusion that in order to be more productive for the firm and myself, and to stay in line with the firm's direction of fee based managed accounts, I find it imperative to obtain a Series 65 license.

Under normal circumstances, and prior to February, 1996, I would simply study for, and obtain my license through the normal channel of examination. However, you are also aware of my medical history and that my 1996 surgery has created a disability and made it virtually impossible for me to obtain the Series 65 licensing through normal channels. Because of my disability, I am requesting that you file the necessary documents on my behalf with the District of Columbia Department of Insurance And Securities Regulation, following protocol and formally requesting an exemption to the examination, so that I can obtain the Series 65 license.

I look forward to your reply.

Most Sincerely,

Norman L. Morgenstein
Associate Vice President
Financial Advisor

