UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------x

NORMAN L. MORGENSTEIN,   :

       Plaintiff,      :  Civil Action

  vs.                    :  No.05-2123(JR)

MORGAN STANLEY DW, INC.,: Volume II

      Defendant.      :

------------------------x

DEPOSITION OF THEODORE A. MILES

Washington, D.C.

Thursday, June 22, 2006

2:00 p.m.

REPORTED BY:

  DONALD R. THACKER

| Page 106 |
|---|

1    30(b)(6) deposition of THEODORE A. MILES, called
2 for examination pursuant to notice of deposition, on
3 Thursday, June 22, 2006, in Washington, D.C. at the
4 Department of Insurance and Securities Regulation,
5 at 2:00 p.m. before DONALD R. THACKER, a Notary
6 Public within and for the District of Columbia, when
7 were present on behalf of the respective parties:
8
9     MICHAEL G. KANE, ESQ.
10     Cashdan & Kane, PLLC
11     1150 Connecticut Avenue, N.W., Suite 900
12     Washington, D.C. 20036
13     908-264-9331
14     On behalf of Plaintiff
15
16     MATTHEW H. SORENSEN, ESQ.
17     Greenberg Traurig
18     1750 Tysons Boulevard, Suite 1200
19     McLean, Virginia 22102
20     703-749-1348
21     On behalf of Defendant
22           -- continued --

| Page 107 |
|---|

1 APPEARANCES (Continued):
2
3     STEPHEN C. TAYLOR, ESQ.
4     THEODORE A. MILES, ESQ.
5     LILAH BLACKSTONE, ESQ.
6     RHONDA K. BLACKSHEAR, ESQ.
7     Government of the District of Columbia
8     Department of Insurance, Securities &
9     Banking
10     Union Center Plaza
11     810 First Street, Northeast, Suite 701
12     Washington, D.C. 20002
13     On behalf of Department of Insurance,
14     Securities and Banking.
15
16 ALSO PRESENT: NORMAN L. MORGENSTEIN
17
18
19
20
21
22

| Page 108 |
|---|

1       P R O C E E D I N G S
2  Whereupon,
3       THEODORE A. MILES
4 resumed the stand and, having been previously duly
5 sworn, was examined and testified further as
6 follows:
7       EXAMINATION (Continued)
8    BY MR. SORENSEN:
9    Q   Good afternoon, Mr. Miles, I am Matt
10 Sorensen. Again, I represent Morgan Stanley Dean
11 Witter.
12     Just to start off, I wanted to note that
13 counsel for the Department of Insurance, Security
14 and Banking and myself have agreed that -- to treat
15 the issue of waiver and accommodation as set forth
16 in the Notice of Deposition as one and the same.
17     The other issue that I wanted to note, I
18 guess -- I will scratch that.
19     Just to clarify, Mr. Miles; you are aware
20 that you are here today giving testimony on behalf
21 of the Department of Insurance, Securities and
22 Banking, correct?

| Page 109 |
|---|

1    A   I understand.
2    Q   And you understand that your previous
3 testimony was given on behalf of the Department of
4 Insurance, Securities and Banking, correct?
5    A   Sir, I may have answered some of those
6 questions thinking of your asking my personal
7 knowledge, and when we have an opportunity to review
8 that transcript, if we need to augment in any way,
9 we will do that.
10    Q   But you are the --
11    A   I am the director.
12    Q   You are the director of the Department of
13 Insurance --
14    A   Securities Bureau in the Department of
15 Insurance Securities and Banking.
16    Q   Just to make sure that that is clear on
17 the record, you are the director of the Securities
18 Bureau in the Department of Insurance, Securities
19 and Banking, correct?
20    A   That is correct.
21    Q   All right.
22     I would like to draw your attention back

## Page 110

1  to Title 17, Chapter 18 of the D.C. Municipal
2  Regulations.
3      A   Yes.
4      Q   This was Exhibit 2.
5          This has been previously marked.
6          MR. TAYLOR:  As Exhibit 2?
7          MR. SORENSEN:  Yes, as Exhibit 2.
8          BY MR. SORENSEN:
9      Q   I wanted to draw your attention to section
10  1860.2.
11     A   Yes.
12     Q   What I wanted to know is that, if someone
13  is licensed in a jurisdiction other than the
14  District of Columbia that does not require a Series
15  65 examination, in order to have a Series 65 license
16  under 1860.2, is it required that that person take
17  the Series 65 exam in D.C.?
18     A   That is correct, with the proviso that the
19  person may seek and possibly obtain a waiver, but
20  the examination requirement does obtain.
21         They don't -- they are not excused from
22  the examination by virtue of having the license that

## Page 111

1  didn't require the exam.
2      Q   So you can't automatically waive, is that
3  what you are saying?
4      A   If your license was in a jurisdiction that
5  did not require the 65 exam.
6      Q   That was a yes?
7      A   It was what it was.
8      Q   No, I understand, I guess.  I just want --
9      A   I am trying to answer the question as
10  accurately as I can, and sometimes a yes will not do
11  the job.  I am trying to tell you what the
12  requirements are.
13     Q   Okay.  I will just rephrase that, I think
14  it may help out.
15         So your testimony was that if the
16  jurisdiction other than D.C. does not require a
17  Series 65 examination, under D.C. law the person
18  would have to take the Series 65 examination, unless
19  they obtained a waiver through some other means?
20     A   That is correct.
21     Q   And they cannot automatically waive into
22  D.C. simply by virtue of having a license somewhere

## Page 112

1  else, correct?
2      A   That is correct.
3      Q   And in order to render a decision --  in
4  order to render a decision on a request for a waiver
5  that is based solely on a disability, would the
6  Department of Insurance, Securities and Banking
7  require that the person seeking the waiver inform it
8  of the -- of what the disability is?
9      A   I am having some trouble with the form of
10  your question because the decision to grant a waiver
11  is an exercise of discretion, and we have to
12  consider a number of factors, some of which are in
13  the regulation.  There is nothing specifically about
14  disability.
15         So that, you know, it -- I couldn't say
16  that the disability would be all that we would look
17  at.
18     Q   I understand.  My question was a bit more
19  focused.  In the case of someone who is requesting a
20  waiver of an examination solely on the basis of
21  disability, would that person be required to inform
22  the DISB as to what the disability is?

## Page 113

1      A   That would be helpful.  That would be a
2  complete request, to the degree that that was the
3  reason, the basis for the request, it would be
4  expected that we would get a description of the
5  disability.
6      Q   So you would -- is it your testimony that
7  you would need to know what the disability is?
8      A   It is not --
9      Q   Actually, let me rephrase that.
10     A   Thank you.
11     Q   You really -- what I am after here is
12  strictly -- is where the request for a waiver is
13  strictly on the basis of a disability, there is no
14  additional information being provided other than the
15  fact that the person is seeking a request -- is
16  requesting a waiver on the basis of their
17  disability?
18         Would they be required to tell the DISB
19  what their disability is?
20     A   I am having trouble with the premise of
21  your question.  I don't know if we would consider a
22  request that was based solely on the disability.

Page 114

1    Q    And why is that?
2    A    Because the regulation and the statute
3  that authorizes the regulation lists some primary
4  concerns and factors that are -- that inform the
5  exercise of discretion.
6        If a person did not, for example, explain
7  how it was that they were, they had the knowledge
8  and the competence, if someone just wrote us and
9  said, I would like to have a waiver of the Series
10  65, I have "X" disability, that would not be a
11  complete application.
12    Q    So in that case you would not grant a
13  waiver --
14    A    Yes, we would want to know a lot more than
15  just what was the nature of the disability.
16    Q    So, in the more general case where
17  disability is at least a part of the application
18  would you require to know what the disability is if
19  that is part of the application?
20    A    We would expect that to be provided.
21    Q    And would you need to know the extent of
22  the disability?  Actually, let me rephrase that.

Page 115

1        Would you need to know whether the
2  disability is permanent or temporary?
3    A    Sir, there is -- when someone is asking
4  for a waiver based on disability there would be a
5  number of considerations regarding the disability
6  that would be relevant.
7        So I mean the duration would be of some
8  interest but we would have to assume, I think, that
9  the disability was going to last for some
10  significant period of time.
11    Q    I guess that -- that isn't fully
12  responsive to what I was asking, and maybe I am
13  asking it the wrong way.
14        I guess what I am trying to draw a
15  distinction between is the case where someone has a
16  temporary disability that might prevent them from
17  taking the exam for a short period of time but could
18  resolve that disability and take the test later.
19        In a situation like that, that is the
20  situation that I am looking at.  And so, I guess
21  with that in mind, would the DISB need to know
22  whether the disability is permanent or temporary?

Page 116

1        MR. KANE:  I am going to object to this
2  line of questioning.  I don't think it is relevant
3  to the case, I think the regulations speak for
4  themselves.
5        These topics were covered in the first day
6  of deposition, and I thought we were here to talk
7  about topics 3 and 4 in the deposition notice, and
8  these questions related to regulations were all
9  covered in the first day of the deposition.
10        MR. SORENSEN:  I think this question goes
11  directly to the issues related to Mr. Morgenstein's
12  application, so it really does speak to issue number
13  three.
14        THE WITNESS:  Well, you are asking about
15  whether we would want to know the duration of the
16  disability?
17        BY MR. SORENSEN:
18    Q    Yes.
19    A    We would, yes, want to know the duration.
20    Q    And would you need to know also whether
21  the disability might substantially limit the
22  person's ability to take the examination?

Page 117

1        MR. KANE:  Objection, legal conclusion.
2        MR. SORENSEN:  I will withdraw that.
3        BY MR. SORENSEN:
4    Q    Would you need to have information that
5  would -- withdraw that.
6        Would you require information on the
7  extent to which, in spite of the person's
8  disability, they may be able to take the exam?
9    A    Sir, that would depend on the way the
10  request was worded.
11        If someone presented a request and
12  accompanied it with the statement that he or she was
13  not able to take the exam, it -- as I said last
14  time, each of these is done on a case-by-case basis.
15        We would -- the request might contain
16  enough information so that that question would be
17  resolved without further inquiry.
18    Q    I understand, but I guess what I am asking
19  is not after the request is received, it is in
20  making a request or in providing information in
21  response to a request for additional information
22  from the DISB, would the person seeking a waiver of

## Page 118

1  the Series 65 exam requirement have to supply
2  information on whether their disability prevents
3  them from taking the examination?
4      A    That would be the premise of the request.
5  When you say supply information, I am not sure I
6  understand what it is you have in mind.
7      Q    Would they have to supply medical
8  documentation that would show that their medical
9  condition prevents them from taking the examination?
10     A    That would -- we would want something
11 along those lines.
12     I think the reason I am having trouble
13 answering your question is that the information that
14 is provided might be sufficient to make that
15 conclusion, reach that conclusion, without
16 specifically stating that in so many words.
17     Q    But if the information provided is not
18 coming from a doctor or from a medical professional,
19 would that be an issue?
20     A    It could be, yes.
21     Q    So, would there be some requirement that
22 the person requesting the waiver at least provide

## Page 119

1  some information from their doctor to support their
2  contention that they cannot take the examination on
3  the basis of their disability?
4      MR. KANE:  Objection; asked and answered.
5      THE WITNESS:  Well, I think I have
6  answered the question.
7      The requests can come in a number of
8  forms; disabilities come in a number of forms.  I am
9  just -- that is as much as I can say about it.
10     BY MR. SORENSEN:
11     Q    So is it your testimony that the DISB
12 would just take their word if someone said they were
13 disabled?
14     A    No, I don't think that is what I said.
15     Q    So would you require then some sort of
16 medical documentation to show that they were not --
17 that their disability prevented them from taking the
18 examination?
19     MR. KANE:  Same objection.
20     THE WITNESS:  Sir, I think I said that it
21 would depend on the submission.  In some instances
22 it might be clear from what was said.  I mean people

## Page 120

1  that make these requests do so under penalty of law.
2      We don't necessarily -- we would have to
3  see what kind of credibility they requested.
4      We don't have a whole set of procedures
5  for these because as I said, we have very few of
6  them, so we don't make that a threshold requirement.
7      BY MR. SORENSEN:
8      Q    So there is no requirement that the person
9  submit any information from the medical
10 professional?
11     MR. KANE:  Same objection.
12     THE WITNESS:  As I have said, we look at
13 each case on its own merits.  If we determine that
14 medical document indication is necessary we ask for
15 it.
16     BY MR. SORENSEN:
17     Q    I guess the reason why I have asked the
18 question in different formats is that really what I
19 would like to get is a simple yes or no.
20     In the case of a disability-based request
21 for a waiver, where the person is putting their
22 medical condition at issue, would the DISB require

## Page 121

1  medical documentation?
2      MR. KANE:  Same objection.
3      MR. TAYLOR:  Objection; form.
4      THE WITNESS:  We don't have a threshold
5  requirement that when someone makes an application
6  for a waiver they accompany that with medical
7  documentation.
8      BY MR. SORENSEN:
9      Q    And that would apply as well to
10 disability-based requests for waivers?
11     A    That was the premise.  I was trying to
12 answer your question about waivers based on a
13 medical condition.  I have said before that we don't
14 look at any application for waiver solely on the
15 basis of disability.
16     Q    Let me draw your attention to Exhibit
17 Number 5 which was previously marked.
18     A    Thank you.
19     Q    You have had time to review the document?
20     A    Yes.
21     Q    Previously you testified that it would be
22 expected that someone requesting a waiver on the

Page 122

1  basis of a disability would provide a description of
2  what their disability was; is that correct?
3    A  Yes.
4    Q  Looking at this exhibit can you tell me
5  what Mr. Morgenstein's alleged disability was?
6    A  May I quote from the document?
7    Q  Sure.
8    A  This is an excerpt, first, from the
9  supplementary neurosurgical report. It is a letter
10  dated December 27th, 1999 from Jeff Jacobsen, M.D.
11      And one of the statements in this report
12  is that Mr. Morgenstein has an "element of fatigue.
13  He has never been able to resume his normal work
14  schedule." "He has had memory deficit for recent
15  events" and "some difficulty with remembering names
16  of people." "In aggregate he feels that overall his
17  functional abilities are diminished because of
18  this."
19      And then among the statements in the
20  "impression" paragraph, are that "he has this
21  dysfunction" and that "some accommodation is likely
22  going to need to be made at his workplace so that he

Page 123

1  can continue to be productive."
2      And then the supplemental or the other
3  document is a progress report dated April 17th,
4  2001, and among the statements in that are that --
5  one of the "Major areas of need are in Visual
6  Thinking and Receptive-Expressive Visuo-Verbal
7  communication from the written word." And a
8  statement about reading speed and a recommendation
9  for "occupational therapy and possibly Cranio-Sacral
10  adjustments."
11    Q  I may have asked this question. Do you
12  know if this is a medical condition or --
13    A  When you say this, what are you --
14    Q  The question I asked previously is could
15  you tell me what Mr. Morgenstein's disability was
16  and you read off a list of conditions. Do you know
17  if this is a medical condition?
18      MR. KANE: I object to the form.
19  Disability in this lawsuit is a legal term. I don't
20  know if that is how you intended to ask the witness,
21  but when you ask disability, he read you what the
22  disabilities that -- well, that were responsive to

Page 124

1  the question, so I think the question has been asked
2  and answered.
3      MR. SORENSEN: The question has not been
4  asked and answered. I think I was asking it
5  incorrectly the first time and I will rephrase it.
6      THE WITNESS: Thank you.
7    BY MR. SORENSEN:
8    Q  Do you know if there is a specific name
9  for the medical condition that the Plaintiff claims
10  to suffer from?
11    A  Well, sir, I didn't see him claiming a
12  specific medical condition. He told us that he had
13  undergone brain surgery, and I don't -- I mean I am
14  not sure whether things that happen as a consequence
15  of brain surgery are considered medical conditions
16  or something else.
17      The report talks about some problems with
18  functioning.
19      And the statement at the beginning of the
20  surgeon's report is that the complaints are "related
21  temporally to the presence of his tumor and
22  subsequent surgery."

Page 125

1      That might mean that they might have been
2  present even if there had been no surgery, I don't
3  know.
4    Q  So, I guess there was something you said I
5  wanted to clarify.
6      Is it your testimony that from these
7  documents you can't tell if this was a medical
8  condition?
9    A  I didn't -- well, I am troubled by the
10  premise.
11      Again, because it is a description of his
12  condition and the adjective medical is somewhat
13  troublesome to me because I don't, I am not a
14  doctor, I wasn't -- we don't state these -- this is
15  whether it was a medical condition, or --
16      We are looking at a report of some
17  problems he had with functioning and we didn't -- I
18  am not sure that we would care whether it was a
19  medical condition or some other condition.
20    Q  I don't think that that is responsive to
21  the question, though.
22      Really all I am asking is whether you can

Page 126

1  tell whether this is a medical condition from the
2  reports.
3         And actually let me rephrase that.
4         What I am asking is can you tell from the
5  medical reports in Exhibit 5 whether the condition
6  the Plaintiff claimed to suffer from was a medical
7  condition?
8         MR. TAYLOR:  Objection.
9         THE WITNESS:  I can't tell, no.
10        BY MR. SORENSEN:
11    Q    And can you tell from those documents
12  whether that condition is permanent or impermanent?
13    A    I don't think that these documents really
14  address what the duration of the problem might be,
15  or the problems.  There is a suggestion about
16  getting some occupational therapy, there is a
17  statement about a need to have several sessions.
18        The surgeon's statement says that "his
19  overall functional abilities are diminished" and
20  that "He has never been able to resume his normal
21  work schedule."
22        You could infer that it was going to be of

Page 127

1  significant duration.  The statement -- there is no
2  specific statement that addresses the prognosis in
3  that regard.
4     Q    I just want to nail this down.  Can you
5  tell --
6         MR. TAYLOR:  Objection --
7         BY MR. SORENSEN:
8     Q    Let me restate the question.  I am not
9  sure that your response directly answered the
10  question I was asking.
11        The question simply was, do these
12  documents tell you whether the condition is
13  permanent or impermanent?
14        MR. KANE:  Objection to the form and I
15  really think that this is outside the scope of the
16  notice.
17        THE WITNESS:  Well, sir, I would get the
18  impression from these that it is a serious condition
19  that is likely to go along for some time, maybe
20  permanent.
21        Occupational therapy is recommended but it
22  doesn't, the report does not specifically state the

Page 128

1  patient has permanent loss of X.
2         BY MR. SORENSEN:
3     Q    So the report doesn't say whether it is
4  permanent or impermanent?
5     A    It has statements that, as I said, give
6  the impression that it is likely to be of
7  substantial duration, maybe ameliorated with
8  occupational therapy.
9     Q    But it does not in fact state that the
10  condition is permanent.
11        MR. TAYLOR:  Objection.
12        MR. KANE:  Objection.
13        THE WITNESS:  I believe that is not --
14        MR. KANE:  Let me just state my objection.
15  The document speaks for itself and also it is
16  outside the scope of this notice.
17        MR. SORENSEN:  It is not outside the scope
18  of the notice, it deals with Mr. Morgenstein's
19  request for a waiver.  I think it is relevant
20  whether the disability is permanent or not permanent
21  and whether the documents he provided supported
22  that.

Page 129

1         MR. KANE:  Well, I will just briefly
2  address that.  Mr. Miles is here as a 30(b)(6) fact
3  witness as to what his office considered or didn't
4  consider, based on the observations of his office.
5         There has been no foundation laid that
6  they considered the things you are asking him about.
7  You are asking him things now at the present time,
8  does this letter tell you, well, did they consider
9  that three years ago, four years ago.
10        MR. TAYLOR:  He has answered the question
11  two or three times already.
12        MR. SORENSEN:  The answer has not been
13  responsive to the question.  The question is what
14  does the document provide the agency?  Does it state
15  whether the condition is permanent?
16        MR. KANE:  My objection to that is the
17  document speaks for itself.
18        THE WITNESS:  The document does not
19  contain a statement about the likely duration of the
20  condition.
21        BY MR. SORENSEN:
22    Q    And neither document specifically said

Page 130

1  that Mr. Morgenstein cannot take the Series 65 exam;
2  is that correct?
3      A    That is correct.
4      Q    Mr. Miles, when Mr. Morgenstein first
5  requested the waiver of the Series 65 exam his
6  request was referred to Sheppard; is that correct?
7      A    Yes.
8      Q    And Mr. Sheppard requested, in response to
9  Morgenstein's request, Sheppard requested additional
10 information on Mr. Morgenstein's medical condition;
11 is that correct?
12     A    That is correct.
13     Q    And Exhibit 5 that you have in front of
14 you right now, that was the additional information
15 that Mr. Morgenstein provided the DISB in response
16 to Mr. Sheppard's request for additional
17 information; is that correct?
18     A    That is correct.
19     Q    Do you know specifically what medical
20 information Mr. Sheppard wanted to receive from
21 Mr. Morgenstein?
22        Actually, let me rephrase that question.

Page 131

1        When Mr. Sheppard requested that
2  Mr. Morgenstein provide additional information
3  regarding his medical condition, do you know what
4  information he was requesting?
5      A    He may have written Mr. Morgenstein, I
6  just -- I don't recall specifically, but there
7  was -- he was interested in getting more information
8  about his condition.
9      Q    And how do you know that?
10     A    Because of the response. I mean, again, I
11 don't have the whole series of correspondence in
12 front of me, but it is clear that that was what
13 Mr. Morgenstein was being asked to provide.
14     Q    And do you know what type of
15 information -- let me rephrase that.
16        When Mr. Sheppard requested additional
17 information on Mr. Morgenstein's medical condition
18 was he requesting information as to a specific
19 diagnosis?
20     A    I am not sure diagnosis would be the word
21 that he had in mind. Perhaps an evaluation. And I
22 don't have his letter in front of me, but when he --

Page 132

1  when Mr. Morgenstein first made his request I
2  believe he enclosed the letter from the surgeon. So
3  what was the supplement was the report from the
4  visual and conceptual development center.
5        My point is that diagnosis may not be the
6  term you would use for the consequences of surgery.
7      Q    Did Mr. Sheppard then want a description
8  from a medical doctor of what exactly
9  Mr. Morgenstein's condition was?
10     A    Sir, it wouldn't -- he asked -- I don't,
11 as I say, I don't have the terms in which he made
12 the request. He asked for additional information.
13        The report is not, I think, written by a
14 medical doctor. There are evaluations that are done
15 by clinical psychologists, there are other people
16 who are expert in various types of assessment, and
17 so I wouldn't say that it had to come from a medical
18 doctor at this stage in his situation.
19     Q    And did Mr. Sheppard tell you what he
20 wanted as far as medical documentation from
21 Mr. Morgenstein?
22        MR. TAYLOR: Objection; privilege.

Page 133

1        MR. SORENSEN: I really don't see how this
2  is privileged. Mr. Sheppard is a fact witness to
3  this case, he had conversations --
4        MR. TAYLOR: You are talking about what
5  advice.
6        Mr. Miles, as the Department of Insurance,
7  Securities and Banking, I instruct you not to answer
8  the question.
9        MR. SORENSEN: I don't see how this is
10 privileged. He, as a 30(b)(6) witness, has an
11 obligation to conduct a thorough investigation of
12 the facts upon which this deposition was noticed.
13 If he can't tell me what Mr. Sheppard wanted then
14 the agency has an obligation to produce
15 Mr. Sheppard.
16        MR. TAYLOR: You didn't say what time you
17 are talking about.
18        MR. SORENSEN: I am talking about with
19 regard to this request.
20        What Mr. Sheppard wanted to receive from
21 Mr. Morgenstein is directly relevant to this issue.
22 If the agency can't -- if this witness is --

## Page 134

1    MR. TAYLOR: You have got to tell us what
2  timeframe you are talking about. If you are talking
3  about advices got and what information he may need,
4  and then once that advice is given you are talking
5  about the facts of gathering additional information,
6  you have got to separate that.
7    You are saying it broadly, but I don't
8  want him to get into -- you have got to get to the
9  facts rather than the privileged stuff.
10    Do you understand what I am saying?
11    MR. SORENSEN: I do see your line of
12  reasoning and I will clarify the question then.
13    MR. TAYLOR: Thank you.
14    MR. SORENSEN: Putting aside any advice
15  Mr. Sheppard may have given you back when the agency
16  originally processed this request, did Mr. Sheppard
17  tell you what additional information he wanted from
18  Mr. Morgenstein with regard -- when he requested
19  that Mr. Morgenstein provide additional information
20  with regard to his request for a waiver?
21    MR. TAYLOR: That is not privileged. You
22  can answer that question.

## Page 135

1    THE WITNESS: All right. He did give me a
2  general description.
3    BY MR. SORENSEN:
4    Q    What was that description?
5    A    He wanted additional information that
6  would shed light on Mr. Morgenstein's ability to do
7  the job.
8    Q    And did he say whether he wanted that
9  information to come from a medical professional?
10    A    I don't believe it came -- it wasn't that
11  precise. And I believe the concern was that we get
12  information from a credible, disinterested source,
13  and obviously a competent source, but it didn't have
14  to come from a medical doctor.
15    Q    But you said an independent source, so
16  that source could not have been Mr. Morgenstein
17  himself.
18    MR. TAYLOR: Objection as to the form.
19    MR. SORENSEN: The form was repeating the
20  answer of the witness.
21    BY MR. SORENSEN:
22    Q    You said that you wanted information from

## Page 136

1  a credible, independent source. What do you mean by
2  independent source?
3    A    I mean someone other than Mr. Morgenstein.
4    Q    And you said that that information had to
5  be -- that the information that he was requesting
6  had to show that Mr. Morgenstein was capable of
7  performing investment advisory work; is that
8  correct?
9    A    That is correct.
10    Q    And is there anything in the two reports
11  that you have in front of you that shows that
12  Mr. Morgenstein can perform investment advisory
13  work?
14    A    Can?
15    Q    Can perform investment advisory work?
16    A    It talks about his being able to function
17  but with some limits on function, and it didn't get
18  into the kind of detail about cognitive function
19  that might shed light on that question.
20    Q    So neither report provides information on
21  whether Mr. Morgenstein can function as an
22  investment advisor; is that correct?

## Page 137

1    A    It provides information, yes.
2    Q    It provides information that he can
3  function as an investment advisor?
4    A    Yes, what it says is he has never been
5  able to resume his normal work schedule, he has
6  memory deficits, the information I read to you
7  previously. Those are not quantified. And the
8  degree to which they might impact on his ability to
9  perform investment advisory services is not
10  specifically addressed.
11    Q    So neither report addresses whether
12  Mr. Morgenstein can perform investment advisories,
13  is that correct.
14    MR. TAYLOR: Objection, that has been
15  answered.
16    MR. SORENSEN: The witness has not
17  answered this question.
18    THE WITNESS: It is not addressed as such.
19  There are descriptions of what his function was, the
20  impact on his functioning as of the time of these
21  reports.
22    BY MR. SORENSEN:

Page 138

1    Q    And at the time of these reports he was
2  not an investment advisor, was he?
3        MR. TAYLOR: Objection.
4        MR. SORENSEN: Basis?
5        MR. TAYLOR: You have to define what that
6  means.
7        THE WITNESS: He did not have an
8  investment advisor representative license at the
9  time of these reports.
10        BY MR. SORENSEN:
11    Q    And you don't know whether he was acting
12  as an investment advisor at the time, do you?
13    A    In our letter of October 2nd, we took the
14  position that he had been providing investment
15  advisory services without a license.
16    Q    So -- all right, I will back up and ask
17  the question another way.
18        Neither report specifically states that
19  Mr. Morgenstein can act as an investment advisor; is
20  that correct?
21        MR. KANE: Objection, I think that is
22  outside the scope of the deposition and I think the

Page 139

1  document speaks for itself.
2        THE WITNESS: The document does not state
3  specifically whether Mr. Morgenstein can or cannot
4  perform investment advisory functions.
5        BY MR. SORENSEN:
6    Q    So these documents do not provide the
7  specific information that Mr. Sheppard requested?
8        MR. KANE: I object to the form.
9        THE WITNESS: I am not sure exactly what
10  he requested. They provided some information.
11        BY MR. SORENSEN:
12    Q    Mr. Miles, previously you testified that
13  Mr. Sheppard requested that Mr. Morgenstein provide
14  information from a credible, independent source that
15  he could perform -- that would show that his medical
16  condition did not prevent him from performing the
17  work of an investment advisor, correct?
18    A    I think that I testified that that is what
19  he was interested in getting. I don't think I
20  testified that that is what he asked for.
21    Q    But that was what Mr. Sheppard wanted to
22  receive from Mr. Morgenstein?

Page 140

1    A    That is what I -- that is my
2  understanding.
3    Q    And these reports don't show that
4  Mr. Morgenstein, that his condition would not
5  adversely impact his ability to perform the
6  functions of an investment advisor, do they?
7        MR. KANE: Object to the form.
8        THE WITNESS: They do not specifically
9  address his ability to perform investment advisory
10  functions.
11        BY MR. SORENSEN:
12    Q    So they do not specifically provide the
13  information that Mr. Sheppard said he wanted to
14  receive from Mr. Morgenstein?
15    A    That is correct.
16    Q    Do you know if Mr. Sheppard ever requested
17  any additional information from Mr. Morgenstein?
18    A    I know that we had additional
19  communications with Mr. Morgenstein and he provided
20  additional information.
21    Q    Do you know whether any of that additional
22  information came from a medical doctor?

Page 141

1    A    I don't believe that we got any additional
2  information from a medical doctor.
3    Q    Do you know whether any of that
4  information came from any other neutral third party?
5    A    I believe that it all came from
6  Mr. Morgenstein.
7    Q    And by Mr. Morgenstein you mean
8  Mr. Morgenstein himself?
9    A    His letters, yes.
10    Q    Did Mr. Sheppard ever express any opinion
11  to you as to whether Mr. Morgenstein's medical
12  documents were sufficient to justify granting him a
13  waiver?
14        MR. TAYLOR: Objection; privilege. I am
15  not going to let him answer that question.
16        MR. SORENSEN: Well, I think we do have
17  somewhat of a problem, and now may be a good time to
18  address that.
19        If Mr. Sheppard is a part of the
20  decision-making process then I think he is acting as
21  a regulator and not as an attorney.
22        MR. TAYLOR: I think you have the

Page 142

1  documentation of who the decisionmaker was.
2  Sheppard was acting as a processor at that time and
3  he writes a letter to Mr. Morgenstein requesting
4  additional information.
5       But if you are asking the question on if
6  he is asking whether or not there is enough
7  information for Mr. Miles as the securities director
8  to make a final decision, then that would be advice
9  of counsel, which is privileged.
10      MR. SORENSEN: That may help me rephrasing
11 this one.
12      MR. TAYLOR: But if you are asking whether
13 or not he got what he asked for that might be okay.
14 If that helps you.
15      MR. SORENSEN: Yes, I think that has
16 already been covered.
17      MR. TAYLOR: Okay.
18      MR. SORENSEN: Let me ask it this way.
19 BY MR. SORENSEN:
20  Q   Did Mr. Sheppard make any decision for the
21 agency in regards to Mr. Morgenstein's request?
22  A   No, he did not.

Page 143

1   Q   Okay. And did he make any final decision
2  on behalf of the agency with regard to whether the
3  information that Mr. Morgenstein submitted was
4  sufficient?
5       MR. TAYLOR: Object, asked and answered.
6       MR. SORENSEN: This one is slightly
7  different because I am asking whether he made any
8  specific decision with regard to information
9  Mr. Morgenstein submitted as opposed to his request
10 itself.
11      MR. TAYLOR: But before you had based on
12 behalf of the agency in there.
13      MR. SORENSEN: Yes, and --
14      MR. TAYLOR: I am sorry, ask the question
15 again, let me see if I can get it right.
16 BY MR. SORENSEN:
17  Q   Did Mr. Sheppard make any decision on
18 behalf of the agency with regard to whether
19 Mr. Morgenstein's information was sufficient or
20 insufficient?
21  A   No.
22  Q   Do you know if there was any further

Page 144

1  communication between Mr. Morgenstein and the
2  Department of Insurance, Securities and Banking?
3   A   Yes, there was.
4   Q   With whom was that communication?
5   A   I believe that was with Lilah Blackstone,
6  a member of the office of legal affairs.
7   Q   Do you know when Mr. Morgenstein first
8  communicated with Ms. Blackstone?
9   A   I am not sure of the exact date. There
10 were two letters he wrote in July asking about the
11 status of the matter. He then wrote I think two
12 additional letters which gave information about his
13 educational background, his experience, and his
14 current activities at Morgan Stanley.
15  Q   Other than those -- do you know if there
16 were any telephone communications between Ms.
17 Blackstone and Mr. Morgenstein?
18  A   There may have been just in, you know,
19 moving the process. My understanding is that any
20 substantive information was captured in the letters.
21  Q   Do you know whether Ms. Blackstone
22 assisted Mr. Morgenstein in writing any of his

Page 145

1  letters?
2   A   When you say assisted, can you clarify
3  what you mean by that?
4   Q   Do you know whether she provided him any
5  advice as to whether -- as to how to write his
6  letters to the department?
7   A   I am not sure. I don't -- I really don't
8  know. The letters may make reference to questions
9  that she asked which would support the idea that she
10 told him, why don't you tell us about the subject of
11 those letters.
12  Q   But any extent -- the extent of any
13 conversations, do you know whether that was simply
14 requesting additional information that he provided
15 in the form of a letter?
16  A   That is my -- that is my understanding.
17  Q   And so she didn't instruct him on the
18 specifics of what his letter should look like?
19  A   I am not sure that that is a yes or a no,
20 sir, because the letters get quite elaborate, and I
21 don't know whether Ms. Blackstone may have said say
22 something about what you are doing right now, say

Page 146

1    something about your education, you see what I mean?
2        She wouldn't be, in my mind, assisting him
3    but somebody else might say that was assistance.
4    Q    And this is strictly with regard to any
5    conversations you may have had after the department
6    issued its decision denying Mr. Morgenstein's
7    request for a waiver.
8        Do you know whether -- did Ms. Blackstone
9    ever tell you that she had advised Mr. Morgenstein
10    as to how to write his letters?
11    A    Wait a minute.  Now you are saying this is
12    about the time frame after my letter in October or
13    prior to that?
14    Q    After your letter in October of 2001.
15    A    And your question is, did she ever tell me
16    that she had given him suggestions or advice about
17    how to write those prior letters?
18    Q    Yes, that is my question.
19    A    I don't believe she ever told me that.
20    Q    The Department of Insurance, Securities
21    and Banking, did the department require that
22    Mr. Morgenstein submit additional information from a

Page 147

1    neutral third party with regard to his ability to
2    perform the functions of an investment advisor in
3    spite of his condition?
4    A    In spite of his condition?
5    Q    Yes, and let me rephrase that.
6        Did the Department of Insurance,
7    Securities and Banking require that Mr. Morgenstein
8    submit additional information from a neutral third
9    party with regard to his ability to perform the
10    functions of an investment advisor in spite of his
11    alleged medical condition?
12    A    Well, the premise of your question,
13    alleged medical condition, I am not sure I would
14    agree with.
15        But let's -- I don't know that we ever
16    specifically asked for additional information,
17    medical information or third party information after
18    the letter here, Exhibit 5.
19    Q    But the Department of Insurance,
20    Securities and Banking had requested that
21    Mr. Morgenstein provide additional information from
22    a neutral third party to demonstrate that his

Page 148

1    medical condition would not prevent him from
2    performing the functions of an investment advisor;
3    is that correct?
4        MR. KANE:  Objection to the form.
5        THE WITNESS:  I don't -- as I think I
6    testified earlier, I am not sure exactly what was
7    conveyed to Mr. Morgenstein.  I know what our
8    concerns were but those were not communicated in
9    writing and I don't know if that was made explicitly
10    clear to Mr. Morgenstein.
11        BY MR. SORENSEN:
12    Q    And what were the concerns?
13    A    The concern that he would be able to
14    perform the functions of the investment advisor
15    representative, Series 65.
16    Q    And did any of those concerns have to do
17    with his medical condition?
18    A    They had to do with his condition.
19    Q    And was part of that his medical
20    condition?
21    A    Sir, I --
22    Q    I am sorry, let me rephrase that.

Page 149

1        Did those concerns have to do with his
2    alleged disability?
3    A    Yes.
4    Q    And Mr. Morgenstein never provided any
5    neutral third-party information other than Exhibit 5
6    to the Department of Insurance, Securities and
7    Banking to allay those concerns?
8        MR. KANE:  Asked and answered.
9        THE WITNESS:  I -- I am trying to think.
10    Your question is not in any time frame.
11        I don't believe he did.  I am pretty sure
12    he did not, at least nothing in writing prior to my
13    October letter.
14        BY MR. SORENSEN:
15    Q    And are you aware of any -- of him
16    providing any additional information from a third
17    party source to demonstrate that his alleged
18    disability would not affect his ability to perform
19    the role of an investment advisor after your
20    October 2001 letter?
21    A    Well, there were conversations with Morgan
22    Stanley, with various people at Morgan Stanley, and

## Page 150

1    in this context that might be construed as
2    independent.
3          They talked about how the functions might
4    have been performed either by Mr. Morgenstein acting
5    solo or in concert with other people at Morgan
6    Stanley.
7    Q    But they did not -- Morgan Stanley didn't
8    provide you with any information on his disability?
9    A    That is correct.
10   Q    So the Department of Insurance, Securities
11   and Banking never got the information, never got all
12   of the information it needed to make its decision
13   for Mr. Morgenstein; is that correct?
14         MR. KANE: I object to the form.
15         THE WITNESS: We made our decision on the
16   basis of another factor. And so -- I am not
17   prepared to speculate about whether we had enough
18   information one way or the other.
19         BY MR. SORENSEN:
20   Q    And the decision that you ultimately made
21   was to deny Mr. Morgenstein's request for a waiver;
22   is that correct?

## Page 151

1    A    That is correct.
2    Q    After you made the decision to deny
3    Mr. Morgenstein's request for a waiver, did
4    Mr. Morgenstein approach the agency, approach the
5    Department of Insurance, Securities and Banking to
6    request that it reconsider its decision?
7    A    He did approach the agency, the
8    department. I don't want to use the term reconsider
9    because that has got special baggage but he
10   certainly, he presented another way of working with
11   his situation that might give us a basis for giving
12   him a license on a limited basis.
13   Q    Why did you say that you wouldn't use the
14   word "reconsider"?
15         MR. TAYLOR: Objection.
16         MR. SORENSEN: What basis?
17         MR. TAYLOR: I am not sure it has
18   relevance.
19         THE WITNESS: I am saying that because I
20   have the handicap of being a lawyer, and so when you
21   talk about reconsideration, typically to me that
22   conjures up a procedure for reconsideration and

## Page 152

1    criteria for seeking reconsideration, et cetera,
2    none of which took place in this situation.
3          Secondly, he never, I think, used that
4    word in his conversations, at least it wasn't
5    presented to me in that form.
6          BY MR. SORENSEN:
7    Q    So he simply -- he was still seeking a
8    waiver of the Series 65 examination requirement; is
9    that correct?
10   A    He was looking for a way to operate
11   without having to take the exam. Whether that would
12   have amounted to a waiver, I am not prepared to say.
13   We didn't get that far.
14         MR. TAYLOR: Why don't we take a break?
15   We have been going about an hour and 20 minutes, a
16   ten-minute break, unless you are fairly close --
17         MR. SORENSEN: I don't think, I really
18   don't think I have much more than five or ten
19   minutes.
20         MR. TAYLOR: All right, we can go ahead.
21   I am sorry about that.
22         BY MR. SORENSEN:

## Page 153

1    Q    In May of 2002 the Department of
2    Insurance, Securities and Banking made a decision
3    telling Mr. Morgenstein that it would not consider
4    his request for a waiver any further unless Morgan
5    Stanley sponsored his request for the waiver; is
6    that correct?
7    A    That is correct.
8    Q    So after the October 1st -- after the
9    October 2001 decision Mr. Morgenstein did indeed
10   pursue, continue to pursue, a waiver of the Series
11   65 examination; is that correct?
12   A    As that -- I mean that letter uses the
13   term.
14   Q    I am going to show you what was previously
15   marked as Exhibit Number 7.
16   A    Yes.
17   Q    This e-mail references a meeting. Do you
18   know what took place in that meeting?
19   A    I have some recollection of the meeting.
20   Q    What took place in the meeting?
21   A    Mr. Morgenstein came to the offices of the
22   department accompanied by another individual with

## Page 154

1  the Morgan Stanley Washington office who had the
2  Series 65 license.
3    Q   And what did he specifically request in
4  the meeting?
5    A   Well, they discussed the kind of activity
6  that he might engage in and the relationship or the
7  way that he might interact with the other person so
8  that the Department's concerns about the adequacy
9  of, you know, the protection of his customers, would
10  be addressed.
11    Q   In the end the agency decided -- let me
12  rephrase that.
13      In the end DISB decided Mr. Morgenstein
14  could not pursue that activity without a Series 65
15  license; is that correct?
16    A   No, that is not correct.
17    Q   In Exhibit 7 the Department seems to be
18  saying that its decision in the October 2, 2001
19  letter stands, and it doesn't say anything about
20  permitting him to have this waiver situation.
21    A   Yes, I think it does, actually.
22    Q   Could you show me what you are referring

## Page 155

1  to?
2    A   Yes. There is a sentence that says "we
3  explained to you" in our meeting in March that "in
4  order for the Department to consider other factors
5  regarding your waiver, we would first require that
6  your firm Morgan Stanley formally request a waiver
7  on your behalf."
8      The context of that is that in the
9  discussion. As I recall, our view was that if this
10  relationship or any other sort of relationship was
11  going to work it was going to require the firm to
12  stand behind it in the same way that I mentioned
13  last time.
14      The firm has a supervisory responsibility
15  as to all of its representatives. So the request
16  for Morgan Stanley to support this was not just a
17  matter of form, it was intended to make it clear
18  that Morgan Stanley was behind this and would put
19  its resources behind the arrangement.
20    Q   So essentially, the decision was unless
21  Morgan Stanley sponsored the request for waiver
22  Mr. Morgenstein would not receive a waiver -- well,

## Page 156

1  no I think that is probably the wrong way to say
2  this.
3      Essentially all this document said to
4  Mr. Morgenstein was that in order to further
5  consider his request for a waiver the Department of
6  Insurance, Securities and Banking would require that
7  Morgan Stanley sponsor his application; is that
8  correct?
9    A   Well, that is the wording, and I have
10  tried to give you the context.
11    Q   But I guess to specifically answer the
12  question, yes or no, this document simply says that
13  in order to receive further consideration of his
14  request for a waiver, Mr. Morgenstein --
15    A   And the other factors, yes.
16    Q   -- Mr. Morgenstein would be required to
17  obtain Morgan Stanley's sponsorship for his
18  application; is that correct?
19    A   That is correct.
20    Q   And the DISB never expressed any opinion
21  as to whether Morgan Stanley should support or
22  sponsor this application; is that correct?

## Page 157

1    A   That was up to the firm.
2    Q   And the DISB never expressed any opinion
3  to Morgan Stanley that it should sponsor this
4  application?
5    A   I don't believe that that ever happened.
6    Q   The DISB never told Mr. Morgenstein that
7  if Morgan Stanley did sponsor his application that
8  it would automatically grant his request for a
9  waiver?
10    A   No. Well, I don't want to answer that too
11  quickly, sir.
12      I am try being to be accurate about this,
13  and I know that the problem of the prior activity
14  didn't necessarily go away.
15      Certainly it would definitely be helpful
16  in taking care of his situation going forward.
17  Morgan Stanley's support and sponsorship was
18  paramount but that wouldn't necessarily get past all
19  of our concerns.
20    Q   So even if Morgan Stanley had sponsored
21  his application the DISB would have had discretion
22  to deny the request; is that correct?

Page 158

1    A   Well, I would put it the other way around.
2  The decision to grant a waiver is an act of
3  discretion and the factors that have to be
4  considered are for us to review.
5        It might be that we would have said if you
6  set it up in a certain way Mr. Morgenstein doesn't
7  need a license.
8        I mean I just don't know what we would
9  have done because we don't know what Morgan Stanley
10 would have represented.
11   Q   And let me make it clear what I am asking.
12       Assuming that Morgan Stanley simply
13 sponsored the request and said this was our stamp of
14 approval, the DISB would have had to independently
15 reviewed the request for a waiver; is that correct?
16   A   Yes.  As I said previously, this was not
17 just a matter of a formality at this point, after
18 these many months of consideration.  We weren't just
19 looking for somebody to check off a box and say we
20 sponsor this.
21   Q   So Morgan Stanley's sponsorship, in and of
22 itself, would not have been sufficient to

Page 159

1  automatically grant the waiver.
2        MR. TAYLOR:  Objection; asked and answered
3  already.
4        MR. KANE:  And object to the form.
5        THE WITNESS:  When you say "sponsorship"
6  are you talking about just signing a letter that
7  says we support the request, or are you talking
8  about arranging the conditions that may have been
9  discussed as ways to take care of the various
10 concerns?
11       BY MR. SORENSEN:
12   Q   Well, let me ask it this way:  You said
13 that this was not -- that at this stage it would not
14 have been a mere formality of granting the waiver
15 request if Morgan Stanley sponsored the application;
16 is that correct?
17   A   No.  What I said was Morgan Stanley's
18 sponsorship would have to be more than a formality.
19   Q   But even assuming Morgan Stanley did
20 sponsor the request for a waiver, the Department of
21 Insurance, Securities and Banking would have to
22 review all of the information and make its own

Page 160

1  decision with regard to the request for a waiver; is
2  that correct?
3    A   Sir, my problem with saying yes or no to
4  that is that in the context of the discussions that
5  took place it may be that we had set out scenarios
6  that might have satisfied us, and if those were met
7  we would have done it, we would have granted a
8  waiver.  I do not remember.
9        But I am not prepared to say that we
10 would, you know, how much more we would have had to
11 do because when Morgan Stanley came back and said
12 they wouldn't support it that was the end of the
13 inquiry.
14   Q   But, had Morgan Stanley simply said we
15 support it, that would not have been enough?
16       MR. TAYLOR:  Objection; that has been
17 asked and answered.
18       THE WITNESS:  I think I have said already
19 that would not have been enough.
20       MR. SORENSEN:  And I just want to be clear
21 about this.  The person who made the final
22 decision --

Page 161

1        MR. TAYLOR:  Objection to the form.
2        BY MR. SORENSEN:
3    Q   The entity that made the final decision
4  with regard to the request for waiver was the
5  Department of Insurance, Securities and Banking?
6    A   That is correct.
7    Q   So, Morgan Stanley itself could not have
8  denied the request for waiver?
9        Well, let me ask it this way.  Morgan
10 Stanley itself did not have authority to grant or
11 deny the request for waiver; is that correct?
12   A   No, they only had the authority to support
13 it or not.
14   Q   And if they did in fact support it it was
15 up to the DISB to make the final decision; is that
16 correct?
17   A   That is correct.
18   Q   Is the name Paul Garipole familiar to you?
19   A   I saw his name as someone who was a cc on
20 some correspondence.
21   Q   And did you ever have any conversations
22 with Mr. Garipole yourself?

Page 162

1    A    Not to the best of my recollection.
2    Q    I think that is all I have.
3         MR. TAYLOR:  Now let's take a break.
4         THE WITNESS:  Okay.
5         MR. SORENSEN:  Take a break.
6         MR. KANE:  Yes, could we take a break; I
7    may have some questions.
8         (3:34 p.m. -- Recess -- 3:54 p.m.)
9              EXAMINATION
10   BY MR. KANE:
11   Q    Mr. Miles, my name is Michael Kane.  I
12   have a few questions for you.  We met earlier.
13   I will ask you to take a look at
14   Exhibit 6.
15        Do you have it there counsel?
16        MR. SORENSEN:  Yes.  I will hand you the
17   file for your convenience.
18        THE WITNESS:  Thank you.  I have it.
19        BY MR. KANE:
20   Q    And Exhibit 6 is the October 2nd, 2001
21   letter, bearing your signature?
22   A    Yes.

Page 163

1    Q    When you reached your conclusion in this
2    letter -- and when I say you, I am talking about
3    your office --
4    A    Right.
5    Q    -- was there any consideration whether the
6    so-called broker/dealer exception applied to
7    Mr. Morgenstein?
8    A    Not that I recall.
9    Q    Are you familiar with the broker/dealer
10   exception?
11   A    Yes.
12   Q    What is your understanding?
13        MR. TAYLOR:  That is not relevant.
14        THE WITNESS:  It is an exception to the
15   investment advisor definition.
16        MR. KANE:  Okay.
17        THE WITNESS:  May I ask you to state your
18   question in the time frame.
19        BY MR. KANE:
20   Q    Well, in this, up to October 2nd, 2001 and
21   prior to that, when your office was considering
22   Mr. Morgenstein's waiver application, did you

Page 164

1    consider whether the broker/dealer exception applied
2    to him?
3    A    I don't believe that we did.
4    Q    Subsequent to October 2nd, 2001 did you
5    consider whether the broker/dealer exception applied
6    to Mr. Morgenstein?
7    A    I don't believe we did.
8         Sir, the question of whether the 65 was
9    required may not have been framed precisely in terms
10   of that exception.
11        There was some, some question was raised,
12   and I am trying to remember the context in which it
13   was raised, that these accounts that Mr. Morgenstein
14   was handling were being converted from one type of
15   account to another and that that may have triggered
16   the requirement to get the 65.
17        And that may or may not have been related
18   to the question of the availability of the
19   exemptions.
20   Q    Do you recall when you had this thought
21   process or when your office engaged in this process?
22   A    There was -- I think -- it may be that it

Page 165

1    was within one of Mr. Morgenstein's letters to us.
2         You know, he wrote about what he was
3    doing, and without going back and looking at those
4    letters with this in mind I couldn't swear that that
5    was where I saw it.  It may have been.  That would
6    be a likely place.
7         But, the point is that it supported the
8    notion, whatever -- whenever I saw that statement,
9    it supported the notion that the license was going
10   to be required unless there was a waiver.
11   Q    But sitting here today you can't recall
12   whether your office analyzed whether the
13   broker/dealer exception applied to Mr. Morgenstein?
14   A    To the best of my recollection we did not
15   look at that particular situation.
16        I should say that a number of times, then
17   and now, individuals and firms seek to be licensed
18   as investment advisors and investment advisor
19   representatives, even if they might be able to
20   assert that exception.
21   Q    Well, in this letter that is Exhibit 6 you
22   reference Mr. Morgenstein placing under management

Page 166

1  four investment accounts while being employed in the
2  District of Columbia, I am reading at the bottom of
3  the first page.
4      A    Yes.
5      Q    You say, when you placed the account on
6  behalf of your cousin that conduct violated Section
7  202 of the Securities Act of 2000.
8      Do you recall Morgenstein opining on
9  whether your conclusion was accurate or not?
10     A    Well, we got a communication later in 2002
11 from someone in their compliance department that
12 rendered an opinion about that.
13     Q    And did you agree or disagree with that
14 conclusion?  Did your office agree or disagree with
15 that conclusion or opinion?
16     A    I am not sure we reached a final position
17 on it.
18         MR. KANE:  I am going to ask the reporter
19 to mark this as 8, that is what we are up to now?
20         MR. SORENSEN:  Yes.
21         (Exhibit 8 marked for identification.)
22         BY MR. KANE:

Page 167

1      Q    The reporter has handed you what has been
2  marked as Exhibit 8?
3      A    Yes.
4      Q    Showing you Exhibit 8, is this a true and
5  accurate copy of an e-mail --
6         MR. TAYLOR:  Object, you might want to let
7  him read it first.
8         MR. KANE:  Yes.
9         THE WITNESS:  I have no reason to question
10 the accuracy of this copy.
11        BY MR. KANE:
12     Q    And does this contain the opinion you were
13 referring to earlier in your testimony?
14     A    Yes.
15     Q    Would it be accurate to say that Mr. Lowe
16 is responding to your office's inquiry about
17 possible activity Mr. Morgenstein may have engaged
18 in that violated the investment advisor laws or
19 regulations?
20     A    Well, as I recall we asked for all of his
21 activity and that was without characterizing it as
22 being in compliance or out of compliance.

Page 168

1      That request was made to Ms. Robertson.
2  And this response, apparently she forwarded the
3  request to Mr. Lowe, and he sent this back to us.
4      Q    And Ms. Robertson is with Morgan Stanley?
5      A    That is correct.
6      Q    And is it your testimony that your office
7  did not draw any conclusion as to whether Mr. Lowe's
8  opinion as expressed in Exhibit 8 was accurate or
9  not?
10     A    That is my testimony, yes.  That is what I
11 said.
12     Q    Do you recall what your office did, if
13 anything, with the Exhibit 8 when it received it?
14     A    I believe that was received by Ms.
15 Blackstone and then conveyed to another person in
16 our office.
17     Q    And who was that?
18     A    That was the person that I had hired, I
19 think, that summer to be in charge of our
20 examinations division, Jay Knight.
21     Q    For what purposes was it given to Ms.
22 Knight?

Page 169

1      A    Mr. Knight.  To review it and decide
2  whether any follow-up ought to be done with that.
3      Q    Do you know if that happened?
4      A    Not to my knowledge.
5      Q    So as far as you know Mr. Knight was given
6  this document with those instructions but then you
7  don't know what happened after that?
8      A    That is correct.
9      Q    Is Mr. Knight still with your office?
10     A    He is not.
11     Q    When did he leave?
12     A    He left in -- I think -- October 1 or
13 September 30th of 2005.
14     Q    Do you know where he is now?
15     A    Yes.
16     Q    Where is he now?
17     A    He is with the NASD.
18     Q    Here in Washington, D.C.?
19     A    I think he works in the Rockville office,
20 I am not sure.
21     Q    Do you know where he lives?
22     A    He lives in Fredericksburg, Maryland.

## Page 170

1    Q    Do you have his address or contact
2  information?
3    A    I do. I didn't bring it with me but we --
4  I mean you could call the NASD and they could refer
5  you to him.
6    Q    And, Mr. Knight's first name --
7    A    J-A-Y.
8    Q    And Knight is with a K?
9    A    Right.
10   Q    Do you know if Mr. Knight passed off this
11 assignment to anyone?
12   A    I don't know.
13   Q    Did Mr. Knight make any final report about
14 the status of his findings that would give some
15 indication of where he was on Exhibit 8?
16   A    Well, he made a report about assignments.
17 My recollection is that it did not refer to the
18 Morgan Stanley situation.
19   Q    Do you know why that was?
20   A    Well, this was -- at this point it was an
21 old matter and he may have just -- I don't know, it
22 just wasn't in that report.

## Page 171

1    Q    Was this Exhibit 8 and the instructions
2  that Mr. Knight had been given, was it an issue that
3  sort of fell through the cracks?
4    A    That is quite possible. That is a loaded
5  term.
6        But, I haven't -- I don't remember any
7  other discussion, or activity, about this factor.
8    Q    If you could take a look at Exhibit 7
9  which is probably in that pile there.
10       MR. SORENSEN: Yes, at the bottom.
11       THE WITNESS: Yes.
12       BY MR. KANE:
13   Q    Is Exhibit 7 a true and accurate copy of
14 an e-mail sent to Mr. Morgenstein from Lilah
15 Blackstone of your office?
16   A    That is correct.
17   Q    And is the information contained in this
18 e-mail accurate?
19   A    Well, sir, the information is stated in
20 the e-mail --
21   Q    Let me ask you a specific question. Sort
22 of in the middle of the message it says "our office

## Page 172

1  has been notified that Morgan Stanley will not seek
2  a waiver of the Series 65 examination requirements
3  on your behalf."
4    A    Yes.
5    Q    Is that accurate?
6    A    To the best of my knowledge, yes.
7    Q    You are giving that testimony in your
8  30(b)(6) capacity?
9    A    Yes.
10   Q    Yes?
11   A    I am. My understanding is that Morgan
12 Stanley explicitly declined to support
13 Mr. Morgenstein's request as it stood in the spring
14 of 2002.
15   Q    Does your office know why that was, why
16 Morgan Stanley did not --
17   A    No.
18   Q    Let me finish.
19       Do you know why Morgan Stanley would not
20 apply for the waiver on Mr. Morgenstein's behalf?
21   A    We do not.
22       MR. KANE: I will show you what I will ask

## Page 173

1  the reporter to mark as Exhibit 9.
2        (Exhibit 9 marked for identification.)
3        BY MR. KANE:
4    Q    This is from Lilah Blackstone, dated
5  March 26th, 2002?
6    A    Yes.
7    Q    And showing you what has been marked as
8  Exhibit 9, have you had a chance to look at the
9  document?
10   A    Let me look at it a little longer.
11   Q    All right.
12   A    All right.
13   Q    Is Exhibit 9 a true and accurate copy of
14 an e-mail that Ms. Blackstone sent to herself with a
15 copy to you, Dana Sheppard and Maurice Goff?
16   A    That is correct.
17   Q    Does this accurately reflect the substance
18 of the conversation she had with Mary Robertson from
19 Morgan Stanley?
20   A    As far is I know, yes.
21   Q    I am asking that in your capacity of the
22 30(b)(6) deponent.

Page 174

1    A   Yes. Yes.

2    Q   This note to file as it is called, states

3  "Ms. Robertson explained that because of certain

4  supervisory concerns that Mr. Morgenstein's manager

5  had with respect to requesting the waiver on

6  Mr. Morgenstein's behalf, the firm would not be

7  requesting a waiver from our office, and would

8  require that Norman Morgenstein take the Series 65

9  examination."

10        Did your office have an understanding of

11  what those supervisory concerns were?

12    A   I am hesitating because they may have been

13  discussed in the conversation between the two, Ms.

14  Robertson and Ms. Blackstone, and this doesn't go

15  into any detail and I did not personally get into

16  detail.

17        I don't know the nature of the supervisory

18  concerns, personally, and I am not sure what the

19  scope of the concerns was.

20    Q   Let's go off the record.

21        (4:11 p.m. -- Recess -- 4:18 p.m.)

22        MR. KANE:  Back on the record.

Page 175

1        THE WITNESS:  Mr. Kane, the note to the

2  file refers to the conversation that was held, took

3  place between Ms. Blackstone and Ms. Robertson.

4  There is a reference to certain supervisory

5  concerns.

6        The department does not have any specific

7  recollection of what those concerns may have been.

8  The focus was on basically the bottom line, that

9  Morgan Stanley was not going to support the

10  application.

11        BY MR. KANE:

12    Q   And directing your attention to the last

13  sentence, Ms. Blackstone states Ms. Robertson says

14  she will provide our office with an e-mail of the

15  firm's position, and goes on to say a few more

16  things. Do you know if that was ever done?

17    A   I don't believe I have seen a document

18  that is of the sort referred to in that sentence.

19    Q   Aside from what you have testified to

20  today, have you told me about all of your office's

21  conversations or communications with Morgan Stanley

22  concerning Mr. Morgenstein?

Page 176

1    A   There may have been phone calls and calls

2  to remain in contact. I don't believe there were

3  other substantive conversations but, you know, that

4  is just as far as not only my personal recollection

5  but the recollection of the agency beyond the

6  communications that have been set forth in these

7  exhibits.

8    Q   So you can't think of any other

9  conversations your office has had?

10    A   No.

11    Q   What was -- could you describe what your

12  office's reasons were for telling Mr. Morgenstein

13  that -- strike that.

14        Could you describe your office's reasons

15  for offering Mr. Morgenstein the opportunity to have

16  Morgan Stanley apply for the waiver on his behalf?

17    A   Well, Mr. Morgenstein was -- didn't take

18  no for an answer very readily, and so he came back

19  to us after the October letter.

20        And sometime in the first quarter of 2002,

21  and I think even in one of his letters prior to

22  October, he may have suggested the possibility of

Page 177

1  some kind of arrangement of working essentially

2  under close contact with some way of having another

3  person at the firm be involved in handling his

4  accounts to the degree that there would be, between

5  in that combination, adequate care being given to

6  the accounts, and that it would be feasible to have

7  that be supervised.

8        And in elaborating about what may have

9  been there -- but then when -- I believe that is the

10  kind of thing that was discussed when he came in in

11  the spring of 2002, but I don't remember.

12        And I say I, here, we, the department, do

13  not recall what specifically we said to him and the

14  lady that came in with him at that time. But they

15  came away from that meeting and then the other

16  correspondence followed.

17    Q   Do you recall anyone from your office

18  telling Mr. Morgenstein that Morgan Stanley did not

19  follow protocol?

20    A   No.

21    Q   I have no further questions.

22        MR. SORENSEN:  I just have a couple to

## Page 178

1  follow up on Mr. Kane's questions.
2          EXAMINATION
3      BY MR. SORENSEN:
4     Q   Directing your attention back to Exhibit
5  Number 8.
6     A   Yes.
7     Q   There is a reference to -- this is about
8  halfway down the e-mail from Doug Lowe. There is a
9  reference to the agent -- a situation in which "the
10 broker/dealer or agent receives no special
11 compensation for the investment advisory services"?
12    A   Yes.
13    Q   Do you see that?
14     What is special compensation?
15    A   I am laughing because that question was
16 the subject of about a five-year rulemaking at the
17 SEC and it is a very intricate regulatory concept.
18     The SEC in '05 came out with a rule that,
19 among other things, overruled a sixty-year old
20 interpretation by the general counsel of the SEC in
21 1940 that interpreted special compensation.
22     So I would rather not say any more about

## Page 179

1  the specifics.
2      That is when you use that term talking
3  about the broker-dealer exception you are bringing
4  in several law review articles and volumes about how
5  to interpret that.
6     Q   So what is special compensation might be
7  subject to interpretation?
8     A   Absolutely.
9     Q   And would a fee-based compensation system
10 as opposed to commissions-based compensation qualify
11 as a form of special compensation?
12     MR. TAYLOR: Objection; legal conclusion.
13     THE WITNESS: Fee-based might depend on
14 the way the fee was designed. There are a number of
15 different fee arrangements that firms enter into on
16 the advisory side. So that doesn't tell me enough.
17     BY MR. SORENSEN:
18    Q   Would an asset-based fee compensation be a
19 form of special compensation?
20     MR. TAYLOR: Same objection.
21     THE WITNESS: Let me go back a moment, if
22 I may, because the broker/dealer exception has two

## Page 180

1  prongs. One is special compensation, the other is
2  the activity substantially related to broker/dealer
3  activity.
4      And when you have an asset-based fee you
5  are getting away from the commission structure that
6  was traditional in the brokerage business.
7      So that, without -- whether it is special
8  compensation or not, and you can argue it is special
9  compensation or that that makes the relationship
10 something more than an ordinary -- substantially
11 related to the ordinary business of a broker, if you
12 follow me.
13     BY MR. SORENSEN:
14    Q   I think I do. So is it your testimony
15 that it would not be a clear-cut question whether
16 someone receiving an asset-based fee was -- fell
17 within the broker/dealer exception?
18     MR. TAYLOR: Objection; you are asking him
19 for a legal opinion.
20     MR. SORENSEN: Actually I will withdraw
21 that.
22     BY MR. SORENSEN:

## Page 181

1     Q   Would the fact that -- well, I will
2  withdraw that.
3      Would an asset-based fee payment situation
4  for a broker raise a, potentially raise a red flag
5  with regard to whether a Series 65 license would be
6  required?
7     A   It would certainly raise a question. I am
8  not sure I would color it red, but it would raise a
9  question.
10    Q   But it would raise a question as to
11 whether a Series 65 license was required?
12    A   Yes.
13    Q   And generally, to receive asset-based
14 fees, is it required that a person have a Series 65
15 license?
16    A   I am trying to think if there are any
17 situations where that is not the case. I mean there
18 are a number of situations where an individual is
19 exempt for other reasons, for example, so that the
20 asset-based fee, even if it is the case, wouldn't
21 trigger a registration requirement, the Series 65
22 requirement.

Page 182

1    It is more on the spectrum of toward the
2  broker/dealer end or toward the investment advisor
3  end, it is more toward the investment advisor end,
4  but the purpose of this rule change was to try to
5  de-link brokers compensation from commissions so
6  that they would, their interests would be more
7  aligned with your clients, and that is part of the
8  change.
9    But this is an area that is extremely
10 intricate and I don't want to just, you know, talk
11 about a legal conclusion without -- I would have to
12 go back and look at the rules as they were in 2001.
13   Q   You also mentioned that Mr. Morgenstein
14 had proposed that he have some sort of supervisory
15 relationship with someone at -- well, someone else
16 at his -- let me rephrase that.
17   You also mentioned that Mr. Morgenstein
18 had mentioned to the DISB the possibility of someone
19 at Morgan Stanley who was properly licensed
20 supervising his work?
21   A   Well, supervising might not be the, that
22 is a specific term that has regulatory connotations,

Page 183

1  but the idea was that the general possibility was
2  that someone who had a license could share with him
3  the responsibility of handling the account, and that
4  that might avoid the licensing requirement. That
5  was the way I understood the request.
6    Q   Would that be the basis for his seeking
7  the waiver of the licensing requirement?
8    A   After October of 2001?
9    Q   Yes.
10   A   That was the premise of his coming in with
11 the lady.
12   Q   So that would have been the basis of his
13 waiver request in 2002 when he came in?
14   MR. TAYLOR: Objection.
15   THE WITNESS: Well, there were a number of
16 concerns and I don't remember. And when I say I,
17 here, I mean the department doesn't remember all of
18 the things that we may have conveyed to
19 Mr. Morgenstein as important to us, but that was
20 certainly an important part of it.
21   BY MR. SORENSEN:
22   Q   I am not sure that directly answers the

Page 184

1  question. I --
2    A   Well, you are asking me if this is what
3  his request was based on, and I think we had a
4  dialogue. He was saying how can I get to do this
5  job, how can I continue to work?
6    And we were trying to figure out, both he
7  and the department, whether from a regulatory point
8  of view there was a way to do that.
9    Q   And Mr. Morgenstein was, what he suggested
10 is that -- well, let me back up.
11   Was Mr. Morgenstein's suggestion that if
12 the DISB granted him a waiver he would work in the
13 relationship with the duly-licensed individual?
14   A   I believe he put that in one of his
15 letters, that representation.
16   Q   And in the end the DISB stopped
17 considering these requests and informed
18 Mr. Morgenstein that he would need to obtain Morgan
19 Stanley's sponsorship if it were to continue to
20 consider his requests; is that correct?
21   A   Well, I think the sequence may be off. I
22 think that in the course of our communication we

Page 185

1  said if this is going to -- if you want to set up
2  something like this you are going to have to have
3  the firm support it.
4    Q   But it did eventually form -- I will back
5  up.
6    Morgan Stanley in fact did not support the
7  request?
8    A   That is correct.
9    Q   And when that happened, the DISB informed
10 Mr. Morgenstein that it considered his request to be
11 closed; is that correct?
12   A   That is correct.
13   Q   Even if Morgan Stanley had supported the
14 request the ultimate discretion -- let me back up.
15   Even if Morgan Stanley had supported the
16 request, the final discretionary authority over
17 whether or not to grant Mr. Morgenstein's request
18 rested with the DISB, is that correct?
19   MR. KANE: Asked and answered.
20   THE WITNESS: Yes, I believe I answered
21 that. I believe I said that I didn't remember
22 exactly how we conveyed to Mr. Morgenstein what it

Page 186

1  was we expected, and it may be that we had, you
2  know, developed our thinking to the point that if he
3  was able to meet those requirements we would have
4  allowed him to operate in accordance with our
5  thinking.
6       That may or may not have been something
7  that would meet the definition of a waiver,
8  depending on how it was structured, and as I say, I
9  don't remember what exactly we said he might have to
10 do.
11      BY MR. SORENSEN:
12      Q   I am not sure that that answers the
13 question.
14      My question is whether the final
15 discretionary authority over whether or not the
16 request would be granted or denied rested with the
17 Department of Insurance, Securities and Banking?
18      A   My problem is with the word "final." We
19 had the discretionary authority but if we decided,
20 for example, that the way it was structured didn't
21 require a license, it wouldn't be a waiver at all.
22      So that is -- I have testified that we had

Page 187

1  the discretion.  It was a matter of discretion for
2  the department to act on waiver requests, including
3  this one.
4       Q   I don't have any other questions.
5       MR. TAYLOR:  We are done.
6       (Whereupon, at 4:39 p.m., the deposition
7  was concluded.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 188

1  I HEREBY CERTIFY that I have read this transcript of
2  my deposition and that this transcript accurately
3  states the testimony given by me, with the changes
4  or corrections, if any, as noted.
5
6
7              X
8
9
10
11 Subscribed and sworn to before me this        day
12 of        , 20        .
13
14
15
16      X
17           Notary Public
18
19
20
21 My commission expires:              .
22

Page 189

1              C O N T E N T S
2
3  WITNESS                        EXAMINATION
4  THEODORE A. MILES
5    by Mr. Sorensen              108, 178
6    by Mr. Kane                  162
7
8
9
10
11
12              E X H I B I T S
13
14 EXHIBIT NUMBER                 IDENTIFIED
15
16 Exhibit 8                      166
17 Exhibit 9                      173
18
19
20
21
22

Page 190

1    CERTIFICATE OF NOTARY PUBLIC & REPORTER

2

3    I, DONALD R. THACKER, the officer before whom the

4    foregoing deposition was taken, do hereby certify

5    that the witness whose testimony appears in the

6    foregoing deposition was duly sworn; that the

7    testimony of said witness was taken in shorthand and

8    thereafter reduced to typewriting by me or under my

9    direction; that said deposition is a true record of

10    the testimony given by said witness; that I am

11    neither counsel for, related to, nor employed by any

12    of the parties to the action in which this

13    deposition was taken; and, further, that I am not a

14    relative or employee of any attorney or counsel

15    employed by the parties hereto, nor financially or

16    otherwise interested in the outcome of this action.

17

18

19    --------------------------

20         Notary Public in and for the

21         District of Columbia

22    My Commission Expires:  May 14, 2011