IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - -x

NORMAN L. MORGENSTEIN,    :

    :

        Plaintiff,    :

    :

    vs    :  Civil Action

    :  No. 05-2123 (JR)

MORGAN STANLEY DW, INC.,    :

    :

        Defendant.    :

- - - - - - - - - - - - - -x


Washington, D.C.


Monday, June 26, 2006


Deposition of:

HARRY WACHS

called for examination by counsel for Defendant,

pursuant to notice, commencing at 2:38 p.m., at

the Law Offices of Greenberg Traurig, L.L.P., 815

Connecticut Avenue, N.W., 7th Floor, Washington,

D.C., before Delores M. Green, a Notary Public in and

for the District of Columbia, when were present on

behalf of the respective parties:

Page 2

1   APPEARANCES:
2   On behalf of the Plaintiff:
3       MICHAEL G. KANE, ESQ. (via Telephone)
        Cashdan & Kane, P.L.L.C.
4       1150 Connecticut Avenue, N.W., Suite 900
        Washington, D.C. 20036-4129
5       (202) 862-4353
6
    On behalf of the Defendant:
7
        MATTHEW H. SORENSEN, ESQ.
8       Greenberg Traurig, L.L.P.
        1750 Tysons Boulevard, Suite 1200
9       McLean, Virginia 22102
        (703) 749-1348
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 3

1                       I-N-D-E-X
2   WITNESS:                          PAGE:
3   HARRY WACHS
4       Examination by Mr. Sorensen         4, 124
5       Examination by Mr. Kane             114
6
7   EXHIBIT:                          PAGE:
8   No. 1   Subpoena & Notice of Deposition     11
9   No. 2   VCDC Phone Inquiries               18
10  No. 3   Application to the Vision &
            Conceptual Development Center      23
11
    No. 4   Handwritten Notes                  36
12
    No. 5   Progress Report                    69
13
    No. 6   Handwritten Notes                  127
14
                    - oOo -
15
16
17
18
19
20
21
22

Page 4

1               P-R-O-C-E-E-D-I-N-G-S
2   Whereupon,
3               HARRY WACHS,
4   was called as a witness and, having been first duly
5   sworn by the Notary Public, was examined and
6   testified as follows:
7       EXAMINATION BY COUNSEL FOR DEFENDANT
8       BY MR. SORENSEN:
9       Q.   Good afternoon, Dr. Wachs.  My name is Matt
10  Sorensen.  I represent Morgan Stanley.  We're the
11  defendant in this case.  With us by phone is
12  plaintiff's counsel, Michael Kane.
13          Dr. Wachs, could you state your name, full
14  name for the record and spell your name.
15      A.   Harry Wachs, H-A-R-R-Y W-A-C-H-S.
16      Q.   And could you state your address for the
17  record, please.
18      A.   2460 Huntingfields Drive, Huntingtown,
19  Maryland 20639.
20      Q.   And could you tell me if you have ever been
21  deposed before?
22      A.   Yes.

Page 5

1       Q.   And how many times have you been deposed
2   before?
3       A.   I'm guessing.  I don't remember.  Probably
4   four or five.
5       Q.   All right.  I'm going to briefly run down
6   the rules of the deposition for you.  I'm sure you
7   probably know most of this already.
8           I'm going to be asking you a series of
9   questions.  I need you to give me oral answers; yes
10  or no wherever appropriate.  Uh-huh or huh-huh are no
11  good.  And a nod or a shake of the head also can't
12  get picked up by the court reporter.  Do you
13  understand?
14      A.   Absolutely.
15      Q.   And if you don't understand any of the
16  questions that I'm asking or can't hear a question
17  that I ask, just let me know and I'll repeat the
18  question or I'll rephrase it as appropriate.
19      A.   Okay.
20      Q.   If you give me an answer to a question that
21  I ask, I'm going to assume that you've understood the
22  question.  Okay?

| Page 6 |
|---|

1    A.  Okay.
2    Q.  And if at any point in the deposition you
3  need to take a break, just let me know and we'll take
4  a break.
5    A.  Okay.
6    Q.  Please wait until after I've finished
7  asking the question before you answer and I'll try to
8  behave as well and wait until you finish giving an
9  answer before I go on to ask the next question.
10  Okay?
11    A.  Okay.
12    Q.  And at times you may give an answer as
13  completely as you can to a question that I've asked
14  and then remember later on in the deposition
15  something that might further explain your answer to
16  the question or might add to it.  Please just let me
17  know and I'll give you an opportunity to add to your
18  testimony.  Okay?
19    A.  Okay.
20    Q.  And during the course of the deposition,
21  plaintiff's counsel may at times insert objections to
22  my questions.  Unless he instructs you not to answer

| Page 7 |
|---|

1  a question on the basis of --
2    A.  Unless he what?
3    Q.  Unless after he states the objection he
4  instructs you not to answer on the basis of
5  privilege, you will have to answer the question.  Do
6  you understand?
7    A.  I don't understand that.
8    Q.  Okay.  Basically there may be objections at
9  times during the deposition, such as object to the
10  form.  That's just an objection to how I phrased the
11  question.  You can go ahead and answer the question
12  if you understand the question.  If not, as I said
13  before, just ask me to repeat the question or
14  rephrase it.  And then you can go ahead and answer
15  the question.
16    The only grounds on which you cannot answer
17  a question that I've asked is if counsel for the
18  plaintiff instructs you that the question is covered
19  by the attorney-client privilege and instructs you
20  not to answer.  Okay?
21    A.  So that gentleman can tell me not to answer
22  a question?

| Page 8 |
|---|

1    Q.  Only on the grounds of attorney-client
2  privilege.
3    A.  But he can tell me not to answer and I have
4  to obey him?
5    MR. KANE:  Right.  I mean I'm by telephone,
6  Doctor, so there's a certain limit in what I can do.
7    THE WITNESS:  Yeah.  I'm sitting here soak
8  and wet and you're not here.
9    MR. KANE:  Well I'm nice and dry, so sorry.
10    BY MR. SORENSEN:
11    Q.  And lastly, you understand that the
12  testimony that you're giving today is under oath?
13    A.  Absolutely.
14    Q.  And you understand that that testimony has
15  the same force and effect as if you were in a court
16  of law, correct?
17    A.  Okay.  Listen, when you pause, I sometimes
18  don't know if you're finished or not.  So if I answer
19  in the middle, you'll understand that.
20    Q.  I do.  And it may help if you wait just a
21  minute after, not a full minute, but wait while I'm
22  asking a question.  Because at times, I will pause in

| Page 9 |
|---|

1  the middle of a sentence.  Especially when I'm
2  thinking if I need to rephrase a question, I may have
3  a longer pause.
4    A.  Okay.
5    Q.  Okay?
6    A.  Absolutely.
7    Q.  All right.  Dr. Wachs, have you taken any
8  medication or drugs that might interfere in any way
9  with your ability to answer my questions today?
10    A.  Absolutely not.  Never do.
11    Q.  And are you sick at all?
12    A.  You mean now?
13    Q.  Sick or under a doctor's care.  Yes
14    A.  No.
15    Q.  And is there any other reason why you can
16  think of why you wouldn't be able to answer my
17  questions fully and truthfully?
18    A.  I can't think of any.
19    Q.  Okay.  Have you reviewed any documents in
20  preparation for this deposition?
21    A.  Just the file that I have on this
22  gentleman.

Page 10

1    Q.  And that file was created by your office;
2  is that correct?
3    A.  By me.
4    Q.  By you.  And have you had any
5  communications with anyone about the substance of
6  your testimony today?
7    A.  Only the other optometrist in the office.
8    Q.  Okay.  And who is this other optometrist?
9    A.  Amanda Zeller, Z-E-L-L-E-R.
10   Q.  And what was the nature of your
11  conversation with Ms. Zeller?
12   A.  Do you know anything about this?  What's
13  going on?
14   Q.  And how did she respond?
15   A.  I don't know.  Do you know anything about
16  it?
17   Q.  And did Ms. Zeller ever treat
18  Mr. Morgenstein?
19   A.  No.  It was long, long before she got into
20  the office.
21   Q.  And were you the only doctor for the Vision
22  and Conceptual Development Center who --

Page 11

1    A.  Yes.
2    Q.  -- treated Mr. Morgenstein?
3    A.  Yes.
4    Q.  And Dr. Wachs, you understand that you are
5  here as a representative of the Vision and Conceptual
6  Development Center to give testimony regarding its
7  treatment of Mr. Morgenstein?
8    A.  I guess so.
9        MR. SORENSEN:  And I'm going to mark this
10  as Exhibit 1.
11       Mark, I'm showing Dr. Wachs a copy of the
12  subpoena and Notice of Deposition.
13       MR. KANE:  All right.
14       (Exhibit No. 1 was marked for
15       identification.)
16       BY MR. SORENSEN:
17   Q.  Actually it may be helpful since I'm going
18  to be going through documents, it may be helpful to
19  put away any additional documents and we'll go
20  through the ones that I have.
21   A.  Do I now have to refer to this, or can I
22  file it?

Page 12

1    Q.  Well, we're going to have to use that for
2  purposes of the deposition, and I'll be giving it to
3  the court reporter at the end of the deposition to go
4  along with the deposition transcript.  Okay?
5    A.  Okay.
6    Q.  All right.  I've now shown you what's been
7  marked as Exhibit 1.  Have you had a chance to review
8  the document?
9    A.  Yes.
10   Q.  And this was your Notice of Deposition in
11  this case?
12   A.  Yes.
13   Q.  Well I shouldn't say you.  This is the
14  Notice of Deposition of the Vision and Conceptual
15  Development Center?
16   A.  Yes.
17   Q.  And they have produced you as
18  representative to testify on the four numbered areas
19  of inquiry in the attached Notice of Deposition; is
20  that correct?
21   A.  The four, I have to look again.
22       Oh, these four?

Page 13

1    Q.  Yes.
2    A.  Yeah.
3    Q.  And you are prepared to testify on these
4  four subject areas?
5    A.  I'll do the best I can.
6    Q.  Okay.  Dr. Wachs, how did you first come to
7  know Mr. Morgenstein?
8    A.  He came in to me for an examination.
9    Q.  And when was that?
10   A.  March 23, 2001.
11   Q.  And do you know if he made that appointment
12  or if someone else had made the appointment for him?
13   A.  I really have no idea.
14   Q.  And do you know if he was referred to you?
15   A.  It says who referred you to Dr. Wachs?  A
16  Louise Dugan; a Louise Dugan, Licensed Social Worker.
17   Q.  And are you familiar with Louise Dugan?
18   A.  At the present time, no.  I might have
19  known her then and forgot about her.  But I don't
20  know her now.
21   Q.  Okay.  And do you know what the purpose of
22  Mr. Morgenstein's visit was on March 23rd?

## Page 14

1    A.  To me?

2    Q.  Yes.

3    A.  Yeah, he said -- reason for referral, a

4  reading disability for acoustic neuroma.

5    Q.  Do you recall whether he mentioned anything

6  about an accommodation he was seeking?

7    A.  I'm not sure I know what you mean.  Can I

8  explain something?

9    Q.  Yes.

10    A.  There's two ways that I use accommodation.

11  So you better tell me what you mean by accommodation.

12    Q.  Okay.  Did he say that he was seeking a

13  work-related accommodation for a reading disability

14  when he first scheduled his appointment with you?

15    A.  In other words, you're using the word

16  "accommodation" as some sort of supportive care at

17  the workplace?

18    Q.  Well not necessarily supportive care.  Any

19  kind of assistance at work, and one example could be

20  like a reader.

21    A.  I don't see anything about that.

22    Q.  And so you don't recall him ever mentioning

## Page 15

1  anything about the work-based accommodation he was

2  seeking?

3    A.  Well I certainly don't recall it and I

4  don't see it in my notes.

5    Q.  And do you recall if Mr. Morgenstein said

6  anything about the Series 65 Examination?

7    A.  This what?

8    Q.  A Series 65 Examination?

9    A.  A Series 65 Examination; is that what

10  you're saying?

11    Q.  Yes.

12    A.  I don't even know what that is.

13    Q.  And you don't recall if Mr. Morgenstein

14  mentioned anything about that?

15    A.  Nothing in my notes.

16    Q.  And you don't have any other independent

17  recollection of whether --

18    A.  No.

19    Q.  How many times did you see Mr. Morgenstein?

20    A.  Just the one time on March 23rd.

21    Q.  And did you have any additional

22  communication with Mr. Morgenstein after the

## Page 16

1  March 23rd appointment?

2    A.  Evidently he called the office, did not

3  speak to me.  Now do you want that information?

4    Q.  Yeah.  Just one second.  Yeah.  Do you know

5  when Mr. Morgenstein called your office?

6    A.  July 31, 2001.

7    Q.  Do you know if he made any attempt to

8  contact your office between March 23rd and July 31,

9  2001?

10    A.  No.  Mr. Morgenstern (sic) called me on

11  July 31, 2001.

12    Q.  Mr. Morgenstern?

13    A.  Morgenstein or something.  This is a

14  written note from my office manager who answered the

15  phone at that time.

16    Q.  And when did Mr. Morgenstein -- is this the

17  July 31, 2001 --

18    A.  Right.

19    Q.  -- call that you're referring to?

20    A.  Right.

21    Q.  And you have no recollection of any other

22  telephone call with Mr. Morgenstein?

## Page 17

1    A.  No.  They're supposed to write it in here.

2  That's the last thing.

3    Q.  But you have no independent recollection of

4  any other --

5    A.  No.

6    Q.  -- telephone calls with Mr. Morgenstein?

7    A.  No, I don't.

8    Q.  And do you know what the July 31, 2001

9  telephone call was about?

10    A.  Yes.

11    Q.  And what was it about?

12    A.  Mr. Morgenstein called.  He no longer sees

13  Louise Dugan and does not wish to come in.  I'm to

14  make the file inactive.

15    Q.  And did that mean that you were to close

16  his account out as a patient?

17    A.  Yes.  And put it in our inactive file.  We

18  don't throw it away.  We keep it in an inactive file.

19    Q.  And that simply means that he wasn't

20  seeking any additional treatment from you; is that

21  correct?

22    A.  That's correct.  That's correct.

## Page 18

1    Q.   And do you recall if you had a telephone
2    call with Mr. Morgenstein on or around February 1,
3    2001?
4    A.   There's nothing in my records to that
5    effect.
6         MR. SORENSEN: Mark this as Exhibit 2.
7         (Exhibit No. 2 was marked for
8         identification.)
9    BY MR. SORENSEN:
10   Q.   I'm handing you what's been marked as
11   Exhibit 2.
12   A.   Okay.
13        MR. SORENSEN: Mike, this is the VCDC Phone
14   Inquiries document.
15        MR. KANE: Okay. Got it.
16        BY MR. SORENSEN:
17   Q.   Let me know when you've had time to review
18   it.
19   A.   I already saw it.
20   Q.   Okay. Dr. Wachs, this document seems to
21   indicate that on or around February 1, 2001, you had
22   a telephone call with Mr. Morgenstein?

## Page 19

1    A.   No. This is our phone inquiry. It doesn't
2    get to me.
3    Q.   Oh.
4    A.   This goes to the office manager, and they
5    ask those questions. And then if the patient makes
6    an appointment, then it's given to me. If they don't
7    make an appointment, it's thrown away.
8    Q.   So this would either be a message he left
9    or a conversation he had with someone else from your
10   office; is that correct?
11   A.   Yes. When he made the initial appointment,
12   this is what my office manager wrote down that he
13   said as to why he wanted to come in.
14   Q.   And prior to today, did you review this
15   document?
16   A.   I don't recall if I saw this one. I really
17   don't. But there's nothing to it. It's just name
18   and address is on it.
19   Q.   Okay. And so the part of the document that
20   says "tumor removed (acoustic neuroma) reading
21   disability as result," that information was simply
22   what Mr. Morgenstein told the person in your office

## Page 20

1    with whom he spoke; is that correct?
2    A.   That's correct.
3    Q.   And there was no diagnosis to this effect,
4    at least as far as this phone record is concerned; is
5    that correct?
6    A.   That led to this document?
7    Q.   Yes.
8    A.   No.
9    Q.   And let me just clarify for the record.
10   You just testified that there was no diagnosis that
11   was associated -- let me rephrase that.
12        There was no diagnosis from your office to
13   support the statement that the tumor removed, reading
14   disability as a result was actually true; is that
15   correct?
16   A.   No. That's just his words.
17   Q.   Is an acoustic neuroma a condition with
18   which you're familiar?
19   A.   Only I know what the words mean. But it's
20   out of my field.
21   Q.   Have you ever treated a patient with an
22   acoustic neuroma, other than Mr. Morgenstein?

## Page 21

1    A.   I can't recall specifically, no.
2    Q.   And do you know if Mr. Morgenstein
3    mentioned any other details regarding his alleged
4    reading disability to the person with whom you spoke
5    from your office on February 1, 2001?
6    A.   All I know is what's on this paper.
7    Q.   Okay. Have you ever seen a patient before
8    that claimed a reading-related disability as a result
9    of surgery, other than Mr. Morgenstein?
10   A.   Yeah. Absolutely.
11   Q.   And approximately how many such patients
12   have you seen?
13   A.   I've been doing this for 58 years, and I
14   could have -- dozens.
15   Q.   Did you ever see a patient who had had a
16   surgery for an acoustic neuroma who claimed a reading
17   disability as a result, other than Mr. Morgenstein?
18   A.   Not that I know of.
19   Q.   Have you ever treated patients who had
20   surgery to remove other tumors who have claimed
21   reading disabilities as a result of that?
22   A.   Yes.

## Page 22

1    Q.   And what sort of tumors did they have
2  removed?
3    A.   What sort of tumors?
4    Q.   Yes.
5    A.   I don't know the medical term of them. But
6  they would have tumors removed that would cause
7  cortical disturbance, cortical deficiency; seizure
8  disorders, et cetera.
9    Q.   And where were these tumors? What part of
10 the body?
11   A.   They would all be cortical.
12   Q.   So in the eyes?
13   A.   No, no, no, no. In the brain.
14   Q.   Do you recall any of the details of what
15 the names of any of these tumors were?
16   A.   No. I really don't. I don't particularly
17 pay attention. I don't particularly emphasize or
18 dwell on the names of the tumors.
19   Q.   Did you ever confirm that the tumor was the
20 reason for these people's alleged reading disability?
21   A.   No.
22   Q.   And did you ever confirm that the removal

## Page 23

1  of the tumor was the cause of these people's reading
2  disability?
3    A.   No.
4         MR. SORENSEN:  I'd like to mark this as
5  Exhibit 3.
6         (Exhibit No. 3 was marked for
7              identification.)
8         MR. SORENSEN:  Mike, I'm showing the
9  witness the February 19, '01 Application to the
10 Vision and Conceptual Development Center.
11        MR. KANE:  Right. I got it.
12        BY MR. SORENSEN:
13   Q.   Dr. Wachs, let me know when you've had a
14 chance to review the document.
15   A.   I looked this over before I came in. I'm
16 ready.
17   Q.   Okay. And was this document filled out by
18 you or Mr. Morgenstein?
19   A.   By Mr. Morgenstein.
20   Q.   And do you see in the right-hand margin
21 next to Louise Dugan, LCSW, there's two statements;
22 no O.T., no P.T.?

## Page 24

1    A.   Yes.
2    Q.   Do you know who wrote that?
3    A.   I did.
4    Q.   And why did you write that?
5    A.   Because he told me he had no occupational
6  therapy, had no physical therapy. It's either that
7  or that this Louise Dugan doesn't do occupational
8  therapy or physical therapy. The no means not; and
9  O.T. is occupational therapy; P.T. is physical
10 therapy. But I don't know whether that refers to
11 Dugan or to Mr. Morgenstein.
12   Q.   And do you recall if Mr. Morgenstein had
13 said that he had ever had a recommendation for
14 occupational therapy or physical therapy?
15   A.   Just what's in here. Let me see my other
16 notes here. No. I see nothing to that.
17   Q.   Now Mr. Morgenstein when he first saw you,
18 do you recall exactly what symptoms he was
19 experiencing?
20   A.   There's two questions on here. Specific
21 reason for referral and what he want to find out from
22 the exam. Do you want me to read those to you?

## Page 25

1    Q.   Well I understand what the document says.
2  I guess what I'll ask first is do you have any
3  independent recollection of what symptoms
4  Mr. Morgenstein claimed he was experiencing?
5    A.   Other than what's on these notes, no.
6    Q.   Okay. And so all you recall is that he had
7  stated that he had a reading disability from an
8  acoustic neuroma?
9    A.   That's what's in the notes.
10   Q.   And you also recall that he asked if this
11 could be corrected?
12   A.   That's correct.
13   Q.   And could you turn to page 3 of Exhibit 3?
14   A.   Okay.
15   Q.   About one-third of the way down the page,
16 there's a question, State any chronic physical
17 problems.
18   A.   Yes.
19   Q.   And in response to that Mr. Morgenstein
20 said, I get tired easily, balance problems, visual
21 problems because of loss of balance nerves.
22   A.   Yes.

## Page 26

1    Q.  Do you see that?  Let me back up.  Do you
2  recall any specifics about his alleged tiring easily?
3    A.  Only what's written down here.
4    Q.  So you don't have any specific recollection
5  of those symptoms?
6    A.  No.
7    Q.  And do you have any specific recollection
8  of what his balance problems were?
9    A.  No.  I don't.
10    Q.  And do you have any specific recollection
11  of what the visual problems he was claiming to have
12  were?
13    A.  I have a whole -- that's what was my
14  examination.  I don't understand.
15    Q.  Okay.  Then I guess I'll get to that piece
16  by piece.  Mr. Morgenstein claimed that he was
17  suffering from -- well let me back up.  I'll rephrase
18  that.
19       Towards the bottom of the page, do you see
20  the question, Do you have blurred vision or sting?
21    A.  Yes.
22    Q.  And the answer is yes.  Do you know whether

## Page 27

1  that yes was to blurred vision specifically?
2    A.  It probably was both of those things.  I
3  usually would circle one if it was.  But I can't
4  answer for sure.
5    Q.  So you don't know for certain whether that
6  was blurred vision or whether it was sting?
7    A.  Correct.
8    Q.  And Mr. Morgenstein stated that he had this
9  symptom when he was trying to read; is that correct?
10    A.  The blurred vision or sting?
11    Q.  Yes.
12    A.  Yes.
13    Q.  He also stated that he had blurred vision
14  at distances, correct?
15    A.  Yes.
16    Q.  And that he had blurred vision for objects
17  that were near to him, correct?
18    A.  Yes.
19    Q.  And is it possible that the blurred vision
20  when he was reading was attributable to a factor, to
21  the same factors that caused his blurred vision for
22  distance and close reading?

## Page 28

1       Actually let me ask that question in
2  another way.
3       Do you know whether one of the problems
4  with Mr. Morgenstein was that he had an insufficient
5  prescription for his glasses?
6    A.  His prescription was pretty good.
7    Q.  So that was not the reason why he had
8  blurred vision at distances and close?
9    A.  Evidently not.
10    Q.  Do you see the question where it says, Do
11  you ever see double?  And the response is I'm sure I
12  have.
13    A.  Yes.
14    Q.  Do you know whether this was simply a guess
15  by Mr. Morgenstein?
16    A.  A guess?  You're saying a guess?
17    Q.  Yes.
18    A.  I don't think I'm in a position to answer
19  that.  I couldn't tell who is guessing or not
20  guessing.
21    Q.  And do you recall ever asking him whether
22  he in fact did see double?

## Page 29

1    A.  I always ask that question in an
2  examination.  But I don't see anything in my notes
3  specifically on that.
4    Q.  So you don't recall him ever telling you
5  during the course of your examination that he was
6  seeing double?
7    A.  There's nothing in my notes.
8    Q.  And you don't have any other independent
9  recollection of whether he said that?
10    A.  No.
11    Q.  And do you see on page 4 of Exhibit 3 the
12  statement, Do you occasionally lose focus when
13  reading?
14    A.  Yes.
15    Q.  Each time I blink is the answer?
16    A.  Yes.
17    Q.  Further down it also states, Do you like to
18  read?  And Mr. Morgenstein responded not really.
19    A.  Yes.
20    Q.  And below that it states, How much do you
21  read?  And there's a statement, Not as much as I
22  should.

## Page 30

1    A.   Yes.
2    Q.   Could Mr. Morgenstein's problem with
3    skipping words be attributed to the fact that he
4    admittedly did not read much?
5    A.   No.  You couldn't say that.
6    Q.   Is it possible that one of the causes of
7    him skipping words when he was reading is the fact
8    that he admittedly did not read much?
9    A.   No.  I don't think so.
10   Q.   And why is that?
11   A.   Because just not reading is not a factor to
12   cause double vision or any of the symptoms he has.
13   Q.   But I'm dealing specifically with skipping
14   words.
15   A.   Even skipping words.
16   Q.   So you're saying that the fact that you do
17   not read much could not lead you to skip words when
18   you read?
19   A.   It could lead to some people.  But it by
20   itself -- if someone said to me, I don't read much, I
21   would not suspect that they were skipping words.
22   Because you could not read for a year and then pick

## Page 31

1    up a book and not skip words.
2    Q.   But that is one possible cause for
3    Mr. Morgenstein skipping words?
4    A.   I would be hard pressed to agree with you.
5    But anything could, you know -- anything could be a
6    cause.  But not a typical cause.
7    Q.   Okay.  But you could not rule out that
8    Mr. Morgenstein's admitted -- the fact that he did
9    not read as much as he would want to would -- let me
10   rephrase that.
11        You can't rule out the fact that
12   Mr. Morgenstein did not read very often may have had
13   something to do with his skipping words when he read?
14   A.   Can I ask you for some clarity, or is that
15   not permissible?
16   Q.   Sure.  I can clarify the question.  You
17   can't sitting here today -- well actually let me
18   rephrase that.
19        At the time that you saw Mr. Morgenstein,
20   you couldn't rule out the fact that his not reading
21   often may have had something to do with his skipping
22   words when he read; is that correct?

## Page 32

1    A.   I've got to talk to you some because your
2    question is confusing me.
3    Q.   Okay.  What specific part would you like me
4    to clarify?
5    A.   The definite statement that this causes
6    that.  I couldn't say that, that not reading often
7    would cause someone to skip words.
8    Q.   Yeah.  And I'm not asking if this was the
9    cause.  What I'm asking is that you could not rule
10   out as one possible cause for Mr. Morgenstein's
11   skipping words, the fact that he did not read at all.
12   A.   I wouldn't even label it a possible cause.
13   Q.   So you're saying that -- I mean I'm trying
14   to get your testimony straight on this.
15        It seems before you testified that the fact
16   that Mr. Morgenstein did not read very often may have
17   had something to do with his skipping words, but that
18   you couldn't definitively say yes or no.  Is that
19   correct?
20   A.   Not quite.  Can I restate your question?
21   Q.   Sure.
22   A.   Okay.  Not reading often does not cause a

## Page 33

1    person to skip words.  So it isn't that I couldn't
2    rule it in or out, I wouldn't tie the two together at
3    all.
4    Q.   So you would say it could never be the
5    cause of someone skipping words?
6    A.   I can't say never, because there might be a
7    situation where it happens.  But I don't think it's
8    due to not reading often.
9        But then, you see, if you got someone who
10   was a nonreader and they skipped a lot of words, they
11   wouldn't like to read.  So on the other hand, if it
12   would be I don't read often because I skip words,
13   that's different.
14   Q.   Well, I mean it seems that the answer to
15   that, then, is there's simply -- and it seems like
16   what you're saying to me, and tell me if this is
17   wrong, is that there is -- there could be -- actually
18   let me rephrase that.
19        If I'm understanding your testimony
20   correctly, you've stated that it's possible that
21   someone is not reading often could lead them to skip
22   words when they sit down and read.  But you can't

Page 34

1  confirm whether that is or is not the case?
2      A.  I know what you're asking me.  But I think
3  you're putting the cart before the horse.  If someone
4  would say I skip words, therefore I don't like to
5  read and don't read often, that's perfectly
6  understandable.  To say that I don't read often and
7  that causes me to skip words is not an acceptable
8  statement.
9      Q.  And why is it not an acceptable statement?
10     A.  Because there's nothing in not reading
11  often that would cause a person to skip words.
12     Q.  And is there any sort of scientific study
13  that's been done that shows that there is no
14  correlation between those two?
15     A.  No.  And let me say another thing.  When
16  you read your law stuff, very often you scan it.  You
17  don't read all the little ifs and ands and buts and
18  you skip a lot of words.  Okay.  And very often the
19  more you read, the more words you skip because you
20  don't have to read every word, okay.  If a person
21  skipped a lot of words and lost the meaning because
22  of it, then they wouldn't want to read.

Page 35

1      Q.  Let me ask another question.  You see in
2  Exhibit 3, this is still on page 4, where it says, Do
3  you skip words or reread and the response is all the
4  time?
5      A.  Yes.
6      Q.  Could skipping words and having to reread
7  have anything to do with not reading often?
8      A.  Sure.  As a result, not as a cause.
9      Q.  What do you mean as a result and not a
10  cause?
11     A.  It would make reading laborious and it
12  would make it uninteresting and confusing and so on
13  and therefore, why read?
14     Q.  But is it possible that someone who hasn't
15  read often may skip words or have to reread because
16  they simply are not used to reading all that often?
17     A.  If they are a capable reader or if they
18  have a reading disability.
19     Q.  Assuming that they are a capable reader,
20  would their lack of reading potentially cause them to
21  skip words?
22     A.  I doubt it.

Page 36

1      Q.  But you can't be certain of that?
2      A.  It's -- only because in my field, unlike in
3  your field, anything is possible.  You can't be that
4  definitive.
5      Q.  Okay.  What examination did you perform on
6  Mr. Morgenstein?
7      A.  I called a Visuo-cognitive evaluation.
8      Q.  And what is entailed in a Visuo-cognitive
9  evaluation?
10     A.  A number of factors to determine if he is
11  making sense out of his sense of sight.
12     Q.  And what are those factors?
13     A.  Well, do you have a copy of this page?
14          MR. SORENSEN:  Actually I'll mark that as
15  the next exhibit.  Could we mark this as Exhibit
16  Number 4.
17          Mike, I'm showing Dr. Wachs the handwritten
18  notes.
19          MR. KANE:  Okay.
20          (Exhibit No. 4 was marked for
21          identification.)
22          THE WITNESS:  Okay.  I'll read from this.

Page 37

1  It's sure to tell you different phases of the
2  examination.  Reading from left to right on the first
3  page.
4          We did a sight examination to find his
5  acuity at distance in the air and his ocular
6  sensorimotor or his ability to move his eyes, focus,
7  converge and so on.  Okay.
8          Then the next thing under academic, I
9  evaluated the visual infrastructure of academics.
10          BY MR. SORENSEN:
11     Q.  And what do you mean by that?
12     A.  There are certain things that everybody
13  that does any reading in any country under any
14  conditions has to develop before they can get into
15  decoding in their native tongue.  And those are the
16  things.
17     Q.  And what are those?
18     A.  Well, first of all, a knowledge of
19  laterality, right and left.  Secondly, the ability to
20  put letters to sound in their culture.  Thirdly, the
21  ability to write the alphabet of their culture but in
22  a complex way.

## Page 38

1    Q.   And what do you mean by a complex way?
2    A.   Well, you know, you write, A, B, C, D, and
3  so on. What we have them do is put A on the
4  right-hand side of the paper, B on the left hand and
5  they're jumping back and forth, as opposed to the
6  usual way of A, B, C, D sequentially. Okay?
7    Q.   Okay.
8    A.   Then decoding and then actually reading;
9  and then the ability to know numbers, numerical
10  literacy and place value, et cetera, et cetera; and
11  then the syntax ability; and then the decoding, their
12  decoding ability in noncultural form.
13    Q.   You mentioned decoding as one of the
14  aspects. What do you mean by decoding?
15    A.   There were two phases. One is decoding
16  cultural words, such as if I show you C-A-T, you'll
17  say cat. Okay?
18      The other is decoding this symbol. It
19  could be a circle represents ka (Ph.); and this
20  symbol, let's say, a triangle represents air (Ph.);
21  and this symbol a dot represents ta (Ph.). And so
22  you can have circle, triangle, dot and they would

## Page 39

1  interpret that as cat.
2    Q.   So the second form of decoding is the
3  association of a symbol with a sound?
4    A.   Correct. Cultural sound.
5    Q.   And you mentioned syntax ability. What do
6  you mean by syntax ability?
7    A.   We give them a paragraph to read. It's
8  something like the squirrel and its Tingen spingled
9  colic over the month. Okay. And he has to be able
10  to read that. That's what we call "jabber walking."
11  Do you remember reading Alice in Wonderland? There's
12  a poem in there towards growing the scene. He tows
13  the car and give them away. That's called jabber
14  walking.
15      It sounds like English, but it's nonsense
16  words. Okay. They have to read those nonsense and
17  then questions are asked such as who spingled colic
18  with the canole? And then they'll look up there and
19  find it and it's Tingen.
20      And the only way you can do that is if
21  you're good at syntax. And syntax varies in various
22  cultures. Like in German, they say make the door

## Page 40

1  shut. But here, we say shut the door. And it's that
2  type of thing that you're trying to pick up.
3    Q.   So you're trying to pick up their ability
4  to understand sentence structure, correct?
5    A.   That's one way to put it, yes.
6    Q.   And you mention decoding in noncultural
7  form. What do you mean by decoding in noncultural
8  form?
9    A.   Well just like I said if you wrote down the
10  C-A-N-O-L-E and his T-I-N-G-E-N S-P-I-N-G-L-E-D,
11  that's nonwords. It's nonsense words. Okay?
12    Q.   Uh-huh.
13    A.   But if you're a good reader, you should be
14  able to read it and make sense out of it,
15  syntax-wise. But it's nonsense words.
16    Q.   Okay. Were there any other parts of the
17  examination?
18    A.   Yeah.
19    Q.   And what were those?
20    A.   Then there's the auditory visual which I
21  call seeing sounds. You give the person a sound and
22  they've got to add on, take away, substitute, et

## Page 41

1  cetera.
2    Q.   And what do you mean add on, take away,
3  substitute?
4    A.   Well, if you say sordamnick take away dam,
5  what's left? And you could say sornick. And then
6  you say take that middle sound and put it at the end,
7  put it at the beginning. So they got to be able to
8  visualize the sounds and be able to manipulate them.
9  A good reader can do that easily. And it's very
10  important for spelling.
11    Q.   Any other parts of the exam?
12    A.   Yes. Let me move into graphic which is
13  representational thought or your ability to represent
14  your thought in graphic form.
15      So you say draw a person, draw a house,
16  draw a bird's eye view of this room, and copy these
17  forms.
18    Q.   And what do you mean "copy these forms"?
19    A.   Well you show them various geometric forms,
20  one card at a time. And they have to draw that
21  geometric form on a piece of paper. The test I
22  actually used is called "The Bender-Gestält." That's

## Page 42

1    a classical -- the traditional drawing test.
2        Q.   And are there any other aspects of the
3    examination?
4        A.   Yes.  Another one we do is called
5    "Receptive and Expressive Communication."  So I give
6    them a paragraph to read, and it says put a red peg
7    in the top row six holes from the right.  Put two
8    blue pegs in the second column from the left in the
9    third and fourth hole from the top.  And they read
10   that.
11       And then I have another paragraph that I
12   read to them.  So number one, they're getting their
13   information from the written word; and the other,
14   they're getting their information from hearing it.
15       Q.   And that was the receptive -- I'm sorry.
16       A.   Receptive-Expressive Communication.
17       Now, I can tell you on that one, he in
18   reading, he got all the pegs in the right hole, but
19   instead -- he got right and left mixed up.  On
20   hearing it, he did not get left and right mixed up.
21   So in other words, it would be two holes from the
22   left and he put his peg two holes from the right.

## Page 43

1        Q.   So he got it completely right when he heard
2    the instructions, correct?
3        A.   When he heard it.
4        Q.   And I'm sorry.  That was a yes, that he got
5    it correct when he heard the instructions?
6        A.   Yes.
7        Q.   Were there any other aspects of the
8    examination?
9        A.   Yes.  We then did visual thinking.  Now
10   visual thinking is where you give him blocks and dots
11   and you make designs on them or make with them.  They
12   copy them and then they flip them over from side to
13   side and from top to bottom and so on, requiring
14   visualization of a manipulated item.
15       Q.   And could you describe what they do with
16   those blocks?
17       A.   You make a design with a triangle, a
18   square, and a diamond.  Okay.  All the blocks are
19   attached to each other, not permanently, just pushed
20   against each other.  And then you say, how would that
21   look if it were flipped over toward you?  How would
22   it look if it were flipped over to the right?  How

## Page 44

1    would it look if it were flipped over to the left?
2    They have three blocks, and they have to make the
3    design in that manner.
4        Q.   So they're changing the angle in which the
5    blocks are set up?
6        A.   Not the angle, but the position.
7        Q.   And what exactly does this test with regard
8    to visual thinking?
9        A.   It tests your ability to look at something
10   and mentally manipulate it.
11       Q.   Any other aspects to the test?
12       A.   Yes.  We do a logic test.
13       Q.   And what is entailed in a logic test?
14       A.   Are you familiar with Pierjay (Ph.)?
15       Q.   I am not.
16       A.   Okay.  Well, this is evaluating his ability
17   to logically deduce answers from pictures, from
18   words.  In other words, it's like puzzle solving in a
19   logical manner.  And of course, the way I do it it's
20   all visual.
21       Q.   Could you explain how you do it?
22       A.   Yeah.  In this particular test I gave him,

## Page 45

1    there's a book that was produced by Hahn's First
2    (Ph.) of Catholic University that has a number of
3    these items.  And --
4        Q.   What are these items?
5        A.   I'm going to explain it to you.
6        Q.   Okay.
7        A.   It might show a tube with three balls in it
8    that is straight up and down.  And it says if you
9    tilted the tube this way, how would the balls come
10   out?  So you mentally have to visualize the tube
11   being tilted and how would the balls come out.
12       For example, the tube is up vertically and
13   you put a black ball in first and then a spotted ball
14   and a white ball.  And then you inverted the tube,
15   the white ball would come out first.
16       Q.   Is that all?
17       A.   That's -- are you done with the logic?
18       Q.   Is that all?
19       A.   The testing?  No.
20       Q.   No, no.  Let me rephrase the question.
21       Is that all that's involved in the logic
22   test?

## Page 46

1    A.  Oh, no, no.  That was just an example.
2    Q.  But there's other tests similar to that?
3    A.  There was one, two, three, four, five six,
4  seven tests.
5    Q.  And do you know what the other seven tests
6  were?
7    A.  Uh-huh.
8    Q.  Could you tell me what those were?
9    A.  Okay.  One test showed four squares, with
10  five houses in three of the squares and four houses
11  in the other.  One of the squares has all the houses
12  bunched to the top of the square.  All the other ones
13  have the houses scattered around.  So someone that
14  didn't have good visualization would see all that
15  space in the one square where they were all pushed to
16  the top and would say, oh, there's got to be more
17  grass in that field than in any of the others because
18  there's so much space there.  Okay.
19        The second one was if you had two line
20  drawings and you put them together somehow, which of
21  these four would they make?  Should I go on?
22    Q.  Yes.

## Page 47

1    A.  The third one was a picture.  And there
2  were four people in the picture.  One at the north,
3  one at the south, one at the east, one at the west.
4  And it say how does the scene appear to the person
5  that's at the north end of this picture?
6        And you'd have to be able to mentally put
7  yourself in that position and know that the building
8  on the left of that person would, to the observer, be
9  on the right of the observer.  And you have to be
10  able to mentally manipulate yourself.  Okay?
11    Q.  Okay.
12    A.  Then there's another one that says if you
13  put a heavy ball in water and a lighter ball in
14  water, but the heavy ball was small and the lighter
15  ball was big, which would make the water rise up
16  more?  This is all done by pictorial representation.
17  So if someone would confuse what makes the water go
18  up, the weight of the ball or the size of the ball.
19  Go on?
20    Q.  Sure.
21    A.  You know what a Venn diagram is, or should
22  I explain it?

## Page 48

1    Q.  I know what a Venn diagram is.
2    A.  Okay.  So then you give a Venn diagram and
3  you say, what would go in the middle of the Venn
4  diagram?  Okay.  Which one of these four things would
5  be in the middle of a Venn diagram?
6    Q.  Sorry.  So you got a Venn diagram and you
7  have four items?
8    A.  Yeah.  You have a Venn diagram and the Venn
9  diagram has triangles in one of the circles, black
10  shading in another circle, and little things in the
11  third circle.  So a little black -- what did I say
12  triangles?
13    Q.  Yes.
14    A.  A little black triangle would go in the
15  middle.
16    Q.  Okay.  Anything else?
17    A.  Yep.  Then we give him paragraphs to read
18  about a picture.  There are more boys than girls.
19  There are more girls than children and so on.  Then
20  he has to pick out which one of those statements are
21  true about that picture.
22    Q.  Any other aspects of the test?

## Page 49

1    A.  The last one was probability.  He has three
2  black balls, two white balls, and one spotted one.
3  If you mixed all the balls up and covered your eyes
4  and made three choices, which one would more likely
5  pull out?  So it's a probability thing.
6    Q.  And that was the last of the tests?
7    A.  That's the last of the logic ones.
8    Q.  Any other tests that you administered?
9    A.  Then I did a general movement test.
10    Q.  And what's involved in that?
11    A.  I evaluate which is his preferred hand; can
12  he imitate my static position.  I'll put my hand over
13  my head, under my armpit and so on.  Then can he walk
14  a line cross-legged, forward, backward?  What
15  reflexes does he still sustain, primitive reflexes
16  that he still sustained that could be interfering
17  with his movement?  That's the movement test.
18    Q.  Any other tests?
19    A.  Then I did a speed reading test on him for
20  accuracy and speed.
21    Q.  So that you were simply testing how fast
22  and how accurate his reading was?

## Page 50

1    A.   Yes.

2    Q.   And how is that administered?

3    A.   There are paragraphs that you give him and

4  he's timed as to how long it takes.  And there are 10

5  questions to answer when he finishes.

6         Can you excuse me?  Can I get a drink of

7  water?

8         MR. SORENSEN:  Oh, certainly.  Can we go

9  off the record for a minute.

10        (A brief break was taken.)

11        THE WITNESS:  Okay.  So we left off with

12  the speed reading.

13        BY MR. SORENSEN:

14    Q.   Yes.  Was there any other tests that you

15  administered?

16    A.   Just the health of the eye.

17    Q.   And is there a specific name for any of the

18  tests that you administered?

19    A.   For the health of the eye?

20    Q.   Yes.

21    A.   Basically it was ophthalmoscopy.

22    Q.   And how do you spell that?

## Page 51

1    A.   O-P-H-T-H-A-L-M-O-S-C-O-P-Y.

2    Q.   O-P-H-T-H-A-L --

3    A.   M-O-S-C-O-P-Y.  Ophthalmoscopy.

4    Q.   And what's involved in ophthalmoscopy?

5    A.   Well you've had your eyes examined.  You

6  know when they take a real strong light and they get

7  right up next to your eye, they're looking inside of

8  it.  You remember that?

9    Q.   Yes.

10    A.   That's ophthalmoscopy.

11    Q.   And that was the end of the exam?

12    A.   Yes.

13    Q.   All right.  I'd like to retrace some of

14  this.  What were the results of the sight exam that

15  you administered to Mr. Morgenstein?

16    A.   Acuity in the right eye with glasses 20/15;

17  in the left 20/20 plus; both eyes 20/15.  At near,

18  20/20 throughout.  Convergence was good.  Do you want

19  me to go through the whole thing?

20    Q.   And the convergence is another part of the

21  sight exam?

22    A.   Yes.

## Page 52

1    Q.   And what does convergence mean?

2    A.   The ability to bring your two eyes together

3  to a point at near.

4    Q.   And you said convergence was good?

5    A.   Convergence was good, yes.

6    Q.   Any other detail?

7    A.   Tracking, the ability to follow a moving

8  object.

9    Q.   And how was his tracking?

10    A.   Pardon me?

11    Q.   And what was the results of that?

12    A.   Fine.

13    Q.   So his tracking was also good?

14    A.   Tracking was good.

15    Q.   Any other aspects of the sight exam?

16    A.   Focusing.

17    Q.   And how is Mr. Morgenstein -- how did he do

18  on focusing?

19    A.   Inadequate.

20    Q.   And what do you mean by inadequate?

21    A.   He didn't focus as well as he should have

22  for his age.  I shouldn't say should have.  I should

## Page 53

1  say could have.

2    Q.   And how did you measure how he focused?

3    A.   With a minus lens.

4    Q.   Could you spell that?

5    A.   M-I-N-U-S.

6    Q.   And what do you mean when you say he didn't

7  focus as well as he could have?

8    A.   You put a minus lens in front of somebody

9  and you watch that eye and the fellow eye, and you

10  see if the two of them respond, because when you

11  focus, the fellow eye should turn in.  If you focus

12  with your left eye, the right eye should move toward

13  your nose.

14    Q.   And so what exactly does the minus lens do?

15    A.   The minus lens takes away power that you

16  have to supplant with your internal mechanism of

17  focusing.

18    Q.   And is there a standard measure for how

19  well someone Mr. Morgenstein's age should be able to

20  focus?

21    A.   Well, it is a standard measure.  But there

22  is an expectation.

## Page 54

1    Q.  And what is that expectation?

2    A.  That he should be able to clear at his age

3  a minus three lens, at least.  But there again, it

4  isn't cut and dry.

5    Q.  And did he clear any other minus lenses?

6  Is there only a minus three lens?

7    A.  Well that's all I had to use.

8    Q.  And he did not clear the minus three lens?

9    A.  Right.  I don't think he even cleared a

10  minus two.

11    Q.  And did you check that?

12    A.  Yeah.

13    Q.  In his exam?

14    A.  I start with a five and then go down.  I

15  don't have exactly the lenses that I put on him.  But

16  I usually go five, three, two, and so on.  I have

17  down "inadequate."  So my coding that would mean that

18  he couldn't really clear probably a minus two.  But I

19  don't have that number written down.

20       You see, when I do an examination, I don't

21  want to go down to the specifics.  This is good or

22  this is not good.  Because if they've got a problem

## Page 55

1  when they come in for visual training, that's the

2  areas we work on.

3    Q.  Would the fact that Mr. Morgenstein's focus

4  was not as good as it could have been, as you said,

5  would that have in and of itself meant anything?

6    A.  It wouldn't be enough to prevent him from

7  reading.  But it would be more laborious for him to

8  read than if he had real good focusing.

9    Q.  And it couldn't have any effect on his

10  ability to follow oral instructions or process things

11  that -- let me just ask that question.

12       It wouldn't have any effect on his ability

13  to follow oral instructions; is that correct?

14    A.  You mean the ones that he heard?

15    Q.  Yes.

16    A.  No.

17    Q.  And it wouldn't --

18    A.  Unless the instructions required him to

19  focus.  In other words, you can give the oral

20  instructions.  It might be put these two dots in the

21  middle of these three dots.  And that might be a lot

22  of focusing there.

## Page 56

1    Q.  You mean focusing with his visual?

2    A.  Yes.

3    Q.  Mr. Morgenstein wouldn't have had trouble

4  understanding oral instructions?

5    A.  No.

6    Q.  And he wouldn't have had trouble

7  understanding sentences or paragraphs that were

8  spoken to him; is that correct?

9    A.  No, not -- the focusing has nothing to do

10  with what you're talking about.

11    Q.  Okay.  And what were the results of the

12  academic test?

13    A.  That he did fine.  His reading and decoding

14  of cultural words was at 12th grade level.  But his

15  inference was at 7th grade level.  Everything else

16  was a hundred percent.

17    Q.  And you stated that the results of this

18  test overall were fine?

19    A.  Yeah.

20    Q.  So that means he did as was expected of

21  him, correct?

22    A.  All except for that inference.

## Page 57

1    Q.  And is it normal to have one aspect of this

2  test that a patient may be weak on?

3    A.  I don't know I'd use the word "normal."

4  But I'd say it's not unusual.

5    Q.  There was nothing unusual about the results

6  of his academic test?

7    A.  Right.

8    Q.  And what were the results of auditory

9  visual examination?

10    A.  That was a hundred percent all up and down

11  the line.

12    Q.  So he did perfect on that?

13    A.  Yes.

14    Q.  And what were the results of his Graphic

15  Representational Thought?

16    A.  Lots of problems there.

17    Q.  And what were the problems?

18    A.  Draw a person was eight-year old level.

19  Draw a house was at eight to six-year-old level;

20  eight year, six months.  Drawing of a room was not

21  adequate.  That's a bird's eye view of a room.  And

22  copying forms what was not adequate.

Page 58

1    Q.   And how do you measure the adequacy of
2    these drawings?
3    A.   All of that is qualitative measurements,
4    not quantitative.
5    Q.   And what do you mean by qualitative
6    measurements?
7    A.   That they're not statistically or
8    numerically graded.  They're graded from how they
9    look and what's included, et cetera.
10    Q.   And what was it about Mr. Morgenstein's
11    drawings that made you say they were inadequate?
12    A.   Which one?
13    Q.   We'll start with the person that he drew.
14    A.   His drawing of the person, the body parts
15    weren't put in the right place.  Do you want to see
16    it?
17    Q.   No.  I guess what I'm asking is if you have
18    any recollection of what it was about --
19    A.   Yeah.  Absolutely.  There was drawings with
20    body parts not in the right place.  The form was
21    inadequate.  It was a drawing that a younger child
22    would do.

Page 59

1    Q.   Now is it possible that someone skilled in
2    terms of how they draw might have an effect on the
3    outcome of this test?
4    A.   Yeah.  Sure.
5    Q.   And so somebody who is skilled at drawing
6    would do better on this test than somebody who is not
7    skilled?
8    A.   Yes.  But their skill at drawing would just
9    put them in a more developed category.  Because this
10    is developmental.
11    Q.   Okay.
12    A.   So it just means that they developed that
13    function.
14    Q.   And so they would -- the results of the
15    test would indicate that they were drawing at a
16    higher level, like say, a college level versus --
17    A.   A higher -- I'm sorry.
18    Q.   Would it be fair to say that somebody who
19    was skilled at drawing would be drawing at, say, a
20    college level versus an eight-year-old level; is that
21    correct?
22    A.   That's a definition of skill.

Page 60

1    Q.   But at least as far as how the results of
2    the tests are measured, you said that one of the
3    results showed that Mr. Morgenstein was drawing at an
4    eight-year-old level.  If he was a better, let's say,
5    natural artist, would it be possible that that would
6    have influenced how well he scored?
7    A.   That's what the score is all about.  The
8    scoring says this is where that person is
9    developmentally.
10    Q.   Okay.  And so the natural artist is more
11    advanced developmentally than --
12    A.   That's correct.
13    Q.   Let me just finish the question just so we
14    have a clear record.
15    A.   I apologize.
16    Q.   It's okay.  I do the same thing sometimes
17    when I'm asking a question.
18    Just to make sure it's clear.  A natural
19    artist, someone with natural artistical talent would
20    receive a higher score on the Graphic
21    Representational Thought than somebody who is not a
22    natural artist, correct.

Page 61

1    A.   Could, not would.
2    Q.   Okay.  But somebody who drew well would
3    receive a higher score than someone who drew poorly?
4    A.   Correct.
5    Q.   If Mr. Morgenstein rushed through any of
6    his drawings, would that have potentially impacted
7    his score?
8    A.   If he what?
9    Q.   Rushed through his drawings.  Let me back
10    up.
11    Mr. Morgenstein drew several different
12    shapes and items for you; is that correct?
13    A.   Correct.
14    Q.   And when he drew those shapes and items, if
15    he had rushed through his drawings, or in other
16    words, drawn them very quickly, might that have
17    affected how he scored on this test?
18    A.   It could, could have.  But he didn't.
19    Q.   He did not rush through this?
20    A.   No.
21    Q.   And how do you know he did not rush through
22    it?

## Page 62

1    A.  I can show you this one drawing.  You can
2  see that he didn't.  This is a series of cards
3  presented to him one at a time.  Look at how precise
4  and organized he was and so on.
5    Q.  But putting that aside, do you have any
6  recollection of how much time it took Mr. Morgenstein
7  to draw these?
8    A.  No.  Time is never a factor where I'm
9  concerned.
10    Q.  And so you don't recall timing
11  Mr. Morgenstein on this test?
12    A.  No.  But if someone rushes through -- if
13  someone is careless, I always make a note of that.
14  And I don't have any notes about there being careless
15  or rushing.
16    Q.  Okay.  You had testified that in response
17  to the receptive communication test
18  Mr. Morgenstein -- well let me back up.
19      How did Mr. Morgenstein perform on the
20  receptive communication test?
21    A.  A hundred percent when he listened to it,
22  okay, and a hundred percent in position when he read

## Page 63

1  it.  But everything to the right, he put down to the
2  left.  When it said three holes from the right, he
3  put it down three holes from the left, all five pegs.
4    Q.  And overall, how did that score turn out?
5  Was that normal or below normal?  How is that scored?
6    A.  Well it's very low for a 57-year-old
7  gentleman to make that type of mistake.  And
8  comparing his reading and his listening, it was night
9  and day.  When he read right, he would be able to --
10  is when he got confused.  When he heard right,
11  R-I-G-H-T, he had no trouble.
12    Q.  And the visual thinking --
13    A.  Yes.
14    Q.  -- test.  How did that turn out?
15    A.  Very low.
16    Q.  And why did it turn out low?
17    A.  He was functioning at the expected level of
18  a 6 1/2 year old.  He had what we would consider a
19  definite visual thinking problem.
20    Q.  And is there a formal diagnosis for that?
21    A.  A formal diagnosis?
22    Q.  Like a name for a condition like that.

## Page 64

1    A.  There probably is a lot of names.  But a
2  name that is accepted would just be inadequate visual
3  thinking.  That's about the best way to say it.
4    Q.  And what was it about his exam that led you
5  to conclude that he was functioning at the expected
6  level of a 6 1/2 year old?
7    A.  I gave him a design which was a tilted
8  square, meaning the square in the middle was more
9  like a diamond, okay, you know with corners facing
10  him as opposed to one of the sides facing him, okay,
11  and said how would this design look if you turn it
12  over toward you.  And he had difficulty.
13    Q.  And is there a specific result that would
14  fit you into a certain age range on the visual
15  thinking test?  I mean you testified that he was
16  functioning at the expected level of a 6 1/2 year
17  old.  I guess what I'm asking is how did you reach
18  that specific number?
19    A.  Because I have evaluated hundreds and
20  hundreds and hundreds of children under all sorts of
21  conditions in every indigenous culture you can
22  imagine.  And so I know what various kids can do at

## Page 65

1  certain ages.  All right.  And that's what he was
2  measured against.
3    Q.  So your experience?
4    A.  Yes.
5    Q.  And what were the results of the logic
6  test?
7    A.  He did very well on that, all on
8  everything.
9    Q.  So he did as would have been expected?
10    A.  Maybe better.
11    Q.  And the general movement test, how did he
12  perform on that?
13    A.  Very well.
14    Q.  Any problems with his balance?
15    A.  No.
16    Q.  And how did he do on the speed reading
17  test?
18    A.  A hundred and seventy words a minute at an
19  80 percent comprehension.  That's below what one
20  would expect for a person in his position and of his
21  age.
22    Q.  Is it abnormally low?

Page 66

1    A.   Not abnormally low.  But certainly low.
2    Q.   And as I understand, 80 percent
3    comprehension is sort of on the low end of the median
4    for the college graduate; is that correct?
5    A.   Well, let's see a college graduate.  For a
6    person that's doing the work that he was doing at the
7    time, yeah.  Had he gotten to that level.
8    Q.   So he was on the low end of the median?
9    A.   Yeah.
10   Q.   In terms of his comprehension, that is?
11   A.   No.  That would be speed.  Comprehension
12   is, I would say, 80 to a hundred is expected.  Eighty
13   percent is not real low.
14   Q.   Okay.  So he was on the low end of the
15   median for his speed --
16   A.   Yes.
17   Q.   -- but at average level for his
18   comprehension?
19   A.   Just at average, yeah.
20   Q.   And how did the exam for the health of his
21   eye turn out?
22   A.   Fine.

Page 67

1    Q.   In terms of speed in which Mr. Morgenstein
2    read, would the fact that he admittedly did not read
3    often, would that potentially impact the speed at
4    which he read?
5    A.   Probably.
6    Q.   And so if he didn't read often, he might
7    read slower than someone who read often?
8    A.   Yes.
9    Q.   And in the speed reading exam, you tested
10   him for comprehension and you said his comprehension
11   was average, correct?
12   A.   Yeah.
13   Q.   And after you concluded your examination of
14   Mr. Morgenstein, did you reach any formal diagnosis
15   of his condition?
16   A.   Well, I couldn't give it a specific
17   diagnosis.  I don't work that way.  But I found gaps
18   in his functioning that could be corrected.  It could
19   be improved, I should say.
20   Q.   And what do you mean by they could be
21   improved?  You said corrected first.  Why did you
22   back off that and say improved?

Page 68

1    A.   Because corrected is too mechanical a word.
2    Q.   But these areas that Mr. Morgenstein in
3    which he was somewhat deficient, you believe that
4    they could be improved?
5    A.   Yes.
6    Q.   And how much so?
7    A.   Probably a hundred percent.  Let me stop
8    for just a minute.  I do therapy.  And any therapy by
9    definition is very highly weighted toward the
10   person's desire and effort.  So if he really wanted
11   to improve them, they could improve.  If he didn't
12   want to improve them, nothing would happen.
13   Q.   And did you ever form any impression as to
14   whether Mr. Morgenstein really wanted to improve
15   these deficiencies?
16   A.   Well that's hard for me to say, because I
17   didn't see him that much and he never came back.  All
18   I know is that I examined him on 3/23.  I had a
19   conference on 4/4.  I get a call on 7/31 that says
20   don't bother me.  Put me inactive.
21   Q.   And do you believe that he was put on
22   inactive because he did not have any desire to pursue

Page 69

1    treatment?
2    A.   Well, I can't say that.  I just know that
3    he told me that he didn't want to pursue treatment.
4    MR. SORENSEN:  Mark this as Exhibit 5.
5    Mike --
6    MR. KANE:  Yes.
7    MR. SORENSEN:  -- I'm marking as Exhibit 5
8    the progress report from the Vision and Conceptual
9    Development Center.
10   MR. KANE:  How many pages is that?
11   MR. SORENSEN:  It's just the one page.  It
12   was the other report that Mr. Morgenstein supplied to
13   the DISB.
14   MR. KANE:  Oh, okay.  And that's Exhibit 5?
15   MR. SORENSEN:  Yes.  That's Exhibit 5.
16   (Exhibit No. 5 was marked for
17   identification.)
18   BY MR. SORENSEN:
19   Q.   Dr. Wachs, you have reviewed the document?
20   A.   Yeah.
21   Q.   And directing your attention to the bottom
22   of the page, it says "His desire for improvement of

## Page 70

1  balance and stability of the visual fixation is
2  somewhat guarded by optimistic."
3      What did you mean by that?
4      A.  That he likely could improve if he really
5  put his heart and soul into it.
6      Q.  And why did you say that it was guarded,
7  somewhat guarded?
8      A.  Because I didn't know how much effort he'd
9  put into the therapy.  That's why I have down there
10  that I need 10 sessions with him to make a better,
11  more definitive prognosis.
12      Q.  And I guess part of it is I'm seeing the
13  word "guarded."  Did he give you any indication
14  during the examination that he might be somewhat
15  skeptical of the treatment?
16      A.  I don't remember.
17      Q.  Did he give you any indication that he may
18  not have been interested in pursuing the treatment?
19      A.  Again, I don't remember.
20      Q.  And you said that you would have to work
21  with him for at least 10 sessions before you could
22  give him a full prognosis; is that correct?

## Page 71

1      A.  I don't understand the word "full."  I
2  would say more definitive.
3      Q.  More definitive.  So you did not believe
4  that this initial prognosis was definitive?
5      A.  The prognosis that I made at that time was
6  definitive from my standpoint, okay, but not as to
7  the ultimate of what it could be.
8      Q.  And when you say "ultimate of what it could
9  be," are you simply referring to the possibility for
10  improvement?
11      A.  Not just the possibility for improvement --
12  well, yes.  I'd say.  Yeah.  I'd have to agree,
13  possibility for improvement.
14      Q.  And might the prognosis have changed during
15  those 10 sessions as to what Mr. Morgenstein's
16  problem was?
17      A.  Well, I knew what his problem was.
18  Prognosis was how successful could this be.
19      Q.  And by "this," you mean the treatment?
20      A.  Yes.
21      Q.  And did you ever tell Mr. Morgenstein that
22  you did not believe that he could improve his

## Page 72

1  condition?
2      A.  Not that I know of.
3      Q.  And is there anything in your reports that
4  would indicate that his condition was one that could
5  not be treated?
6      A.  No.
7      Q.  And you also made certain recommendations
8  in this progress report.  You recommended that
9  Mr. Morgenstein see Kelley Dorfman for nutrition?
10  Who is Kelley Dorfman?
11      A.  She's a nutritionist, local D.C.
12  nutritionist.
13      Q.  And why would you refer him to a
14  nutritionist?
15      A.  Because many times -- well, you have to
16  understand something about physiology, that the brain
17  has certain nutrients.  As strange as they seem, one
18  of the nutrients come from the intestines.  Several
19  of them come from intestines.
20      Well if you're not eating the right foods,
21  then those nutrients don't get passed on to the brain
22  and the brain isn't functioning, the brain isn't

## Page 73

1  being fed and can't function as well as it should.
2      There's also things like lead and various
3  heavy metals that could be interfering with the
4  brain's nutrition.  Yeast Candida can cause problems
5  and so on.
6      Q.  And you also recommended that he visit the
7  Spectrum Center for auditory integration training?
8      A.  Right.
9      Q.  What do you mean by that?
10      A.  Well, it's a well-known fact that music is
11  a good nutrient for the brain.  And these people that
12  work in the auditory integrative training play
13  certain frequencies that activate the brain.  And I
14  have found that many times that helps with some of
15  these difficulties in reading and so on.
16      Q.  And you also recommended that
17  Mr. Morgenstein seek out occupational therapy?
18      A.  Yes.
19      Q.  Why was that?
20      A.  Because of some of the balance and some of
21  the other things that they could look into it in more
22  depth than I was looking into it.

## Page 74

1    Q.   And might one of those things that they
2    could have looked into be reading?
3    A.   No.  Strictly movements.
4    Q.   Strictly for movement?  But the results of
5    his movement exam were fine?
6    A.   Mine?
7    Q.   Yes.
8    A.   Yes.
9    Q.   I'm sorry.  I think we may have answered
10   that at the same time.  The answer to that was yes?
11   A.   Yes.
12   Q.   And you also recommended that he possibly
13   seek out Cranio-Sacral adjustments.  What do you mean
14   by that?
15   A.   Do you know what Cranio-Sacral is or shall
16   I explain it?
17   Q.   I have no idea what that is?
18   A.   Okay.  The bones in your skull at any age
19   can be manipulated.  And that's called Cranio-Sacral
20   adjustments.  And oftentimes these Cranio-Sacral
21   adjustments allow the brain to function better.
22        And I'd say it's worth a try, nothing

## Page 75

1    specific.  In other words, I wasn't saying you
2    definitely have to see a Cranio-Sacral man.  I said
3    take a look at it.
4    Q.   And do you know whether Mr. Morgenstein
5    ever sought out Cranio-Sacral adjustments?
6    A.   I have no idea.
7    Q.   And do you know whether he sought out
8    occupational therapy?
9    A.   I have no idea.
10   Q.   And do you know if he consulted with the
11   Spectrum Center for auditory integration?
12   A.   I have no idea.
13   Q.   And do you know whether he saw Kelley
14   Dorfman?
15   A.   I have no idea.
16   Q.   And you said that he never sought any
17   additional treatment from you?
18   A.   That's correct.
19   Q.   And do you know if he sought any additional
20   treatment from anyone else?
21   A.   I have no idea.
22   Q.   Well let me back up.  What is your area of

## Page 76

1    expertise?
2    A.   Visuo-cognitive optometry.
3    Q.   Do you know if Mr. Morgenstein sought out
4    another Visuo-cognitive optometrist for treatment?
5    A.   I have no idea.
6    Q.   But you believe that his condition could
7    have been treated; is that correct?
8    A.   Yes.
9    Q.   And do you know why Mr. Morgenstein never
10   followed up for any additional visits with you?
11   A.   I have no idea.
12   Q.   And did his not attending any of these 10
13   sessions that you mentioned in the progress report,
14   did that mean that you didn't have an opportunity to
15   fully evaluate him?
16   A.   No.  I evaluated him.
17   Q.   So the initial evaluation was complete?
18   A.   Yes.  What the 10 sessions were for, as we
19   talked about earlier, was to give a prognosis, a
20   better prognosis, to see how successful it would be.
21   Q.   Did you ever perform any testing that
22   linked Mr. Morgenstein's problems with his acoustic

## Page 77

1    neuroma?
2    A.   You mean directly with the acoustic
3    neuroma?
4    Q.   Yes.
5    A.   I wouldn't know how to do that.
6    Q.   And you wouldn't know for certain whether
7    his surgery to remove the acoustic neuroma caused the
8    problem he was complaining of?
9    A.   No.  That's not my field.
10   Q.   And so those problems could have predated
11   his surgery for his acoustic neuroma; is that
12   correct?
13   A.   Anything is possible, yes.
14   Q.   But I'm asking specifically.  You don't
15   know whether his problems may have predated his
16   surgery to remove his acoustic neuroma?
17   A.   I do not know.
18   Q.   And had you ever seen any other patients
19   who had the same symptoms as Mr. Morgenstein?
20   A.   Dozens of them.
21   Q.   And what was the success rate for the
22   treatment that you had in mind for Mr. Morgenstein

## Page 78

1  with those patients?
2  A. The ones that would follow through with
3  treatment?
4  Q. Yes.
5  A. Very high.
6  Q. So you believe that there was a high
7  probability that if Mr. Morgenstein accepted this
8  treatment that he would have improved?
9  A. Probability.
10  Q. That there would be a high probability --
11  I'm sorry. Let me rephrase the question.
12     Is it your testimony that there's a high
13  probability that Mr. Morgenstein would have -- his
14  condition would have improved had he accepted the
15  treatment that you had proposed?
16  A. And really worked at it?
17  Q. Yes.
18  A. Yes.
19  Q. You see at the bottom of the document
20  that's been marked as Exhibit 5?
21  A. Yes.
22  Q. There's a statement "Mr. Morgenstein is

## Page 79

1  going to have Louise Dugan call us to discuss our
2  findings."
3  A. Yes.
4  Q. "And that point he will decide a future
5  course of action." Do you recall having a phone call
6  with Mr. Morgenstein or Louise Dugan?
7  A. With Mr. Morgenstein about Louise Dugan; is
8  that what you're saying?
9  Q. No. No. Let me rephrase. Do you recall
10  having a telephone call with Mr. Morgenstein?
11  A. On July 31st where he said he didn't want
12  to continue. He doesn't want to do anything about
13  it.
14  Q. And during that phone call, did you discuss
15  your findings with Mr. Morgenstein?
16  A. No. I didn't even talk to him there. Only
17  the office manager spoke to him.
18  Q. Okay. And did you have any phone call with
19  Louise Dugan?
20  A. No.
21  Q. Okay.
22  A. Not that I have in my records.

## Page 80

1  Q. And so did you ever share with
2  Mr. Morgenstein your findings?
3  A. Absolutely.
4  Q. And did you do that during the March 23,
5  2001 evaluation?
6  A. No. I did that on April 4th.
7  Q. And what happened on April 4th?
8  A. I went and I explained to him everything
9  that I found. I told him that I felt that he could
10  be helped, that I couldn't give him a positive
11  duration of therapy, and that the success of the
12  treatment -- I shouldn't say success of the
13  treatment, the prognosis was guarded.
14  Q. When you said you went and told him this,
15  was this a face-to-face meeting with Mr. Morgenstein?
16  A. On April 4th?
17  Q. Yes.
18  A. Yes.
19  Q. And who set up that meeting? Was it
20  Mr. Morgenstein or you?
21  A. Well it's part of -- after I do the
22  examination, then we schedule a conference.

## Page 81

1  Q. And who attended the conference?
2  A. He and I.
3  Q. No one else?
4  A. That's all I have written down.
5  Q. And are there any other details that you
6  recall about the April 4th conference with
7  Mr. Morgenstein?
8  A. I think we've covered everything.
9  Q. And in this conference you recall telling
10  him that you thought his condition could be improved
11  if he sought treatment?
12  A. That what I have written down here.
13  Q. And that's your recollection; is that
14  correct?
15  A. Yes.
16  Q. And did you personally have any further
17  contact with Mr. Morgenstein after April 4th?
18  A. No.
19  Q. And the only contact was the June -- was it
20  the July 31st telephone call?
21  A. The July 31st telephone call wasn't with
22  me. It was with my office manager.

## Page 82

1    Q.  Okay.  But that was the only other
2  additional contact Mr. Morgenstein had with your
3  office?
4    A.  Yes.
5    Q.  And do you know if Mr. Morgenstein
6  requested that you produce the report that's been
7  labeled as Exhibit 5?
8    A.  I don't remember.
9    Q.  Do you know why you would have produced the
10  document that been marked as Exhibit 5?
11    A.  I don't recall if at that time we were just
12  doing tapes or we were sending out this type of
13  report.  But at one point in my practice, I stopped
14  doing reports and just made a tape recording and we'd
15  give the patient the tape.  I don't know if that was
16  at this time or not.  We very likely had the
17  conference, gave him the tape and still did this
18  little report.
19    Q.  And why would you have done the written
20  report in addition to that?
21    A.  It was just routine at the time.  Maybe.  I
22  don't recall.

## Page 83

1    Q.  Did he say anything about needing the
2  report in connection with an accommodation he was
3  seeking at work?
4    A.  He might have.  But I don't recall it.
5    Q.  And you don't recall whether he mentioned
6  that he needed this report in connection with a
7  waiver of the Series 65 Examination?
8    A.  I have nothing written down, so I don't
9  know.
10        MR. SORENSEN:  Okay.  Right now might be a
11  good time for a break.  We can go off the record.
12        (A brief break was taken.)
13        BY MR. SORENSEN:
14    Q.  Dr. Wachs, did you ever develop an opinion
15  as to whether Mr. Morgenstein was capable of taking
16  an exam?
17    A.  I don't know how to answer that one.
18    Q.  Did your evaluation of Mr. Morgenstein, was
19  that sufficient for you to draw a conclusion as to
20  whether or not he could take a securities licensing
21  exam?
22    A.  A securities licensing exam, I would have

## Page 84

1  no idea.  I don't know what a securities licensing
2  exam involves.
3    Q.  Okay.  Do you believe Mr. Morgenstein was
4  capable of taking a multiple choice test?
5    A.  Capable of taking one, sure.
6    Q.  And do you believe Mr. Morgenstein was
7  capable of taking a multiple choice test with the
8  benefit of someone to read him the questions and
9  answers?
10    A.  You know, I'm a little hesitant about
11  answering your question, because what do you mean by
12  capable?  Anybody is capable of taking any test.
13    Q.  So do you believe -- well, let me back up.
14  Because I think this may be asked in the wrong way.
15        Do you recall Mr. Morgenstein ever asking
16  for your opinion as to whether he was capable of
17  taking any sort of exam?
18    A.  Not to my knowledge.
19    Q.  And based on your initial evaluation of
20  Mr. Morgenstein, did you have sufficient data to
21  determine whether he was capable of taking any
22  particular form of exam?

## Page 85

1    A.  You're asking me the same question.
2  Anybody is capable of anything.  Some people will get
3  a high score; some people will absolutely fail
4  everything.  But they're capable of taking the test.
5    Q.  Do you believe that Mr. Morgenstein was
6  capable of studying information that he may need to
7  know to take an exam?
8    A.  My findings indicate that Mr. Morgenstein
9  had a visual problem which could interfere with
10  anything he does involving sight.
11    Q.  But you don't know the extent to which it
12  would interfere with his --
13    A.  Only on the things that I've tested.
14    Q.  Do you know to what extent
15  Mr. Morgenstein's visual problems might have affected
16  his ability to take an exam?
17    A.  Okay.  Let's say he took the LSATs.  Okay.
18  I think his vision probably would definitely cause a
19  problem -- he would definitely be lower in a score if
20  he took the LSATs.
21    Q.  Do you believe that would hold true even if
22  he had someone reading him the questions and answers?

## Page 86

1     A.   Less so but still.

2     Q.   And why do you say "but still"?

3     A.   Because a lot of the things in the LSATs

4 are visual. Now the logic part of the LSATs, he

5 would do great.

6     Q.   And that would be with or without someone

7 to read him the questions?

8     A.   No. It would be better if someone read him

9 the questions.

10     Q.   But you don't know whether

11 Mr. Morgenstein's visual problem might have affected

12 his ability to take any form of securities licensing

13 exam, do you?

14     A.   I don't know what's involved. Tell me

15 what's involved.

16     Q.   And did Mr. Morgenstein ever tell you what

17 was involved?

18     A.   That never came up that I know of.

19     Q.   And so you never had the information that

20 you needed to form an opinion as to whether

21 Mr. Morgenstein could or could not have -- well, let

22 me rephrase that.

## Page 87

1       Mr. Morgenstein never gave you the

2 information that you might need in order to determine

3 whether his reading problem might have affected his

4 ability to take a securities licensing exam; is that

5 correct?

6     A.   To the best of my knowledge, that never

7 came up.

8     Q.   And so you wouldn't have had the

9 information you needed to render an opinion on that,

10 correct?

11     A.   I was never asked. It never came up. It's

12 a difficult question to answer, because it's a

13 neither, never question.

14     Q.   But Mr. Morgenstein never gave you the

15 information that you would need in order to answer

16 that question; is that correct?

17     A.   The question never came up. If he would

18 have said to me -- if you're asking me could he pass

19 that test, I'd say I don't know.

20       If the question came up, did he tell you

21 anything about wanting to pass that test, that never

22 came up. If you're saying if an individual like him

## Page 88

1 wanted to take that test, then I'd say, well, what

2 does the test involve? And then I can better answer

3 the question.

4     Q.   And Mr. Morgenstein never told you what the

5 test involved?

6     A.   It never came up. Why would he tell me?

7     Q.   But I guess what I'm asking is a question

8 that can be answered yes or no. He never told you

9 what the Series 65 test involved?

10     A.   He never told me.

11     Q.   And so without that information, you could

12 not renter an opinion as to whether

13 Mr. Morgenstein -- whether his reading condition

14 might have affected his ability to take that exam; is

15 that correct?

16     A.   I love you lawyers and the way you ask

17 questions. It's kind of an ambiguous question and

18 I'm having trouble trying to give you the answer that

19 is truthful and complete, et cetera. I don't want to

20 give a false statement. I don't want to say

21 something that will lead to a false conclusion.

22     Q.   Okay. Well we can break it down. You

## Page 89

1 testified that in order to determine whether

2 Mr. Morgenstein's condition might have affected his

3 ability to take a particular exam, you would have to

4 know what was in the particular exam; is that

5 correct?

6     A.   Absolutely.

7     Q.   And you also testified that Mr. Morgenstein

8 never told you what was in this Series 65 exam?

9     A.   That's correct.

10     Q.   And so without any information on what was

11 in the Series 65 exam, you couldn't tell one way or

12 the other whether Mr. Morgenstein's condition would

13 have affected his ability to take the exam?

14     A.   That statement is correct.

15     Q.   And based on your analysis of

16 Mr. Morgenstein, do you feel that you could opine on

17 what accommodations for taking the exam might help

18 him to take the exam?

19     A.   The only thing that I could say any exam

20 that he took, if it was a written exam, I'd say he'd

21 do better if he read, if it was read to him.

22     Q.   Can you determine based on your examination

## Page 90

1  of Mr. Morgenstein what would be an appropriate
2  accommodation for his condition if he were to take an
3  examination?
4      A.  Yeah.  Number 1, have it read to him.
5  Number 2, have him work without any glaring lights,
6  anything that would be visually disturbing.
7          I would say if there were drawings required
8  that were creative, I think that that wouldn't be a
9  good indication of whether or not he could do well on
10  a job.
11          If it was like an architectural test where
12  he had to manipulate or an engineering test where he
13  had to manipulate things or figure out how things
14  would look after they were manipulated, I'd say that
15  would be difficult for him.  So there are bits and
16  pieces, and a lot depends on what the exam was, how
17  it was given and so on.
18      Q.  And would you be able to give an opinion as
19  to whether a complete waiver of the examination
20  requirement would be a necessary accommodation?
21      A.  Well if you waiver the examination, an
22  examination was going to determine whether or not you

## Page 91

1  would be successful on the job, such an act would be
2  foolish.
3      Q.  I guess what I'm asking is -- this is an
4  exam that an individual would have to take to get a
5  particular license, to perform a certain kind of
6  work.
7      A.  What type of work?
8      Q.  This would be investment advisory work
9  which would be distinguished from bond trading.
10      A.  Oh, so it's all -- yeah.  Now, I
11  understand.  No, I don't think he'd have any trouble
12  with that.
13      Q.  I guess what I'm asking is is whether based
14  on your examination of Mr. Morgenstein you would have
15  concluded that the only appropriate accommodation for
16  him with regard to such an examination would be a
17  complete waiver of the examination requirement.
18      A.  Boy, that's a hard question to answer.
19  You're putting me in a position of God, and I would
20  find it difficult to -- you know, complete waiver,
21  that's a pretty strong word.
22      Q.  Well, do you feel that based on your

## Page 92

1  examination you could have given an opinion as to
2  whether a complete waiver of the examination
3  requirement was the only appropriate accommodation
4  for Mr. Morgenstein?
5      A.  For a financial job, you know, a job in
6  finance?
7      Q.  Well, no.  This is not for a financial job.
8  This is for a particular license as a financial
9  advisor.  Mr. Morgenstein -- let me back up and by
10  way of background give you some facts that I think
11  may help in answering the question.
12          Mr. Morgenstein already had a couple of
13  different licenses for the work he did.  He wanted to
14  perform new work that required a new license.
15          Now, do you believe that based on your
16  examination of Mr. Morgenstein you could render an
17  opinion as to whether a complete waiver of the
18  examination requirement for the license that
19  Mr. Morgenstein was seeking was the only
20  accommodation that would have worked for him with
21  regard to that exam?
22          MR. KANE:  I'm going to object on the basis

## Page 93

1  of the form of the question, foundation.  Also it's
2  an incomplete hypothetical.
3          MR. SORENSEN:  Well I'm not asking a
4  hypothetical question.  I'm asking whether the
5  witness feels that his examination of the plaintiff
6  provided him with sufficient information so that he
7  could render an opinion on whether the only
8  appropriate accommodation for the plaintiff was a
9  complete waiver of the exam requirement.
10          THE WITNESS:  I'd have to see the exam.
11          BY MR. SORENSEN:
12      Q.  And having acknowledged that you haven't
13  seen the exam and that Mr. Morgenstein never showed
14  you the exam, you didn't have enough information to
15  tell whether a complete waiver of this exam
16  requirement was the only appropriate accommodation
17  for Mr. Morgenstein?
18      A.  Well, the answer is yes with a but.
19      Q.  What do you mean yes with a but?
20      A.  The answer to your question, the answer to
21  your statement is yes.  But I can't give a positive
22  yes unless I see the exam.

Page 94

1    Q.   And what are you saying yes to?  Could you
2  explain that?
3    A.   When you said if he was incapable -- this
4  is what I heard you say.  If he was incapable of
5  taking the exam, would it be a wise idea to give him
6  a waiver of the whole total exam?  That's what I
7  understood you to say.
8    Q.   Well that wasn't my question, really.
9    A.   I misunderstood.
10   Q.   My question is based on your examination of
11 the plaintiff, you couldn't determine whether he was
12 incapable of taking the Series 65 exam; is that
13 correct?
14   A.   Because I don't know what that exam is.
15   Q.   Okay.  But you could not at the time that
16 you created the report that we've labeled as
17 Exhibit 5, you could not tell whether a complete
18 waiver of the Series 65 Examination was the only
19 appropriate --
20   A.   You know with all due respect, it's the
21 same as saying I couldn't say that he could speak
22 Chinese.  My exam wouldn't tell me whether or not if

Page 95

1  the exam was written in Chinese could he pass the
2  exam.
3        You know I don't know the exam.  It's not
4  really fair to ask me a question like that.  I think
5  it's too broad.
6    Q.   I guess what I'm asking is just that -- and
7  what I'm not asking is whether you think he could
8  have or couldn't have.  I'm asking whether you had
9  sufficient information based on your examination of
10 the plaintiff, which you've told me was the only
11 thing you conducted with him, based on that
12 examination alone, did you have sufficient
13 information to tell whether a complete waiver of this
14 Series 65 Examination was the only appropriate
15 accommodation for the plaintiff?
16   A.   Or any other exam.  That's true.
17   Q.   I'm sorry.  What was the -- was that a yes
18 or a no?
19   A.   I just don't want to give the wrong
20 information to you or to the attorney inside that box
21 or anything else.  I don't want to misinform anybody.
22 So my answer to that is I know nothing about this

Page 96

1  Series 65, is it?
2    Q.   Yes.
3    A.   -- Series 65 exam is going to involve
4  things that would normally be for an engineer or an
5  architect or nuclear scientist or a person that just
6  does reading.  If his job is just reading, well then,
7  I see no reason why he couldn't have taken that exam.
8  But I don't want to misinform.  I don't think that's
9  putting me in a fair thing, in his favor or against
10 him.
11   Q.   Okay.  Well let me back up and ask the
12 question piece by piece.
13        Without information on what exactly was in
14 the examination, you couldn't tell whether a complete
15 waiver of the examination is the only appropriate
16 accommodation; is that correct?
17   A.   You're absolutely right.
18   Q.   And Mr. Morgenstein never told you what was
19 in the examination?
20   A.   That's correct.
21        MR. KANE:  That's been asked and answered a
22 lot of times.

Page 97

1        MR. SORENSEN:  Okay.
2        THE WITNESS:  What did he say?
3        MR. SORENSEN:  The objection was asked and
4  answered.
5        BY MR. SORENSEN:
6    Q.   You didn't have any independent information
7  on what was in this Series 65 exam; is that correct?
8    A.   Never heard of it.
9    Q.   Okay.  So having acknowledged that
10 Mr. Morgenstein never told you what was in the exam
11 and that you didn't know independently what was in
12 the exam and having already testified that without
13 knowing that information, you couldn't tell whether a
14 complete waiver of the examination is the only
15 appropriate accommodation?  You could not tell as of
16 the date that you wrote the report that we've labeled
17 as Exhibit 5 whether a complete waiver of the
18 examination was the only appropriate accommodation;
19 is that correct?
20   A.   That's correct.
21   Q.   And in fact, you previously testified that
22 you believed that it's possible that a reader or some

## Page 98

1  other accommodation may be appropriate; is that
2  correct?
3      A.  Depending on the type of exam, yes.
4      Q.  I just have a couple of questions regarding
5  your background.
6      A.  My background?
7      Q.  Yes.  And then I think I'll be done.
8          What's your educational background?
9  Actually let me ask that another way.
10         What college did you attend?
11     A.  Pennsylvania State College of Optometry.
12     Q.  And prior to that, did you attend an
13 undergraduate?
14     A.  No.  I was too busy protecting America.
15     Q.  And what branch of the service was that in?
16     A.  The Army Air Force.
17     Q.  And how many years were you in the Army Air
18 Force.
19     A.  Three and a half.
20     Q.  And were you discharged at the end of your
21 3 1/2 years?
22     A.  Yes.

## Page 99

1      Q.  What type of discharge?
2      A.  You mean Honorable or Dishonorable, that
3  type of thing?
4      Q.  Yes.
5      A.  Honorable.
6      Q.  And did you have any formal education at a
7  university after you attended Pennsylvania State
8  College of Optometry?
9      A.  I was on the faculty at Catholic University
10 and I was a professor at GW.
11     Q.  But you didn't attend as a student?
12     A.  No.
13     Q.  And what did you teach at Catholic?
14     A.  Child development.  Well, it wasn't really
15 child development.  I should just say development of
16 thinking.
17     Q.  And at GW?
18     A.  Same thing.
19     Q.  And your training at Pennsylvania State
20 College of Optometry, what training did they give you
21 in this area of development of thinking?
22     A.  Very little.

## Page 100

1      Q.  And what do you mean by very little?
2      A.  This is a new field that developed in
3  around oh, 1950, '52.  I've been doing this since
4  1948.  And I kind of, I guess you'd say, pioneered
5  it.
6      Q.  And what is the specific area of optometry
7  in which you practice?
8      A.  I guess you'd say developmental.
9      Q.  Developmental optometry?
10     A.  Okay.  That's good enough.
11     Q.  And have you ever had any formal training
12 in psychology or psychiatry?
13     A.  Formal university, no.  But I've attended
14 many, many lectures.  And I've lectured all over the
15 world on it.  Most of my education is hands on.
16     Q.  Do you have any professional license?
17     A.  Yeah.
18     Q.  And what is that license?
19     A.  Optometry.
20     Q.  Any other professional licenses?
21     A.  No.
22     Q.  And your license has never been suspended

## Page 101

1  or revoked?
2      A.  No.
3      Q.  Have you ever testified before -- no.  I'm
4  sorry.  You testified previously that you had been
5  deposed four or five other times?
6      A.  Yes.
7      Q.  And have you given any testimony at trial
8  ever?
9      A.  Yes.
10     Q.  How many times?
11     A.  I think two or maybe three.
12     Q.  Now of the five depositions, were any of
13 those depositions given as an expert witness?
14     A.  They were mostly civil suits.
15     Q.  Do you know whether you were a lay witness
16 in those civil suits or an expert witness?
17     A.  I was either the pro or the antagonist.
18     Q.  Oh, so you were either the plaintiff or the
19 defendant in those suits?
20     A.  Yes.
21     Q.  And what was the nature of the suits?
22     A.  All of them?  I sued GW.  I sued --

## Page 102

1    Q.  What did you sue GW for?
2    A.  What I sued GW for?  They owed me money and
3  refused to pay it.
4    Q.  And what did they owe you money for?
5    A.  Various acts that I performed.
6    Q.  Is that as a professor?
7    A.  Yes.
8    Q.  And how was that suit resolved?
9    A.  They settled out of court, in my behalf.
10    Q.  I'm sorry.  What do you mean by they
11  settled in your behalf?
12    A.  They gave me the money that I wanted plus.
13    Q.  And the other suits?
14    A.  I have a farm.  Someone was riding a horse
15  and fell off a horse and sued me.  See if I can
16  remember any of this.  I think one was Sears and
17  Roebuck.  I bought something and they didn't want to
18  honor their warranty.  Another was against Jeep.
19  Things like that I can't really remember all the
20  details.  They're not really that important.
21    Q.  What was the nature of the suit against
22  Jeep?

## Page 103

1    A.  They had a car that they had defective
2  windows in, you know.  This was a long time ago when
3  the first windows went up and down when you push a
4  buttons, you know, before your time.  And they
5  couldn't make it work.
6    Q.  And you were the plaintiff in that case?
7    A.  Yes.
8    Q.  And how was that suit resolved?
9    A.  I think they had to give me a whole new
10  door or something.  I don't remember really.  But it
11  was settled in my behalf.  I know that.
12    Q.  And the suit against Sears, how was that
13  resolved?
14    A.  The judge said on the front of your -- I
15  remember this very plainly.  On the front of your
16  catalog, it says "satisfaction guaranteed."  And you
17  didn't satisfy this young man, and therefore you owe
18  him.
19    Q.  So was the judgment in your favor?
20    A.  Yes.
21    Q.  And the suit regarding the person who fell
22  off of the horse, how was that resolved?

## Page 104

1    A.  I really can't remember exactly how.  I
2  think -- it was an insurance case.  And I think that
3  they lost.  The person who said that lost.  Because
4  they really rode to horse without permission and so
5  on and so forth.
6    Q.  And the testimony you gave at trial, was
7  that in one of these four cases that you've mentioned
8  to me?
9    A.  Yeah.  I gave -- I guess in all of them it
10  was.
11    Q.  Do you recall ever being hired by someone
12  to give expert testimony in court?
13    A.  Yeah.  Once in someone -- let's see.  What
14  the hell was that for?  That was in Pittsburgh, and I
15  can't remember.  I remember the guy's name.  I can't
16  remember everything about it.  I can't remember all
17  the details.  Those aren't important things in my
18  life, so I can't recall all the details.  I'm sorry.
19    Q.  Do you recall whether you were deposed or
20  testified at trial in that case?
21    A.  In that case, that was trial.
22    Q.  You testified at trial?

## Page 105

1    A.  Yes.
2    Q.  And did you testify as an expert witness?
3    A.  I don't know.  I guess I would be.  I guess
4  it was an expert witness.
5    Q.  Did the plaintiff pay you for your
6  testimony?
7    A.  I can't remember.
8    Q.  Actually let me back up.  Do you recall
9  whether you testified for the plaintiff or the
10  defendant in that case?
11    A.  This was for the plaintiff in that case.
12    Q.  And do you recall what the case was about?
13    A.  I really can't.  But I know he lost.
14    Q.  Do you recall what you were asked to give
15  testimony on?
16    A.  No, I can't.  I'm sorry.
17    Q.  Do you recall whether you were asked to
18  give an opinion as to whether this person had any
19  sort of reading disability?
20    A.  No.  It wasn't that.
21    Q.  So you weren't called to give an opinion
22  on --

Page 106

1    A.  On something and I can't remember what it
2  was.  But it wasn't reading.
3    Q.  Did the opinion have to do with any
4  learning disability?
5    A.  I don't think so.  You know you're talking
6  about 40 years ago, 50 years ago.
7    Q.  Is there any sort of records that you would
8  have that might let you know that if you looked at
9  them you could tell whether you testified as an
10  expert or not?
11    A.  No.  I'm sure that that's down the tube.
12    Q.  But you do not recall ever being called as
13  an expert witness in the area of learning related
14  disabilities?  Well let me rephrase that so it's a
15  little bit more clear.
16      You don't ever recall being called to
17  testify either in a deposition or at trial regarding
18  any learning disabilities?
19    A.  No.  I don't think so.
20    Q.  And I just want to go back through the
21  elements of the tests that you administered to the
22  plaintiff.  The sight exam --

Page 107

1    A.  Yes.
2    Q.  -- is this a generally accepted
3  examination?
4    A.  Yeah.  It is the same thing that you got
5  for your glasses.  But instead of worrying about
6  whether the person can see clearly, I was testing to
7  see if the person can see intelligently.
8    Q.  And is it generally accepted within the
9  optometrist community?
10    A.  Of course.
11    Q.  And is it generally accepted within the
12  ophthalmologist community?
13    A.  Absolutely.
14    Q.  And the academic exam, is that generally
15  accepted within the optometrist community?
16    A.  Only in the ones that I've trained.
17    Q.  What do you mean only in the ones that
18  you've trained?
19    A.  I do a lot of speaking and putting on
20  courses, et cetera.  And the people that I've trained
21  know how to do this.  It's something I created.
22    Q.  Okay.  But is it generally accepted by

Page 108

1  optometrists that you have not trained?
2    A.  They don't even know about it.
3    Q.  And is it generally accepted by
4  ophthalmologists?
5    A.  They definitely don't know about it.
6    Q.  And the auditory visual examination, is
7  that generally accepted by optometrists?
8    A.  Some of it, yes.  The others they don't
9  know about.  All these things are things that I
10  developed over my 58 years in practice.
11    Q.  So the Graphic Representational Thought --
12    A.  That's different.  That is accepted.
13    Q.  That's generally accepted --
14    A.  Yeah.  Graphic is -- almost every
15  psychometric evaluation involves a form of graphics.
16    Q.  So that's generally accepted by
17  psychologists?
18    A.  Yeah.  Except that I go into it deeper than
19  most people.
20    Q.  But is it a form of examination that's
21  generally accepted within the optometrist community?
22    A.  Those that know about it, yes.  But not

Page 109

1  everybody knows about it.
2    Q.  And is it generally accepted within the
3  community of ophthalmologists?
4    A.  They definitely don't know about it, unless
5  they've taken some course in child development.
6    Q.  So the Graphic Representational Thought, is
7  that an exam that's generally performed by a
8  psychologist or psychiatrist?
9    A.  Yeah, generally psychologists.  Some
10  psychiatrists.  But most psychologists will do a
11  graphic exam.
12    Q.  And the Receptive-Expressive Communication
13  test, is that also one that's generally performed by
14  psychologists or psychiatrists?
15    A.  Yeah.  And by speech therapist and
16  occupational therapists.  Most people in the field of
17  child development will do a form of that, some form
18  or another.
19    Q.  Do you know whether that test is generally
20  accepted within the optometrist community?
21    A.  Yeah.  I would say most optometrists would
22  accept it, yeah.

## Page 110

1    Q.  And would the same hold true for
2  ophthalmologists?
3    A.  They don't even know about it.  I have yet
4  to meet an ophthalmologist who would know about it.
5  And maybe there are some that are interested in child
6  development.  But it would have to be someone who is
7  an ophthalmologist plus interested in child
8  development.  Then if they were an ophthalmologist
9  plus, they'd probably know about it.
10       But most ophthalmologists are surgeons.
11  They don't worry about the other stuff.  This is all
12  functional.
13    Q.  Okay.  And the visual thinking examination,
14  is that another one that's generally performed by
15  psychologists and psychiatrists?
16    A.  Almost every psychometric test has a form
17  of it.  But I developed and initiated a hierarchy
18  that is unique.  And the optometrists now, it's
19  become quite popular and most optometrists know about
20  it.
21    Q.  Okay.  And do you know whether it's
22  generally accepted within the field of optometry?

## Page 111

1    A.  Yeah.
2    Q.  And the logic test, is that one that's
3  generally performed by a psychiatrist or
4  psychologist?
5    A.  Psychologist and child developmentalist,
6  speech therapist, anybody that's interested in
7  children.
8    Q.  Is it one that's generally performed by
9  optometrists?
10    A.  No.
11    Q.  And the general movement test, is that
12  generally performed by optometrist?
13    A.  Some of it.
14    Q.  And what is the other part?  Who would
15  perform the other parts of it?
16    A.  Oh, speech therapists, occupational
17  therapists, physical therapists, movement people,
18  perceptional motorists, people that delve into
19  movement as a form of intelligence, yes.
20    Q.  And the speed reading test, is this
21  something that's generally administered by
22  optometrists?

## Page 112

1    A.  Some optometrists.  But mostly that is
2  educational.  See, I was a professor at GW in the
3  Department of Education in the Reading Center, you
4  see.  That's where I picked a lot of that up.
5    Q.  Did you ever train an individual by the
6  name of Dr. Kraskin?
7    A.  Which one?
8    Q.  This would be a D.C. area ophthalmologist.
9    A.  There's a couple of them.
10    Q.  Which Dr. Kraskin have you trained?
11    A.  I didn't train, but I was a colleague of
12  Dr. Robert Kraskin.  His son Jeffrey is practicing
13  now.
14    Q.  He practices in the D.C. area?
15    A.  Yes.  At 4600 Massachusetts Avenue.
16    Q.  And when you said that you were a colleague
17  of Robert Kraskin, what do you mean by that?
18    A.  He and I got into this field about the same
19  time right when it started.  We were, oh, I guess you
20  call us, I'm going to say this word, but I don't mean
21  it to be braggadocio or something.  But we were kind
22  of the pioneers in it.  We helped get it started.  He

## Page 113

1  is now deceased.
2    Q.  Do you know what training Jeffrey Kraskin
3  had in these methods that you pioneered?
4    A.  Well, he worked with his father for many
5  years.  He's a fine young man.
6    Q.  And did his father teach with you?
7    A.  No.
8    Q.  Do you know if his father was ever a
9  professor at any university?
10    A.  No.  I don't think he was.
11    Q.  Do you know whether his father had any
12  formal psychological or psychiatric training?
13    A.  No.  I think just optometry.  By formal you
14  mean in a university?
15    Q.  In a university.
16    A.  I don't think so.  Most of our knowledge
17  had to be, you know, where you dig down and come up
18  dirty, you know, the hands on.  Books weren't
19  written.
20    Q.  Okay.  I think that that's all the
21  questions that I have.  You've understood the
22  questions that I've asked you today?

## Page 114

1    A.  Most of them.
2    Q.  And --
3    A.  But you've made it clear.  You clarified
4  the ones that I didn't understand.
5    Q.  Okay.  And you've testified truthfully as
6  to all the questions I've asked you, correct?
7    A.  Absolutely truthfully.  I don't know any
8  other way to be.
9        MR. SORENSEN:  Okay.  Mike, that wraps up
10  all the question that I had.  Do you have any
11  questions you want to run through?
12        EXAMINATION BY COUNSEL FOR PLAINTIFF
13        BY MR. KANE:
14    Q.  I have a few questions.  And if you don't
15  understand me or hear me, please let me know.
16        You've testified to a conversation with
17  Mr. Morgenstein on April 4th.  Do you recall that?
18    A.  I didn't have that conversation.  That was
19  my office manager.
20    Q.  How do you know your officer manager had an
21  conversation on April 4th?
22    A.  Because we record all conversations.

## Page 115

1    Q.  Where was that recorded?
2    A.  Right in this folder that I have right in
3  front of me.
4    Q.  I may have missed what document that was
5  but --
6    A.  It's not a document.  It's in what we call
7  our conclusion sheet.
8        MR. KANE:  Let's go off the record.
9        (A brief break was taken.)
10        BY MR. KANE:
11    Q.  Doctor, I was referring to an April 4th
12  conference with Mr. Morgenstein.
13    A.  Yes.  That was with me, yes.
14    Q.  That was with you.  Now did you make any
15  notes of that conversation?
16    A.  Yeah.  I'm showing him now.
17    Q.  And are those notes also on that folder?
18    A.  Yes.
19    Q.  Oh, they are.  Okay.  And could you just
20  read the notes as they're written on the folder?
21    A.  As they're written?
22    Q.  Yeah.

## Page 116

1    A.  Number 1, RX as is.  Number 2, HW call
2  Louise Dugan.  Number 3, Vision & Conceptual
3  Development can help extend reading duration.
4  Equilibration is guarded.
5    Q.  All right.  And that's the extent of it?
6    A.  Right.
7    Q.  And those are notes you made on April 4th?
8    A.  Right.
9    Q.  Is that information you shared with
10  Mr. Morgenstein?
11    A.  Just now, yes.  And that was shared in the
12  course of our discussion and his questions.
13    Q.  No.  I'm sorry.  Was that information
14  shared with Mr. Morgenstein back on April 4th?
15    A.  Oh, yeah.  This is a summation of what was
16  shared with him.
17    Q.  Do you recall specifically what you told
18  Mr. Morgenstein about the likelihood of the success
19  of any treatment?
20    A.  Not exactly.  But from my notes here, it
21  would be, hey, you want help; come on in.  But I need
22  time to evaluate you.  As far as prognosis is

## Page 117

1  concerned, you're going to have to work hard in the
2  office and at home.  If you want to do it, let's go
3  to work.  And if you don't want to do it, you know,
4  no sense in even getting started.
5    Q.  And I'm referring to Exhibit 5, which
6  hopefully you still have there in front of you.
7    A.  I have it.
8    Q.  All right.  You refer in here to 10
9  sessions?
10    A.  Yeah.
11    Q.  Would those be one session every week or
12  every day?  How would that work?
13    A.  People come in one to three times a week.
14  He would make that choice.
15    Q.  Okay.  So it could be once a week or it
16  could be as much as three times a week?
17    A.  Correct.
18    Q.  And you said you would need at least 10 of
19  those sessions before you could give him an estimate
20  how long the treatment would take?
21    A.  A more accurate statement, yes.
22    Q.  Okay.  And would those 10 sessions also be

## Page 118

1  done along with these other treatments you had
2  recommended like the Kelley Dorfman nutrition?
3      A.  Well those were suggestions to see those
4  people and see if they think they could help him. It
5  wasn't a treatment. It was more talk to these people
6  and see if there's anything that they do that could
7  help you.
8      Q.  Okay. And in the same document, you state
9  that his reading is at 170 words a minute?
10     A.  Correct.
11     Q.  And you said the average for college should
12 be 350 words a minute?
13     A.  That's what I had found, yes; 350 to 500.
14     Q.  Now when you say for college, does that
15 mean college level?
16     A.  Pardon?
17     Q.  Does that mean college level?
18     A.  Yeah. The successful college students that
19 I have worked with their reading speed averages
20 between 350 and 500.
21     Q.  But you found that Mr. Morgenstein was
22 reading at about half that?

## Page 119

1      A.  Let me look that up, because I don't
2  remember making the following statement.
3      MR. SORENSEN: I object to the form.
4      THE WITNESS: What? Yeah. He was 170.
5      BY MR. KANE:
6      Q.  And when you evaluated him reading 170
7  words a minute, was that reading a particular kind of
8  material?
9      A.  Yeah. What it is is it's a series of
10 one-page stories or articles. And then you answer
11 questions about that. It's kind of a standardized
12 testing. But it isn't -- well I should say it's
13 formalized, but not necessarily standardized. It's
14 not quantitatively arranged, but it's formal in that
15 you can tell people what their reading speed is and
16 get an idea of their accuracy.
17     Q.  And would the speed he read it, would that
18 decrease if the material he was reading was perhaps
19 technical in nature?
20     A.  Well, I'm certain if the article was on
21 nuclear science, you know, it certainly wouldn't be
22 the same.

## Page 120

1      Q.  You would anticipate that the speed would
2  go down depending on the --
3      A.  Well, it might go down; it might go up.
4  Some people when they're reading an article that they
5  don't understand, they get done in a hurry.
6      Q.  Well, then, would his accuracy suffer?
7      A.  Yeah. His accuracy would suffer
8  tremendously.
9      Q.  How many patients do you think you've seen
10 since April of 2001?
11     A.  What did you say?
12     Q.  How many patients do you think you've seen
13 since April of 2001?
14     A.  Oh, my God. I see about anywhere between
15 150 and 200 a week for training. And for
16 examinations, I see -- well at that time, I was being
17 booked three and four months in advance. I've since
18 had a couple of other optometrists in the office with
19 me. So how many patients would I see? About five a
20 month -- I'd say 50 to 60 new patients a year.
21 That's in my office. But I also go out of the
22 country. Like I was in Italy a couple week ago, and

## Page 121

1  I saw five patients. So you know, I'm just counting
2  the ones that I see in the United States in my
3  office.
4      Q.  And did you draw any conclusions as to
5  Mr. Morgenstein's ability to retain the information
6  he was reading?
7      A.  No. We didn't do a subsequent testing
8  after an hour delay or two days delay or something.
9  That wasn't the purpose of that test.
10     Q.  Is there a test for that, for retention?
11     A.  Well, the test that you do in a retention
12 is you wait a while and then you ask additional
13 questions. You ask the same questions sometimes.
14     Q.  About what the person read?
15     A.  Right.
16     Q.  Is the reason you didn't do that test is
17 because Mr. Morgenstein never came back?
18     A.  No. That wasn't of interest to me.
19     Q.  And why wasn't that of interest to you?
20     A.  Because I was interested in what he could
21 do, not what he could retain. Because what I wanted
22 to find out is what he could do and what he couldn't

## Page 122

1  do. Because I know that if we would work with him,
2  his retention would improve no matter what.
3        But I had to know where we'd get started.
4  See, my testing wasn't just to test him. My
5  evaluation was where do we get started, what do we do
6  to improve things.
7        Is he gone?
8    Q.  No. I'm here. I'm just looking at my
9  notes. Give me a minute.
10        All right. Do you know what was involved
11  in studying for the Series 65 Exam?
12    A.  I don't have any idea what that exam is all
13  about.
14    Q.  Right.
15    A.  What are some of the questions they ask in
16  that exam?
17    Q.  Let's not go into that. It's too late.
18    A.  Okay. You know, you keep asking me about
19  that Series 65. That's like my saying to you, what
20  are the exams that you have to do to find out what's
21  the gestation period of a polar bear, you know? It's
22  beyond my knowledge. It's just hoodoo voodoo. I

## Page 123

1  never heard of a Series 65.
2    Q.  Do you know why Mr. Morgenstein came to
3  you?
4    A.  I can only tell you what he said, and
5  that's in the form that he filled out or that we
6  filled out upon his intake. And it says here -- I
7  think we covered that.
8    Q.  That's all right. You don't have to
9  respond.
10    A.  Here it is. He came to me because he had a
11  tumor removed, acoustic neuroma; his left eye no
12  longer blinks all the way. He's got a reading
13  disability as a result. That's what he said on his
14  intake.
15        MR. KANE: All right. I have no further
16  questions. Just for the record, though, and matters,
17  I would ask could we have that folder photocopied.
18        MR. SORENSEN: Yeah. I'll look into that
19  and I'll see if we can just do that here.
20        MR. KANE: Maybe make it an exhibit to the
21  deposition just so it's clear what it is the witness
22  was referring to.

## Page 124

1        MR. SORENSEN: Okay. Can we mark as an
2  exhibit a photocopy in just a second?
3        THE REPORTER: Yes.
4        MR. SORENSEN: All right. Mike, what I'm
5  going to do is I have a couple of follow-up questions
6  based on some of what your questions were. As soon
7  as I'm done with those, I'll photocopy the exhibit
8  and we'll just mark it and identify it. Will that
9  work?
10        MR. KANE: That will work fine.
11        THE WITNESS: Are you guys done or --
12        MR. SORENSEN: I just have a couple of
13  follow-up.
14        THE WITNESS: Is Mike still going to stay
15  on?
16        MR. SORENSEN: Yes. He is.
17        EXAMINATION BY COUNSEL FOR DEFENDANT
18        BY MR. SORENSEN:
19    Q.  What was the number 3 thing that you
20  identified in your April 4th conversation with
21  Mr. Morgenstein?
22    A.  That VCD can help extend his reading, the

## Page 125

1  duration. But equilibration is guarded.
2    Q.  So your statement was that the therapy you
3  were proposing could help with his ability to read --
4    A.  That's correct.
5    Q.  -- is that correct?
6    A.  Correct.
7    Q.  And you also testified that retention
8  wasn't an issue for you. Do you know if this was an
9  issue for Mr. Morgenstein?
10    A.  Not in my history.
11    Q.  So you don't have any recollection of
12  Mr. Morgenstein saying that his ability to retain
13  information he had read was an issue for him?
14    A.  Nothing in my records.
15    Q.  And you don't have any independent
16  recollection of that?
17    A.  Correct.
18    Q.  It was also your testimony that one of the
19  reasons why you weren't as concerned with retention
20  was that with treatment you believe that his reading
21  retention would improve; is that correct?
22    A.  That's correct. With successful treatment.

Page 126

1    Q.   And on what did you base that opinion?
2    A.   Fifty-eight years of experience.
3    Q.   So you believe based on your experience
4    that his reading retention would improve?
5    A.   Could improve.  You know, he would have to
6    be the determinant of that.
7    Q.   And he would be the determinant of that by
8    seeking treatment; is that correct?
9    A.   By eagerly getting into it, helping me and,
10   you know, working hard and so on.
11   Q.   And he did not do that; is that correct?
12   A.   Correct.
13        MR. SORENSEN:  That's all the questions I
14   have.  Mike, do you have any follow-up before I copy
15   this exhibit and we enter it?
16        MR. KANE:  No.  I don't.
17        THE WITNESS:  Are you done?
18        MR. SORENSEN:  Yeah.  I just have to get --
19        THE WITNESS:  Okay.  Can I ask both of you
20   a question?
21        MR. SORENSEN:  Could we go off the record,
22   please.

Page 127

1        (A brief break was taken.)
2        BY MR. SORENSEN:
3    Q.   I just wanted to mark this as Exhibit 6.
4    And note that Exhibit 6 was the document to which you
5    were referring when you testified regarding the April
6    4th meeting with Mr. Morgenstein, is that correct,
7    Dr. Wachs?
8    A.   Correct.
9        (Exhibit No. 6 was marked for
10           identification.)
11        MR. SORENSEN:  All right.  Anything else,
12   Mike?
13        MR. KANE:  I have nothing else.
14        MR. SORENSEN:  Okay.  That's it.
15        Thank you, Dr. Wachs.
16        (At 5:40 p.m., the proceedings were
17   concluded.  Reading and signature were waived.)
18
19
20
21
22

Page 128

1         CERTIFICATE OF NOTARY PUBLIC
2         I, DELORES M. GREEN, a Notary Public in
3    and for the District of Columbia, before whom the
4    foregoing Examination Under Oath was taken, do hereby
5    certify that witness whose testimony appears in the
6    foregoing pages was duly sworn by me; that the
7    testimony of said witness was taken by me in
8    shorthand at the time and place mentioned in the
9    caption hereof and thereafter reduced to typewriting
10   under my supervision; that said Examination Under
11   Oath is a true record of the testimony given by said
12   witness; that I am neither counsel for, related to,
13   nor employed by any of the parties to the action in
14   which this Examination Under Oath is taken; and,
15   further, that I am not a relative or employee of any
16   attorney or counsel employed by the parties thereto,
17   nor finandally or otherwise interested in the
18   outcome of this action.
19        _____
             Delores M. Green
20           Notary Public in and for
             THE DISTRICT OF COLUMBIA
21
     My commission expires:
22   January 1,