IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - -x

NORMAN L. MORGENSTEIN,        :

                             :

         Plaintiff,          :

                             :

     vs                      :   Civil Action

                             :   No. 05-2123 (JR)

MORGAN STANLEY DW, INC.,      :

                             :

         Defendant.          :

- - - - - - - - - - - - - -x



Washington, D.C.


Tuesday, August 8, 2006


Deposition of:

         JEFFREY KRASKIN

called for examination by counsel for Defendant,

pursuant to notice, commencing at 9:46 a.m., at

the Law Offices of Greenberg Traurig, L.L.P., 815

Connecticut Avenue, N.W., 7th Floor, Washington,

D.C., before Delores M. Green, a Notary Public in and

for the District of Columbia, when were present on

behalf of the respective parties:

## Page 2

1  APPEARANCES:
2    On behalf of the Plaintiff:
3        DAVID R. CASHDAN, ESQ.
         Cashdan & Kane, P.L.L.C.
4        1150 Connecticut Avenue, N.W., Suite 900
         Washington, D.C. 20036-4129
5        (202) 862-4353
6
     On behalf of the Defendant:
7
         JOHN F. SCALIA, ESQ.
8        MATTHEW H. SORENSEN, ESQ.
         Greenberg Traurig, L.L.P.
9        1750 Tysons Boulevard, Suite 1200
         McLean, Virginia 22102
10       (703) 749-1348
11
12
13
14
15
16
17
18
19
20
21
22

## Page 3

1                I-N-D-E-X
2  WITNESS:                              PAGE:
3  JEFFREY KRASKIN
4    Examination by Mr. Scalia              4
5
6  EXHIBIT:                              PAGE:
7  No. 1  Notes of Dr. Kraskin            14
8  No. 2  Progress Report of Dr. Wachs    42
9  No. 3  Cover Letter & Report of Dr. Kraskin 52
10 No. 4  Ltr dtd 6-27-06 from Dr. Kolsky to
          M. Sorensen Re: Norman Morgenstein  52
11
   No. 5  Medical Records                 59
12
   No. 6  Web Site Article ADD/ADHD -
13        Behavioral Optometry by Jeffrey H.
          Getzell                          98
14
                - oOo -
15
16
17
18
19
20
21
22

## Page 4

1              P-R-O-C-E-E-D-I-N-G-S
2  Whereupon,
3            JEFFREY KRASKIN,
4  was called as a witness and, having been first duly
5  sworn by the Notary Public, was examined and
6  testified as follows:
7     EXAMINATION BY COUNSEL FOR DEFENDANT
8     BY MR. SCALIA:
9     Q.  Good morning, Dr. Kraskin.  How are you?
10    A.  Good morning.
11    Q.  As you know, I'm John Scalia, and I
12 represent Morgan Stanley in a lawsuit brought against
13 the company by a Norman Morgenstein alleging
14 disability discrimination and retaliation.
15       Will you, please, state your full name and
16 spell your full name for the record.
17    A.  It's Dr. Jeffrey Kraskin.  Jeffrey,
18 J-E-F-F-R-E-Y; Kraskin, K-R-A-S-K-I-N.
19    Q.  And have you ever been deposed before?
20    A.  No.
21    Q.  Have you ever served as an expert witness
22 in any litigation or arbitration or similar legal

## Page 5

1  proceedings before?
2     A.  Not in legal proceedings, in legislative
3  proceedings.
4     Q.  Okay.  Since you haven't been deposed
5  before, let me just take a few minutes to kind of go
6  over some of the ground rules to make sure that you
7  understand what the ground rules are and make the
8  court reporter's life as easy as possible this
9  morning.
10       I will ask you a series of questions and
11 you hopefully will give me a series of answers to my
12 questions.  And let's do our best not to talk over
13 one another as we might do in normal conversation,
14 because it makes her job very difficult to kind of
15 distinguish between what one another is saying when
16 we're both talking over one another.  So I will try
17 to let you finish your answer before I jump in and
18 interrupt you with a follow-up question and I'll ask
19 you to do the same when I'm asking questions.  Okay?
20    A.  Okay.
21    Q.  And oral audible responses are required as
22 opposed to shaking or nodding of the head.  Okay?

## Page 6

1    A.  Correct.

2    Q.  All right.  Perfect.  If you don't

3  understand a question, please let me know that you

4  don't understand it, and I'll rephrase it as

5  appropriate.  But if you don't tell me that you don't

6  understand a question, I will assume that you do

7  understand it.  Okay?

8    A.  Correct.  Understood.

9    Q.  Let me know if you need to take a break at

10  any point, and I'll accommodate that.  The only thing

11  I would ask is that if I have a question pending that

12  you give me an answer to that question before we go

13  off the record and take a break.  Okay?

14    A.  Okay.

15    Q.  You understand that you're under oath today

16  and that requires you to testify truthfully and

17  accurately to the best of your ability?

18    A.  Yes.

19    Q.  Is there any reason why you would not be

20  able to do so today?

21    A.  Not that I know of.

22    Q.  Mr. Kraskin may -- I'm sorry.  Mr. Cashdan

## Page 7

1  may -- that's going to be --

2    MR. CASHDAN:  You want Dr. Cashdan?

3    MR. SCALIA:  No.  That is not going to be

4  the last time that I make that mistake today, I bet.

5    MR. CASHDAN:  I have a case where the issue

6  of doctor versus mister is very, very important.  It

7  involves a Ph.D.  A couple of times I have bestowed

8  upon the person who was lacking in --

9    MR. SCALIA:  I bet you're --

10    MR. CASHDAN:  -- the Ph.D., the doctoral

11  cand -- and the other side loves it.

12    MR. SCALIA:  Right.

13    BY MR. SCALIA:

14    Q.  Well, I apologize.  Mr. Cashdan may on

15  occasion interpose objections to my questions.

16  Unless the objection is based on a privilege and

17  there is an instruction for you not to answer the

18  question, you have an obligation to go ahead and

19  answer the question even though he's made the

20  objection.  Do you understand that?

21    A.  I understand.

22    MR. CASHDAN:  Unless he chooses to rephrase

## Page 8

1  the question based upon my objection.

2    MR. SCALIA:  Correct.

3    BY MR. SCALIA:

4    Q.  Have you been retained by Mr. Morgenstein

5  to provide expert opinion in this litigation?

6    A.  I have to stop and think for a moment,

7  because I first saw Mr. Morgenstein as a patient --

8    Q.  Okay.

9    A.  -- and then after seeing him as a patient,

10  yes.

11    Q.  When did you first see Mr. Morgenstein as a

12  patient?

13    A.  Can I have my record back?

14    Q.  Sure.

15    A.  April 4, 2006.

16    Q.  And how did you come to see Mr. Morgenstein

17  on April 4, 2006?  Was he referred to you by another

18  doctor?  What were the circumstances?

19    A.  He was referred to me by Dr. Rick Simon due

20  to complaints.

21    Q.  Who is Dr. Rick Simon?

22    A.  He is a colleague optometrist in downtown

## Page 9

1  Washington.

2    Q.  And were you familiar with Dr. Simon before

3  he referred Mr. Morgenstein to you?

4    A.  Yes.

5    Q.  What is your understanding of the nature of

6  Dr. Simon's practice?

7    A.  Dr. Simon has a general practice of

8  optometry, downtown Washington situated with an

9  optical setting.  So he provides what I consider to

10  be basic good general optometric care.

11    Q.  And why did Dr. Simon refer Mr. Morgenstein

12  to you?

13    A.  The statement in my understanding was

14  relative to what's referred to as a binocular

15  dysfunction.

16    Q.  What's your understanding of what is meant

17  by binocular dysfunction?

18    A.  Dr. Simon had explained to me that he was

19  finding that Mr. Morgenstein's two eyes were not

20  working well together.  Mr. Morgenstein had some

21  complaints and that this was not an area that within

22  eye care, within vision care that Dr. Simon pursues,

## Page 10

1    but it's one that he then refers out.
2        Q.   Okay. Has Dr. Simon made other referrals
3    to you?
4        A.   Yes.
5        Q.   Approximately how many?
6        A.   Over the last 26 years, I think it could be
7    maybe 50.
8        Q.   Okay. Do you have an understanding of what
9    sort of medical care Dr. Simon had been giving to
10   Mr. Morgenstein up to the point in time that he
11   referred him to you?
12       A.   My understanding was that Dr. Simon had
13   provided him with glasses to give him best acuity at
14   both distances in near.
15       Q.   Two different pairs of glasses; one for
16   near vision, one for --
17       A.   Two pairs of glasses; one for distance, one
18   for near.
19       Q.   How many times have you seen
20   Mr. Morgenstein as a patient?
21           MR. CASHDAN:  Form.
22           THE WITNESS:  I've seen Mr. Morgenstein

## Page 11

1    twice.
2           BY MR. SCALIA:
3        Q.   When I say "seen," I mean he came to you to
4    your medical office as a patient to be evaluated by
5    you. Is that your understanding of what I meant?
6        A.   That's my understanding of what you meant.
7    I'll also say it is my understanding in general.
8    I've only seen Mr. Morgenstein twice.
9           MR. CASHDAN:  Mr. Scalia --
10          MR. SCALIA:  Yes.
11          MR. CASHDAN:  -- I wanted to interpose an
12   objection. Mischaracterization prior testimony, said
13   he came to him initially as a patient and then your
14   next question assumed that both visits were in that
15   context. And I'm not sure that's been established,
16   because I thought he testified previously that he
17   first came as a patient and not as an expert.
18          MR. SCALIA:  Okay.
19          MR. CASHDAN:  So I think you ought to
20   clarify is all I'm saying.
21          MR. SCALIA:  I'm going to.
22          BY MR. SCALIA:

## Page 12

1        Q.   Is it accurate that you have seen
2    Mr. Morgenstein in any capacity only twice?
3        A.   Correct.
4        Q.   And was the first time on April 4, 2006?
5        A.   Correct.
6        Q.   When was the second time?
7        A.   The second time would be April 6, 2006.
8        Q.   And in what capacity did you see
9    Mr. Morgenstein on April 6, 2006?
10       A.   That was the follow-up visit as part of a
11   new patient evaluation. Patients return for a
12   conference to discuss the findings.
13       Q.   Let's go back to the first visit. If you
14   could explain to me what took place in that first
15   visit on April 4, 2006. What kind of evaluation, if
16   any, was conducted and what discussions you and
17   Mr. Morgenstein had?
18       A.   Like any new patient, when Mr. Morgenstein
19   arrived in the office, he would fill in his intake
20   form of simply his name and address, then we would
21   meet and we would go back to my conference room and
22   discuss a history of his complaints and his past

## Page 13

1    visual and health history. That would then proceed
2    and that's usually about 15 to 20 minutes depending
3    on that patient. After that, we proceed to the
4    evaluation examination room where a standard
5    optometric evaluation, looking at all aspects of
6    visual function would perform which would result in
7    one hour of visit. Then Mr. Morgenstein left.
8        Q.   And please describe for me what took place
9    during the second visit, the one that took place on
10   April 6, 2006.
11       A.   On April 6th, he would have returned to the
12   office, which he did, and we would go back to the
13   conference room and I would review with him and I
14   would present him with a copy of my conference notes
15   which are here in the record. And I would --
16       Q.   Will you, please, identify those in the
17   record?
18       A.   The conference notes are the one that's
19   dated April 4, 2006. And they're numbered down the
20   page, two pages from 1 to 21 with comments; and then
21   alternative care presentation, there are four
22   comments made on the page.

## Page 14

1    Q.  Okay.
2    A.  And I would speak from those notes going
3  over the history as presented, the findings in my
4  observation, and then my conclusions.
5    Q.  Okay.
6       MR. SCALIA: Could I have this document
7  marked as Exhibit 1.
8       (Exhibit No. 1 was marked for
9       identification.)
10      BY MR. SCALIA:
11    Q.  Dr. Kraskin, is this an accurate copy of
12  the document that you were just testifying about?
13    A.  Yes, it is.
14    Q.  This is yours to hold on to. I'm going to
15  come back to that some point in the deposition.
16  That's the original.
17      Will you, please, recount for me to the
18  best of your ability the discussions that took place
19  between you and Mr. Morgenstein on April 4, 2006?
20    A.  Going back to what's now called Exhibit 1,
21  it would be that he told me about Dr. Simon referring
22  him and asking him why he was here at the office. He

## Page 15

1  explained that he had problems regarding his visual
2  function and his ability to read and sustain
3  attention.
4       He spoke of his medical issues regarding
5  the acoustic neuroma and he spoke of his general
6  effects of what he considered his visual balances and
7  his general balance of body. He then discussed,
8  because I asked, what was his work, what had been his
9  work and he discussed his previous work as far as I
10  understood it and discussed that there had been some
11  visual difficulties that he thought had interfered
12  with his performance.
13    Q.  Anything else?
14    A.  Just in the discussion of his general
15  health, overall health, he mentioned about that and
16  the arthritis and some medication for cholesterol and
17  what he basically did as far as his enjoyments of
18  activities.
19    Q.  And what, if any, exams did you conduct of
20  Mr. Morgenstein on April 4th?
21    A.  When I do an examination of a patient, it
22  is pretty consistent on all patients. So it's not

## Page 16

1  specific to a complaint. So therefore we enter the
2  examination room and we begin by looking in what's
3  referred to as a Telebinocular or some people refer
4  to it as a stereoscope. And we look at by showing
5  various slides in that instrument of seeing how a
6  person is putting or teaming both eyes together, the
7  integration of both eyes. It will also evaluate and
8  give a sense of clarity of seeing and that instrument
9  is referred to as visual discrimination.
10      From there, we move over and take a quick
11  check of eye pressure. That's related to the
12  disease, glaucoma. From there, we move to a visual
13  field instrument, because with all patients of this
14  age group, I do a visual field. That's looking at
15  peripheral awareness and some neurological aspects of
16  the retina. And from that situation, we then move to
17  the general examination chair in which one then takes
18  beginning with acuity, the clarity of seeing at
19  distance.
20      If the person has glasses, and in this case
21  he did, both with and without his glasses and then
22  the rest of the continuing optometric examination.

## Page 17

1  Do you want me to describe the rest?
2    Q.  Sure. Please.
3    A.  After taking of acuity, I will do what's
4  called "a cover test," covered; and after the cover
5  test, we'll do ocular motilities, tracking, near
6  point of convergence. From there, we look at ocular
7  health.
8    Q.  How do you -- going back to --
9       MR. CASHDAN: Well, one second. Was he
10  finish with his answer?
11      THE WITNESS: No. We have more to discuss
12  what goes on in the exam.
13      MR. CASHDAN: Okay. If you want to break,
14  fine. I just want to make it clear that he hasn't
15  finished his answer.
16      MR. SCALIA: No. And I understand he
17  hasn't finished. I want to interrupt him if I may.
18      MR. CASHDAN: That's fine.
19      BY MR. SCALIA:
20    Q.  If you could go back and explain to me what
21  the cover test or cover testing is, what that
22  consists of.

## Page 18

1  A.  The cover test is done which both at
2  distance and at near where the person fixates, looks
3  at a target at distance at one point, another point
4  at near in which then an ocular or a paddle is moved
5  in front of either eye and what the doctor is
6  observing is to observe that the patient can maintain
7  the fixation, both eyes stay remaining looking at the
8  target of regard.
9  Q.  So the purpose of the cover test is to
10  determine each eye's ability to maintain focus; is
11  that accurate to say?
12  MR. CASHDAN:  Form.
13  THE WITNESS:  The purpose -- would you like
14  to repeat your question for a moment?
15  BY MR. SCALIA:
16  Q.  Do you understand my question?
17  A.  I don't agree with your language.
18  Q.  Okay.  What don't you agree?
19  A.  I believe you used the word "focus."  And
20  it has nothing to do with focus.
21  Q.  Okay.  I think the word you used was
22  "fixation."

## Page 19

1  A.  Fixation.
2  Q.  Okay.
3  A.  So the essence of the cover test is to give
4  an observation -- never definitive -- is to give an
5  observation of do the two eyes remain team.  Can they
6  maintain a fixation, a point of regard both at
7  distance and at near.  The word "focus" to me is
8  speaking of clarity.
9  Q.  Acuity?
10  A.  Acuity.
11  Q.  Okay.  And then I believe after the cover
12  test you mentioned ocular tracking?
13  A.  Ocular motility then tracking.
14  Q.  And what does that mean?
15  A.  That means looking at a fixation target.
16  Generally in this case it was what's referred to as a
17  muscle light or someone may say a little flashlight.
18  And the patient is asked to follow the light and the
19  doctor is observing that the eye can move in all
20  directions, that there's no paralysis.  You're
21  looking at pupiliary reflex, the reflex in the pupil
22  to know if both eyes appear to be pointing the same

## Page 20

1  position in space.  As you move in different points
2  of gaze, you're observing again the patient's
3  movements of both eyes and if they're moving equally.
4  Q.  Okay.  With the ocular motility and
5  tracking tests, is the purpose to determine the two
6  eyes' movement and reflexes in unison with one
7  another or separate from one another?
8  A.  Actually in testing, you're looking at both
9  situations.  You're looking at both individual eye
10  movement and teaming eye movement.
11  Q.  Okay.  Then I think you were beginning to
12  tell me about another -- and I counted it as the
13  seventh test, when I interrupted you.
14  A.  After that position of doing what I said
15  was the ocular motility test, then we followed next
16  with looking at eye health.
17  Q.  Okay.
18  A.  External and internal eye health.
19  Q.  And how do you test that?
20  A.  And that's looking again with the light,
21  with a flashlight looking at the external of the eye,
22  the front of the eye, looking to see if there's any

## Page 21

1  specific issues on the lids of any disturbances,
2  infections, redness, irritations.  Then with another
3  instrument which is an ophthalmoscope.  This is
4  direct ophthalmoscopy.  The patient looks into the --
5  excuse me -- the doctor, I look into the eye looking
6  through that instrument into the eye looking at the
7  lens of the eye through the lens of the eye to the
8  retina of the eye, looking at eye health of the
9  vascular system on the retina, the optic nerve, the
10  macula which is a fine point of attention of the eye,
11  seeing over the general sense of eye health to detect
12  if there are any concerns there.
13  Q.  Do you conduct any other tests or
14  examinations of Mr. Morgenstein on April 4th?
15  A.  Then after the eye health, an instrument is
16  brought before the patient's face referred to as a
17  phoropter that has many lenses in it.  It's an
18  instrument that people look through in the
19  continuation of the optometric examination of then
20  refractive status, the clarity of seeing.  And if
21  there are glasses necessary or needed for one to see
22  more clearly is determined.  And then further testing

## Page 22

1    through that instrument, just look at the integration
2    of both eyes, the binocular function of both eyes,
3    for both distance and at near.
4         And after that test, that instrument is
5    then removed from the face. And then it's further
6    testing of stereopsis or 3-D viewing is done through
7    the use of polarized filters looking at a standard
8    stereo card, a stereo book referred to as a Titmus,
9    T-I-T-M-U-S, Titmus slide. And after that --
10   Q.   I'm sorry. What's the general purpose of
11   the stereopsis?
12   A.   Testing of stereopsis is to see as general
13   sense of not only is the person teaming both eyes,
14   but are they perceiving three dimensionality through
15   a testing tool. Because in real life, 3-D can only
16   be tested through the use of filters or stereoscopes.
17   Q.   Okay.
18   A.   And for Mr. Morgenstein that was then the
19   conclusion of that examination.
20   Q.   Were there any tests that you considered
21   doing that you did not do on April 4th?
22   A.   No.

## Page 23

1    Q.   Did you conduct any other tests of
2    Mr. Morgenstein on April 6th?
3    A.   No.
4    Q.   Did you review any documents or reports
5    that had been prepared by Dr. Simon in connection
6    with your evaluation of Mr. Morgenstein?
7    A.   No.
8    Q.   Did you have any discussions with Dr. Simon
9    about Mr. Morgenstein?
10   A.   Only to thank him for the referral.
11   Q.   Going through the examinations, the
12   different tests that you conducted on Mr. Morgenstein
13   on April 4th, are those all generally accepted tests
14   or testing procedures in your field?
15   A.   They are.
16   Q.   Do you have a particular area of expertise?
17   A.   I do not consider that I do.
18   Q.   Are you familiar with a field or area of
19   expertise called "the developmental optometry"?
20   A.   I am aware that people do use that phrase.
21   Q.   Are you engaged in the field of or the work
22   of developmental optometry?

## Page 24

1    A.   I've been told I am.
2    Q.   Do you have an understanding of what is
3    meant by developmental optometry?
4    A.   I do. And I utilize in my practice what is
5    referred to as "the behavioral model of vision."
6    Q.   And what does that mean?
7    A.   The behavioral model of vision is looking
8    at not just purely eye health and clarity of seeing,
9    but looking at visual operation, function and
10   processing; how a person's vision process affects
11   their daily life from the beginning of their life to
12   the end of their life.
13   Q.   And is that what you understand others to
14   refer to as developmental optometry?
15   A.   Some people refer to it as developmental.
16   Some people refer to it as behavioral.
17   Q.   Do you draw a distinction between the two
18   definitions or phrases, developmental --
19   A.   I do not.
20   Q.   Is behavioral optometry generally accepted,
21   a generally accepted field of medicine?
22   A.   The use of a behavioral model of vision is

## Page 25

1    a generally accepted understanding of visual function
2    in the optometric profession.
3    Q.   Okay. Is one required to have a license of
4    any sort in order to engage in behavioral optometry
5    or the behavioral model of vision?
6    A.   There's no specific license for the model
7    of health care that you choose. There is a specific
8    license for practicing optometry.
9    Q.   Have you developed any opinions in your
10   capacity as an expert witness in this matter?
11   A.   No other opinions in the alternatives that
12   I presented to Mr. Morgenstein.
13   Q.   Well let's walk through those together if
14   we can. And you're referring to your April 6th
15   meeting with him?
16   A.   On April 6th, the presentation of my notes
17   that you refer to as Exhibit 1. Do you want me to
18   describe these to you?
19   Q.   That would be helpful. Thank you.
20   A.   I presented, as I do with all patients,
21   optometric program alternatives care, alternatives
22   because I do not tell a patient what they must do.

## Page 26

1    So the first alternative is a conventional
2  eye care approach, that which any good eye care
3  practitioner would recognize and would present which
4  is in this case have distance glasses or what I refer
5  to as "distance compensation" for improved acuity at
6  distance, that he had healthy eyes, healthy eyeballs.
7  And there were no specific ocular eyeball, meaning
8  defects to the eyeball itself, and that the present
9  distance glasses met that basic need. So there was
10 no change in the glasses that he presented himself
11 with.
12    The behavioral model which is number 2, the
13 behavioral model of vision would say not only do you
14 have the glasses at distance, but you should have
15 some appropriate glasses for all of your near
16 centered work, and the use of those glasses would
17 provide for better function, meaning more comfort,
18 clarity of seeing. And if the person can see clear
19 and can feel more comfortable, they can usually
20 present a little bit more of visual efficiency.
21 That's why it says "minimal increased visual
22 efficiency."

## Page 27

1    Q.  And where are you looking on this exhibit?
2    A.  Number 2.
3    Q.  Number 2.
4    A.  Number 2 under Optometric Care Program
5  Alternatives. And if I were to have provided a pair
6  of glasses, I would have wanted Mr. Morgenstein to
7  return in three months for a re-evaluation
8  examination to compare data.
9      The third alternative says "visual
10 training." And that alternative was in order to
11 develop more improved visual efficiency that we would
12 use the form of visual training therapy to develop
13 those more effective abilities and use of those
14 abilities. And I would anticipate some improvement
15 in all of those visually oriented activities.
16     And the fourth comment here was that due to
17 when I was looking at eye health in a general sense
18 and some comments that Mr. Morgenstein made that care
19 should be taken to maintain observation of his left
20 eye due to the incomplete blink and the potential for
21 reduced sensitivity of corneal responses that could
22 have resulted in some corneal dystrophies over time.

## Page 28

1    Q.  Looking at number 4 -- I'm sorry. Are you
2  done?
3    A.  I am done with those alternatives.
4    Q.  Looking at number 4, what do you mean by
5  "maintain observation of the left eye"?
6    A.  He should be aware of any irritations,
7  dryness. And then if necessary, I would have
8  referred him to an ophthalmological colleague, a
9  corneal specialist to treat any potential corneal
10 issues.
11    Q.  Was there any specific care that you
12 recommended to Mr. Morgenstein that he could engage
13 in in order to keep his left eye healthy?
14    A.  I may have mentioned to him, and I
15 generally do when this comes up, again it's assuring
16 that the person make sure they have complete blink of
17 that eye; and that if necessary, they may want to
18 consider using some lubricating drops; but that if it
19 went to a further stage of irritation, he should be
20 seen by a corneal eye expert.
21    Q.  Do you know if Mr. Morgenstein was using
22 eye drops for his left eye to maintain lubrication?

## Page 29

1    A.  I do not know.
2    Q.  At the time that you evaluated
3  Mr. Morgenstein, did you form an opinion as to
4  whether he had a complete blink of his left eye?
5    A.  Number 14 on those notes of the notes that
6  are reflecting the examination state, "The
7  examination for ocular pathology and abnormality was
8  negative except for the observation of reduced
9  complete blink of the left eye."
10    Q.  Is it possible to evaluate sort of on a
11 spectrum on a scale of incomplete blink versus
12 complete blink, like where he fell? Was he in the
13 middle? When you say he had an incomplete blink, it
14 suggests to me that he was able to blink a little bit
15 at least. Is that fair to say?
16    A.  My recollection would be that because of my
17 notes that the blink was not so incomplete that it
18 was not a full blink at times, but that it was
19 resulting in a dryness and could result in a corneal
20 abrasion. This was not an issue of the eye not
21 closing and therefore would immediately be referred
22 to someone else to find out where the issue is.

## Page 30

1    Q.  In your opinion, could Mr. Morgenstein have
2  prevented damage to the corneal due to dryness by
3  using eye drops to lubricate the eye?
4    A.  It's not my specialty.  I can't answer that
5  question.
6    Q.  In looking at number 3 under the
7  "Optometric Care Program Alternatives," which is
8  identified as visual training, can you explain to me,
9  please, what sort of visual training you had in mind,
10  if any, for Mr. Morgenstein?
11    A.  My office when I speak of visual training,
12  visual training is a curriculum of various visual
13  activities.  It is not specific to an individual
14  patient.  If the patient enters visual training, they
15  completely go through a curriculum of care, learning
16  through the use of various instrumentation, lenses
17  and filters how to use both eyes more effectively and
18  more efficiently in their daily routine and task.
19      So due to and related to the data and
20  related to the complaint, it was my opinion that the
21  potential for improvement could be met potentially
22  with some visual training.

## Page 31

1    Q.  Are you able to assess how much improvement
2  one could anticipate through such visual training for
3  Mr. Morgenstein?
4    A.  I would only assess the change during
5  visual training.
6    Q.  Why did you anticipate that there would be
7  some improvement with Mr. Morgenstein's vision
8  through this training?
9    A.  One, 27 years of experience working with
10  patients with similar data of reduced binocular
11  function; two, whenever you work with a human being
12  and present them with opportunities to use both eyes
13  more effectively and officially, they can make change
14  in development.
15    Q.  When you informed Mr. Morgenstein of these
16  various alternatives, did you provide Mr. Morgenstein
17  with any other program alternatives beyond the four
18  that are identified in Exhibit 1?
19    A.  There was a discussion during the
20  conference because of his concern early on and the
21  mention in his history of issues that had affected
22  his work of what possibly could have been

## Page 32

1  recommendations at that time if he had been
2  continuing to work at this time.  And those were
3  various accommodations to address the issues without
4  doing any visual work to further develop.
5    Q.  Did you discuss what accommodations might
6  be available to him?
7    A.  I mentioned to him that I was looking at
8  this, that accommodations could include talking
9  books, meaning books on tape; that if he were in a
10  situation where he could not maintain his reading
11  time and speed, that an accommodation could be a
12  person hired to read to him; and because he mentioned
13  something about a testing situation at his work, that
14  he had data that was consistent with others that it
15  would not be uncommon to make requests for untimed
16  testing or extended time in testing.
17    Q.  Anything else?
18    A.  No.  At least not that I remember.
19    Q.  Fair enough.  Did Mr. Morgenstein bring
20  with him to the April 4th evaluation either of his
21  pairs of eyeglasses?
22    A.  He brought with him, because of my notes

## Page 33

1  here mean that he brought with him a distance pair of
2  glasses and a near pair of glasses, yes.  But yet
3  there was also a third pair that he did not bring at
4  the time of the examination he brought at the time of
5  the conference.  And that's why at the top of Exhibit
6  Number 1 you'll see "using at near in handwriting."
7    Q.  Okay.
8    A.  Because that was written during the
9  conference when he presented another pair of glasses
10  that he had.
11    Q.  Did he have two pairs of near glasses?
12    A.  He had two different pairs of glasses for
13  near that were presented to me.
14    Q.  Do you know why he had two?
15    A.  Can I look at my notes to see if I --
16    Q.  Sure.  Take your time.
17    A.  There's no note in my notes regarding why
18  he had two different pairs of near glasses.
19    Q.  As you sit here today, do you have an
20  understanding as to why he had two pairs of near
21  glasses?
22    A.  Patients in the past lead me to believe

Page 34

1    that when they have two different pairs of
2    prescriptive glasses, one pair is probably an older
3    pair and one pair is a more recent pair.
4        Q.   Did you form an opinion as to whether the
5    pair of near glasses that he did bring with him to
6    the conference -- well, strike that.
7        It's your testimony that he brought a pair
8    of distance glasses to the April 4th meeting and a
9    pair of near glasses to the April 4th meeting?
10       A.   Yes.
11       Q.   And that he then brought a second pair of
12   near glasses to the April 6th conference?
13       A.   Correct.
14       Q.   Did you form an opinion as to whether
15   either pair of the near glasses was adequate to
16   enable Mr. Morgenstein to perform nearsighted
17   functions in his daily life?
18       A.   What I would determine is that the first
19   pair that he brought on the April 4th meeting would
20   have been the closest pair of glasses to allow him
21   best clarity of seeing on the date of the
22   examination.  It would not have been what I would

Page 35

1    have prescribed exactly.
2        Q.   Did you tell him that?
3        A.   Yes.
4        Q.   Did you recommend to him that he get a
5    better prescription of near glasses?
6        A.   No.  Because the glasses that he was using
7    met his needs.  There was no significant urgency to
8    change the glasses.  That would not have altered his
9    clarity of seeing or his effectiveness of what he was
10   doing.
11       Q.   Did you form an opinion as to whether
12   through the use of his corrective glasses for both
13   distance and near vision Mr. Morgenstein was able to
14   see in terms of clarity of vision within a normal
15   range?
16       A.   In a prescription -- and I want to stand
17   corrected on something, if I may, because I just
18   looked at a note.
19       Q.   Sure.
20       A.   To answer your question right now first,
21   the glasses prescriptions that he presented to me,
22   the distance and the near would provide him with

Page 36

1    standard acuity.  The correction I want to make is
2    that he must have presented to me written
3    prescriptions from Dr. Simon from November of '05
4    because my note number 13 says that the near
5    prescription was unavailable at the time of the
6    evaluation.  So that would lead me to believe that
7    the two type prescriptions I had as written copies
8    that he presented me from Dr. Simon.
9        Q.   Okay.
10       A.   Or that I may have also called Dr. Simon's
11   office, because on my record sheet under Dr. Simon's
12   name is a phone number on my examination.  There's a
13   phone number which would lead me to believe that I
14   may have just called him, called their office, called
15   his office and asked what are the prescriptions.
16       Q.   Okay.  In turning again to Exhibit 1 in the
17   second page that discusses Optometric Care Program
18   Alternatives and looking at the second one there
19   entitled "behavioral," did you discuss with
20   Mr. Morgenstein that particular item?
21       A.   Yes.
22       Q.   What do you recall discussing with him?

Page 37

1        A.   I would have discussed that an appropriate
2    near pair of glasses would bring about better clarity
3    of seeing at near.  And if you have more clarity of
4    seeing at near, you would be more comfortable.  If
5    you're more comfortable, you can go a little bit
6    longer with what you're doing.
7        Again, I would bet my recollection would be
8    that this is typed here also, instead of saying and
9    continue with your present glasses, because I did not
10   have the glasses in front of me that he was using.
11       Q.   Did you recommend to him that he should
12   return to visit with you in three months for a
13   further evaluation?
14       A.   No.  That would only be if I changed any
15   glasses prescription.
16       Q.   Okay.  Did you conduct any tests of
17   Mr. Morgenstein's eyes that would enable you to
18   determine his ability to read for periods of time,
19   like how long he could read?
20       A.   I did not do a reading test.
21       Q.   Are there such tests that could be done?
22       A.   Educational diagnosticians may do a reading

## Page 38

1   test. And it is not something that I do personally
2   and there are some colleagues that do reading tests
3   in their offices.
4       Q.  Did you recommend that such testing be
5   provided, that Mr. Morgenstein look into having such
6   tests done?
7       A.  No, because that wasn't part of the issue.
8       Q.  Well let me back up. What specific
9   complaints was Mr. Morgenstein making to you?
10          MR. CASHDAN: Form.
11          BY MR. SCALIA:
12      Q.  Let me start again. When you met with
13  Mr. Morgenstein on April 4th, did he describe for you
14  specific complaints that he was having with respect
15  to his vision?
16      A.  He did as part of the history and those are
17  the notes on Exhibit 1 in the top between numbers 3
18  and 12 would be his discussion.
19          But specific to your question, he stated
20  that he feels strain in muscles around the left eye,
21  that in regards to reading, he cannot read for more
22  than five to ten minutes at a time.

## Page 39

1           He mentioned in regards to his feelings of
2   associated with his acoustic neuroma that the
3   radiation treatment as he reported to me that there
4   was some compromising of a facial nerve that resulted
5   in some eye movement difficulty.
6       Q.  Let me stop you there if I can.
7       A.  Uh-huh.
8       Q.  I want to make sure I understand that last
9   point about the radiation treatment. Are you saying
10  that Mr. Morgenstein one of his complaints to you was
11  that as a result of the radiation treatment to
12  address the recurrence of his tumor that he believed
13  that he had nerve damage to his left eye?
14      A.  Not to his left eye.
15      Q.  And where was the nerve damage?
16      A.  The statement was to me that his
17  understanding was the trigeminal nerve was
18  compromised with the radiation treatment.
19      Q.  Do you have an understanding what the
20  trigeminal nerve is?
21      A.  Yes. Yes.
22      Q.  What is that understanding?

## Page 40

1       A.  We have these three groupings of nerves in
2   our face that are going to deal with specific areas
3   of lid movement and eye movement.
4       Q.  Did Mr. Morgenstein provide you with any
5   basis for his belief that there had been damage to
6   his trigeminal nerve as a result of the radiation
7   treatment?
8       A.  The statement made to me would lead me to
9   believe in my opinion that this is a statement that
10  he had been told.
11      Q.  Did you look at any medical reports that
12  may have been prepared in connection with
13  Mr. Morgenstein's radiation treatment?
14      A.  No.
15      Q.  Did you talk to any of the doctors who were
16  involved in his radiation treatment?
17      A.  No.
18      Q.  In your examination of Mr. Morgenstein,
19  were you able to assess the condition of his vision
20  after the radiation treatment as opposed to before
21  the radiation treatment? Do you understand the
22  question?

## Page 41

1       A.  I understand the question. I just can't go
2   back to the future. So my data is data that was the
3   effect of his function on April 4, 2006. Optometric
4   or visual data speaks of not only today but of past.
5   But I do not have any data from the past to compare
6   specifically to life history.
7       Q.  Did Mr. Morgenstein tell you that he
8   believed that the condition of his vision was worse
9   after the radiation treatment than it had been before
10  the radiation treatment?
11      A.  No. I don't have a note that it was worse
12  after the second occurrence.
13      Q.  Are you able to opine on the condition of
14  Mr. Morgenstein's vision in the 2001 to 2003 time
15  frame?
16      A.  I don't think I can tell you specifics of
17  what occurred between 2001 and 2003. What I can do
18  is look back at notes from other eye care
19  practitioners if they're available to know what was
20  there, and he did present to me a copy of notes from
21  a colleague who saw him prior to that period of time.
22      Q.  Is that Dr. Wachs?

## Page 42

1    A.   That would be Dr. Wachs.

2    Q.   Were you familiar with Dr. Wachs before

3 Mr. Morgenstein mentioned his name to you?

4    A.   Absolutely.

5    Q.   How had you come to know of Dr. Wachs?

6    A.   Dr. Wachs is a colleague here in the D.C.

7 area. And Doctors of Optometry who deal in the

8 behavioral model vision, we meet on a monthly basis

9 for continuing education to discuss various

10 alternatives of care that may be out in the public.

11   Q.   And is Dr. Wachs one of those?

12   A.   Dr. Wachs is one of those individuals who

13 does come to those meetings.

14   Q.   Have you had an opportunity to form an

15 opinion about Dr. Wachs' capabilities as an

16 optometrist?

17   A.   Dr. Wachs is recognized throughout actually

18 internationally for his abilities in optometry.

19       MR. SCALIA:  I ask you to mark this as

20 Exhibit 2, please.

21       (Exhibit No. 2 was marked for

22       identification.)

## Page 43

1        BY MR. SCALIA:

2    Q.   What about you? Have you formed an

3 opinion, your own opinion regardless of what the

4 international community may think of Dr. Wachs? Have

5 you formed your own independent?

6    A.   Dr. Wachs, I have.

7    Q.   And what is that opinion?

8    A.   Dr. Wachs provides an excellent optometric

9 care utilizing many models that he, himself, has

10 developed and he utilizes uniquely in his office are

11 those people which he may have trained or taught.

12   Q.   Have you formed an opinion about any of

13 these particular models that Dr. Wachs has created

14 himself as to whether they're effective or not?

15   A.   I can only say that from my observation of

16 common patients between us and studying research that

17 his work is admirable and does meet many people's

18 needs.

19   Q.   Did Mr. Morgenstein indicate to you his

20 opinion of Dr. Wachs?

21   A.   No.

22   Q.   Let me ask you to take a look at Exhibit 2

## Page 44

1 and let me know if you recognize this document.

2    A.   I believe I do. Let me just double-check

3 something, because yours is smaller.

4    Q.   Yes. I noticed that when I saw yours. I

5 think they're the same. Feel free to compare them.

6        MR. CASHDAN:  I need a new pair of glasses.

7        MR. SCALIA:  Get that one off the record.

8        MR. CASHDAN:  Yeah. That's off the record.

9        THE WITNESS:  Yes. It is the same. I do

10 recognize it.

11       BY MR. SCALIA:

12   Q.   Is this the report that you were just

13 referring to?

14   A.   This is a report that Mr. Morgenstein

15 provided me prior to my conference on April 6th.

16   Q.   Did he provide it to you on April 4th when

17 you met with him?

18   A.   No.

19   Q.   Did he provide it to you after April 4th?

20   A.   Just look at something here.

21   Q.   Sure.

22   A.   He provided it to me on April 4th. After

## Page 45

1 his examination, he faxed it to me, faxed it to my

2 office.

3    Q.   And did you review Exhibit 2 in preparation

4 for your April 6th meeting or conference with

5 Mr. Morgenstein?

6    A.   I did review the comments made.

7    Q.   Are there any statements in Exhibit 2

8 contained in Exhibit 2 with which you disagree?

9    A.   There are comments within it that I may not

10 have personally made as recommendations.

11   Q.   And what are those?

12   A.   Having to do with nutrition. There was

13 nothing in my history that would lead me to have

14 referred in this case for nutrition. His referral or

15 recommendation regarding the Spectrum Center, I

16 probably if I was going to make a recommendation in

17 regards to auditory integration, I probably would

18 have chosen a different center, a different place

19 only because of age group.

20   Q.   What do you mean by that?

21   A.   The Spectrum Center I think of as dealing

22 with small children.

## Page 46

1    Q.   Okay.  What is auditory integration
2  training?
3    A.   As I understand it, it is a training of
4  listening to various sounds to try to get a person to
5  integrate, to team the ears.  But yet again back to
6  the history, that makes little logic to me in regards
7  to the acoustic neuroma which has done nerve damage.
8  That's why it would not have been a recommendation of
9  mine.
10       And the next one, next comment of
11 occupational therapy of possibly cranio-sacral
12 adjustments.  Again occupational therapy, he did not
13 show me or did not present for me a life skill issue
14 here that I would have thought of occupational
15 therapy.  And the cranio-sacral adjustments possibly
16 I would have if he had presented at the time that I
17 saw him issues in regards to more balance problems.
18       Q.   What's your understanding of what
19 cranio-sacral adjustments are?
20       A.   There are practitioners of cranio-sacral
21 work who utilize very light touch of the hand usually
22 upon the skull at the top of the head and slight

## Page 47

1  movements to realign the bone plates of the skull,
2  because they do move.  And there are studies in
3  people who work in this area who believe by making
4  those adjustments they can bring better balance to
5  the body.  That does not mean balancing the body, but
6  better balance of what are referred to as "body
7  energies."  And last comment, I just do not know the
8  person, Louise Dugan.
9        Q.   Anything else contained in the document --
10       A.   No --
11       Q.   -- that you disagree with?
12       A.   No, that I would not have made a
13 recommendation.  I don't disagree.
14       Q.   Right.  I understand.  What's your
15 understanding of what graphic representational
16 thought is?
17       A.   In my understanding of graphic
18 representational thought is that when I observed
19 records or a discussion through Dr. Wachs would be
20 the presentation of forms or shapes to the patient
21 and the patient would draw those shapes and forms.
22       And I do this with children generally or

## Page 48

1  people who have had specific head trauma or shown
2  specific issues within the history.  I will add that
3  testing in an adult.
4        Q.   Did you conduct that testing on
5  Mr. Morgenstein?
6        A.   I did not do that with Mr. Morgenstein.
7        Q.   Why not?
8        A.   Because he did not meet my criteria of a
9  head trauma to do that.
10       Q.   Do you see the sentence -- I don't know,
11 not quite halfway down on Exhibit 2 -- that says
12 "Major areas of need are in Visual Thinking and
13 Receptive-Expressive Visuo-Verbal communication from
14 the written word"?
15       A.   I do see that sentence.
16       Q.   Do you have an understanding as to what was
17 meant by that?
18       A.   I can only make an interpretation in my
19 mind and in my model of what that means.
20       Q.   Okay.  Please do.
21       A.   I would interpret that to mean that the
22 collective data Dr. Wachs had at the time shows that

## Page 49

1  Mr. Morgenstein had difficulty in visual processing
2  of information, information taking in through both
3  eyes in both effectiveness and efficiency upon which
4  he took in information and then the integration of
5  that which he sees, hears, and communicates verbally.
6        Q.   Did Mr. Morgenstein inform you as to
7  whether or not he had gone through any treatment
8  process with Dr. Wachs?
9        A.   My handwritten notes state that no work was
10 done with Dr. Wachs because the prognosis was low.
11       Q.   Did you form your own independent opinion
12 as to whether or not Dr. Wachs believed that the
13 prognosis was low?
14       A.   My only opinion is based on the comment in
15 this report that was presented to me that states
16 "guarded but optimistic."
17       Q.   And that's, if I can direct your attention
18 the Exhibit 2, if you're referring to the sentence --
19       A.   Fifth line up.
20       Q.   From the bottom?
21       A.   From the bottom.
22       Q.   -- that says "His desire for improvement of

## Page 50

1 balance and stability of visual fixation is somewhat
2 guarded but optimistic"?
3    A.   Correct.
4    Q.   And is it your understanding that that
5 statement refers to Dr. Wachs' belief or feeling that
6 it was guarded but optimistic or Mr. Morgenstein's?
7    A.   Since this note is signed by Dr. Wachs, I
8 take it to believe that it's Dr. Wachs' impression.
9    Q.   But the sentence says his desire for
10 improvement is somewhat guarded but optimistic,
11 correct?
12    A.   It does state that.  But my reading would
13 mean that Mr. Morgenstein had a desire for
14 improvement of balance and stability of his visual
15 fixation.  I throw in a comma and therefore it's
16 somewhat guarded but optimistic.
17    Q.   Okay.  Did you have any discussions with
18 Mr. Morgenstein about whether Dr. Wachs was guardedly
19 optimistic about the improvement of Mr. Morgenstein's
20 visual conditions through treatment?
21    A.   The only thing I can state again is that my
22 note says in my own handwriting that Dr. Wachs

## Page 51

1 reviewed in 1997, 1998 due to visual processing
2 issues (no work done - prognosis, arrow down),
3 meaning low.  So that's all he would have said to me.
4    Q.   How would you characterize your prognosis
5 of Mr. Morgenstein as of April 6, 2006?
6    A.   The visual data that I collected and the
7 presentation of Mr. Morgenstein on that date would
8 lead me to believe the reason why I didn't put it in
9 my notes as an alternative would be that the
10 potential was there to make change in the visual
11 training, but that I did not as I do in most of my --
12 many of my records, I should say, put down a period
13 of time that one would be involved in visual
14 training.  Because it would be unclear and one would
15 have to work with him to know what level of change he
16 might achieve, which actually I would say is
17 consistent in a sense.  Dr. Wachs' note says 10
18 sessions.  I don't make that comment.
19    Q.   But you both were of the same mind that one
20 would need to undergo some course of treatment in
21 order to determine what level of improvement might
22 take place; is that correct?

## Page 52

1        MR. CASHDAN:  Form.
2        THE WITNESS:  I don't know what Dr. Wachs
3 was thinking.  I can only read.
4        BY MR. SCALIA:
5    Q.   But based on your interpretation of
6 Exhibit 2.
7    A.   My interpretation of the sentence and my
8 personal feeling of working with myself would be in
9 this case one would need to work with the patient for
10 a short period of time to see if change is
11 potentially possible as expected.
12        MR. SCALIA:  All right.  We've been going
13 over an hour.  If we can take a short break.  That
14 would be okay with you, a five-minute break?
15        MR. CASHDAN:  That's fine.
16        (A brief break was taken.)
17        (Exhibit Nos. 3 and 4 were marked for
18        identification.)
19        BY MR. SCALIA:
20    Q.   Dr. Kraskin, you have before you what's
21 been marked as Exhibit 4 to this deposition.  Would
22 you, please, take a moment to look at it and let me

## Page 53

1 know if you recognize it, if you've seen it before.
2    A.   It appears to be the one that's in my
3 record, yes.
4    Q.   This is a medical report from a Dr. Martin
5 Kolsky dated June 27, 2006 --
6    A.   Uh-huh.
7    Q.   -- is that correct?
8    A.   Yes.
9    Q.   And you've seen this before?
10    A.   I have been given the opportunity to look
11 at this, yes.
12    Q.   Have you formed any opinions about the
13 contents of this report?
14    A.   I have formed some personal opinions.
15    Q.   And what are those?
16    A.   Not having anything to do with basically
17 the front page, the first page.  But looking at the
18 neuro-ophthalmologic comments here that
19 Dr. Kolsky, while being only an ophthalmologist,
20 certainly agrees and I would agree with him, that the
21 acuity was clear and that the eyeballs are healthy.
22 And again about the left eyelid is stated here as I

Page 54

1   have already stated and the corneal issue that's
2   mentioned under slit lamp examination, as I mention,
3   I would agree with that.
4          And as I look at the motility comment from
5   a medical eyeball health point of view that he does
6   have eyes that move, again as I have stated in my
7   record, and that the neurological evaluation of the
8   motility did not reveal, as I read this and my
9   reading of it, would not reveal any lesions on the
10  neuro pathway.
11         And I come to that statement by
12  Dr. Kolsky's writing of vestibular ocular reflex.
13  And that is a neuro-ophthalmological review of
14  looking at neurological legions on pathways but not
15  visual function or efficiency.
16         So on the sense of an eyeball health, I
17  would answer that in the impression that this person
18  has a healthy eyeball in their head, just as he
19  states.
20      Q.  Are there any statements in this document
21  with which you disagree?
22      A.  I would disagree with the phrase

Page 55

1   "completely normal" under motility if that is
2   implying a statement of function and efficiency.
3          If it's implying purely related to as I
4   believe in a neuro-ophthalmological examination would
5   looking purely at the health of the individual six
6   extra ocular muscles, the muscles that surround the
7   eyes, that they are normal muscles, I would agree.
8   But if the intent is different than that, I would
9   have to disagree.
10      Q.  I want to make sure I understand the
11  distinction you're making.  Are you saying that you
12  would agree to the extent that Dr. Kolsky is stating
13  that the single left eye, the motility, the left eye
14  on its own is normal on the one hand?  But if he's
15  saying on the other hand that the two eyes teaming
16  together are normally integrated and function
17  normally together, that's something you would
18  disagree with?  I'm trying to put this in a lay
19  person's terms that I can understand.
20      A.  Number one, he's not just speaking of the
21  left eye there.
22      Q.  Okay.

Page 56

1       A.  What I'm saying is that I completely accept
2   as in my own eye health evaluation that the muscles
3   that moves the eye, the six muscles that move the
4   eyeball -- each eyeball has six muscles in them --
5   that they are healthy and they move the eye in all
6   directions.  I absolutely agree.  And that's the
7   statement here.
8          If the statement is meant to say anything
9   else, then I would need to understand that.
10      Q.  Beyond the possible exception of what you
11  just testified about, are there any statements in
12  this document with which you disagree?  And again, we
13  are referring to Exhibit 4, the Kolsky report.
14      A.  I would raise question with why he has in
15  quotes the word "incoordination."  I don't understand
16  why the word is in quotes, what that means.  So until
17  someone can explain or Dr. Kolsky can explain what he
18  means by placing the word "incoordination" in quotes,
19  I would have to say I cannot understand that sentence
20  in what that relationship means.
21      Q.  Anything else?
22      A.  Nothing else on page 2.  If you want me to

Page 57

1   look at page 1 if there's anything I would disagree
2   with, I'll look at that.  Do you want me to do that?
3       Q.  Please do.  Yes.  Thank you.
4          If you would look at page 1 of his notes,
5   the second paragraph up from the bottom, I've already
6   stated I would have to disagree with being stated as
7   a developmental optometrist who specializes in
8   reading problems.  Number one, I do not consider
9   myself someone who specializes in reading problems
10  and I do not use the label "developmental
11  optometrist" at any time.
12         And I do not believe that I use the phrase
13  "told him that his eyes were not coordinated
14  together." I don't use the phrase "not coordinated
15  together."  So I would disagree with the sentence as
16  written that it's not an appropriate reflection of my
17  profession and my practice.
18      Q.  Why don't you refer to your practice as
19  developmental optometry?
20      A.  My practice is a practice of optometry,
21  period, with the emphasis using the behavioral model
22  of vision.  The use of the phrase which is used

Page 58

1  "developmental" or used here "developmental
2  optometrist" or "behavioral optometrist" are in my
3  opinion considered in-house words within the
4  profession to distinguish for people at times where
5  their interest may lie.
6       And some people, some colleagues may use it
7  on a business card to distinguish themselves in the
8  marketplace of eye care. I don't find that
9  necessary, nor do I believe it's appropriate to do
10  since I chair the licensing for the District of
11  Columbia. For optometry, I just don't find it within
12  appropriate ways of listing ourselves.
13      Q.  To your knowledge, does the phrase
14  "developmental optometry" carry a negative
15  connotation by some within the field of optometry?
16      A.  Not that I'm aware of.
17      Q.  Okay. I want the record to reflect that
18  you have your file back.
19      A.  And I appreciate it.
20      MR. SCALIA:  We've made a couple copies of
21  it.
22      I think, Counsel, you got a copy?

Page 59

1       MR. CASHDAN:  Yes.
2       MR. SCALIA:  And why don't we go ahead and
3  just mark this as Exhibit 5. I will represent on the
4  record is a complete copy of Dr. Kraskin's medical
5  file concerning Mr. Morgenstein.
6       MR. CASHDAN:  Could we clarify for the
7  record that this package includes some documents
8  which were provided to Dr. Kraskin by me? So I'm not
9  sure -- depending on what you mean by "medical file"
10  whether or not it's part of his medical file or part
11  of his file as an expert in this case for which
12  either way we produced.
13      MR. SCALIA:  Right.
14      MR. CASHDAN:  I'm just squibbing over the
15  terminology --
16      MR. SCALIA:  Medical file.
17      MR. CASHDAN:  -- it's all a medical file,
18  even if it contains medical records from other
19  people.
20       (Exhibit No. 5 was marked for
21       identification.)
22      BY MR. SCALIA:

Page 60

1       Q.  Dr. Kraskin --
2       MR. CASHDAN:  We would treat it the same
3  way and want confidentiality and not exposing it to
4  the public.
5       MR. SCALIA:  Right.
6       BY MR. SCALIA:
7       Q.  Dr. Kraskin, how would you characterize
8  this file?
9       A.  The file that I presented to you up to from
10  the beginning, from the front, except for your
11  subpoena, from the page stated "diagnostic facts and
12  programing" if it remained in order, if it was
13  printed in order, to the page that has my name at the
14  top that is the intake page with Mr. Morgenstein's
15  handwriting on it and acknowledgement of receipt of
16  the privacy notice, that is what I would consider his
17  patient medical record.
18       Behind that, and I had a place behind it on
19  purpose, is information or materials that have to do
20  with this case after I saw him as a patient. So that
21  would begin with, if it was kept in order, with my
22  note to Mr. Kane of Cashdan & Kane.

Page 61

1       Q.  So assuming we've made a copy --
2       A.  In order.
3       Q.  -- in order --
4       A.  Which appears that you have.
5       Q.  -- which we have attempted to do. Let me
6  put it this way, as you maintained the record, is it
7  fair to say that or accurate to say that the medical
8  file ends beginning with the April 29, 2006 letter
9  from you addressed to Michael Kane?
10      A.  Correct.
11      Q.  And from that point on those are documents
12  relating to your serving as an expert witness in this
13  litigation; is that accurate to say?
14      A.  Correct.
15      MR. SCALIA:  Yes?
16      MR. CASHDAN:  Off the record.
17       (A brief break was taken.)
18      BY MR. SCALIA:
19      Q.  Dr. Kraskin, did you ever talk to Dr. Wachs
20  about Mr. Morgenstein?
21      A.  I attempted to ask Dr. Wachs a question
22  regarding Mr. Morgenstein, but this office had

## Page 62

1  apparently already deposed him and he would not
2  discuss the case with me.
3      Q.  Okay.  What did you do, if anything, to
4  prepare for today's deposition?
5      A.  I read over my notes.  I looked over
6  materials of copies that had been presented to me of
7  other notes through Mr. Morgenstein's attorney.  And
8  I also did a little quick scanning on acoustic
9  neuroma and vision, looking at other colleagues to
10  know their inferences on that, and I think I just
11  again just looked over the materials.
12      Q.  What information in particular did you look
13  at with respect to the issue of acoustic neuroma?
14      A.  What I was interested in knowing is in
15  specific to acoustic neuroma were there other
16  instances of cases that affected visual processing,
17  visual efficiency.  Because when I evaluated
18  Mr. Morgenstein, I was looking at his visual
19  performances as presented on the optometric
20  evaluation but not relating or really concerning
21  myself with the time at the time with acoustic
22  neuroma in and of itself.  And so looking, doing

## Page 63

1  searches, there were other interesting information of
2  acoustic neuromas associated with transient visual
3  abnormalities.  There's a comment by a colleague in
4  Evanston, Illinois, I believe.  It was in Illinois in
5  the Chicago area, who he, himself, presents on his
6  web site issues of acoustic neuroma affecting him in
7  his visual process and how he sees a number of
8  patients now who have suffered from acoustic neuroma
9  and associated visual inefficiencies as a result of
10  the acoustic neuroma.
11      Q.  So is it accurate to say that you were
12  attempting to educate yourself about the potential
13  effects of acoustic neuroma on one's visual
14  performance?
15      A.  I think it would be fair to say that I
16  wanted to know were there issues in which acoustic
17  neuroma had any bearing on visual performance issues.
18      Q.  And what did you determine in that regard?
19      A.  According to sites which I did find --
20      Q.  These are web sites?
21      A.  These are web sites, Internet sites by
22  simply Googling acoustic neuroma and vision that

## Page 64

1  there seems to be some potential of relationship.
2      Q.  Did you take any steps to verify the
3  accuracy of the information contained on any of these
4  web sites?
5      A.  The colleague in Illinois I happen to know
6  personally, but I did not make a phone call to him.
7  So I do respect his information and I do respect his
8  practice and that I have referred to his practice
9  when patients have moved to the area of Evanston,
10  Illinois.
11      Q.  And what is that individual's name?
12      A.  Jeffrey Getzell.
13      Q.  How do you spell that?  Well she is going
14  to ask you afterwards anyway --
15      A.  That's all right.
16      Q.  -- so I thought I'd save you both the time.
17      A.  Jeffrey, J-E-F-F-R-E-Y; Getzell,
18  G-E-T-Z-E-L-L.
19      Q.  Thank you.  Did you happen to retain any of
20  the web site information that you looked at?
21      A.  I do have a printout of his page.
22      Q.  I would like to make a copy of that as well

## Page 65

1  if I may.  Thank you.
2      Were there any other particular web sites
3  that you recall looking at other than this one from
4  Mr. Getzell?
5      A.  No specific.  There were numerous sites
6  associated with acoustic neuroma that seemed to be
7  copies repeatedly of the same pages no matter what
8  school, association, university, medical school that
9  listed the same symptoms.  And there's no specific
10  one.
11      Q.  How much time did you spend doing this web
12  site scanning?
13      A.  Probably about two hours.
14      Q.  And did you also look at some documents
15  other than the web site scanning that you just
16  testified about and the documents contained in your
17  report or your file that's in front of you?  Are
18  there any other documents that you looked at?
19      A.  The only other thing that I looked at was
20  provided by Mr. Cashdan, the deposition of Dr. Wachs.
21      Q.  And was there anything in particular, any
22  statements contained in Dr. Wachs' deposition

## Page 66

1  testimony that you can recall reviewing?

2      A.  A mentioning of my late father.

3      Q.  Anything else?

4      A.  Nothing else specific.

5      Q.  Did you form any impressions about

6  Dr. Wachs' testimony?

7      A.  No.

8      Q.  Did you have a meeting with Mr. Cashdan in

9  preparation for today's deposition?

10     A.  We did meet once.

11     Q.  And when was that?

12     A.  I have to refer to Mr. Cashdan because -- I

13  have to think about when this meeting was originally

14  scheduled the last time.  So it would have been a few

15  days prior to the last time this meeting was

16  scheduled.

17     Q.  And how long approximately was that

18  meeting?

19     A.  Thirty-five to 40 minutes.

20     Q.  Do you recall what you discussed?

21     A.  The format of how questions are asked and

22  the concept of a deposition.

## Page 67

1      Q.  Did you have any discussion -- well, let me

2  back up.  Who attended that meeting?

3      A.  Myself and Mr. Cashdan.

4      Q.  And was there anyone else there?

5      A.  No.

6      Q.  Was there any discussion about the

7  substance of your expert opinions in this case or the

8  substance of your deposition testimony?

9      A.  I think that Mr. -- as I recall,

10  Mr. Cashdan asked me some questions in regards to my

11  findings.

12     Q.  And do you recall what those discussions

13  were, what those questions were?

14     A.  No.  But they're similar to yours.

15     Q.  Just trying to find out if he asked any

16  that I should be asking.  Do you recall any specific

17  questions that were asked of you?

18     A.  Questions that had to do with

19  Mr. Morgenstein and this testing that was to take

20  place at his previous job.

21     Q.  Okay.  When you met with Mr. Morgenstein on

22  either April 4th or April 6th, what discussions did

## Page 68

1  you have with him about any testing that he was

2  required to undergo in connection with his

3  employment?

4      A.  It was my understanding simply that he

5  worked in the area of financial advisor at Morgan

6  Stanley.  He worked until the end of 2003, and that

7  he had found that his eye -- that his reading had

8  become worse over time and that's why he searched or

9  met with Dr. Wachs back in that period of time

10  shortly a year after the surgery for the acoustic

11  neuroma, that he felt that his reading had been

12  compromised, his ability to maintain reading and that

13  it states that in my notes as far as working on

14  computers, because I asked in your office did you

15  have computers, that he said it was only okay if

16  there were numbers.  But if it wasn't numbers, if you

17  got into reading words, he would again have the

18  challenges that he associate with reading that he

19  could not read for more than five or ten minutes at a

20  period.

21     Q.  Were you able to conduct any medical tests

22  or examinations that could identify how long

## Page 69

1  Mr. Morgenstein would be able to read, you know, for

2  any given duration before his eyes tire to the point

3  where he would have to rest?

4      A.  I did not do any specific testing of

5  reading.  And it is my judgment of looking at data

6  that is derived binocular function, how the two eyes

7  are teamed together to make an assessment and present

8  an opinion on how long one may last when doing a

9  sustained concentrated near task, whether that be

10  reading, writing, computer, knitting, any sustained

11  concentrated near task.

12         And so no, I did not take a specific test.

13  I look at the testing that has to do with, again, the

14  teaming of both eyes and I compare those numbers as

15  we do to what we refer to as the expected.  And I

16  make a professional opinion judgment of what I expect

17  may happen.

18     Q.  And did you reach an opinion in this

19  particular case with Mr. Morgenstein?

20     A.  I did.

21     Q.  And what was that opinion?

22     A.  That because his ability to control

## Page 70

1  convergence that the teaming of both eyes looking
2  close at near was so poor that this person would
3  either, one, have to take breaks probably I would say
4  within 15 minutes, 15 to 20 minutes of time; or that
5  they may go into a postural head movement that would
6  create a head tilt or turn that would block out an
7  eye, so not using both eyes together to try to go
8  further; or that as an adult they may sophisticate
9  their process and have built in other momentary
10 breaks looking away from the task and then returning
11 to it, picking up the phone as a way to take a break,
12 pick up a bottle of water to take a break and those
13 types of issues.
14     Q.  Did you form an opinion as to how long
15 these breaks would have to last in order for that
16 person to be able to resume reading for
17 comprehension?
18     A.  Generally the break is usually to get back
19 and restart usually within two to five minutes for
20 most people.  Some people have had significant head
21 trauma will find that it takes longer.
22     Q.  And would you put Mr. Morgenstein in that

## Page 71

1  group of people who had significant head trauma?
2     A.  I don't know.
3     Q.  Were you able to form an opinion as to
4  Mr. Morgenstein specifically in how long it would
5  take him to take a break and then resume reading for
6  comprehension?
7     A.  There's no testing that I did that would
8  give me that number.
9     Q.  Would you agree that your having data from
10 reading testing would have been helpful in your
11 determining how long Mr. Morgenstein would be able to
12 read for comprehension before having to take a break?
13     A.  Having had the opportunity before the
14 conference to have the notes from Dr. Wachs from a
15 number of years earlier of that reading test that he
16 apparently provided or did in his office, that gave
17 me insight into his level of performance and the type
18 of break that might be necessary.
19     Q.  Okay.  Do you know what testing Dr. Wachs
20 did, what reading test he conducted?
21     A.  No.  No, I do not.
22     Q.  Do you know for sure that Dr. Wachs even

## Page 72

1  conducted reading testing of Mr. Morgenstein?
2     A.  I'm going back to what you referred to as
3  Exhibit 2.
4     Q.  And is there something in Exhibit 2 that --
5     A.  There's a statement that says "A cursory
6  evaluation of reading speed and accuracy shows that
7  he is reading at 170 words a minute with 80 percent
8  accuracy.  The average for college should be 350
9  words a minute with 80 to 90 percent accuracy."
10    That led me to believe as a former teacher,
11 my original earlier degree was in elementary
12 education, early childhood education that for an
13 adult operating at this level would be showing that
14 their efficiency rate was significantly impacted.
15    Q.  Were you able to form an opinion on the
16 effect that Mr. Morgenstein's vision impairment was
17 having on his daily life activities?
18    A.  Would you repeat that?
19    Q.  Yes.  Were you able to form an opinion as
20 to what, if any, impact Mr. Morgenstein's vision
21 impairment was having on his ability to perform daily
22 life activities?

## Page 73

1     A.  And do you mean by "daily life activities"
2  things he's doing today?
3     Q.  At the time that you evaluated him in early
4  April of this year.
5     A.  I would say that looking at the data, it
6  could raise questions because he informed me that his
7  present enjoyments were television, some computer
8  use, biking, and swimming.  Looking at the
9  performances on the visual basis here of poor control
10 of convergence, having a tendency at distance to
11 focus a bit too close in space that they may impact
12 some of the things such as biking and knowing really
13 where am I in space as I'm traveling on that bike and
14 knowing when to break, when not to break.
15    There was a small vertical deviation
16 between the two eyes which may be very reflective of
17 an imbalance in body posture and may relate to
18 something that had to do with the acoustic neuroma.
19 I do not know.  But there was a small vertical
20 deviation which was greater at distance, so distance
21 activities.
22    If he had an interest in a ball sport which

Page 74

1    he did not state, it would lead me to believe he may
2    have some challenges in tracking, following a ball
3    and responding to it in ways that he may have
4    operated differently before. I don't know.
5         He did not state except for some computer
6    use that he was presently spending a great deal of
7    time doing sustained concentrated near. So I've
8    already mentioned the data does state and imply that
9    there would be difficulty sustaining at near. It
10   doesn't appear that he's doing that presently.
11       Q.   What about driving?
12       A.   Driving can be impacted just as a bicycle
13   potentially in the sense of being more cognizant of
14   your surroundings, being aware that if I'm focusing
15   too close in space that I may be driving actually a
16   little bit more defensively than I need to; might be
17   a hassle for the person driving behind me, not in
18   front of me.
19       Q.   Did he complain about driving being a
20   problem?
21       A.   It does state there is a problem. He
22   mentioned when riding a bike --

Page 75

1        Q.   And you're looking at Exhibit 1?
2        A.   I'm looking at Exhibit 1, number 9. "When
3    riding a bicycle, he must keep eyes fixated forward
4    or he will lose his balance."
5         In other words, he can't look to either
6    side while riding. That would cause him to shift.
7    And the next statement is "The problem does not exist
8    in the car when driving."
9        Q.   Are you able to opine on the extent to
10   which, if any, his vision impairment would impair his
11   balance, his physical balance?
12       A.   I can.
13       Q.   What is your opinion? Have you formed an
14   opinion in that regard?
15       A.   I think I have.
16       Q.   What is your opinion?
17       A.   Understanding that there is the vestibular
18   and ocular relationship of the inner canals of the
19   ear in balance and a relationship to eyes where they
20   are fixating in space, that if one is again
21   inappropriately positioning themselves with their
22   eyes in space, it can cause them to shift in how well

Page 76

1    they maintain their balance. And then further, if
2    this acoustic neuroma has affected, and that would be
3    looking at some other reports, if it has affected any
4    of the canals of the ear, that would add further
5    challenge to the relationship of the ocular
6    vestibular reaction which might inflict upon the
7    visual system creating more imbalance.
8        Q.   Did you form an opinion as to whether
9    Mr. Morgenstein did in fact suffer from balance
10   problems as a result of any vision impairment that he
11   may have?
12       A.   I only know -- I did not form an opinion.
13       Q.   Did you conduct any tests that were
14   designed to assess whether and the extent to which
15   his vision impairment would affect his balance?
16       A.   I did not do any general motor testing.
17       Q.   Did Mr. Morgenstein complain about
18   information retention or memory problems as a result
19   of his vision impairment?
20       A.   I don't believe there's any specific
21   statements by him stating difficulty in memory to me.
22       Q.   Did that issue come up at all during your

Page 77

1    evaluation or conference with him?
2        A.   During the conference it would have come up
3    as far as a discussion of the evidence revealing
4    these ocular motor problems that as one is doing,
5    let's say, a reading task, that they may have to go
6    back and reread for better understanding, better
7    meaning because as the visual process is, in quotes,
8    fatiguing, tiring. Because there's nothing in an
9    eyeball that tire, but that the body is saying I
10   cannot keep this up right now, that one would lose
11   their visual attention, concentration to it and
12   therefore have to go back and reread. I would have
13   mentioned that and would have asked that.
14       Q.   Do you recall any specific discussion with
15   Mr. Morgenstein?
16       A.   I do recall and later on. And it wasn't at
17   this history. That's why during the conference that
18   we may have a conference of oh, yes, these are
19   things I have felt, is that why that may happen.
20       Q.   Going back to the issue of reading, would
21   someone with Mr. Morgenstein's visual condition,
22   vision condition, be able to read for a longer period

## Page 78

1  of time than he otherwise might by covering up the
2  affected eye, in his case the left eye?
3      A.  First, I'm not sure why you're saying
4  affected left eye.  The left eye is only affected, if
5  I remember right it was the lid thing.
6      Q.  Okay.
7      A.  So your question of covering an eye, it is
8  a coping mechanism or a body dynamic that many people
9  discover or happenstance to discover as I mentioned a
10  moment ago about the head tilting or turning.
11         If you cover an eye, you no longer have a
12  true binocular dysfunction because you're not
13  operating in that way.  But at the same time you've
14  reduced the natural direction of the visual process.
15  Meaning you were born into the world, you've been
16  operating as a two-eyed individual.  If you all of a
17  sudden interrupt that, you've changed your typical
18  modality of functioning.
19      Q.  Are you able to opine on how long one might
20  be able to -- how much additional time one might be
21  able to read without taking a break if one were to
22  close one eye while reading?

## Page 79

1      A.  I cannot.
2      Q.  Is it accurate to say that it would offer
3  an individual some additional reading time before
4  having to take a break?
5      A.  It's not an uncommon comment to hear from
6  other individuals, other patients about covering an
7  eye, and oh, I can go a little bit longer.
8      Q.  I want to go back to the testimony that
9  you've given about discussions that you had with
10  Mr. Morgenstein or a discussion, I don't want to put
11  words in your mouth, regarding testing, a test he was
12  required to take while working at Morgan Stanley.
13         What do you recall discussing with him in
14  that regard?
15      A.  The only thing I understand, I have to
16  separate it now from conversations or meaning from
17  papers I've seen, would be that after work there was
18  some tests that he needed or was supposed to take and
19  because of his problem that he was discovering of
20  having challenges in reading that he was finding this
21  a challenge to do this test, whatever the test may
22  be.

## Page 80

1      Q.  And as you sit here today, do you have some
2  further understanding as to what he was referring to?
3      A.  I believe it's a computer test, some
4  testing for the work position.
5      Q.  Was it a test for a Series 65 license for a
6  broker?
7      A.  No clue what a Series 65 license means.
8      Q.  All right.
9      A.  I have read that and I remember seeing that
10  phrase in the deposition of Dr. Wachs now that you've
11  used the phrase.
12      Q.  Right.
13      A.  I don't know what it is.
14      Q.  So you don't know what the test consists
15  of, what the Series 65 Examination consists of; is
16  that true?
17      A.  Absolutely not.  Generally when someone ask
18  me or I make a conclusion regards to their visual
19  attention and they may be in a testing situation,
20  it's not a matter of what is the test.  It's that
21  it's a sustained concentrated near task at what
22  position and under what conditions.

## Page 81

1      Q.  Did Mr. Morgenstein at any time indicate to
2  you an inability to prepare to study to take the
3  test?
4      A.  I don't recall.
5      Q.  Do you recall exactly what the nature of
6  his complaint was with respect to having to take this
7  test?
8      A.  It's not in my original intake notes about
9  the test.  So that would have been after during the
10  conference a mentioning of taking a test.  And that's
11  what would lead me to have made a note about if you
12  were to pursue going back to work, as I mentioned
13  earlier, these are accommodations that are consistent
14  with the data line that for anyone who is taking
15  testing or is in work that wants to continue.  These
16  are consistent accommodations that may be requested.
17      Q.  Have you formed an opinion as to the extent
18  to which Mr. Morgenstein is unable to care for
19  himself, take care of himself as a result of his
20  visio-related difficulties?
21      A.  There's nothing in the history that directs
22  that there's a life, quality of life issue of taking

## Page 82

1  care of himself. I'm not sure really what that
2  means. If you want to explain that.
3      Q.  Yeah, I will. His ability to feed himself,
4  clean himself, as examples.
5      A.  There's nothing in the optometric data that
6  gives any direction about those issues of feeding,
7  being able to see foods, to intake food, to know
8  where my plate is or be able to find my plate, or to
9  clean myself.
10     Q.  And did he make any complains along those
11 lines to you?
12     A.  No.
13     Q.  What about sleeping? Did he complain of
14 any sleeping problems?
15     A.  Under the general health question, he did
16 not make mention of any sleep disorders.
17     Q.  Do you know what Mr. Morgenstein's job at
18 Morgan Stanley was?
19     A.  The statement I have here would be he wrote
20 on his intake "financial advisor," in quotes I have
21 something. I wrote stockbroker. And that may have
22 just come from a sense of what he was explaining to

## Page 83

1  me that he may have had some involvement with.
2      Q.  Do you have an understanding as to how much
3  reading was required for that position?
4      A.  No.
5      Q.  If I can have you turn to Exhibit 3.
6          MR. CASHDAN: This is the May 9, 2006
7  packet?
8          MR. SCALIA: Correct.
9          BY MR. SCALIA:
10     Q.  Do you have Exhibit 3 in front of you?
11     A.  I do.
12         MR. CASHDAN: Excuse me. Did you mark this
13 as six?
14         MR. SCALIA: I did not.
15         THE WITNESS: I haven't even gotten back my
16 original yet. Thank you, sir.
17         BY MR. SCALIA:
18     Q.  Dr. Kraskin, do you recognize Exhibit 3?
19     A.  I do.
20     Q.  And is Exhibit 3 a letter from you to
21 Michael Kane, Mr. Morgenstein's counsel in this case,
22 dated May 9, 2006, in which you enclose a copy of

## Page 84

1  your expert report?
2      A.  Yes.
3      Q.  So the first page is the cover letter and
4  the remaining portion of Exhibit 3 is the actual
5  April 29, 2006 Report, correct?
6      A.  Correct.
7      Q.  Does this expert report contain all of your
8  conclusions and opinions reached in this matter?
9      A.  It should.
10     Q.  Are you aware as you sit here today of any
11 conclusions or opinions that you have reached in this
12 matter that are not contained in this report?
13     A.  Let me see if there's anything else I would
14 have said.
15         I don't believe there's anything else I
16 would have added.
17     Q.  Okay. If I can direct your attention to
18 the second paragraph on the first page of the report
19 itself.
20     A.  Uh-huh.
21     Q.  Do you see where it says "Presently
22 Mr. Morgenstein reports that while the near glasses

## Page 85

1  may provide added acuity they are difficult to use
2  and result in feeling of muscle strain around the
3  left eye"?
4      A.  Uh-huh.
5      Q.  Do you recall any discussions with
6  Mr. Morgenstein about that particular issue?
7      A.  Again going back to the original intake,
8  that is a comment that he made. And looking at the
9  data, I'm sure we discussed in the conference time
10 about why he may in my opinion be more feeling of a
11 muscle strain around his left eye than whether be
12 both eyes or no eyes.
13     Q.  Did he explain to you why he believed they
14 were difficult to use, the nearsighted glasses?
15     A.  The glasses for near?
16     Q.  Yeah. Thank you.
17     A.  I'm correcting you on that --
18     Q.  Right. Right.
19     A.  -- because they have a different meaning.
20 No.
21     Q.  Did you form an opinion as to why he might
22 be feeling a muscle strain around the left eye as a

## Page 86

1  result of using the near glasses?
2      A.  I believe in my opinion that the strain
3  that he feels is probably more associated with the
4  blink interpretation than -- and he may be aware of
5  it when he is doing close work, therefore having the
6  near glasses on because he has difficulty maintaining
7  convergence, teaming both eyes.  So he's bringing
8  attention within himself to the task he's doing which
9  is not being able to sustain over a period of time.
10     Q.  So in other words, it's your opinion that
11 the muscle strain that he says he was feeling around
12 his left eye really wasn't a function of him wearing
13 the near glasses but rather was a function of him
14 performing near functions?
15     A.  That would be my opinion.
16     Q.  And did you explain that to him?
17     A.  I'm sure in our conference we had that
18 discussion.
19     Q.  Did he indicate to you at any time that he
20 wasn't using the near glasses?
21     A.  Not when doing a near task, no.
22     Q.  Do you see in the last sentence of

## Page 87

1  paragraph 2 of your report where it says "There are
2  many times that he finds himself without glasses
3  because nothing seems to help resolve the discomfort
4  associated with eye movements"?
5      A.  There's a comment in my notes which comes
6  about, it says here "uses distance glasses for select
7  needs such as driving, many times does not have the
8  glasses because he reports problems with eye
9  movements.
10     Q.  So did you understand him to be saying that
11 he many times doesn't use the glasses?
12     A.  At distance.
13     Q.  Okay.  Just for distance.
14     A.  And that's why the sentence comes after the
15 sentence that says "The distance are used selectively
16 for driving needs.  There are many times that he
17 finds himself," those were directed to the distance
18 glasses, not the near glasses.
19     Q.  Thanks.  Do you see in the third paragraph
20 of your report, the third sentence there where it
21 says "The visual complaints of binocular integration
22 interference and problems associated with eye

## Page 88

1  movements have continued to increase since the
2  initial neuroma and the recurrent tumor"?
3      A.  Yes.
4      Q.  Were you able to form an opinion as to the
5  pattern of increased problems that he was
6  experiencing?  In other words, was the increase in
7  the problems accelerating as a result of the
8  recurrence of the tumor?
9      A.  I have no knowledge.
10     Q.  Is it accurate to say that you are only
11 able to test Mr. Morgenstein's vision impairment as
12 it existed on April 4, 2006?
13     A.  As I said earlier, optometric data when
14 it's collected reveals not only what's happening
15 today, but it gives insight into the past.
16     Q.  Have you been able to form an opinion as to
17 the severity of Mr. Morgenstein's binocular
18 integration interference in the 2001 and 2002, 2003
19 time frame?
20     A.  Opinion?
21     Q.  Uh-huh.
22     A.  By looking at the notes from the colleague

## Page 89

1  I accept, Dr. Wachs' notes, that report to my data
2  today, I make an opinion that there have been
3  discomforts and challenges using both eyes.
4          Further, I would say that looking at the
5  data would cause me to raise a question about how the
6  person -- if this data had been this way from 20, 30,
7  40, 50 years ago, I would question how the person
8  made it without complaints, made it through their
9  life without complaints prior.  Because I would have
10 expected to hear I've had reading problems, I've had
11 problems sustaining at near since I was in high
12 school, since I was in middle school, since I was in
13 college.
14     Q.  Okay.  Based on the testing that you
15 conducted of Mr. Morgenstein and the data that you've
16 reviewed from Dr. Wachs' evaluations of
17 Mr. Morgenstein, have you been able to reach an
18 opinion as to whether Mr. -- based solely on that and
19 not calling into mind anything that Mr. Morgenstein
20 himself told you, just looking at your data and
21 Dr. Wachs' data, were you able to form an opinion as
22 to whether or not Mr. Morgenstein's condition

## Page 90

1  worsened from the time that Dr. Wachs had evaluated
2  him and the time that you evaluated him?
3      A.  I wanted to do that.  My problem was this
4  is why when you asked me had I spoken with Dr. Wachs,
5  that was my intent because I cannot read his writing.
6  And I was having a terrible time reading his data
7  that was then sent to me in relation to this case to
8  understand so I could compare numbers from that
9  period of time to this period of time.  He would not
10  answer the question.
11      Q.  And in reading his deposition testimony,
12  did that enable you to form any opinion on that
13  issue?
14      A.  No, not definitive to what you're asking me
15  right now.
16      Q.  Let me direct your attention to the last
17  paragraph on the first page of your report which
18  states, "He reports that the visual difficulties
19  interfered with his previous work performance and the
20  ability to meet specific job demands."
21      Do you recall any specific discussion with
22  Mr. Morgenstein about job demands that he was unable

## Page 91

1  to perform due to his visual difficulties?
2      A.  During our conference on April 6th and
3  going further into discussion, this is when he
4  brought forth further comments regarding his ability
5  to read, do work, and this testing comment came up
6  about not being able to meet the demand or criterion
7  of doing this task and which resulted, as I
8  understood it, in him not having a position any
9  longer.
10      Q.  Was there anything else that he said he
11  couldn't do at work, any performance-related
12  functions that he was unable to perform due to his
13  vision problems?
14      A.  I don't recall.
15      Q.  Let me direct your attention to the second
16  page of your record under the section entitled
17  "Diagnosis."
18      A.  Uh-huh.
19      Q.  What do you mean by "a stress induced
20  visual problem"?
21      A.  That's a phrase that's used to state that
22  when the work demand, the visual demand, not meaning

## Page 92

1  office work, any visual demand if it is greater than
2  a person's ability to do the demand, they're going to
3  have a problem.
4      And his data reveals that form of concern
5  in which this person if they're pushed to do visual
6  tasks well beyond their basic ability, they're going
7  to have a problem and therefore we use the term
8  "stress."
9      Q.  Okay.  Second line there, what do you mean
10  by "ocular-motor dysfunction"?
11      A.  Ocular motor is the teaming of both eyes,
12  how the two eyes are working together.
13      Q.  That's another way of saying binocular
14  dysfunction?
15      A.  Correct.  But I will correct and say that
16  is a way to say binocular dysfunction.  But it also
17  has a very specific meaning when you say ocular
18  motor.
19      Q.  What does that mean?
20      A.  Because there are two different diagnostic
21  codes on an insurance basis.  One can have a
22  binocular dysfunction and the ocular motor may be

## Page 93

1  better teamed.  So you wouldn't classify it as a
2  definite ocular-motor dysfunction.  You would
3  classify it that they're not teaming both eyes well
4  together.
5      But in this case, there was also the small
6  vertical deviation between the two eyes and a slight,
7  if I remember right, let me look back, an
8  intermittent what's referred to as "strabismus" which
9  means not keeping both eyes together, a turning of an
10  eye.
11      Q.  What do you mean a turning of the eye?
12      A.  An eye turning up, down, in or out.  And
13  there was a small divergent strabismus at times.
14      Q.  Direct your attention to the third page of
15  your report, the very top paragraph.
16      A.  Uh-huh.
17      Q.  You state "His visual processing of
18  information derived through the visual system is
19  directly impacted and would therefore result in
20  reduced work performance, both general and visual
21  fatigue, and the inability to sustain focus to the
22  task."

Page 94

1    Were you able to form an opinion as to what
2    degree his visual processing of information would be
3    directly impacted by his ocular-motor dysfunction?
4    A.   Again as I stated earlier, this goes back
5    to the statement of that due to this reduced
6    performance, I would expect a person not to be able
7    to last, as I said earlier, probably more than 15 to
8    20 minutes and would show signs of not being able to
9    maintain their visual attention to the task, their
10   visual concentration to the task, and may have to go
11   back and redo the work or take a break.
12   Q.   Let me direct your attention to the next
13   paragraph on page 3 of your report where you state,
14   "It is my opinion that this reduction in visual
15   performance has a direct relationship to the tumor as
16   discussed in the history, and that the resulting
17   reduced visual performance and function has existed
18   since prior to 1999 as noted by Dr. Harry Wachs in
19   his report dated March 2001."
20   How do you reach that opinion?
21   A.   That again was looking at Dr. Wachs' notes
22   of reduced processing and taking an inference not

Page 95

1    that the direct relationship meaning the tumor
2    caused, but that this tumor's presence, possibly the
3    removal of the tumor, changed how he was orienting
4    visually, because again it affects the vestibular and
5    ocular relationship of where I am in space.
6    Q.   Was does vestibular mean?
7    A.   Ear.
8    Q.   Okay.
9    A.   And the three semicircular canals which
10   cause you to know where you are in space; if you're
11   upside down, sideways or not.
12   And by affecting that relationship, it will
13   affect the balance relationship and therefore in my
14   opinion would have had an impact. And by looking at
15   Dr. Wachs' notes gives me a sense -- again not having
16   the specific data to compare the number; instead of
17   apple to apple, instead of granny apple to granny
18   apple, it might be granny apple to somebody else's
19   apple -- that his performances have reduced and have
20   existed as reduced.
21   Q.   If I can have you look at that same page,
22   third page of your report under "Recommendations" or

Page 96

1    appear to be three categories of recommendations.
2    And if I can have you compare those with the
3    Optometric Care Program Alternatives in your April 4,
4    2006 Report, which is Exhibit 1, how do the
5    recommendations in your expert report differ from
6    these program alternatives?
7    A.   Number 1 recommendation, continue his
8    present glasses is the conventional comment on the
9    other one. The number 3 on visual training is the
10   number 3 on the visual training of the alternatives.
11   As I said before in my original notes, the
12   behavioral in my original conference it was
13   discussing of would there be need for a different
14   lens at near. And from the conference standpoint and
15   further discussion that was not going to be a change.
16   But within the further discussions of the
17   potential to that this gentleman would like to go
18   back and do some work, in our further discussions,
19   that's what led to my making notes to myself after
20   the conference of regards to possible accommodations;
21   if this person were to return to work, what
22   accommodations might be necessary to meet their

Page 97

1    needs.
2    And the fourth alternative is listed in my
3    original notes, because I had already had the
4    conversation with Mr. Morgenstein did not appear
5    appropriate for this report.
6    Q.   Okay. And if I can turn your attention to
7    the remaining portion of Exhibit 3.
8    A.   Yep.
9    Q.   Appears to be resume?
10   A.   Vitae.
11   Q.   Vitae. Does this accurately represent your
12   list of credentials?
13   A.   It does accurately list as of that date,
14   that which I was involved in or associated with at
15   the time.
16   Q.   At what time, at the date --
17   A.   At the date of writing this note, April 29,
18   2006.
19   MR. SCALIA:  Thanks.  Let's take a short
20   break if we can.
21   (A brief break was taken.)
22   MR. SCALIA:  Back on the record.  We can

## Page 98

1  mark this as exhibit next in line. I lost track of
2  what that is.
3      THE REPORTER: Six.
4          (Exhibit No. 6 was marked for
5          identification.)
6      BY MR. SCALIA:
7      Q. Dr. Kraskin if you could take a look at
8  Exhibit 6. Is this a copy of the printout of the web
9  site that you looked at, that you testified earlier
10 pertaining to Jeffrey Getzell?
11     A. Yes.
12     Q. And you see where there are certain
13 sections that are underlined?
14     A. Yes.
15     Q. Is that your underlining?
16     A. Yes.
17     Q. And why did you underline those particular
18 sections?
19     A. As I read, I have a tendency to underline
20 things that I want to be able to go back and recheck.
21     Q. And do you see in the underlined section in
22 the very first paragraph of Exhibit 6 where

## Page 99

1  Dr. Getzell states in essence that patients who have
2  vision problems relating, you know, following
3  acoustic neuroma surgery that their vision problems
4  are treatable?
5      A. Yes.
6      Q. Is that consistent with your opinion with
7  respect to Mr. Morgenstein?
8      A. That's consistent with my opinion of the
9  alternative of offering some visual training, yes.
10     Q. If I can turn your attention back to your
11 expert report, page 3 of the expert report in
12 particular.
13     Again, the third recommendation that states
14 "Visual training therapy may be considered to develop
15 and restore the desirable and adequate visual
16 abilities, and the freedom to utilize these
17 abilities."
18     Is it your opinion that if Mr. Morgenstein
19 were to undergo the recommended visual training
20 therapy that that therapy would develop and restore
21 his visual abilities to a desirable and adequate
22 level?

## Page 100

1      A. It's my opinion that if he were to take on
2  some visual training therapy, that would be the
3  direction and goal. And as I stated earlier, due to
4  this case, like some others, we would have to see how
5  changes are taking place during visual training.
6      Q. But based on the data that's available to
7  you as you sit here today and the complaints and the
8  comments that Mr. Morgenstein made to you during your
9  evaluation of and in your conference with him, is it
10 your opinion that it would be likely that the
11 recommended therapy would return him or would improve
12 his vision to an adequate level?
13     A. It's my opinion that doing appropriate
14 visual training would do and if it were effective for
15 him, as I expect it would be based on the data, that
16 we would get more effective and desirable and
17 adequate visual abilities.
18     Q. But as you sit here today, you just can't
19 determine the extent to which the improvement --
20     A. I cannot, nor can I tell you how long a
21 period of time involving visual therapy would be.
22     Q. Have you ever seen this document before?

## Page 101

1      A. I think when I was looking at some data
2  that Mr. Cashdan may have shown me, this -- if I'm
3  not right, maybe the intake form for Mr. Morgenstein.
4  But I don't have it.
5      Q. Okay. I think --
6          MR. CASHDAN: For the record, I don't
7  believe that I've seen this before. And I'm
8  reasonably confident that we did not provide it to
9  Dr. Kraskin. I could be mistaking.
10         MR. SCALIA: Okay. I'll represent that it
11 is not part of the file that you've produced today.
12         THE WITNESS: Yeah.
13         MR. CASHDAN: Right. I don't think I have
14 it in my file. If it was produced, I mean if we have
15 it, I haven't seen it.
16         MR. SCALIA: Okay.
17         MR. CASHDAN: But as you know, Mr. Kane is
18 the primary attorney in this case.
19         MR. SCALIA: Correct. I understand.
20         And just for clarification on the record
21 purposes, I just want to identify the document as
22 Exhibit 3 to whatever deposition was taken in this

## Page 102

1    case on June 26, 2006. I believe that was Dr. Wachs'
2    deposition.
3        MR. CASHDAN: That was your deposition?
4        MR. SCALIA: Correct. And it is a
5    multi-page document on its face dated February 19,
6    2001, on Harry Wachs letterhead.
7        THE WITNESS: May I ask you a question?
8        MR. SCALIA: Sure.
9        THE WITNESS: Would that have been included
10    with the deposition?
11        MR. SCALIA: It was a document -- yes. It
12    would have been attached to the original deposition.
13    It was a document --
14        THE WITNESS: So I scanned the deposition.
15    I may have seen it then.
16        MR. CASHDAN: I don't think the deposition
17    we provided you included the exhibits.
18        MR. SCALIA: Right.
19        THE WITNESS: But I've seen Dr. Wachs'
20    intake forms before so --
21        MR. CASHDAN: All right. Okay.
22        THE WITNESS: Well I have no clue.

## Page 103

1        BY MR. SCALIA:
2        Q.  Just one last question on this, and I'm not
3    going to mark it as an exhibit if your answer to my
4    question is as expected.
5        Is it accurate to say that you did not rely
6    on this document in preparing, in either evaluating
7    Mr. Morgenstein or conferring with him on April 6th
8    or in the preparation of your expert report?
9        A.  That would be very correct.
10        Q.  I've gone around a little bit with you on
11    your ability to assess or opine on Mr. Morgenstein's
12    vision, the state of his vision in the 2001 to 2003
13    time frame. And you'll correct me if I'm
14    mischaracterizing your testimony, I don't intend to
15    do it, but is it accurate to say that you are able to
16    opine somewhat on the state of his condition during
17    that time frame based on data that you reviewed that
18    had been collected by Dr. Wachs?
19        A.  Yes.
20        Q.  And can you identify for me specifically
21    what documents or records of Dr. Wachs' you reviewed
22    in reaching that opinion?

## Page 104

1        A.  It would be the one-page report referred to
2    as Exhibit 2.
3        Q.  Okay. Did you encourage Mr. Morgenstein to
4    seek treatment for his vision condition?
5        A.  I don't generally encourage patients to do
6    any one specific alternative. I discuss alternatives
7    with them. I will answer questions. And I'll guide
8    in response to their questions.
9        And you'll see in the copy that you've made
10    of my record that the diagnostic facts and
11    programming form of him has return April '07 because
12    that was the essence of the result of the exam that
13    we were not pursuing at this time any other
14    alternative except that I listed him as my office
15    will call him in a year for a re-evaluation annual
16    vision eye health evaluation check.
17        Q.  I'm sorry. Where's that?
18        A.  That's on the sheet when you copied my
19    record --
20        Q.  Okay.
21        A.  -- the first sheet. This is a program
22    sheet which simply tells me when the person will

## Page 105

1    return, what the date of their entry was, and any
2    other little note that I may make.
3        Q.  Did Mr. Morgenstein inform you that he was
4    not interested in pursuing a course of treatment with
5    you?
6        A.  No. He did not inform me that he wish to
7    pursue any course of treatment at this time.
8        Q.  I'm confused about your previous answer.
9    Why was it decided that he would not come back to you
10    before April of 2007?
11        A.  This point he hasn't made a determination
12    to do any care provided by me. And my office is
13    what's referred to as "a program practice" which
14    means we don't just throw you in a file.
15        Q.  Right.
16        A.  We set it up so that if you haven't said
17    anything, we will call you in a year to remind you of
18    good vision and eye health care. And that's how this
19    file has been set up at this point in the program.
20        Q.  Did you ever tell Mr. Morgenstein words to
21    the effect that there was nothing he could do to
22    improve his vision condition?

## Page 106

1    A.  No.  That's not my language.

2    Q.  But anything to that effect?

3    A.  Not that I recall.  It's not my language.

4    Q.  If Mr. Morgenstein were to have testified

5  in his deposition in this case that you did not

6  suggest to him any course of treatment that he could

7  pursue in order to improve his reading, would that

8  statement be accurate?

9    A.  I would say that he didn't understand

10  completely the conference.

11    Q.  Why would you say that?

12    A.  Because there were alternatives listed.

13  There are four alternatives stated during our

14  conference.  And no alternative except for the first

15  one says keep with your present glasses and do

16  nothing.

17    Q.  Is the behavioral model of vision, is that

18  a generally accepted practice by medical doctors and

19  in particular by ophthalmologists?

20    A.  No, because ophthalmologists are not

21  optometrists.

22    Q.  I understand that.  But they could still

## Page 107

1  have an opinion about whether or not behavioral model

2  of vision is a generally acceptable practice or

3  course of medical care.

4    A.  I can't answer the question.

5    Q.  You don't know one way or the other?

6    A.  I do not know of an opinion that's

7  expressed across the board.  I know of my

8  ophthalmological colleagues that I refer to and refer

9  to me they have a clear understanding of when to

10  refer and to use the -- for their patients to benefit

11  from the model of vision that I use.

12    Q.  And do you know if that model is generally

13  accepted by the American Academy of Pediatrics?

14    A.  The American Academy of Pediatrics is not

15  optometry.

16    Q.  But do you know if the behavioral model of

17  vision that you practice is generally accepted by the

18  American Academy of Pediatrics?

19    A.  I have no clue.

20    Q.  What about by the American Academy of

21  Ophthalmology?

22    A.  I have no clue.

## Page 108

1    Q.  What about by the American Association for

2  Pediatric Ophthalmology and Strabismus?  Am I

3  pronouncing that correctly?

4    A.  Again, I have no clue of what their

5  opinions are.

6        MR. SCALIA:  I have no further questions.

7        MR. CASHDAN:  I have no questions.

8        MR. SCALIA:  Pardon me?

9        MR. CASHDAN:  I have no questions.

10        Oh.  I do have one question.  Could I see

11  the document you didn't introduce that was Exhibit 3?

12  I may or may not have a question.  I have to look at

13  it before I --

14        (Pause)

15        MR. CASHDAN:  I have no questions.  Thank

16  you.

17        (At 12:48 p.m., the proceedings were

18  concluded.  Reading and signature were not waived.)

19

20

21

22

## Page 109

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLUMBIA

2

       - - - - - - - - - - - - - -x

3  NORMAN L. MORGENSTEIN,    :
                              :

4       Plaintiff,    :
                      :

5    vs            : Civil Action
                   : No. 05-2123 (JR)

6  MORGAN STANLEY DW, INC.,  :

7       Defendant.    :
       - - - - - - - - - - - - - -x

8

        ACKNOWLEDGEMENT OF DEPONENT

9

       I, JEFFREY L. KRASKIN, do hereby

10  acknowledge that I have read and examined pages 4
    through 108 inclusive, of the transcript of my

11  deposition taken on Tuesday, August 8, 2006, and
    that:  (Check appropriate box)

12

    [  ] the same is the true, correct, and complete

13  transcription of the answers given by me to the
    questions therein recorded.

14

    [  ] except for the changes noted in the attached

15  Errata Sheet, the same is the true, correct, and
    complete transcription of the answers given by me to

16  the questions therein recorded.

17

18   _____     _____
     Date          Signature

19

20

21

22

Page 2010

CERTIFICATE OF NOTARY PUBLIC

I, DELORES M. GREEN, a Notary Public in and for the District of Columbia, before whom the foregoing Examination Under Oath was taken, do hereby certify that witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me in shorthand at the time and place mentioned in the caption hereof and thereafter reduced to typewriting under my supervision; that said Examination Under Oath is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this Examination Under Oath is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of this action.

_____
Delores M. Green
Notary Public in and for
THE DISTRICT OF COLUMBIA

My commission expires:
January 1,