UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| **NORMAN L. MORGENSTEIN** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **CA No. 05-2123 (JR)** |
| ) | |
| **MORGAN STANLEY DW INC.** ) | |
| ) | |

**DECLARATION OF NORMAN MORGENSTEIN**

My name is Norman Morgenstein. I am over the age of 21 and I am competent to make this declaration based on my personal knowledge.

1. I worked in the District of Columbia for Morgan Stanley and its predecessor companies for over 32 years as a Financial Advisor.

2. For that period of time, I performed the duties of a stockbroker.

3. In that capacity, I was responsible for investing the assets of my clients in an appropriate manner.

4. I held a Series 7 and a Series 3 license. Through 1998, I was licensed as an Investment Advisor Representative in the State of Maryland.

5. During all of my tenure, my father Alvin Morgenstein also worked at the firm.

6. In or about December 1995, an acoustic neuroma was discovered on the left side at the distal end of my left inner ear. On February 29, 1996, I had surgery to remove the tumor. Although the tumor was successfully removed, damage to several nerves that the tumor encompassed left me with issues of hearing, balance, facial paralysis and eye muscle control. Most disturbing was my inability to read for a normal length of time.

Following my surgery my left eyelid would not blink normally.  This led to tearing in the eye.  When I would sit down to read I could only concentrate for 10-15 minutes.  Further I could not retain everything I was reading.  When I read, many times, I would have to re-read passages several times before I absorbed the meaning of what I was reading.  When attempting to read, my left eye would blur (it does not blink entirely closed) causing me to loose my place on the page, as well as a break in my concentration and creating difficulty in absorbing the material. I would also have occasional headaches while reading, tire easily and many times would fall asleep.  This was drastically different from how I read prior to surgery.

7. In addition, my left side balance nerve was compromised during the procedure, causing me to tire easily due to the necessity of my leg muscles to work harder to maintain balance.

8. My ability to read was such that I could not study for or sit for the Series 65 examination.

9. Despite my limitations, I was able to return to work in 1997.

10. However, over the course of the next several years I continued to have problems as a consequence of the surgery.  In early 2001 I sought treatment from medical professionals concerning my reading problems.  I saw Dr. Wachs in March 2001.  In the consultation, Dr. Wachs was very discouraging about improving my reading problems.

11. I also continued to see Dr. Simon, an optometrist because of my reading problems.  I also consulted two ophthalmologists at George Washington University.

12. I did not see Dr. Jacobsen since 1999. That was in connection with my desire to have a modem on my office computer so that I could work from home. Dr. Jacobsen provided a medical justification for the request which was accepted by MS.

13. I have not seen Dr. Fitzgerald since 1996.

14. In the early 1990's I had placed four accounts into Investment Consulting Services (ICS) program. I received compensation from these accounts on a transaction basis.

15. On March 9, 2001, I was contacted via e-mail by Hugo Jauregui of MS's National Registration Department. Mr. Jauregui indicated that I needed to be registered as an IAR in order to be paid compensation on the four accounts that I had placed into ICS in the early 1990's. Mr. Jauregui's e-mail stated:

> "National registration does not have you registered as an Investment Advisor in the state where your branch is located [the District of Columbia]. ICS sales credits therefore will be jeopardized if requirements are not met within a timely fashion. Please forward appropriate documents to National Registration. Information about this topic can be found on the intranet under ICS Headlines. ICS Account(s)   642-098051   642-98144   642-112559   642-116655   642-149105"

16. Apparently, my IAR registration in Maryland had lapsed because of a change in the law in 1998. A Series 65 license was required to be an Investment Advisor in D.C. The license could be obtained by taking an exam or obtaining a waiver.

17. I knew that studying for and taking the exam would be impossible for me because of my reading disability.

18. Within days of Mr.Jauregui's e-mail, Morgan Stanley, through its representative Paul Garipoli of MS National registration, contacted me and informed me that he (Mr.

Garipoli) had tried to have my Series 65 license reinstated in the state of Maryland and/or registered in the District of Columbia as an Investment Advisor, but that he was not successful.

19. I advised Mr. Garipoli of my reading disability and my belief that I would not be able to study for the Series 65 exam.

20. Mr. Garipoli directed me to contact Mr. Theodore Miles of the DC Department of Insurance and Securities Regulations (DISR) and request a waiver of the Series 65 examination. Mr. Garipoli assured me that he would assist in the preparation of the waiver request.

21. Defendant's representative, Mr. Garipoli, assisted me in drafting the letter requesting the waiver, which was dated April 4, 2001. I copied Mr. Garipoli on the letter. D.C. regulations specifically provided for a waiver, regardless of disability, from the examination if the Commissioner, in his discretion, believed that such a waiver was warranted. The factors the Commissioner was to consider included:

  a) whether the applicant has disciplinary history
  b) Whether the applicant has certified to Department staff persons that the applicant has reviewed the act and this title.
  c) Whether the applicant has substantial long-term and continuous experience as a principal, agent or employee, other than in a clerical capacity of a broker-dealer or investment adviser. Staff persons also will consider whether the applicant has similar experience in a responsible position, other than in a clerical capacity, in the securities, banking, finance or other related business.
  d) Whether the applicant has some continuous experience in a responsible position, other than in a clerical capacity, in the securities, banking, finance or other related business and also possesses educational credentials or professions designations such as one of the following:
  e) An advanced degree obtained through graduation from a formal degree program of an accredited educational institution with a concentration in economics, finance, mathematics, business, business administration or similar subjects.

DC SR regulations at §1860.5.

22. At no time did MS suggest that I was not providing enough medical information to the DSIR in order to obtain the waiver. I wrote that I believed that I met the standards of the waiver and, in addition, that a waiver was justified because of my disability.

23. Thereafter, over the next several months, DISR had a series of interactions with me, some in writing and some via telephone in which it requested information from me that I supplied as best I could. Lilah Blackstone, then the Assistant General Counsel at DISR, worked with me during this time. I, meanwhile, kept MS aware of the entire process by faxing copies of correspondence to Mr. Garipoli in New York and talking to him on the phone about the matter.

24. In a letter dated October 2, 2001, the DSIR, by Mr. Miles, Director, Securities Bureau, denied my request for a waiver from the exam. The DISR concluded that it could not grant me a waiver because it found with regard to the four accounts that I had placed under management in the 1990s (these were the accounts Mr. Jaruegi had alerted me to) that I was in violation of the District's regulations when I "placed under management four (4) investment accounts [in question] while being employed in the District of Columbia." Mr. Miles reasoned that "One of the most important factors in determining whether to grant a request for a waiver is whether the applicant has violated any of the provisions of the security laws and regulations of the District of Columbia."

25. The DISR letter of October 2001 did not address my disability.

26. For unknown reasons I did not find out about the DISR's decision until December 2001.

27. Once I learned of the DISR's decision, I contacted Ms. Blackstone, the Assistant General Counsel at DISR, and asked for a meeting with DISR. I informed Mr. Garipoli

in New York about this request. Ms. Blackstone arranged the meeting with me, Mr. Miles, Mr. Sheppard, Mr. Goff and Ms. Blackstone in DISR's offices.

28. At the meeting, DISR personnel advised me that they would like to grant me the waiver. She further told me that MS did not follow protocol and should have applied for the waiver on my behalf. They advised me that it (DISR) would ask MS <u>to</u> apply for the waiver on my behalf.

29. DSIR, through Ms. Blackstone, informed me on May 21, 2002 that MS would not apply for a waiver on my behalf. I was never told why MS would not apply for a waiver.

30. I understood from Carolyn Greenhalgh, the branch administrative manager that MS concluded that I did not need the Series 65 license in order to receive compensation on the 1990s accounts because I was paid on a transaction basis meaning I only received compensation if there was trading activity in the accounts. This was different from a fee based account where the financial advisor would be paid a fee regardless of whether any trading occurred. I continued to receive compensation on these accounts thereafter.

31. Given that I continued to receive compensation on these accounts, I did not pursue the matter further although I did not understand why MS would not comply with the DISR's request that it apply for a waiver on my behalf.

32. In December 2002, my father Alvin was 92 years old and had been working at MS and its predecessor companies for some 38 years.

33. He had numerous sizeable client accounts totaling slightly more than twenty million ($20,000,000) dollars. My father decided to retire. He handed over his accounts to me.

6

34. I concluded that the accounts I had "inherited" needed to be "managed." In the 1990's the nature of Morgan Stanley's retail business started to change. Traditionally, brokers such as I would buy or sell stocks at the client's direction. In the 1990's, with the advent of internet trading, that business model began to change. Morgan Stanley encouraged moving accounts of substantial size (minimum $100,000) into managed money in which fees would be bundled into a percentage of the assets managed for all services rendered under the program. i.e. management of the assets and cost of transactions. In this model I would be paid on a fee basis as opposed to a transaction basis.

35. I believed that I would likely need the Series 65 and that I would have to revisit the issue in order to place the inherited accounts into managed money. At the time, I was unaware of any other exception to the Series 65 requirement. I have since learned that I may have been able to place these accounts into wrap accounts even without a Series 65 license although MS may have still insisted that I have the Series 65 even though the law may not have required it.

36. I still had the same concern, however, that I could not study for the Series 65 exam because of my reading disability.

37. I thought that I would go to my supervisor Ron Masci, who was aware that I had recently inherited these accounts and discuss with him the possibility of MS applying for the waiver on my behalf because of my disability.

38. I sent the following letter and e-mail to Mr. Masci on or around November 20, 2003: "….I have come to the conclusion that in order to be more productive for the firm and myself, and to stay in line with the firm's direction of fee based managed accounts, I

7

find it imperative to obtain a Series 65 license. Under normal circumstances, and prior to February 29, 1996 [the surgical date]……I am requesting that you file the necessary documents on my behalf with the District of Columbian Department of Insurance And Securities Regulation, following protocol and formally requesting an exemption to the examination, so that I can obtain the Series 65 license."

39. Within four (4) days, Mr. Masci called me into my office in order to discuss the e-mail. During the meeting, Mr. Masci was visibly angry. Without discussion, Mr. Masci told me that the waiver was not going to happen. He told me that I needed to retire or that I would be fired. Mr. Masci threatened me that if I did not retire he would disconnect my telephone and workstation and cancel my other licenses.

40. I left the meeting shaken. I decided to confirm that Mr. Masci was really insisting that I leave the firm or that Mr. Masci would fire me and on December 1, 2003, I sent an e-mail which stated in part: "So there would be not misunderstanding as to the contents of our meeting on November 24th………either I retire, or you will discharge me."

41. Mr. Masci responded by stating that my understanding of the retirement date was accurate. He did not challenge my recollection that I did not have a choice.

42. I resigned because I did not have a choice.

43. In 2001 – 2002, I never asked MS to apply for the waiver from the Series 65 on my behalf. My understanding from DISR was that they would ask MS to apply for the waiver.

44. MS never asked me for medical information in connection with my request for a waiver from the DISR.

45. I did not refuse to engage in a dialogue with MS concerning my desire to obtain a Series 65 exam waiver. At one time MS sent me a form to request accommodations from the organization that gives the exam. But this was limited to accommodations for actually taking the exam. My first problem was in studying for the exam.

46. In fact, MS never explained to me why it would not apply as DISR had requested for a waiver on my behalf. It was MS that refused to engage in a dialogue in 2001-2002. For example, it did not offer a tutor, or a reader or any technology that might make studying for the exam easier.

47. I did not have a contract of employment with MS.

48. Mr. Masci did not suggest that I retire in our meeting. Mr. Masci made it clear that he was demanding that I retire or he would terminate me. Previously, Mr. Morgenstein only talked about retirement as an option.

49. If I had been able to place these accounts under management, I would have made a great deal more money than I had been making in the previous few years.

50. I disagree that I was a "below average performer" over the course of my 32 years of employment. I have had many successful years at MS.

51. I never asked Ms. Greenhalgh to apply for the waiver on my behalf.

52. Following my forced retirement, I spoke with Charles Schwab about employment there but was told that a Series 65 was needed. Also, I received contact from a head-hunter, who also wanted the Series 65 license.

53. My production exceeded FA's who remained at MS after my forced departure.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

                                                                                       _____

                                                                                        Norman Morgenstein

Dated:   September 15, 2006