**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NORMAN L. MORGENSTEIN** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 05-2123 JR** |
| ) | |
| **MORGAN STANLEY DW Inc.** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**DEFENDANT MORGAN STANLEY DW, INC.'S**
**REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

PAGES

I.     SUMMARY OF UNDISPUTED MATERIAL FACTS……………………………  1

II.    MORGENSTEIN HAS FAILED TO RAISE A GENUINE DISPUTE
       OF FACT AS TO MORGAN STANLEY'S STATUTE OF
       LIMITATIONS DEFENSE……………………………………………………  3

III.   MORGENSTEIN HAS FAILED TO RAISE A GENUINE DISPUTE OF
       FACT AS TO WHETHER MORGAN STANLEY FAILED TO GRANT
       HIM A REASONABLE ACCOMMODATION TO WHICH HE WAS
       ENTITLED……………………………………………………………………  7

       A.    Morgenstein Presents No Evidence From Which A Jury Could
             Conclude That He Was Disabled…………………………………………  8

       B.    It Remains Undisputed That The Series 65 License Was Not
             An Essential Function Of Morgenstein's Job……………………………  11

       C.    It Remains Undisputed That Morgenstein's Waiver Request Was Not A
             *Reasonable* Accommodation…………………………………………..  13

       D.    It Remains Undisputed That Morgenstein Failed To Engage In The
             Interactive Process………………………………………………………..  14

IV.    MORGENSTEIN FAILS TO RAISE A GENUINE DISPUTE OF
       FACT AS TO WHETHER HE WAS SUBJECT TO RETALIATION………….  17

       A.    It Remains Undisputed That Morgenstein Did Not Engage
             In Protected Activity In November 2003…………………………………  18

       B.    It Remains Undisputed That No Causal Connection Exists Between
             Morgenstein's Alleged Protected Activity and "Forced" Retirement…….  19

       C.    Morgenstein Fails to Present any Evidence of Pretext………………………  22

IV.    MORGENSTEIN FAILS TO RAISE A GENUINE FACTUAL DISPUTE
       AS TO HIS DISABILITY DISCRIMINATION CLAIM…………………………  24

CONCLUSION……………………………………………………………………………  25

i

TABLE OF AUTHORITIES

PAGES

Federal Cases

Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 577, 119 S.Ct. 2162, 2174, 144 L.Ed.2d 518 (1999) ............................................................................................................................... 13

Bloom v. New York City Bd. of Educ. Teachers' Retirement System of CTY of New York, 2003 WL 1740528, at *3 (S.D.N.Y. April 2, 2003) ................................................... 7

Castle v. Bentsen, 876 F.Supp. 1, 3 (D.D.C. 1994) ...................................................... 20

Cox v. Rumsfeld, 2003 WL 21691044, at *7 (W.D.Wis. June 19, 2003) ..................................... 7

Del. State Coll. v. Ricks, 449 U.S. 250, 258 (1980) ........................................................ 6

Dhuria v. Trustees of the University of the District of Columbia, 827 F.Supp. 818, 828-29 (D.D.C. 1993) ........................................................................................................... 20

E.E.O.C. v. Sears, Roebuck & Company, 417 F.3d 789, 806 (7th Cir. 2005) ............................. 18

Elmenayer v. ABF Freight System, Inc., 318 F.3d 130, 135 (2d Cir. 2003) .................................. 4

Fullard v. City of New York, 274 F.Supp.2d 347, 362-63 (S.D.N.Y. 2003) ......................... 20, 21

Gleklen v. Democratic Cong. Campn. Comm., 199 F.3d 1365, 1369 (DC Cir. 2000) ................... 2

Globus v. Skinner, 721 F.Supp. 329, 335 (D.D.C. 1989) .................................................. 21

Gonzalez v. National Bd. of Medical Examiners, 60 F.Supp.2d 703, 708 (E.D.Mich. 1999) ....... 9

Goos v. National Association of Realtors, 715 F.Supp. 2 (D.D.C. 1989) .................................. 20

Groderick v. Donaldson, 338 F.Supp.2d 30, 43 (D.D.C. 2004) ............................................. 20

Hayes v. Shalala, 902 F.Supp. 259, 264 (D.D.C. 1995) ..................................................... 20

Haynes v. Williams, 392 F.3d 478, 482 (D.C. Cir. 2004) ................................................... 10

Hoffman, 256 F.3d 568, 577 (7th Cir. 2001) ........................................................... 11, 12

Hopkins v. Women's Division, General Board of Global Ministries, 284 F.Supp.2d 15, 25 (D.D.C. 2003) ............................................................................................................... 8

Kalekiristos v. CTF Hotel Management Corp., 958 F.Supp. 641, 657 (D.D.C. 1997) .................. 8

Keyes v. D.C., 372 F.3d 434, 439 (D.C.Cir. 2004) ......................................................... 17

McGill v. Callear, 973 F.Supp. 20, 23 (D.D.C. 1997) ....................................................... 18

McGill v. Munoz, 203 F.3d 843 (D.C. Cir. 2000) ........................................................... 18

Moore v. Ashcroft, 401 F.Supp.2d 1, 21 (D.D.C. 2005) ..................................................... 1

Passer v. American Chemical Society, 935 F.2d 322, 332 (D.C. Cir. 1991) ............................. 18

Peeples v. Coastal Office Products, Inc., 203 F.Supp.2d 432, 466 (D.Md. 2002) ..................... 19

Pyramid Sec. Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1123 (D.C. Cir. 1991) ......................... 6

Reynolds v. The US Capitol Police Board, 357 F.Supp.2d 2, 16 (D.D.C. 2004) ......................... 7

Schroeder v. The University of Illinois at Chicago, 1997 WL 43205, at *2 (N.D. Ill. Jan. 27, 1997) ......................................................................................................................... 4

Singletary v. District of Columbia, 351 F.3d 519, 525 (D.C. Cir. 2003) .................................. 20

Smith v. District of Columbia, 271 F.Supp.2d 165, 171 (D.D.C. 2003) .................................. 11

Stewart v. District of Columbia, 2006 WL 626921, at *5-6 (D.D.C. March 12, 2006) ......... 3, 4, 6

Thompson v. Rice, 422 F.Supp.2d 158, 180 (D.D.C. 2006) .............................................. 23

Weigert v. Georgetown University, 120 F.Supp.2d 1, 22 (D.D.C. 2000) ............................. 22, 24

Wells v. Shalala, 228 F.3d 1137, 1145-46 (10th Cir. 2000) ............................................... 19

Notwithstanding Plaintiff Norman Morgenstein's protests to the contrary, summary judgment is an "integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Moore v. Ashcroft*, 401 F.Supp.2d 1, 21 (D.D.C. 2005). It is a particularly appropriate means of weeding out unfounded claims of discrimination, for which the plaintiff can produce no significantly probative evidence. *Id.* Such is the case here. Morgenstein's Opposition fails to identify any **material** facts that are **genuinely** in dispute. He makes a desperate attempt to avoid summary judgment by introducing immaterial facts, making unsupported allegations, and contradicting his own prior testimony. Such "factual disputes" cannot support a denial of Morgan Stanley's motion for summary judgment.

## I.    SUMMARY OF UNDISPUTED MATERIAL FACTS

The following material facts remain undisputed.

The Investment Advisory Services product area is but one of many specialized product areas in which Morgan Stanley's Financial Advisers **may** transact business. Morgan Stanley does not require its Financial Advisors to transact business in this product area. And Morgan Stanley does not require its Financial Advisors to obtain any licenses (*i.e.,* Series 65 or Series 66) necessary for transacting business in Investment Advisory Services unless they actually are transacting business in this product area. Masci Dec. (Def. Ex. 1), ¶¶12-13.

In 2001, Morgenstein sought to register as an Investment Adviser Representative with the DISR without having passed the Series 65 exam, by asking the DISR for a waiver of this exam requirement. Def. MPA, p. 8; Plaintiff's Statement of Material Facts in Dispute ("Pltf. SOF"), ¶¶21-22. The DISR denied Morgenstein's request in October 2001, because it determined he had transacted business in Investment Advisory Services without a license. Def. MPA, p. 9; Pltf.

SOF, ¶23. The DISR subsequently informed Morgenstein that it would not reconsider its decision unless Morgan Stanley requested the waiver on his behalf. Pltf. SOF, ¶26; Def. Ex. 22.[1]

In early 2002, Morgenstein asked Morgan Stanley to apply on his behalf for a waiver of the Series 65 exam. Def. Ex. 5, Resp. to Int. No. 2, pp. 6-7. Morgan Stanley denied this request on several occasions between March and May of 2002. Pltf. Dep. (Def. Ex. 4), 121:3-122:9; Def. Exs. 22, 24, 26. But Morgan Stanley attempted to assist Morgenstein in obtaining accommodations so that he could take the exam. Def. Ex. 27; Pltf. Dep., 220:5-11. Morgenstein failed to pursue any of the accommodations proposed by Morgan Stanley, or any other potential accommodations. Pltf. Dep., 220:10-13, 222:1-9; Def. Ex. 28. In May 2002, the DISR confirmed to Morgenstein that Morgan Stanley would not seek a waiver on his behalf. At this point, Morgenstein considered his waiver request to be a dead issue.[2] Def. MPA, pp. 11-12; Pltf. SOF, ¶28.

At all relevant times Morgan Stanley required all of its Financial Advisors with eight or more years of experience, including Morgenstein, to produce at least $200,000 in gross annual revenue. Those who did not were penalized with a lower commission rate for their work. Def. Ex. 29, MSDW 01848; Masci Dec., ¶16; Pltf. SOF, p. 25. For each of the final three years of his employment (2001, 2002, and 2003), Morgenstein's gross annual revenue production was below $150,000, which resulted in his being penalized with the lower commission rate. Masci Dec.,

---

[1] Morgenstein attempts to contradict the DISR's version of its statements to him about the circumstances under which it would reconsider his request. Pltf. SOF, ¶27; Pltf. Affidavit, ¶¶27-28. However, Morgenstein's "evidence" consists of his own characterizations of out-of-court statements made by another witness. This Court must disregard such inadmissible hearsay statements. *Gleklen v. Democratic Cong. Campn. Comm.*, 199 F.3d 1365, 1369 (DC Cir. 2000).

[2] Morgenstein's Opposition for the first time contends that he gave up seeking a waiver because he was told that he did not need the Series 65 license to receive commissions (as opposed to asset-based fees) on the accounts under his management. This Court must disregard this contention because it contradicts his prior deposition testimony that he gave up on this issue in response to the DISR's May 21, 2002 e-mail. Pltf. Dep., 147:20-149:4.

¶15; Def. Ex. 30, MSDW 00703.  Due to Morgenstein's low production numbers, Mr. Masci

engaged Morgenstein in discussions in the Spring and Summer of 2003 about the possibility of

Morgenstein retiring from Morgan Stanley.  Def. MPA, p. 13; Pltf. SOF, pp. 26-27.

On November 20, 2003, having not raised the issue since he abandoned it in May 2002,

Morgenstein sent a letter to Mr. Masci once again asking Morgan Stanley to apply on his behalf

for a waiver of the Series 65 exam.  Def. MPA, pp. 13-14; Pltf. SOF, ¶43.  Mr. Masci met with

Morgenstein on November 24, 2003 to discuss his November 20, 2003 letter.  Def. MPA, p. 14;

Pltf. SOF, ¶44.  During the meeting, Mr. Masci informed Morgenstein that Morgan Stanley

would not revisit its decision not to apply for a waiver; Mr. Masci called attention to

Morgenstein's low revenue production and once again raised the issue of Morgenstein's

retirement.  Masci Dep., 49:12-51:8; Pltf. Dep., 197:19-198:1, 204:9-205:7.

Morgenstein retired on December 31, 2003.  Def. MPA, p. 14; Pltf. SOF, p. 28.

## II.    MORGENSTEIN HAS FAILED TO RAISE A GENUINE DISPUTE OF FACT AS TO MORGAN STANLEY'S STATUTE OF LIMITATIONS DEFENSE.

Morgenstein's Opposition fails to sufficiently refute Morgan Stanley's position that his

discrimination and reasonable accommodation claims (Counts I and II) are time-barred under

this Court's recent holding in *Stewart v. District of Columbia*, 2006 WL 626921, at *5-6 (D.D.C.

March 12, 2006).  *Stewart* involved a hospital employee who, as a disability-related

accommodation, requested reassignment on two separate occasions.  She first requested the

reassignment in January 2002, and the hospital denied the request.  Ten months later, in October

2002, she again requested the reassignment, and the hospital again denied her request.  She filed

her EEOC charge in June 2003, over a year and a half after the hospital had denied her original

request.  This Court held that the statute of limitations on her reasonable accommodation claim

began to run in January 2002, when the hospital denied her original reassignment request, and

3

that she could not extend the statute of limitations by simply resurrecting the same request ten months later. The facts here are materially the same. Morgenstein first asked Morgan Stanley to seek a waiver in March 2002, and the Company denied that request as early as March 25, 2002 and no later than May 21, 2002. There is no reason that this Court's ruling in *Stewart* should not govern this case.

Morgenstein contends that *Stewart* was wrongly decided because this Court improperly equated the denial of an accommodation request with discrete employment decisions such as terminations or demotions. But he offers no legal support for his position,[3] and this Court's holding in *Stewart* is consistent with other courts' holdings that the denial of an accommodation request is a discrete employment action. *See Schroeder v. University of Illinois at Chicago*, 1997 WL 43205, at *2 (N.D. Ill. Jan. 27, 1997); *Elmenayer v. ABF Freight System, Inc.*, 318 F.3d 130, 135 (2d Cir. 2003). Furthermore, were this Court to reject its prior holding in *Stewart* in favor of Morgenstein's proposed rule, plaintiffs in reasonable accommodation cases would be able to unilaterally and arbitrarily toll the statute of limitations, rendering the statute of limitations meaningless. Such an absurd result cannot be tolerated, as this Court expressly recognized in *Stewart*. 2006 WL 626921, *6 (rejecting argument that disabled employee "[may] simply re-start the statute of limitations by re-requesting the denied accommodation").

Morgenstein next contends that this case is factually distinguishable from *Stewart* because: (1) he never asked Morgan Stanley to apply on his behalf for a waiver of the Series 65 exam before November of 2003; (2) he did not need the waiver until he made the request in

---

[3] The cases Morgenstein cites - *Singh v. George Wash. Univ.*, *Pantazes v. Jackson* and *Humphrey v. Memorial Hospitals Ass'n* - do not address the issue of whether the denial of an accommodation is a discrete act; they simply stand for the correct, but irrelevant proposition that the ADA requires an interactive process.

4

November of 2003; and (3) Morgan Stanley's denial of his request constituted a continuing violation of the DCHRA.  Each of these arguments lacks merit.

Incredibly, Morgenstein's Opposition for the first time contends that it was the DISR - not he - who asked Morgan Stanley to apply for the waiver in early 2002 (and that he did not make this request to Morgan Stanley until November of 2003).  Pltf. Opp., p. 24.  This desperate attempt to avoid summary judgment is belied by the evidentiary record before this Court. Morgenstein presents no evidence in support of his assertion that the DISR asked Morgan Stanley to seek the waiver on his behalf.  And the evidence establishes irrefutably that the DISR did *not* ask Morgan Stanley to request a waiver on Morgenstein's behalf, but merely informed Morgenstein that it would revisit his request to the agency only if Morgan Stanley sought the waiver on his behalf.  Def. Ex. 22.  That is a far cry from *asking* Morgan Stanley to request the waiver.  In addition, the undisputed documentary evidence establishes that it was Morgenstein himself who, for well over a year, was actively and aggressively pushing Morgan Stanley to seek a waiver from the DISR.  Def. Exs. 14, 17, 24, 26, 27, 28.  And, in his own sworn interrogatory answers, Morgenstein previously admitted that *he* asked Morgan Stanley to apply for the waiver in March 2002:

> In March 2002, Plaintiff and Diane Sher, a co-worker who held a Series 65 license, met with Theodore Miles, Lilah Blackstone, Dana Sheppard and Mr. Goff, who all worked at DCSR [sic]…  Later that month, Ms. Blackstone of DCSR [sic] advised Plaintiff that DCSR [sic] had contacted Mary Robertson of MS NY registration.  Plaintiff then contacted Ms. Robertson and faxed her relevant paperwork.
>
> ***Plaintiff then attempted to have Defendant apply for the waiver on his behalf.***
> Andrea Rouse, an employee of Defendant, advised Plaintiff in an e-mail dated March 25, 2002, that in order to get the District of Columbia Investment Advisor license … he would have to sit for the exam.

Def. Ex. 5, Resp. to Int. No. 2, pp. 6-7 (emphasis added). Morgenstein cannot create a disputed fact by contradicting this prior testimony; this Court must disregard this argument altogether. *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991).

In any event, exactly how Morgenstein's waiver request came to Morgan Stanley's attention in 2002 is wholly irrelevant to the statute of limitations issue. The only date that is relevant for purposes of determining when the limitations period began to run on Morgenstein's discrimination and accommodation claims is the date on which he was first informed that Morgan Stanley would not grant the requested accommodation. *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (statute of limitations begins to run on date employee first learns of adverse employment decision). Morgenstein does not dispute that this date was March 25, 2002. Def. Ex. 36; Pltf. Dep. at 121:3-122:9.

Morgenstein also attempts to distinguish *Stewart* by arguing that because needed the Series 65 license more in November 2003 than he did in March of 2002 (when he originally requested this accommodation), his November 2003 request - not his March of 2002 request - triggered the statute of limitations. But in *Stewart* this Court rejected a nearly identical argument - that is, the plaintiff's contention that the limitations period did not begin until her second reassignment request was denied because the accommodation had become more necessary due to her worsening medical condition. *Stewart*, 2006 WL 626921, at *6.[4] Morgenstein's attempt to distinguish *Stewart* in this regard only underscores the fact that its holding is squarely applicable to his disability and accommodation claims.

---

[4] This holding was entirely consistent with the Supreme Court's *Ricks* holding that "[t]he proper focus [in determining the date on which the statute of limitations begins to run for a claim of discrimination] is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." 449 U.S. at 258.

Finally, there is no support for Morgenstein's argument that the denial of his waiver request amounted to a "continuing violation." As this Court recognized in *Reynolds v. The U.S. Capitol Police Board*, "the Supreme Court has limited the continuing violation doctrine to hostile work environment claims. 357 F.Supp.2d 2, 16 (D.D.C. 2004) (*citing National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).[5] Morgenstein has not made a hostile work environment claim. The continuing violation theory is therefore inapplicable.

For these reasons, Morgenstein's discrimination and accommodation claims (Counts I and II) are time-barred.

## III. MORGENSTEIN HAS FAILED TO RAISE A GENUINE DISPUTE OF FACT AS TO WHETHER MORGAN STANLEY FAILED TO GRANT HIM A REASONABLE ACCOMMODATION TO WHICH HE WAS ENTITLED.

Morgenstein's Opposition fails to raise a genuine dispute of fact as to the essential elements of his discrimination and reasonable accommodation claims (Counts I and II). Specifically, Morgenstein presents no evidence from which a reasonable jury could infer that: (1) he was disabled at the time he requested an accommodation from Morgan Stanley; (2) his

---

[5] All but two of the cases Morgenstein cites in support of his "continuing violation" theory were decided before the Supreme Court's *Morgan* decision. *See* Pltf. Opp., p. 44 n.17. Those cases must be disregarded for this reason alone. The remaining two cases - *Bloom v. New York City Bd. of Educ. Teachers' Retirement System of Cty of New York*, and *Cox v. Rumsfeld* - are factually distinguishable. *Cox* involved an employee who had made multiple requests for **different accommodations**. 2003 WL 21691044, at *7 (W.D.Wis. June 19, 2003). This case, by contrast, involves multiple requests for the **same accommodation**. In any event, the *Cox* court did not even apply the continuing violation theory; it merely held that because the employer had not notified the employee of the denial of two of his requested accommodations until shortly before the employee initiated the EEO process, the employee's claims regarding those two particular accommodations were timely filed. *Id.*, at *7-8. No such facts exist in the present case. *See* Def. Exs. 22, 24; Pltf. Dep., 121:3-122:9, 147:20-149:4. *Bloom*, like *Cox*, involved an employee's multiple requests for different accommodations. 2003 WL 1740528, at *3 (S.D.N.Y. April 2, 2003). In addition, unlike Morgenstein, the plaintiff in *Bloom* alleged that performance of her job without the requested accommodations posed a health risk to her. *Id.*

7

requested accommodation was necessary to perform the essential functions of his job; (3) the requested accommodation was reasonable; and (4) he engaged in the interactive process.

A.    **Morgenstein Presents No Evidence From Which A Jury Could Conclude That He Was Disabled.**

Morgenstein argues that a jury could conclude from the evidence that his "ability to read is worse than that of 'most people.'"[6] Pltf. Opp., p. 33.  But even assuming Morgenstein may be a below average reader, that fact does not support a finding that (at the time he sought the accommodation from Morgan Stanley) he had a reading *disability* - that is, that he was *substantially limited* in the major life activity of reading.  To support that finding, Morgenstein must establish the existence of his alleged disability *with medical evidence obtained during the term of his employment*. *Kalekiristos v. CTF Hotel Management Corp.*, 958 F.Supp. 641, 657 (D.D.C. 1997).  This is not, as Morgenstein contends, a mere procedural requirement; it is an essential part of his burden of establishing that he suffered from a medical condition that triggered a duty to reasonably accommodate him.[7] *Id.*  And Morgenstein has failed to produce any medical evidence, created during the term of his employment, that he suffered from a reading disability at the time he asked Morgan Stanley to seek the waiver.

The single contemporaneous medical report on which Morgenstein relies in his Opposition is Dr. Wachs' April 17, 2001 Progress Report.[8]  But this report - particularly when

---

[6] Morgenstein's Opposition concedes that his non-vision related medical conditions are not covered disabilities. *Hopkins v. Women's Division, General Board of Global Ministries*, 284 F.Supp.2d 15, 25 (D.D.C. 2003).

[7] Morgenstein mischaracterizes Morgan Stanley's arguments in its moving brief.  Morgan Stanley does not argue that his failure to provide *the Company* with medical documentation is fatal to his claim that he was disabled.  Rather, it asserts that Morgenstein cannot establish that he is disabled because he has failed to present *this Court* with any medical evidence *contemporaneous with his employment* that demonstrates that he was disabled.

[8] Morgenstein's Opposition concedes that Dr. Jacobson's December 27, 1999 Supplementary Neurosurgical Report did not constitute medical evidence of a reading disability.

coupled with Dr. Wachs' deposition testimony - contains no evidence from which a reasonable

jury could conclude that Morgenstein suffered from a reading disability.  Def. Ex. 11.  The report

merely states that "cursory" testing indicated that Morgenstein's reading speed was below

college level.  The mere fact that Morgenstein may have read slower than the average college

student does not support a finding that his impairment rose to the level of a disability.  *Gonzalez*

*v. National Bd. of Medical Examiners*, 60 F.Supp.2d 703, 708 (E.D.Mich. 1999) (proof that

plaintiff's reading was worse than the average college graduate was not sufficient to demonstrate

a reading disability, because the appropriate standard is whether his reading was worse than the

average person in the general population).  Dr. Wach's report does not state that Morgenstein's

reading was worse than that of the average person in the general population.  Furthermore, in his

deposition, Dr. Wachs clarified that while Morgenstein's reading speed was below average for

college, his reading accuracy and comprehension were normal.  Wachs Dep., 66:14-19.

Dr. Wachs' report contains no further information concerning Morgenstein's reading

abilities, and does not diagnose Morgenstein with any identifiable reading disability (such as

dyslexia).[9]  And Dr. Wachs testified in his deposition that he was unable to provide any specific

diagnosis of Morgenstein.  Wachs Dep., 67:13-19.  The report expressly states that Dr. Wachs

would need to evaluate Morgenstein for at least ten sessions in order to diagnose Morgenstein's

medical condition.  *Id.*  It is undisputed that Morgenstein never pursued any further treatment

from Dr. Wachs, and that Dr. Wachs therefore never had an opportunity to provide a diagnosis.[10]

---

[9] Morgenstein relies on *Bartlett v. N.Y. State Bd. of Law Exam'rs* for the proposition that a jury
could conclude that he suffers from a reading disability.  That reliance is misplaced.  In *Bartlett,*
at least four medical experts diagnosed the plaintiff with dyslexia.  2001 U.S. Dist. LEXIS
11926, *12-41 (S.D.N.Y. August 15, 2001).  Here, neither Dr. Wachs nor any other
contemporaneous medical expert diagnosed Morgenstein as having a reading disabiliy.

[10] In fact, Morgenstein testified that he did not seek any further diagnosis of or treatment for his
alleged condition before this litigation.  Pltf. Dep., 56:3-57:11, 59:16-60:5.

Wachs Dep., 75:16-18; Pltf. Dep., 56:3-57:11, 59:16-60:5.  For these reasons, Dr. Wachs' report is insufficient to raise a genuine factual dispute as to whether Morgenstein suffered from a "reading disability."[11]

Morgenstein attempts to rely on Dr. Kraskin's 2006 expert report to establish the existence of a disability, asserting that the D.C. Circuit has rejected *Kalekiristos*'s holding that medical information created after the employee has left employment cannot serve as the evidentiary basis  disability.  Pltf. Opp., p. 34 n.9.  But the cases he cites do not even address this issue.  And the rationale of *Kalekiristos* is particularly applicable here, where, by Morgenstein's own admission, his condition substantially deteriorated due to a post-employment recurrence of the tumor.  Pltf. Dep., 10:15-11:22.  Any evaluation of his condition that followed this treatment, including Dr. Kraskin's, cannot accurately assess his condition during employment; and therefore is not probative of whether he was disabled at that time.

Finally, Morgenstein argues that he need not provide ***any*** medical evidence of his alleged reading disability.  The cases he cites do not support this extreme position.  They merely hold that a plaintiff need not present medical evidence of the ***extent*** of his impairment; they do not hold that a plaintiff need not present medical evidence of the ***existence*** of an impairment.  *See, e.g., Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004).  None of the cases cited by Morgenstein questions, much less rejects, this Court's ruling in *Kalekiristos* that the employee must present ***medical evidence*** to demonstrate the existence of an impairment.

For these reasons, Morgenstein fails to present any evidence from which a reasonable jury could conclude that he had a protected disability.  His discrimination and accommodation claims must therefore be dismissed.

---

[11] Dr. Wachs also testified that Morgenstein's slow reading could have been due to the fact that Morgenstein did not read often rather than any medical condition.  Wachs Dep., 67:1-8.

**B.**    **It Remains Undisputed That The Series 65 License Was Not An Essential Function Of Morgenstein's Job.**

The DCHRA does not require employers to provide disabled employees with accommodations to perform **non-essential** job functions. *Hoffman*, 256 F.3d 568, 577 (7th Cir. 2001). Furthermore, courts must give deference to an employer's judgment regarding a job's "essential functions." *Smith v. District of Columbia*, 271 F.Supp.2d 165, 171 (D.D.C. 2003).

Here, Morgenstein does not genuinely dispute that he did not need the Series 65 license in order to perform the essential functions of his job. He does not dispute that the only license he was required to hold as a condition of his employment was a Series 7 license. Def. Ex. 2; Masci Dep., 10:20-11:2; Pltf. SOF, p. 12. He does not dispute that the Series 65 license was only required of those employees who **chose** to transact business in the specialized product area of Investment Advisory Services. Masci Dec., ¶12. He does not dispute that neither he nor any other Financial Adviser was ever required to transact business in this product. Masci Dec., ¶¶12-13. He does not dispute that the Financial Adviser position does not exist specifically to perform the function of transacting business in the product area of Investment Advisory Services, or that at least two of the highest-producing Financial Advisers in Morgan Stanley's D.C. Branch Office do not transact any business in this product and do not have a Series 65 or 66 license.[12] Masci Dep., 54:16-55:4; Def. Ex. 30, MSDW 00702-703; Def. Ex. 38, MSDW 03471 and 03474. And, given the number of employees in the D.C. Branch Office with Series 65 or 66 licenses,

---

[12] Morgenstein protests that Morgan Stanley has not provided enough information about these Financial Advisors, but he fails to explain what additional information would be probative (much less why he did not seek such information in discovery). The sole dispositive fact is that at least two of the most productive Financial Advisors in the D.C. Branch Office did not perform Investment Advisory Services - thereby demonstrating that Morgenstein did not need to perform such work in order to make more money. Morgenstein cannot dispute this fact.

Morgenstein cannot argue that there are a limited number of employees who can transact business in Investment Advisory Services - thereby making it essential for him to do so.[13]

Instead, Morgenstein asserts that he needed to place his clients' assets under the management of an Investment Adviser in order to properly service those clients.  But that allegation is sheer speculation: he offers no evidence that any of his clients wanted him to - or even would have allowed him to - place their assets under the management of an Investment Advisor, or that he would have made more money if he had been able to do so.  The reality is that Morgenstein simply *wanted* to transact Investment Advisory Services because he thought it would enable him *to make more money*.  He made this clear in his November 20, 2003 letter to Ron Masci.  Def. Ex. 32 (Morgenstein stating that he wanted the license "to be more productive for the firm and myself").  Morgenstein confuses his personal desires and goals with the requirements of his job.  An identical argument was rejected in *Hoffman v. Caterpillar, Inc*., in which the Seventh Circuit held that an employer is not required to accommodate a disabled employee who wants, but is not required to, perform a non-essential job function.  256 F.3d at 577.  Because Morgan Stanley never required Morgenstein to transact business in Investment Advisory Services, this work was not an essential job function; and it did not become essential simply because Morgenstein wanted to do it (because he thought it would be lucrative).  Under *Hoffman*, Morgan Stanley had no obligation to provide Morgenstein with an accommodation to make more money.

---

[13] Nor does the fact that a large number of the Financial Advisers in the D.C. Branch Office have the Series 65 license mean that the license is required to perform the essential functions of their work.  At most, it indicates merely that Investment Advisory Services is a recent trend in the brokerage industry.  But industry trends do not qualify as an "essential job function."  The dispositive (and undisputed) fact is that Morgan Stanley did not require its Financial Advisers to participate in the Investment Advisory Services line of business.

## C.    It Remains Undisputed That Morgenstein's Waiver Request Was Not A *Reasonable* Accommodation.

Morgenstein's Opposition fails to adequately refute two critical points regarding the unreasonableness of his waiver request.  First, as Morgan Stanley stated in its moving brief, an employer does not discriminate against a disabled employee by requiring the employee to meet applicable regulatory standards even though the regulatory body itself may waive those standards in individual cases.  *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 577, 119 S.Ct. 2162, 2174, 144 L.Ed.2d 518 (1999).  Morgenstein's Opposition attempts to circumvent *Alberston's* on the ground that the regulations at issue in that case provided for an "experimental" waiver program.  But the rationale underlying the *Albertson's* ruling was the fundamental unfairness in requiring an employer to justify *de novo* an existing and otherwise applicable regulation issued by the government - a fundamental unfairness that would exist regardless of whether the government's waiver program is experimental.  Thus, the *Albertson's* ruling applies with equal weight here.

Second, Morgenstein's Opposition fails to genuinely dispute the fact that Morgenstein's waiver request would not have been an effective "accommodation" because it would not itself have enabled Morgenstein to perform the Investment Advisory Services work.  It is elemental that an "accommodation" that would not enable an employee to perform the work is not effective and therefore not reasonable.  Morgenstein has introduced no evidence that the accommodation he was seeking - namely, that Morgan Stanley ask the DISR for a waiver - would have resulted in his obtaining a waiver of the Series 65 exam.  While he asserts that the DISR wanted Morgan Stanley to apply for the waiver, he cites no admissible evidence to support this assertion.[14]  The DISR's May 21, 2002 e-mail, on which Morgenstein's assertion is based, states:

---

[14] Morgenstein's declaration that the DISR made a direct request to Morgan Stanley that it apply on his behalf for a waiver of the Series 65 is inadmissible conjecture and hearsay.

13

> the Securities Bureau has determined that you are not eligible for a waiver of the
> examination requirement … we explained to you that in order for the Department to
> consider other factors regarding your waiver, we would first require that your firm
> Morgan Stanley formally request a waiver on your behalf.

Def. Ex. 22.  In no way can this document be interpreted to support Morgenstein's assertion that

the DISR actually wanted to give Morgenstein a waiver of the Series 65 exam and would have

done so if Morgan Stanley had requested the waiver on his behalf.  In fact, the document

establishes that the DISR already had denied Morgenstein's waiver request.  Morgenstein

presents no evidence that the DISR definitely would have reversed its prior denial if only

Morgan Stanley had applied for the waiver.  Indeed, his characterization of the DISR's position

is absurd on its face.  As the governmental agency responsible for regulating the securities

industry within the District of Columbia, the DISR did not need Morgan Stanley to sponsor

Morgenstein's request in order to grant him a waiver of its own exam requirements.  Miles Dep.

(Pltf. Ex. 4), 27:21-28:19.  Morgenstein concedes this point.  Pltf. Opp., p. 40.

   For these reasons, Morgenstein fails to create a genuine factual dispute as to the

unreasonableness of his waiver request.

**D.**   **It Remains Undisputed That Morgenstein Failed To Engage In The Interactive
Process.**

   In response to Morgan Stanley's defense that he refused to engage in the interactive

process regarding his requests for accommodation, Morgenstein once again asserts that he did

not request an accommodation from Morgan Stanley until November 2003 (and, presumably,

that at that time Morgan Stanley forced him to retire instead of engaging in the interactive

process to determine what, if any, other accommodations might be available).  As set forth in

Section II above, this Court must disregard this preposterous assertion as a direct contradiction of

Morgenstein's prior sworn interrogatory answer.  Having previously admitted in his

14

interrogatory answer that he had asked Morgan Stanley in 2002 to apply for the waiver on his behalf, Morgenstein cannot now ask this Court to disregard Morgan Stanley's efforts to engage in the interactive process throughout 2002. Furthermore, as stated in Section II above, whether it was Morgenstein or the DISR who asked Morgan Stanley to request the waiver in 2002 is irrelevant. The dispositive, undisputed fact is that regardless of who asked Morgan Stanley in 2002 to request the waiver, the Company attempted to engage Morgenstein in the interactive process to determine if other accommodations were available.

Morgenstein goes on to challenge the sufficiency of Morgan Stanley's efforts to engage in the interactive process in 2002. Unbelievably, he contends that Morgan Stanley never offered him an alternative accommodation. There is no admissible evidence supporting this statement. And it is clear from Morgenstein's May 3, 2002 e-mail exchange with Andrea Rouse that Morgan Stanley *was* helping Morgenstein pursue accommodations for him to take the Series 65 exam. Def. Exs. 27, 28. Ms. Rouse informed Morgenstein that Morgan Stanley was not denying his request for accommodation, but only his request that the Company seek a waiver of the exam; and she informed him that "we can start the process for an accommodation if that is what you want." Def. Ex. 27. Indeed, Morgenstein admits in his deposition that Ms. Rouse offered him assistance in obtaining accommodations to take the Series 65 exam, including taking the exam without any time limitations. Pltf. Dep., 220:5-11. And, according to his own deposition testimony, Morgenstein unequivocally told Morgan Stanley in 2002 that he was only interested in obtaining the exam waiver and was not interested in considering any other potential accommodation. Pltf. Dep., 222:5-9 (A. ... I was talking about a waiver, [Ms. Rouse] was talking about accommodation. Q. And you weren't interested in accommodation; correct? A.

15

No. No.  There was no point in it).  In short, Morgenstein cannot genuinely dispute that Morgan

Stanley attempted to engage him in the interactive process in 2002.

Morgenstein also makes the ridiculous argument that in 2002 Morgan Stanley merely was

acting as a "messenger," and not engaging in the interactive process, when it gave him the testing

accommodation form used by NASD.  NASD is the regulatory body with exclusive

responsibility for administering the Series 65 exam and with exclusive authority for granting

accommodations for disabled individuals taking the exam.  Declaration of Raymond Brosious,

attached hereto as Ex. 40.  Just as Morgan Stanley could not itself grant Morgenstein a waiver of

the exam but could support his request (which Morgenstein demanded), so too could it support a

request for an accommodation in taking the exam (which it offered to do) even though it could

not itself grant him the accommodation.  Morgan Stanley's offer to assist Morgenstein in

obtaining an accommodation to take the exam was certainly no less of an "accommodation" than

what Morgenstein requested – that it support his request for a waiver from the DISR.

Morgenstein also contends that Morgan Stanley's proposed accommodation for taking

the exam was inadequate because he believed he would have trouble studying for the exam.  But

there is no medical evidence to support his "belief."[15]  Furthermore, he has introduced no

evidence that he raised this concern with Morgan Stanley in connection with their discussions

regarding accommodations for taking the exam.  Morgenstein cannot be heard to blame Morgan

Stanley for not offering a tutor or a reader, or any technology that might make studying for the

exam easier for him, when he has presented no evidence that he ever asked for any such

accommodations.  In fact, it is undisputed that Morgenstein failed to identify these

accommodations during the interactive process; as he conceded in his deposition, he made no

---

[15] Indeed, his own expert's report states that extra time would be an acceptable accommodation.
Def. Ex. 37, p. 3.

effort to pursue further discussions with Morgan Stanley regarding accommodations that would allow him to take the exam because all he wanted was an outright waiver.  Pltf. Dep., 221:17-222:9.  Based on his own testimony, which he cannot controvert to avoid summary judgment, Morgenstein was the one who abandoned the interactive process.

Finally, Morgenstein asserts that by resurrecting his waiver request in November of 2003, he initiated a new interactive process in which Morgan Stanley failed to engage.  But Morgenstein's November 2003 request did not invite a new discussion regarding possible accommodations; it demanded that Morgan Stanley grant him the very same "accommodation" that it had denied over a year and a half earlier and that Morgenstein himself had considered to be a dead issue since May 2002.  Furthermore, Morgenstein presents no evidence that he would have been any more receptive to alternative accommodations than he had been in 2002.  Accordingly, Morgenstein's November 20, 2003 letter to Ron Masci did not re-initiate the interactive process.

## IV.    MORGENSTEIN FAILS TO RAISE A GENUINE DISPUTE OF FACT AS TO WHETHER HE WAS SUBJECT TO RETALIATION.

Morgenstein fails to create a genuine factual dispute as to whether Morgan Stanley retaliated against him for engaging in protected activity.  Specifically, he fails to present a sufficient factual or legal challenge to Morgan Stanley's position that his November 2003 request was not a protected act or that there was no nexus between his waiver request and his "forced" retirement.[16]  Nor does he sufficiently rebut Morgan Stanley's legitimate, nondiscriminatory reason for initiating retirement discussions.

---

[16] Nor has Morgenstein sufficiently refuted Morgan Stanley's position that his alleged "forced" retirement did not constitute an adverse action.  Morgan Stanley's moving brief (pp. 34-36) presents controlling case-law (*see, e.g., Keyes v. D.C.,* 372 F.3d 434, 439 (D.C.Cir. 2004)) that, even accepting as true Morgenstein's version of the November 24, 2003 meeting, his retirement

A.     **It Remains Undisputed That Morgenstein Did Not Engage In Protected Activity In November 2003.**

Morgenstein's Opposition contends that there is no factual or legal support for Morgan Stanley's position that his November of 2003 request for a waiver of the Series 65 exam did not constitute protected activity.  But it is Morgenstein himself who fails to present any factual or legal support for his position that this particular request constituted protected activity.  He once again mischaracterizes the undisputed facts surrounding his accommodation requests, and completely ignores the well established principle that an employee's participation in the interactive process is essential to his right to an accommodation.

The dispositive issue here is whether in making his November 2003 request, Morgenstein was exercising a right protected by the DCHRA.  *Passer v. American Chemical Society*, 935 F.2d 322, 332 (D.C. Cir. 1991) (employee who was not protected from discrimination under the DCHRA did not engage in protected activity by filing a complaint of discrimination).  The law and the undisputed facts establish that he was not.

There exists a substantial, well-settled body of case-law under both the ADA and the DCHRA holding that a disabled employee is not entitled to the accommodation of his choice, and that his right to an accommodation is conditioned on his duty to engage in the interactive process.  *See, e.g., McGill v. Callear*, 973 F.Supp. 20, 23 (D.D.C. 1997), *overruled in part on other grounds by McGill v. Munoz*, 203 F.3d 843 (D.C. Cir. 2000); *E.E.O.C. v. Sears, Roebuck & Company*, 417 F.3d 789, 806 (7th Cir. 2005); *Wells v. Shalala*, 228 F.3d 1137, 1145-46 (10th

---

was voluntary.  Morgenstein's Opposition attempts to distinguish *Keyes* on the grounds that he, unlike the plaintiff in that case, was an at-will employee.  But Morgenstein does not dispute the fact that he had over 30 days to decide whether to retire, that Morgan Stanley had complaint resolution procedures that he could have used to challenge Mr. Masci's alleged ultimatum, and that he failed to avail himself of those procedures.  The mere fact that he was an at-will employee does not render inapposite the cases Morgan Stanley cites.  And Morgenstein offers no other arguments.

Cir. 2000).  The interactive process is "critical to the proper functioning of the ADA (*and critical to a proper invocation of the employee's rights under the ADA*)."  *Peeples v. Coastal Office Products, Inc.*, 203 F.Supp.2d 432, 466 (D.Md. 2002) (emphasis added).  It therefore stands to reason that an employee who fails to participate in the interactive process loses his right to accommodation and is not exercising any right guaranteed by the DCHRA when he continues to insist on receiving the accommodation of his choice.

Morgenstein fails to genuinely dispute that Morgan Stanley engaged him in the interactive process in 2002 and that he - not Morgan Stanley - refused to engage in this interactive process because he was unwilling to consider any accommodation other than an outright waiver.  *See* Section III.D. above.  And there is no genuine dispute that Morgenstein's November 20, 2003 request was the very same request he made in 2002.  *See* Section II above.  As such, Morgenstein's November 20, 2003 letter was not a protected activity.  To hold otherwise would transform the DCHRA's anti-retaliation provisions from a shield protecting the employee who makes good faith efforts to assert his accommodation rights into a sword through which an employee who refuses to work cooperatively with his employer to identify an appropriate accommodation may extort "accommodations" to which he is not entitled.  Such a result cannot be tolerated.

**B.    It Remains Undisputed That No Causal Connection Exists Between Morgenstein's Alleged Protected Activity and "Forced" Retirement.**

Morgenstein fails to sufficiently refute Morgan Stanley's position that no causal connection exists between his alleged protected activity (his request that Morgan Stanley seek the waiver) and his alleged forced retirement.  Morgenstein's argument that there is a genuine dispute of fact as to whether such a connection exists rests solely on the alleged "temporal proximity" between his request for accommodation and his alleged constructive discharge.  He

19

offers no other evidence of a connection. His "temporal proximity" argument would have this Court focus solely on his November 2003 request. That is contrary to well-settled law: In determining whether the temporal proximity between a protected act and an adverse employment action is sufficient to establish a causal nexus between the two, this Court must focus on the date that the employer first became aware of the alleged protected activity and the date that the alleged adverse action occurred. *Fullard v. City of New York*, 274 F.Supp.2d 347, 362-63 (S.D.N.Y. 2003); *Dhuria v. Trustees of the University of the District of Columbia*, 827 F.Supp. 818, 828-29 (D.D.C. 1993). Here, it is undisputed that Morgan Stanley was aware of Morgenstein's alleged protected activity in March 2002 but that the alleged adverse action did not occur until November 2003.[17] Given the extreme length of time between these two events, Morgenstein cannot establish the requisite causal connection. *See, e.g., Groderick v. Donaldson*, 338 F.Supp.2d 30, 43 (D.D.C. 2004) (refusing to infer causation when alleged adverse action took place over one year after employer's discovery of the alleged protected activity).[18]

---

[17] Morgenstein contends that Mr. Masci was angry when he discovered that Morgenstein had sought a waiver of the Series 65 exam directly from the DISR. However, the portion of Ms. Greenhalgh's deposition testimony that he cites to support this assertion establishes that Mr. Masci was not angry because Morgenstein had made the request, but because he believed Morgenstein had made the request ***directly to the DISR*** in violation of company policy (which Ms. Greenhalgh elsewhere noted prohibited employees from having any contact with regulatory agencies without the firm's knowledge and consent) and had caused the DISR to initiate an investigation that could have jeopardized the firm's license to transact business in D.C. Greenhalgh Dep. (Pltf. Ex. 1), 26:10-27:2, 63:7-64:16. In any event, Morgenstein does not allege that Mr. Masci took any action against him in 2001 or 2002.

[18] Three of the cases that Morgenstein cites are readily distinguishable in that the alleged adverse actions took place within months - not years - of the employer's discovery of the alleged protected activity. *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003) (one month); *Castle v. Bentsen*, 876 F.Supp. 1, 3 (D.D.C. 1994) (three to five months); *Goos v. National Association of Realtors*, 715 F.Supp. 2 (D.D.C. 1989) (two months). The two remaining cases, *Hayes v. Shalala* and *Globus v. Skinner*, are also inapposite. *Hayes* was a failure to promote case; and, because the employee did not apply for a promotion until three years after he had engaged in his protected activity, his employer had no previous opportunity to retaliate against him. 902 F.Supp. 259, 264 (D.D.C. 1995). Here, because Morgenstein argues

20

In *Fullard,* the court held that the plaintiff could not establish a causal nexus between his protected act of filing of an EEO complaint and the adverse action of which he complained because his employer first became aware of the complaint long before the challenged adverse action. 274 F.Supp.2d at 362-63. In that case, the employee had filed an EEO complaint and informed his supervisor of the complaint in October 1995. In the Spring of 1996, he met with an Assistant United States Attorney, who sent a letter to the employer inquiring into the employee's claims. Shortly afterward, the employee was transferred to a position he considered less desirable. The court rejected the employee's contention that the temporal proximity between his allegedly protected act of meeting with the AUSA and the alleged adverse action was sufficient to establish a causal connection. The court reasoned that because the employer had been aware of the employee's EEO complaint since October 1995, any "incentive for DOC officials to retaliate against the plaintiff existed well before he contacted the [AUSA], and yet no action had been taken against him." *Id.*, at 362-363. Accordingly, the employee could not rely on his subsequent act of contacting the AUSA in order to establish a causal connection between his underlying protected activity of filing an EEO complaint and the alleged adverse action. *Id.*

Here, it is undisputed that Morgan Stanley and Mr. Masci were aware of Morgenstein's waiver request as early as March 2002 and that Morgan Stanley took no action against

---

that as an at-will employee Morgan Stanley could have taken adverse action against him at any time, he cannot contend that Morgan Stanley (or Mr. Masci in particular) lacked the ability to do so before November 2003. In *Globus*, the employee had agreed to act as a witness in a Title VII case against her employer. Although her deposition testimony had been given nearly two years before the adverse action at issue, she had remained on the plaintiff's witness list until shortly before the alleged adverse action. It was based on that fact that the court found a temporal nexus. 721 F.Supp. 329, 335 (D.D.C. 1989). Furthermore, *Globus* involved a continuing protected activity that remained unresolved for a long period of time (*i.e.,* being on the witness list), while this case involves a single request for accommodation that Morgenstein himself admitted was resolved over a year before his attempt to revisit the issue in November 2003. Finally, unlike the plaintiffs in *Hayes* and *Globus*, Morgenstein has introduced no evidence other than the alleged timing of the alleged adverse action to support his claim of retaliation.

Morgenstein following his March 2002 request.  Nor can Morgenstein credibly contend that his November 20, 2003 waiver request was fundamentally any different from his 2002 waiver request.  Thus, as in *Fullard*, any incentive for Morgan Stanley to retaliate against Morgenstein would have existed long before the November 20, 2003 waiver request.  Yet Morgan Stanley took no adverse action against him during that period.  Therefore, Morgenstein cannot dispute that no causal connection existed between his alleged protected activity and his alleged constructive discharge.

Because Morgenstein fails to present any facts from which a reasonable jury could conclude that he engaged in protected activity or that a nexus existed between such activity and the alleged adverse action, this Court should summarily adjudicate his retaliation claim.

## C.    Morgenstein Fails to Present any Evidence of Pretext.

In its moving brief, Morgan Stanley presented evidence that Mr. Masci engaged Morgenstein in retirement discussions in the Spring and Summer of 2003, and again during the November 24, 2003 meeting, because of Morgenstein's chronically deficient revenue production.  Morgenstein's Opposition fails to present any evidence that would suggest that this legitimate, non-discriminatory explanation was a pretext for unlawful discrimination.  The only two issues to be decided at the pretext stage are: (1) whether the reason put forward by Morgan Stanley for the alleged adverse action is not the real reason for its actions; and, if so, (2) whether discrimination was the real motivation for its actions.  *Weigert v. Georgetown University*, 120 F.Supp.2d 1, 22 (D.D.C. 2000).  Morgenstein's Opposition fails to adequately address either issue.[19]

---

[19] Morgenstein argues that a factual dispute exists as to whether Mr. Masci told him that he could "resign or be fired" in their November 24, 2003 meeting.  This issue is irrelevant at the pretext stage.  Regardless of whether Mr. Masci said "resign or be fired" or merely suggested that

Morgenstein's Opposition attempts in vain to dispute his unacceptably low revenue production in the last three years of employment. Pltf. SOF, p. 25. But he does not dispute that his gross annual production during those years was $136,709, $146,992, and $112,000, respectively. He admits that he was required to produce at least $200,000 in gross annual revenue. Pltf. SOF, p. 25. And the 2000 annual revenue production that he cites does not even fall within the final three years of his employment. In any event, he cannot dispute that his 2000 revenue production, while not as low as his 2001-2003 production, still fell below the $200,000 threshold.

Nor does Morgenstein create a genuine disputed fact by asserting that other Financial Advisors produced less revenue than he. Morgenstein's performance was not judged against that of every other employee in the D.C. Branch Office, but against that of other Financial Advisers with at least eight years of experience. Morgenstein is careful to assert simply that there were "other FAs" in the D.C. Branch Office who were lower producers than he; he does not, and cannot, establish that he was not among the lowest producing Financial Advisers with his level of experience during each of the final three years of his employment. In any event, Morgenstein's personal speculation that he may not have been the lowest producing Financial Advisor in his office is insufficient to create a genuine issue of material fact. *See Thompson v. Rice*, 422 F.Supp.2d 158, 180 (D.D.C. 2006).

Finally, Morgenstein argues that Morgan Stanley's numbers do not account for the assets he had inherited from his father. That argument is beside the point. Mr. Masci raised the issue

---

Morgenstein consider retirement, the dispositive fact is that the reason for Mr. Masci's statement (regardless of which version) was that Morgenstein's production was poor and was not because Morgenstein had re-requested the waiver. Morgenstein does not dispute this fact. Indeed, he testified that Mr. Masci informed him during the meeting that his production was unacceptable. Pltf. Dep., 197:19-198:1.

of Morgenstein's retirement in his November 2003 discussion with Morgenstein based on his assessment of how Morgenstein was ***actually performing***, not how he ***might*** perform in the future.  Morgenstein's assertion that he would have made more money in future years is sheer speculation, and cannot create a genuine factual dispute as to whether he was underperforming in November 2003.  *Weigert*, 120 F.Supp.2d at 22.

For these reasons, Morgenstein has failed to demonstrate the existence of a triable issue of fact as to whether Morgan Stanley's proffered legitimate, non-discriminatory reason for taking the alleged adverse action was a pretext for retaliation.  It is therefore appropriate to summarily adjudicate Morgenstein's retaliation claim.

## IV.    MORGENSTEIN FAILS TO RAISE A GENUINE FACTUAL DISPUTE AS TO HIS DISABILITY DISCRIMINATION CLAIM.

Morgenstein's Opposition sets forth absolutely no evidence to support his claim that he was constructively discharged based on his disability.[20]  First, for the reasons set forth in Section II. above (and those in Morgan Stanley's moving brief), Morgenstein has failed to present sufficient evidence from which a jury could conclude that he was disabled.  Second, Morgenstein has failed to present sufficient evidence that he was constructively discharged ***because of*** his alleged disability.  The only argument he makes with respect to causation is the same temporal proximity argument he makes in connection with his retaliation claim - namely, the closeness in time between his November 2003 waiver request and the alleged constructive discharge.  But that temporal proximity has no bearing on whether Morgenstein's alleged disability (as opposed to his alleged protected activity) was the reason for his alleged constructive discharge.  Furthermore, Morgenstein does not dispute that despite allegedly being disabled since 1996, he

---

[20]  In his Opposition, Morgenstein asserts for the first time that Count I of his complaint is limited to the allegation that his alleged constructive discharge was based on his disability.

24

was not subjected to any adverse action before November 2003.  As such, he has not

demonstrated that a causal connection exists between his alleged disability and the alleged

adverse action.  Finally, for the reasons set forth in Section III.B. above, Morgenstein has failed

to establish any facts from which a jury could find that Morgan Stanley's proffered reasons for

the challenged action were a pretext for discrimination.

## **CONCLUSION**

For the foregoing reasons as well as those set forth in Morgan Stanley's moving brief,

Morgan Stanley respectfully requests that this Court award it judgment as a matter of law as to

all of Morgenstein's claims.


Date:  September 28, 2006                          Respectfully submitted,


                                                  /s/
                                                  _____
                                                  John F. Scalia (admitted *pro hac vice*)
                                                  Matthew H. Sorensen, D.C. Bar 492130
                                                  **Greenberg Traurig LLP**
                                                  800 Connecticut Avenue, N.W.
                                                  Suite 500
                                                  Washington, D.C.  20006
                                                  (202) 533-2312 (office)
                                                  (202) 261-2668 (fax)

                                                  *Counsel for Defendant Morgan Stanley DW Inc.*

25