## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORMAN L. MORGENSTEIN,         :
                              :
        Plaintiff,        :
                              :
     v.                     : Civil Action No. 05-2123 (JR)
                              :
MORGAN STANLEY DW INC.,       :
                              :
        Defendant.       :

### MEMORANDUM

This case involves allegations of disability discrimination in violation of the D.C. Human Rights Act and is before this court on diversity jurisdiction. Plaintiff Norman Morgenstein alleges that his former employer, Morgan Stanley, forced him to retire because of his disability, refused to accommodate his disability, and retaliated against him for asserting rights protected by the D.C. Human Rights Act. Morgan Stanley has moved to dismiss counts I and II and for summary judgment on counts I, II, and III. For the reasons set forth below, the motion for summary judgment will be **granted**.

### Background[1]

Norman Morgenstein worked as a financial advisor for Morgan Stanley (MS) and its predecessor companies in the District of Columbia for more than thirty-two years before retiring on December 31, 2003. His father, Alvin Morgenstein, worked as a

---

[1]The facts set forth below are undisputed, except where noted.

financial advisor in the same office.  Plaintiff's primary duties
were to assess his clients' financial objectives and advise his
clients on how to achieve them.  In February 1996, plaintiff
underwent surgery for the removal of an acoustic neuroma from his
left inner ear.  After his operation, he experienced partial
deafness, partial facial, eye, and eyelid paralysis, and balance
problems.  Those problems limited his ability to read and to
focus on reading materials.  When he returned from a four-month
leave of absence, however, he resumed work on the accounts he had
managed before his surgery and continued working for MS for
approximately seven years.

On March 9, 2001, plaintiff received an email from Hugo
Jauregui of MS's national registration department.  Dkt. #16-1 at
5.  Jauregui informed plaintiff that, because he had placed four
accounts into a Morgan Stanley program called "investment
consulting services" (ICS) in the early 1990's, he needed to
obtain a District of Columbia "Series 65 Investment Advisor"
license (IAR), either by taking and passing an examination or by
obtaining a waiver, D.C. Regs § 1860.5.[2]  Id.  Plaintiff recalls
that Paul Garipoli from MS's registration department told him

---

[2]Morgenstein already held Series 3 and Series 7 licenses;
the Series 65 license is only required of investment advisors who
receive fees based on the amount of client assets under
management.  Dkt. #15-1 at 7.  Morgan Stanley does not require
all investment advisors to hold Series 65 licenses.

that MS had tried to obtain a D.C. Series 65 license on his
behalf but had been unsuccessful.  Dkt. #16-1 at 6.

On April 4, 2001, with Garipoli's assistance, plaintiff
wrote a letter to the D.C. Government's Department of Insurance
and Securities Regulation (DISR), with a copy to MS, expressing
his desire to obtain a Series 65 investment advisor license.
Dkt. #8 Ex. 1.  He explained that his Maryland Series 65 license[3]
had expired in 1998, and that it was his understanding that he
needed to be licensed in D.C., his "office of domicile."  Id.  He
further explained that, because of disabilities caused by his
surgery, he was unable to study or sit for the Series 65
examination.  Id.  For that reason, he asked to be "'grand-
fathered' to an Investment Advisor status within the District of
Columbia."  Id.

After some back and forth over DISR's concerns that
plaintiff's limitations might impact his ability properly to
advise his clients – including three additional letters from
Morgenstein supporting his request for a waiver – the DISR
rejected Morgenstein's request, by letter dated October 2, 2001.
Dkt. #15 Ex. 19.  DISR director Theodore Miles explained that
plaintiff had violated D.C. securities regulations by placing the
four accounts into ICS without a D.C. Series 65 license, and that
the DISR was not inclined to grant waivers to applicants who had

---

[3]Morgenstein resides in Maryland.

violated "the very part of the requirement [they] now ask us to
waive." Id.  The DISR indicated that it would reconsider the
issue if MS applied for a waiver on Morgenstein's behalf, but, as
Morgenstein was informed on March 25, 2002, and repeatedly
thereafter, MS was unwilling to do so.  Dkt. #16-1 at 8.  MS
declined to apply for the waiver, according to defendant, out of
concerns over its potential liability to dissatisfied customers.
Dkt. #15-1 at 10.  MS offered to explore accommodations that
would allow Morgenstein to sit for the examination, but he was
not interested.  Morgenstein Deposition at 220-22, Dkt. #15 Ex.
4.  As of May 21, 2002, when the DISR sent an email reaffirming
its decision denying Morgenstein's request for a waiver,
Morgenstein understood that the waiver issue had been put "to
rest." Id. at 147-49.[4]

       Meanwhile, the DISR conducted an investigation into
Morgenstein's handling of the four ICS accounts, as did MS
itself.  MS concluded that, because Morgenstein had not received
any special compensation for the four accounts, he qualified for
the broker dealer exception to the Series 65 license requirement

_____

       [4]On March 25, 2002, Morgenstein filed a complaint with MS's
Human Resources Department claiming that MS's failure to renew
his Series 65 license in Maryland constituted disability
discrimination.  Dkt. 15 Ex. 25.  This complaint appears to be a
delayed response to MS's failure to renew his license in 1998,
not a direct response to MS's 2002 denial of his request for MS
to apply for an exam waiver on his behalf.

- 4 -

and thus had not violated any securities regulations.  Dkt. #15-1 at 9, n.2; Dkt. #16-5 ¶ 32.  On September 19, 2002, MS presented that conclusion to the DISR, which took no further action, Dkt. #15-1 at 9, n. 2, and to Morgenstein, who was told by his branch administrative manager, Carol Greenhalgh, that he did not need the Series 65 license to receive compensation on the four 1990s accounts.  Dkt. #16-1 at 9.  After receiving this news, Morgenstein continued receiving compensation on these accounts and stopped pursuing the Series 65 exam waiver.  Id.

In "late 2002," Morgenstein's father retired and handed over his numerous and valuable client accounts to his son.  Dkt. #16-5 ¶ 38.  The combined value of these accounts was approximately $20,000,000.  Id.  At that time, MS was advising investors to move accounts valued at more than $100,000 into the ICS program.  Dkt. #16-1 at 10.  Morgenstein wanted to follow that advice with some of the accounts previously managed by his father, but he believed that, if he did so, he would no longer qualify for an exception to the Series 65 license requirement. Dkt. #16-1 at 10-11.  Morgenstein thought he would need the Series 65 license after all, but, for reasons unexplained on the record, waited approximately a year to raise the issue again with MS.  Dkt. #16-1 at 11.  On November 20, 2003, he sent a letter to his supervisor at MS, Ronald Masci, again requesting that MS apply on his behalf for an exam waiver.  Id.  Four days later,

Masci and Morgenstein met to discuss the letter.  Dkt. #16-1 at
12.

Morgenstein states that Masci was very angry during the
November 24, 2003 meeting, and that Masci "demanded that
Morgenstein retire or be fired in response to his request for an
accommodation."  Dkt. #16-1 at 2; Dkt. #1-2 ¶ 16.  Ronald Masci
and Matthew Ridnouer, a MS employee who was present, remember the
meeting differently.  Both have testified that Masci issued no
such ultimatum, but instead told Morgenstein that he was at risk
of termination in any future force reduction because of his low
performance numbers.  Masci Deposition at 49-51, Dkt. #15 Ex. 3;
Ridouer Deposition at 28-29, 31, Dkt. #15 Ex. 33.  Morgenstein
and Masci agree, in any event, that this was not the first time
Masci expressed concerns about Morgenstein's poor job
performance.  He had in fact been encouraging Morgenstein to
consider retirement since the spring of 2003.  Morgenstein
Deposition at 199-200, Dkt. #15 Ex. 4.

On December 1, 2003, Morgenstein sent Masci an email
seeking confirmation of his understanding (1) that Masci would
not apply for a Series 65 exam waiver on his behalf, and (2) that
his only two choices were to retire or to be discharged.  Dkt.
#15 Ex. 34.  In the same email, he notified Masci that, since he
had "no other choice in the matter," he had accepted the proposed
retirement package and submitted a departure date of December 31,

2003. <u>Id.</u> Masci's response neither explicitly confirmed nor corrected Morgenstein's understanding. <u>Id.</u> Instead, it simply read: "Your assumption of the date is correct. You should plan accordingly." <u>Id</u>.

Shortly after leaving MS, Morgenstein suffered a recurrence of his left acoustic neuroma, which was treated with radiation therapy in July, 2004. Dkt. #15-1 at 14. This recurrence exacerbated his vision problems and has prevented him from seeking additional employment. Dkt. #15-1 at 15.

On November 15, 2004, Morgenstein filed a charge of discrimination with the D.C. Office of Human Rights (DCOHR). Dkt. #15 Ex. 35. On the intake questionnaire he noted that MS declined to apply for an examination waiver on his behalf "approximately 1½ years prior to 11/24/03[,]" apparently referencing the initial refusals during the spring of 2002. Dkt. #15 Ex. 36. He later withdrew his charge and filed a complaint in the Superior Court for the District of Columbia. Dkt. #1 ¶ 1. MS removed the case to this court. Dkt. #1 at 3.

## **Analysis**

### <u>Count II</u>

In Count II, plaintiff claims that MS's refusal to apply for a Series 65 exam waiver on Morgenstein's behalf in late 2003 constituted an unreasonable failure to accommodate a disability, in violation of D.C. Code § 2-1402.11. Defendant has

moved to dismiss this count, or in the alternative for summary
judgment, asserting that it is time-barred under the D.C. Human
Rights Act, § 2-1403.16(a).[5]

Actions pursuant to the D.C. Human Rights Act must be
filed "within one year of the unlawful discriminatory act, or the
discovery thereof." Id. Plaintiff filed his D.C. Office of
Human Rights complaint on November 15, 2004. Dkt. #15 Ex. 35.
Consideration of defendant's untimeliness argument requires
analysis of the parties' competing characterizations of the
"discriminatory acts" charged in Count II.

Plaintiff, in his opposing memorandum and elsewhere,
maintains that the failure to accommodate took place during the
meeting with Ronald Masci on November 24, 2003, during which
Masci refused to apply for a Series 65 waiver on Morgenstein's
behalf and forced him to retire. Dkt. #12 at 6. Defendant
claims that Morgan Stanley's refusal to apply for a Series 65
waiver dates back to March 2002, when Masci's assistant informed
Morgenstein by email that his request for a waiver had been
denied. Dkt. #8 Ex. 2.

Defendant's argument is that Morgenstein may not extend
the statute of limitations simply by repeating his requests for

_____

[5]Defendant also raise untimeliness objections to Count I, to
the extent that it concerns the alleged failure to accommodate.
Given the plaintiff's express statement that Count I does not
include this claim, the defendant's untimeliness argument as to
Count I will not be addressed. Dkt. #16 at 44, n.18.

accommodation and suing within one year of Morgan Stanley's most recent denial, citing <u>Stewart v. District of Columbia</u>, 2006 WL 626921, (D.D.C.) (statute begins to run when employer first denies reasonable accommodation, and is not reset by employee's subsequent requests for the same accommodation), <u>Davidson v. Indiana-American Water Works</u>, 953 F.2d 1058, 1059 (7th Cir. 1992) (limitations period runs from date that employer takes adverse action against employee, not when plaintiff appreciates all harmful consequences stemming from that action), and <u>Del. State Coll. v. Ricks</u>, 449 U.S. 250 (1980) (statute begins to run when employee becomes aware of challenged employment practice; plaintiff's continued employment does not extend statute of limitations).

Morgenstein, in his November 15, 2004, DCOHR complaint, averred that he was filing "within one year of the <u>most recent act</u> of discrimination/retaliation." Dkt. 15 Ex. 35 (emphasis added). The cases cited above instruct, however, that Morganstein had to file within one year of the <u>first</u> act of discrimination, which, as Morganstein clearly recognized, occurred (if at all) in 2002. His DCOHR complaint refers directly to DISR's "explicit" advice that MS "should apply for an exemption on my behalf." <u>Id.</u> That advice was given in 2002, Dkt. #16 at 8, and it was the occasion for Morganstein's request for MS's assistance in applying for a waiver and MS's refusal.

It was MS's refusal that started the statute of limitations running on the failure to accommodate claim.  Indeed, on the DCOHR intake questionnaire, plaintiff described the discriminatory conditions as "refusal to apply for exemption for Series 65," and indicated that the conditions occurred "approximately 1 ½ years prior to 11/24/03."  Dkt. #15 Ex. 36. Morgenstein's failure to accommodate claim was filed on November 15, 2004, one and one-half years too late.

Count I

Morgenstein claims that he suffered from a disability under the D.C. Human Rights Act, that MS knew he suffered from such a disability, and that his termination was based on his disability and/or perceived disability, in violation of D.C. Code § 2-1402.11.[6]  To succeed on this claim, plaintiff must establish a prima facie case of discrimination, demonstrating (1) that he had a disability under the DCHRA, (2) that he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodations, and (3) that a causal connection exists between the disability and the adverse action.[7]

_____

[6]In plaintiff's first amended complaint, he mentions reasonable accommodation and "terms and conditions of employment" within Count I, but in his Opposition to Defendant's Motion for Summary Judgment, he clarifies that Count I is limited to a claim of disability-based termination.  Dkt. #16 at 44, n.18.

[7]Because the DCHRA and the Americans with Disabilities Act (ADA) are substantially similar, courts considering DCHRA claims frequently look to ADA case law for persuasive authority.  See,

<u>Swanks v. Washington Metro. Area Transit Auth.</u>, 179 F.3d 929, 934
(D.C. Cir. 1999).  Once Morgenstein establishes this prima facie
case, the burden shifts to MS to demonstrate a legitimate, non-
discriminatory reason for the adverse action taken against
Morgenstein.  <u>Aka v. Washington Hosp. Ctr.</u>, 156 F.3d 1284, 1288
(D.C. Cir. 1998).  If it succeeds in doing so, Morgenstein must
present evidence to show that the non-discriminatory reason
proffered is a pretext for discrimination.  <u>Id.</u>

A defendant's burden of producing evidence that the
ultimatum was issued for a legitimate, nondiscriminatory reason
is "merely one of production, not one of persuasion."  <u>Cuddy v.
Carmen</u>, 762 F.2d 119, 122-23 (D.C. Cir. 1985).  Morgan Stanley
acknowledges that from early 2003 until Morgenstein's
resignation, Masci strongly encouraged Morgenstein to consider
retiring, and for the purposes of this motion, MS concedes that
Masci issued the complained of ultimatum on November 24, 2003.
Dkt. #15-1 at 13, 35, n.13.  However, MS maintains that these
actions were taken because Morgenstein's gross annual production
during his final three years at MS fell well below the gross
annual revenue required of similarly situated Financial Advisors.
Dkt. #15-1 at 12, 13.

---

e.g., <u>Teru Chang v. Inst. for Public-Private P'ships, Inc.</u>, 846
A.2d 318, 324 (D.C. 2004); <u>Grant v. May Dep't Stores Co.</u>, 786
A.2d 580, 583-84 (D.C. 2001).

Morgan Stanley required investment advisors with at least eight years of experience to produce at least $200,000 annually in gross revenue.  Morganstein fell well short for three years in a row, producing only $136,709 in 2001, $146,992 in 2002, and $112,000 in 2003.  Dkt. #21 at 23.  Morgenstein admits that in the November 24, 2003 meeting, Masci told him that his revenue production was unacceptable.  Dkt. #15 at 14.  Moreover, plaintiff admits that Masci had been encouraging him to retire since early 2003 out of concerns that he might be terminated during a reduction in force.  Dkt. #15 at 39.  In fact, Morgenstein just barely survived a 2002 reduction in force that terminated all financial advisors with over eight years of experience and less than $120,000 in annual gross revenue.  Dkt. #15 at 12.  Again in 2005, Morgan Stanley terminated all financial advisors with eight or more years of experience and less than $225,000 in gross revenue.  Dkt. #15 at 13, n.3.

Morgenstein may well be able to establish a prima facie case of discrimination, but he has neither adduced evidence nor pointed to anything in the record tending to show that Morgan Stanley's legitimate, non-discriminatory reason for the termination was pretextual.

Count III

Finally, plaintiff claims that his termination was a retaliatory response to his assertion of rights protected by the

D.C. Human Rights Act, in violation of D.C. Code § 2-1402.61.  To make out a prima facie case of retaliation, Morgenstein must demonstrate (1) that he engaged in statutorily protected activity, (2) that Morgan Stanley took adverse personnel action against him, and (3) that there was a causal connection between his protected activity and the adverse action.  <u>Lemmons v. Georgetown University Hosp.</u>, 431 F.Supp.2d 76, 91 (D.D.C. 2006); <u>Taylor v. Small</u>, 350 F.3d 1286, 1292 (D.C. Cir. 2003).  If Morgenstein establishes a prima facie case, the burden shifts to MS to articulate a legitimate and non-discriminatory reason for the adverse personnel action.  <u>Stella v. Mineta</u>, 284 F.3d 135, 144 (D.C. Cir. 2002).  Finally, if MS meets that burden, the onus is once again on the plaintiff to demonstrate that the legitimate reasons offered are merely pretext for an act of retaliation.  <u>Id.</u>

Count III fails for the same reason Count I fails: the plaintiff is unable to establish that MS's explanation of Masci's alleged ultimatum is pretextual.  While the close temporal proximity of Morgenstein's November 20, 2003 request (the arguably protected activity) to the November 24, 2003 meeting at which the ultimatum was allegedly issued might suggest possible retaliation when considered alone, proximity alone does not defeat a motion for summary judgment.  Morgenstein had been refused waiver assistance several times over the two years

- 13 -

preceding the November 24th meeting, and Masci had expressed
concerns over Morganstein's low performance for months.
Plaintiff is unable to overcome defendant's legitimate, non-
discriminatory reason for pushing him into retirement: his
deteriorating job performance was objectively unacceptable.
Defendant's motion for summary judgment as to Count III,
therefore, will also be granted.


                              JAMES ROBERTSON
                       United States District Judge